CONFIDENTIAL

## EXPERT REPORT OF ANDRÉ E. JARDINI

1.    I am an attorney duly licensed to practice law in the state of California and a member and President of the firm Knapp, Petersen & Clarke.  I have been asked to present my expert opinion by way of an expert report pursuant to Rule 26 (a)(2)(B) for Valley Forge Insurance Company (Valley Forge) regarding certain attorneys' fees requested in the matter known as *Peiffer Wolfe Carr Kane Conway & Wise, LLP v. Valley Forge Insurance Company* pending in the United States District Court, Eastern District of Louisiana, Case No. 23-6035.

2.    The subject fees are for work performed by Altshuler Berzon, LLP. ("Altshuler"), and Shartsis Friese, LLP ("Shartsis").  These fees have been submitted for payment to Valley Forge. The fees requested include time billed during the period May 2023 to August 2024 (Altschuler) and June 2023 through August 2024 (Shartsis). They were incurred in defending a matter filed in San Fransisco Superior Court by Levin Simes LLP ("Levin") against two of their former attorneys, Rachel Abrams and Brian Perkins, and the law firm they joined upon leaving Levin, Peiffer Wolfe Carr Kane Conway & Wise, ("Peiffer") which was filed in San Francisco Superior Court, and bears case number SFSC Case No CG236066324.

3.    I believe that significant issues exist concerning the reasonableness of the defense fees incurred by both firms.  In my opinion, the requested hours and rates are excessive given the nature of the litigation and the law firms involved. Staffing is top heavy and excessive.  Not all the services appear compensable, including work on a cross complaint. Other billing issues also were identified in the invoices.

4.    Although invoices were presented, given the amounts billed, I do not believe that a full payment could be made. The high hourly rates as well as excessive hours and fees, make the invoices questionable and amounts owing uncertain without further review.

## QUALIFICATIONS

5.    I have practiced law, principally as a litigation attorney, in California, for 47 years.  I have a Bachelor of Arts Degree from the University of Notre Dame, granted in

-1-

KNAPP,
PETERSEN
& CLARKE

CONFIDENTIAL

1973. I graduated from University of California College of the Law, San Francisco (formerly Hastings College of the Law) with a Juris Doctorate in 1976 and was admitted to the Bar of the State of California that same year. I also have been admitted to practice before the United States District Court for the Southern District of California, as well as in the Central District, Northern District and Eastern District. I am admitted to practice and have often appeared before the Ninth Circuit Court of Appeals.

6.    I served as a law clerk to the Honorable Robert Firth of the United States District Court, Central District of California, in 1977 and 1978.

7.    From time to time, I serve as an arbitrator in the Los Angeles County Bar Association Dispute Resolutions Services Program, which concerns attorney-client disputes over legal billings.

8.    I have participated, both as counsel and as an expert witness, in arbitrations and hearings in numerous courts of general jurisdiction concerning attorney fee disputes.

9.    I have been employed at Knapp, Petersen & Clarke since its inception as a law firm in 1981. My practice consists predominantly of trial work. I have tried 55 jury trials to conclusion during my tenure with the firm. I am a member of the American Board of Trial Advocates ("ABOTA"), having achieved "Advocate" status with ABOTA based on the completion of more than 50 jury trials. (Attached hereto as **Exhibit 1** is a listing of some of my trial experience.) These trials cover a wide variety of subject areas, including employment litigation, both on behalf of plaintiffs and defendants, complex litigation, class action matters on behalf of both plaintiffs and defendants, real estate matters, product liability litigation, intellectual property litigation, business litigation, contract disputes, environmental litigation, insurance coverage and bad faith cases, business torts, and other areas.

10.    I am familiar with the time and effort required to effectively litigate breach of contract and breach of fiduciary duty cases such as this.

11.    Over the past 31 years I have personally audited attorney fee submissions, as well as given testimony, in numerous employment matters involving prevailing party fee

KNAPP,
PETERSEN
& CLARKE

-2-

6818190.1  03014/01761

CONFIDENTIAL

requests, complex litigation cases including large business disputes, significant intellectual property cases, large environmental matters, bankruptcy and construction defect cases, and many others. Attached hereto as **Exhibit 2** is a listing of my most recent experiences testifying as to attorneys' fees issues in such matters.

12.    Since 1985, I have been retained by clients and actively engaged in the auditing of legal billings and consulting with companies to control legal expenditures. As a consultant or expert witness, I have personally audited the billings of a large proportion of the major law firms in California, as well as billings of numerous out-of-state firms. To date, I have performed more than 1950 such legal fee audits, with billing reviewed in excess of $2.5 billion.

13.    I have tried and arbitrated numerous cases in which the predominant issue involved is the reasonableness of attorneys' fees and costs.

14.    Attached as **Exhibit 3** is an outline of my qualifications to testify as an expert witness concerning reasonableness of fee issues.

15.    Based on my significant experience relating to legal audit matters and our firm's belief that there was a need for such a service in the legal community, in October of 1991, Knapp, Petersen & Clarke established KPC Legal Audit Services, Inc. I am the founder and the President of that company.

16.    KPC Legal Audit Services, Inc. is a dba of Knapp, Petersen & Clarke. The company specializes in the review and audit of legal billings and consulting and education on legal cost containment.

17.    KPC Legal Audit has been a member of NALFA, the National Association of Legal Fee Analysis, since its inception. I have often been a speaker on attorney fee topics at NALFA seminars and other MCLE events. NALFA has included me in their list of "The Nation's Top Fee Experts" since that listing was created. Attached as **Exhibit 4** is the NALFA Fact Sheet which sets forth their Best Practices in Legal Fee Analysis.

18.    I have spoken on attorneys' fee issues in classes at both USC School of Law and UCLA School of Law.

**KNAPP, PETERSEN & CLARKE**

-3-

6818190.1  03014/01761

CONFIDENTIAL

19.    KPC Legal Audit has reviewed billing relating to a wide variety of different types of litigation including numerous California employment cases, including discrimination and harassment claims, sophisticated business dispute litigation, product liability litigation, intellectual property litigation including patent, trademark and trade secret cases, civil rights claims, other commercial law matters, transactional matters, public interest cases, environmental litigation, family law and bankruptcy matters.  These cases include complex litigation involving attorney fee issues in California and throughout the U.S.

20.    I have testified as an expert witness, through declaration or live testimony, in more than 585 cases regarding reasonableness of legal fees, both on behalf of the proponent of such fees and on behalf of the opposing party.

**STANDARD OF REVIEW**

21.    I am guided by Rule 1.5 of the State Bar of California Rules of Professional Conduct, as this rule concerns California attorneys.  The rule, as applied by court decisions, discusses factors to be considered in determining the reasonableness of attorneys' fees.  The factors include:

(1)  Whether the lawyer engaged in fraud or overreaching in negotiating or setting the fee;

(2)  Whether the lawyer has failed to disclose material facts;

(3)  The amount of the fee in proportion to the value of the services performed;

(4)  The relative sophistication of the lawyer and the client;

(5)  The novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly;

(6)  The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(7)  The amount involved and the results obtained;

KNAPP,
PETERSEN
& CLARKE

-4-

6818190.1  03014/01761

CONFIDENTIAL

(8)  The time limitations imposed by the client or by the circumstances;

(9)  The nature and length of the professional relationship with the client;

(10)  The experience, reputation, and ability of the lawyer or lawyers performing the services;

(11)  Whether the fee is fixed or contingent;

(12)  The time and labor required; and

(13)  Whether the client gave informed consent to the fee.

22.    These standards are regularly applied by courts to determine the reasonableness of attorneys' fees.  Similar standards exist in every jurisdiction, including Louisiana, whose law is applicable in this matter.

23.    The United States Supreme Court opinion in *Hensley v. Eckerhart* (1983) 461 U.S. 424 [103 S.Ct. 1933] is instructive.  The court, in discussing an award of attorneys' fees to a prevailing party, enumerated the factors which should be considered in making such an award.  The starting point in the analysis is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (*Id.* at 433.) The court stated hours that were not reasonably expended should be excluded from the calculation stating:

> Cases may be overstaffed and the skill and experience of lawyers vary widely.  Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fees submission.

(*Id.* at 434.)

24.    In the course of my audit work, I have utilized a number of sources to support my conclusions, including California case law on the topic of reasonable attorneys' fees, State Bar of California Advisory 2016-02 entitled "Analysis of Potential Bill Padding and Other Billing Issues," and other such advisories, those principles frequently discussed in

KNAPP,
PETERSEN
& CLARKE

-5-

6818190.1  03014/01761

CONFIDENTIAL

presentations, including by notable jurists and NALFA, and other secondary sources on legal fee issues.

25. The standard of reasonableness which will be applied in this matter is based on these principles, on my experience in litigation, and my experience in the legal audit practice. I have analyzed the amount sought in fees using my experience and the above standards.

**MATERIALS REVIEWED**

26. I have reviewed the billing records submitted by Altschuler and Shartsis. I have also reviewed certain materials provided by Valley Forge including:

- July 28, 2023 Letter from Valley Forge to Peiffer Wolfe on rates;
- October 12, 2023 Letter from VF to PW on rates;
- Rate charts for AIPI claims in California.

27. I have also reviewed the interrogatory response from Valley Forge on its method for determining rates, which has additional information. I have also reviewed the four page Register of Actions for the underlying matter in San Fransisco Superior Court.

**SUBJECT ACTION**

28. This matter stems from an action filed in San Francisco Superior Court by Levin in May of 2023 alleging breach of fiduciary duty, interference with contractual obligations, and other related causes. The alleged acts that were the basis of the complaint involved two attorneys, one a former partner at Levin, Rachel Abrams, and the other a former of counsel at Levin, Brian Perkins. Both of these attorneys left Levin, and began working for defendant firm, Peiffer. The matter was litigated in San Francisco Superior Court, then moved to JAMS for arbitration. A 10 day arbitration took place in July of 2024.

29. Abrams and Perkins retained Shartsis to defend them in the litigation. Pieffer retained Altschuler. Billing from both Altshuler and Shartsis has been submitted to Valley Forge for reimbursement. The insurer has agreed to defend this action and provide reimbursement subject to a reservation of rights and has referenced certain language within the policy of insurance that identify certain fees incurred by the defense law firms that are

KNAPP,
PETERSEN
& CLARKE

-6-

6818190.1  03014/01761

CONFIDENTIAL

not covered under the policy. The insurer and insured have not resolved these issues, and as a result of these issues, including reimbursable rates, this coverage action was filed in the U.S. District Court in the Eastern District of Louisiana.

**SCHEDULES PREPARED**

30.    Attached as **Exhibit 5** are schedules prepared concerning the billing presented by Altshuler and Shartsis in this matter. They include:

### Total Fees and Costs Billed – All Firms

#### Altshuler Berzon, LLP

- Fees Billed
- Index of Billing Personnel
- Rate Adjustment
- Costs Billed

#### Shartsis Friese, LLP

- Fees Billed
- Index of Billing Personnel
- Rate Adjustment
- Costs Billed

31.    Altshuler is seeking $3,992,687.50 in attorneys' fees, and $230,560.76 in costs, for a total of $4,223,248.26. Shartsis fees total $2,566,232.50, with accompanying costs of $114,159.24, for a total of $2,680,391.74. The combined total of all attorney fees and costs from the two firms is $6,558,920 in fees and $344,720 in costs, for a total of $6,903,640. These amounts are reflected in the attached **Fees and Costs Billed**.

32.    As a result of reviewing the forgoing material, I have developed opinions concerning the issue of reasonableness of the fees billed by defense counsel in this action, based on the invoices submitted to date. I understand that the action is still pending and there will be additional invoices submitted. I have not been asked to address the reasonableness of the costs incurred.

////

KNAPP,
PETERSEN
& CLARKE

-7-

6818190.1  03014/01761

CONFIDENTIAL

**ATTORNEY RATES AND STAFFING CHOICES**

33.    Defense counsel is seeking attorney rates that are excessive, especially given the nature of the services and the level of experience of the attorneys.  Further, their top heavy staffing means that much of the work was performed by high rate attorneys at the exclusion of more appropriate staffing.

34.    Altshuler utilized the services of 19 timekeepers in a matter that lasted just fifteen months. They billed a total of 5,281.00 hours.  This includes three partners, each of whom billed between $1,000 and $1,325 per hour.  The average rate for the partners who billed over 30% of the time was **$1,263.38**. The firm used five associate attorneys, and those rates were also excessive, $625-$750, especially given the level of experience; two to seven years.  Eleven other billing personnel were billed at a very high rates, $325-$350. Their time accounted for 25% of the total.

35.    The overall average rate at Altshuler for all time spent is an astronomical **$756.05** per hour, inclusive of attorneys and non-attorneys alike, see **Index of Billing Personnel.**  While it is likely true that certain attorneys at Altschuler may merit premium rates for services performed in the appropriate matter, the rates sought for this matter, combined with the high rates across all levels of timekeepers, and the overstaffing of this matter have caused the overall fees to be excessive.

36.    These same staffing and rate issues apply to Shartsis.  That firm used 16 timekeepers who billed 3,718.70 hours in fifteen months.  Shartsis personnel included four partners and two "counsel," whose time accounted for over 67% of the total.  Partner rates ranged from $735 to $1,100. They also used three associate attorneys, who are also recent admittees, and seven other billing personnel.  The average firm rate at Shartsis is $690.09, reflecting their top heavy staffing approach and unreasonably high rates.  The high rates across the board have unreasonably increased the cost of the case.

37.    The high rates which are claimed are in excess of reasonable rates for attorneys in this community in similar litigation.

////

KNAPP,
PETERSEN
& CLARKE

-8-

6818190.1  03014/01761

CONFIDENTIAL

38.     Both Altschuler and Shartsis failed to effectively utilize lower cost personnel. To the extent that the two firms did include non-attorneys, much of that time was spent doing ministerial work.  Such as "load documents" into a document review database for review by attorneys, or "edit transcription of voice mail messages" (Shartsis), and "organize documents into SharePoint," "create password-protected folder" (Altshuler).  Altshuler did utilize some paralegal time for document review, however this was in addition to review by both associates and partners. The failure to more effectively use non-attorney personnel in this actively litigated case, inclusive of discovery and document review contributed to the increased fees.

39.     More appropriate staffing choices, using non-attorney and lower cost attorneys to perform the myriad services involved in this case which fit their professional credentials, especially with respect to Shartsis, would have significantly lowered the overall cost of the litigation. Given the significant document review included in this matter it would be typical for qualified paralegals to perform most of that activity, rather than to prepare the documents for attorney review, as was often the case.

40.     The rates claimed in excess of reasonable rates in the community for this litigation have significantly and unreasonably increased the total amount of fees claimed.

**THE 2023 REAL RATE REPORT IS AN APPROPRIATE SURVEY OF RELEVANT RATES**

41.     ELM Solutions, a Division of Wolters Kluwer, publishes annually its Real Rate Report.  I have considered the 2023 Real Rate Report concerning applicable rates in a case such as this in this community.

42.     The Real Rate Report is one of the few available surveys that considers multiple defining criteria relevant to rates, including importantly, the location in which the case is venued.  The report identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal).

43.     The report is a survey of such rates.  As such, it differs markedly from anecdotal recitations of attorney rates selected by parties to substantiate claimed to be

KNAPP,
PETERSEN
& CLARKE

CONFIDENTIAL

reasonable rates. Such a process was used here by Pfeiffer's expert. Selected rates from dissimilar law firms, from unrelated cases, from uninvolved attorneys and the like are, in my opinion, not as probative as a survey which meaningfully reviews all rates against recognized variables.

44.    The Real Rate Report indicates the following key factors that drive rates:

- Type of Litigation, in this case - Insurance Defense
- Years of Experience of the attorneys
- Overhead (the cost associated with the firm's support network and other expenses)
- Firm size

(See **Exhibit 6**, Real Rate Report 2023, "Report Use Considerations," page 5.

45.    The Real Rate Report has been commonly relied upon by courts as evidence of what is the customary rate charged in the forum. This is true nationwide. A Westlaw search of District Court cases in the 9th Circuit which have cited to the Real Rate Report numbers 285 cases.

46.    The report is frequently used by parties and considered by courts in determining local rates. The court's comment in *Pritchett v. Slauson Gas Station, LLC*, 2022WL 319989, at *2 (C.D. Cal. Jan. 10, 2022) is indicative. There the court stated "[T]his Court and others regularly consult the Real Rate Report. . . when awarding attorneys' fees because it is based on actual legal billing, matter information, and paid and processed invoices from a wide range of companies."

47.    My analysis herein will examine these factors in connection with the reported survey information in the 2023 Real Rate Report, the pertinent pages of which I have included as **Exhibit 7**.

**RATES CHARGED BY LARGE DOWNTOWN SAN FRANSICSO LAW FIRMS ARE NOT PROBATIVE**

48.    The fees sought are comparable to high rates charged by large downtown San Francisco law firms as identified by Richard Pearl.

**KNAPP, PETERSEN & CLARKE**

-10-

6818190.1  03014/01761

CONFIDENTIAL

49.    The foregoing rates are not probative in this matter, in my opinion. Rates at large national (or downtown San Francisco) firms are charged to Fortune 500-type clients in very often extraordinarily complex and important litigation.

50.    Such cases include major patent infringement litigation, and other intellectual property litigation, finance and securities litigation, and the like. I have conducted legal audits of such firms in such cases. The magnitude of those matters is far different than is involved here. In one such patent infringement case in which I testified at trial in San Jose, 10,000,000 documents were involved.

51.    The costs associated with such major firms are far in excess of those involved here.

52.    The firm size in such cases is often more than 1,000 lawyers. Here, far fewer are involved in these two defense counsel firms.

53.    The billing process with clients in large complicated hourly matters at such firms differs significantly from the billing records in a case such as here involved. The process of billing in complex cases at such large firms impacts the rates actually achieved.

54.    Thomas Reuters in 2023 reported these rate issues. That report is attached hereto as **Exhibit 8.** The report describes the following types of rates applicable at law firms:

    a.    Standard Rates - the headline rates law firms advertised similarly to the rack rate at a hotel.

    b.    Work Rates – the rates clients agree to pay to engage a law firm on a new matter, typically reflecting a discount off the standard rate.

    c.    Billed Rates – the rates clients are actually billed by their law firm, after prebill adjustments by the law firm called "write downs."

    d.    Collected Rates – the rates clients actually end up paying after reviewing the invoice and making adjustments of their own, commonly called "write offs."

55.    Of particular interest is the concept of "realization," which is the percentage of the work rate that is converted to a collected rate. At the end of the process, reductions

KNAPP,
PETERSEN
& CLARKE

-11-

6818190.1  03014/01761

CONFIDENTIAL

by clients have resulted, based on the Thomas Reuters survey, in a realization of less than 90% of the amount billed. (See **Exhibit 8, Figure 5.**)

56. Here, the law firms seek recovery for virtually every hour billed, with only a few write off's at inapplicable rates or, in the case of Altschuler, a few courtesy percentage reductions to certain invoices which are realized in a widely divergent process of billing and payment.

57. Based on the foregoing, large firm rates in unrelated litigation are not helpful. Also, the rates themselves, as commonly reported, are an overstatement of rates actually paid.

58. Anecdotal information as to high firm rates and ill-fitting survey information are not helpful in determining appropriate rates in this case. Here, we are dealing with much smaller firms, in a very different kind of case under economic circumstances which differ profoundly from those involved in large firm rate settings.

**THE REAL RATE REPORT SUPPORTS RATE REDUCTIONS**

59. As described above, the Real Rate Report is a valuable resource commonly used by courts to set appropriate legal rates factoring in the type of matter and years of experience.

60. As a general matter, on an overall basis, the Real Rate Report data exemplifies that smaller firms typically charge lesser rates. This is most likely the result of lower overhead costs. Both Altshuler and Shartsis would be seen in this data as a smaller firms. As to the rates applicable depending on firm size in Insurance Defense litigation matters, the Real Rate Report data is as follows:

| Size of Firm | First Quartile | Median Quartile | Third Quartile |
|---|---|---|---|
| < than 50 - Partner | $170 | $185 | $ 220 |
| Associate | $150 | $165 | $ 190 |
| > 1,000 -  Partner | $660 | $1,050 | $1,306 |
| Associate | $495 | $725 | $ 963 |

KNAPP,
PETERSEN
& CLARKE

-12-

6818190.1  03014/01761

CONFIDENTIAL

61. The Real Rate Report reports overall litigation rates in San Francisco as follows:

| Position | First Quartile | Median Quartile | Third Quartile |
| --- | --- | --- | --- |
| Partners | $436 | $750 | $1,124 |
| Associate | $341 | $450 | $ 718 |

62. The foregoing numbers include matters of all types and complexity. Insurance Defense cases have lower rates.

63. The Real Rate Report reports San Francisco rates by years of experience.

| Position | First Quartile | Median Quartile | Third Quartile |
| --- | --- | --- | --- |
| < than 3 years | $440 | $570 | $670 |
| 3 to 7 years | $592 | $761 | $875 |
| > 7 years | $464 | $674 | $888 |

64. The foregoing rates concern all litigated cases regardless of type or complexity.  Insurance Defense cases have lower rates.  The foregoing numbers also include firms of all sizes.  Small firms' rates are lower.

65. The Real Rate Report also describes San Francisco rates for Insurance Defense litigation:

| Position | First Quartile | Median Quartile | Third Quartile |
| --- | --- | --- | --- |
| Partner | $535 | $675 | $981 |
| Associate | $385 | $485 | $835 |

66. I have used the information in the Real Rate Report as a basis for my analysis. I do not believe that Third Quartile rates would be appropriate for this matter, given the number of parties and amounts at stake. I have utilized my own legal audit experience in evaluation of legal rates for over 30 years in California. I have also reviewed the correspondence from Valley Forge with rate information regarding the rates the applied to

KNAPP,
PETERSEN
& CLARKE

-13-

CONFIDENTIAL

this matter, as well as the rates they routinely paid in comparable matters in the same community. I believe that the rates that Valley Forge assigned to this matter in their correspondence were reasonable and appropriate.

67.    I have applied rates to each timekeeper which I have adjusted to take into consideration the fact that this matter included time in 2023 and 2024, which would typically have meant rate increases in the calendar year. I have included a schedule for both Altschuler and Shartsis which identifies the **Adjusted Rates** for each timekeeper. I believe that these rates are a fair and appropriate rate for each timekeeper, given their level of experience, the firm, and the nature of the litigation, as well as the venue.

68.    Application of adjusted rates results in the following fees when applied against the hours billed, as set forth on the rate adjustment schedules:

| Timekeeper (Original/Adjusted Rate) | | Bar Admittance | Hours Billed | Original Fees Billed | Adjusted Fees |
|---|---|---|---|---|---|
| **Altshuler Berzon, LLP** | | | | | |
| **Partner** | | | | | |
| Finberg, James M. | ($1,275.00\$475.00) | 1984 CA | 1,111.70 | $1,461,207.50 | $528,057.50 |
| Leyton, Stacey | ($1,100.00\$450.00) | 1999 CA | 471.60 | $539,815.00 | $212,220.00 |
| Pitts, P. Casey | ($1,000.00\$400.00) | 2009 CA | 2.70 | $2,700.00 | $1,080.00 |
| **Associate** | | | | | |
| Baltzer, James | ($675.00\$300.00) | 2020 CA | 979.80 | $661,365.00 | $293,940.00 |
| Bass, Kate | ($625.00\$275.00) | 2022 CA | 0.50 | $312.50 | $137.50 |
| Lee, Harold | ($700.00\$325.00) | 2017 CA | 324.00 | $235,445.00 | $105,300.00 |
| Stender, Talia | ($625.00\$275.00) | 2021 CA | 1,032.20 | $645,125.00 | $283,855.00 |
| Tholin, Robin | ($675.00\$275.00) | 2022 CA | 0.70 | $472.50 | $192.50 |
| **Other Billing Personnel** | | | | | |
| Davidson, Brett | ($350.00\$175.00) | NA | 34.50 | $12,075.00 | $6,037.50 |
| Etter, Arthur | ($350.00\$175.00) | NA | 26.10 | $9,135.00 | $4,567.50 |
| Greenberg, Eliana | ($350.00\$175.00) | NA | 137.80 | $48,230.00 | $24,115.00 |

KNAPP, PETERSEN & CLARKE

-14-

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| Kostman, N. | ($325.00\$175.00) | NA | 13.70 | $4,452.50 | $2,397.50 |
| Laus, A. | ($325.00\$175.00) | NA | 338.90 | $110,142.50 | $59,307.50 |
| Mandani, L. | ($325.00\$175.00) | NA | 3.40 | $1,105.00 | $595.00 |
| Nelson, L. | ($325.00\$175.00) | NA | 59.30 | $19,272.50 | $10,377.50 |
| Shively, C. | ($325.00\$175.00) | NA | 520.80 | $169,260.00 | $91,140.00 |
| Walls, M. | ($325.00\$175.00) | NA | 10.80 | $3,510.00 | $1,890.00 |
| **Shartsis Friese, LLP** | | | | | |
| **Partner** | | | | | |
| Cialone, Frank A. | ($875.00\$450.00) | 1994 CA | 832.80 | $741,720.00 | $374,760.00 |
| Ganjam, Sanjeet S. | ($735.00\$375.00) | 2012 CA | 652.70 | $489,433.50 | $244,762.50 |
| Mottahedeh, Rafi W. | ($1,100.00\$375.00) | 2014 CA | 1.80 | $1,980.00 | $675.00 |
| Ward, Robert C. | ($950.00\$450.00) | 1992 CA | 11.50 | $10,925.00 | $5,175.00 |
| **Counsel** | | | | | |
| Draper, Felicia A. | ($735.00\$400.00) | 2006 CA | 979.30 | $748,510.00 | $391,720.00 |
| Mullin, Mark E. | ($695.00\$375.00) | 2015 CA | 44.90 | $31,505.50 | $16,837.50 |
| **Associate** | | | | | |
| Christopherson, Kathryn S. | ($600.00\$300.00) | 2018 CA | 194.50 | $116,748.00 | $58,350.00 |
| Morrow, Alexander R. | ($575.00\$275.00) | 2021 CA | 5.40 | $3,105.00 | $1,485.00 |
| Van Keulen, Lindsay A. | ($625.00\$300.00) | 2019 CA | 236.50 | $147,812.50 | $70,950.00 |
| **Other Billing Personnel** | | | | | |
| Berggen, Chris R. | ($400.00\$175.00) | NA | 367.90 | $155,862.50 | $64,382.50 |
| Blandino, Phil | ($390.00\$175.00) | NA | 125.50 | $53,103.00 | $21,962.50 |
| Hong, Tyrone H. | ($260.00\$175.00) | NA | 69.20 | $17,992.00 | $12,110.00 |
| Hudson, Amanda J. | ($400.00\$175.00) | NA | 4.80 | $1,920.00 | $840.00 |
| Kalman, Seth | ($320.00\$175.00) | NA | 54.30 | $18,088.00 | $9,502.50 |
| Swanson, Janet | ($200.00\$175.00) | NA | 137.10 | $27,420.00 | $23,992.50 |
| Tahbaz, Michael H. | ($215.00\$175.00) | NA | 0.50 | $107.50 | $87.50 |

**KNAPP, PETERSEN & CLARKE**

////

-15-

CONFIDENTIAL

69.    Using these adjusted rates results in a reimbursement of $1,297,592.50 for Shartsis and $1,662,397.50 for Altshuler, or a total reimbursement of $2,959,990.

70.    The rate reduction, as supported by Real Rate Report survey, and other factors discussed rates results in a rate reduction of 42% which realizes an average hourly rate of $314.79 for Altschuler and 50.5% for Shartsis, for an average hourly rate of $348.94. This average rate includes attorneys and non-attorneys alike, and are for more appropriate for their staffing mix, and with this type of matter. It is also consistent with the rates offered by Valley Forge.

**EXCESSIVE TIME BILLED BY BOTH ALTSCHULER AND SHARTSIS**

71.    Defense requests reimbursement of 8,999.70 hours billed for a period of just 14 months. This would equate to one attorney working full time for a period of 225 weeks.

72.    I observed multiple billing issues that warrant reductions, however as the focus of my work has been on the excessive hourly rates I will simply comment on them here, unless my work is expanded to included that analysis in the future.

73.    In addition to the unreasonable excessive hourly rate and staffing choices by both Altschuler and Shartsis, there are also concerns regarding the work performed. An excessive number of hours were billed in the preparation of work product, and preparation for the arbitration. Multiple timekeepers attended Court hearings and the arbitration. By way of example, I identified up to **seven** timekeepers who each attended the arbitration for Shartsis, and **seven** for Altshuler on the same date(s). Many of those who attended described their work on that date simply as "trial," with no further explanation of the tasks performed. These include non-attorneys. I also identified numerous status conferences and other hearings that were attended by multiple timekeepers from each firm.

74.    Services included in the invoices also included work on a counter claim, and work on defense of claims that are not within the scope of covered claims under the policy of insurance issued herein. These are often included in billing entries with other services, especially with respect to the block billing by Altshuler timekeepers. I reserve the right to further allocate as to the affirmative activity if additional information is provided which

KNAPP,
PETERSEN
& CLARKE

-16-

CONFIDENTIAL

would allow such allocation. Affirmative activity is clearly not recoverable as defense fees. The firms have an obligation to exclude these services from fees submitted to Valley Forge, or to identify and "write off" those fees. Given the billing issues I identified, including vague billing descriptions and block billing it is not clear the extent of this affirmative billing, however there are enough entries that are described to make it apparent that this work is included in the fees submitted herein.

75.     Not all services performed in the course of litigation are compensable as professional legal services. Included within the overhead of a law firm are tasks typically performed by competent legal secretaries or members of the clerical staff. Overhead tasks identified include such as "load documents" into a document review database for review by attorneys, or "edit transcription of voice mail messages" (Shartsis), and "organize documents into SharePoint," "create password-protected folder" (Altshuler). Overhead tasks billed by attorneys include "attended Relatively training." All of these tasks are secretarial or administrative and are typically regarded as overhead by courts. In my opinion and a reduction of the overhead hours and fees is warranted.

76.     Courts have reduced time spent on filing, document organization and other clerical matters that should be covered in hourly rates as normal overhead. See *Ralph W. Keith et al. v. John A. Volpe*, et al. 644 F.Supp. 1312 (C.D. Call. 1986).

77.     In addition to billing for overhead activity, I identified an excessive amount of time spent in interoffice conferencing and "team meetings." Excessive conferencing is typically criticized by courts. While it is important for attorneys and others to stay informed and strategize, conferencing at the levels observed here is inappropriate. This was escalated by the excessive number of timekeepers.

78.     I also observed vague billing descriptions such as "correspondence" and "document review" without any further explanation. There is not sufficient information provided to determine the reasonableness of the time billed. Given that fees are not recoverable for certain work including affirmative activity, as well as defense of claims

////

KNAPP,
PETERSEN
& CLARKE

-17-

CONFIDENTIAL

against Abrams and Perkins for solicitation and intentional acts, it is important that all services be clearly identified.

79. Attorneys at Altschuler frequently presented their time in "block billing," which is the combining of multiple entries with a variety of tasks performed in a single day in one entry with the aggregate time for the entire day billed. This practice, which is criticized by the courts, who have opined that it can result in overbilling as high as 30%, See *In Re Chicago Lutheran Hospital*,89 B.R. 719 (Bankr. N.D. Ill. 1988)

80. Costs by Shartsis include "hard drive," "supplies", "trial supplies" and "meal expense." These are typically overhead expenses also included in the cost of a law firm's operating expenses, and not appropriately billed to a client or insurance company.

81. I have not offered any specific monetary reductions as a result of these excessive billing practices. Given the relatively small number of substantive services and the very high number of hours billed, I believe that a full audit would likely result additional reductions to the fees of both firms. I make these observations as part of my overall opinion that the fees and costs billed by Shartsis and Altschuler are excessive and unreasonable.

**CONCLUSION**

82. The fees invoiced by Altschuler and Shartsis for defense in the *Peiffer* matter are excessive and unreasonable.

83. The hourly rates requested are excessive and not aligned with community rates for the nature of their work as reflected in The Real Rate Report. The rates offered by Valley Forge were reasonable and appropriate in the Insurance Defense market. The staffing choices and overstaffing caused excessive and unreasonable fees.

84. This billing as presented lasted approximately fourteen months, yet the firms billed 8,999.7 hours, an astonishing number given the relatively minor number of services performed. This is the equivalent of one attorney working full time for 225 weeks, or almost 4 ½ years, an astonishing number given the services performed.

////

KNAPP,
PETERSEN
& CLARKE

-18-

6818190.1  03014/01761

CONFIDENTIAL

85.    The firms billed for services including affirmative activity which is not reasonably compensable by Valley Forge.

86.    Shartsis and Altschuler both improperly staffed attendance at court and the arbitration with an unwarranted number of personnel.

87.    There were improper instances of administrative billing as well as excessive interoffice communications and vague billing entries. Altschuler time including inappropriately block billed entries.

88.    I have adjusted the hourly rates to a more appropriate rate for each timekeeper taking into consideration their level of experience, and also considering the nature of the litigation and the location.

89.    Although I have referenced other billing issues, I have not quantified them or taken any further reductions, which may be appropriate.

90.    Of the $6,558,920 requested in attorneys' fees it is my opinion that a maximum reimbursement amount of $2,959,990 in fees is recommended. I have offered no opinion as the costs billed herein. A further review of the services performed and billing issues identified, including further information regarding the vague billing entries, would likely result in a recommended further reduction of at least 15-25%.

91.    Payment of the amount recommended herein would generously compensate for the services performed at more reasonable rates, without any consideration as to the affirmative activity and overbilling issues, which likely resulted from excessive staffing and duplication of effort, as well as the other issues discussed.

Dated: September 30, 2024

By: _____
André E. Jardini

KNAPP,
PETERSEN
& CLARKE

-19-

6818190.1  03014/01761

CONFIDENTIAL

# EXHIBIT 1



CONFIDENTIAL

# ANDRÉ E. JARDINI
# TRIAL EXPERIENCE

**December 2019**  *LaFace v. Ralphs*

trial in Los Angeles Superior Court
Private Attorneys General Action to enforce wage order
re seating for cashiers
4-week trial, and subsequent appeal

**October 2012**  *Mendoza v. Nordstrom*

- trial in United States District Court
- enforcement of day of rest statutes (Labor Code sections 551 and 552)
- Nordstrom had employees work more than six consecutive days on more than 26,000 occasions
- case referred by Ninth Circuit Court of Appeals to California Supreme Court to answer questions regarding interpretation of statutes

**March 2010**  *Mendoza v. ABM Industries*

- 6-week trial (Los Angeles Superior Court)
- prosecution of whistleblower case against employer of HR Director
- financial irregularities and labor violations were observed and reported
- jury finds that the violations and financial issues existed and were accurately reported
- jury finds that whistleblower's activity was not the direct cause of the termination

**August 2009**  *Allstate Insurance v. Thacher, et al.*

- 5-day trial (U.S. District Court/Los Angeles)
- insurance coverage action against insurer who denied coverage and defense to a long-time insured for a personal injury accident at a rental property
- jury finds that primary and excess policies are in force
- jury finds arbitration result in underlying action was not collusive or unreasonable
- $780,000 awarded, to firm's clients. Judgment affirmed on appeal

Revised 9-2022
5641105.1  90000/00007  MISC.



| November 2008 | *Selvin & Weiner v. Bench International Search, Inc.* |

- 11-week trial (Los Angeles Superior Court – Malibu)
- defense of Bench International in a collection action by a law firm
- law firm sought approximately $643,000 (with interest)
- Bench International defended with suit for legal malpractice
- jury awarded only $200,000, without interest
- jury found legal malpractice and misrepresentations had occurred
- case resumed with new jury due to mistrial after 4 weeks

**April 2007**    *Roy v. Edgetech, Inc.*

- 7-day trial (Los Angeles Superior Court)
- suit to enforce two-year employment contract
- defendant paid for only two months to employee who moved from France to take the job
- offer of $40,000; demand of $52,500
- jury finds for plaintiff with penalties, interest and attorneys' fees, award is $225,000

**April 2006**    *Confidential Case Name*

- $30 million class action settlement
- case alleging wage and hour violations against an international package delivery company
- recovery for 13,000 California employees who were allegedly unpaid for hours worked and were not provided required meal and rest breaks
- defendant company altered its procedure at the time of the settlement to comply with California law

**August 2006**    *HJF, Inc., Sitara Management v. Equilon*

- 15-day trial (Los Angeles Superior Court)
- suit for breach of contract and fraud against oil company by gas station owner client
- jury verdict for firm client that administration of lease program caused harm to gas station owner
- jury awards $225,000

**May 2005**    *Goodwin v. City of San Bernardino*

- 5-day retrial (U.S. District Court/Riverside)
- civil rights case for unlawful entry and arrest
- second mistrial due to lack of jury unanimity

-2-

5641105.1  90000/00007



CONFIDENTIAL

**October 2004**          *Confidential Case Name*

- 22-day trial (Los Angeles Superior Court)
- legal malpractice case; lawyers lost summary judgment for failure to produce available evidence
- jury verdict (10-2) that firm client would have recovered for breach of contract and fraud in underlying case
- client deprived of partnership interest in 129 lot residential development
- jury awards $4.2 million

**June 2004**          *Confidential Case Name*

- legal malpractice case
- Imperfect CCP § 998 offer in catastrophic injury case causes loss of hundreds of thousands of dollars
- settled first day of trial (Los Angeles Superior Court)

**March 2003**          *Goodwin v. City of San Bernardino*

- 5-day trial (U.S. District Court/Riverside)
- civil rights case for unlawful entry and arrest
- mistrial due to lack of jury unanimity

**May 2002**          *Amezquita v. John J. Fox, M.D., Inc.*

- 14-day trial (Los Angeles Superior Court - Glendale)
- medical malpractice case
- OB/GYN implants IUD in woman who is already pregnant resulting in premature birth of child with developmental delays

**January 2002**          *Titus v. Randazzo*

- 6-day trial (Los Angeles Superior Court - Glendale)
- client, a juror on a prior case, causes automobile accident
- victim claims serious degenerative nerve problems with medical expenses of six figures
- jury finds accident did not cause claimed injuries

-3-



CONFIDENTIAL

**November 2001**        *Valdivia v. Burlington Northern Santa Fe Corporation*

- 11-day trial (San Bernardino Superior Court - Victorville)
- wrongful death of 10-year-old boy killed by train; accident is witnessed by seven-year-old sister
- settlement offer doubled during trial

**May 2001**        *Orlandini v . San Gabriel Valley Medical Center*

- 6-day trial (Los Angeles Superior Court - Pasadena)
- medical malpractice case
- woman awakens under general anesthesia during hysterectomy

**December  2000**        *Spaggiari v. 21st Century*

- trial (Los Angeles Superior Court - Van Nuys)
- insurance bad faith case
- insurer discontinues living expense coverage necessary for family displaced by Northridge earthquake
- settled for firm client for $525,000 on first day of trial

**October 2000**        *Gaggero v. Stacey*

- 10-day trial (Los Angeles Superior Court - Norwalk)
- firm client, a developer, sues former attorney for legal malpractice
- attorney failed to advise concerning California's anti-SLAPP statute before filing suit for malicious prosecution against neighborhood activists protesting Venice Beach development, resulting in award of attorneys' fees of $102,000
- jury awards $332,177 to firm client

**April 2000**        *Barraza v. Stephenson, Acquisto & Colman*

- 6-day trial (Los Angeles Superior Court - Glendale)
- suit for wrongful termination on account of pregnancy
- law firm fires employee in same telephone conversation in which it learns she is pregnant

-4-

5641105.1  90000/00007



CONFIDENTIAL

**July 1999**                         *Briggs v. Villa Esperanza*

- 5-day trial (Los Angeles Superior Court)
- firm client, a registered nurse, seeks unpaid overtime, interest, penalties and attorney's fees
- compensation awarded by the Department of Labor
- employer appealed; trial de novo in Superior Court
- $59,000 award, plus interest, costs and attorney's fees

**February 1999**                    *Erath v. UCLA, et al.*

- 8-day trial (Los Angeles Superior Court)
- scientific records loaned to UCLA by firm client are lost
- question to be decided is value of the lost documents
- UCLA offers $50,000 before trial, and argues at trial that the documents have no value
- jury awards $125,000 to firm client

**March 1998**                       *Hughes Aircraft v. Associated Aviation Underwriters, et al.*

- 12-day trial (Los Angeles Superior Court)
- representation of AAU, excess carrier in a complicated multi-issue suit for insurance coverage for environmental contamination at Hughes' facility in Fullerton
- damages of $35,000,000 claimed; $25,000,000 had been paid by primary insurers
- jury determines that only 32% of contamination is from a sudden and accidental cause; also, jury diminishes claimed damages by more than $5,000,000
- on appeal award is reduced to nothing based on verdict and offsets

**March 1998**                       *Liberty Paper v. San Paolo Bank, et al.*

- 5-day trial (Los Angeles Superior Court)
- retrial of punitive damage phase of suit for fraud in real estate transaction against Italian bank
- $150,000 offered by defendant bank before trial
- jury awards $1,700,000 to firm's client



CONFIDENTIAL

**February 1998**    *Del Babb v. Property Tax Assistance, Inc.*

- 2-day trial (Martinez Superior Court)
- former employee sues to recover unpaid overtime compensation and unpaid bonuses in the amount of $750,000 against firm client
- case dismissed by plaintiff upon ruling of no entitlement to overtime compensation

**January 1998**    *Hugo Valdivia v. MCE Corporation, Hardy & Harper, Inc.*

- 8-day trial (Los Angeles Superior Court)
- personal injury case, involving knee injury to firefighter at station caused by a defective rolling gate
- $100,000 statutory offer by defendants to firm's client
- client had returned to work 10 months after the accident and had worked without restriction for 20 months before trial
- jury awards $1.5 million to firm's client (12-0 vote)

**November 1997**    *Associated Aviation Underwriters v. Wolfe Air, et al.*

- 12-day trial (Los Angeles Superior Court - Central Civil West)
- insurance bad faith case
- $18,000,000 sought by air carrier for damages caused by alleged failure to pay benefits by insurer due to alleged prior cancellation of insurance policy, all arising out of helicopter accident
- air carrier contended cancellation was ineffective and won summary judgment on this issue
- court finds that insurance company's coverage position is reasonable and judgment awarded for firm's client

**August 1997**    *Liberty Paper v. San Paolo Bank, et al.*

- 5-day trial (Los Angeles Superior Court)
- suit to recover damages for defendant bank's failure to complete sale of commercial office building to firm's client
- $25,000 offered by defendant bank before trial
- jury awards $2,505,000 (including punitive damages) to firm's client

5641105.1  90000/00007



CONFIDENTIAL

**June 1997**                    *Hospital Learning Centers v. Century Properties, et al.*

- 6-day trial (Los Angeles Superior Court - Van Nuys)
- suit to recover value of business property destroyed by post-earthquake demolition of office building
- no offer by defendant building owner
- jury awards $370,000 to firm client (with pre-judgment interest, costs and attorneys' fees, award exceeds $700,000)

**April 1997**                    *Moshfegh v. California Pizza Kitchen*

- 7-day trial (Los Angeles Superior Court - Malibu)
- false imprisonment and discrimination case
- party of eight kept from leaving restaurant and arrested for failure to pay tip

**October 1996**                  *Investor's Thrift v. Old Republic Insurance Company*

- 8-day trial (Orange County Superior Court - Harbor)
- suit to recover loan losses covered by insurance for firm's thrift client
- $200,000 offered by defendants before trial
- jury awards $437,096 (with pre-judgment interest and costs, award exceeds $600,000) to firm's client

**May 1996**                      *Steven Lenarth v. Stephanie Pacetti, Mount Vernon Foods*

- 13-day trial (Los Angeles Superior Court - Burbank)
- casualty case, personal injury from rear end accident; firm represents defendants
- $4,050,000 settlement demand by plaintiff injured on LADOT DASH bus hit by minivan
- Plaintiff suffered fractured knee and torn meniscus allegedly resulting in reflex sympathetic dystrophy. Plaintiff in wheelchair, had not used leg in two years, and would not walk again
- C.C.P. §998 formal offer to compromise of $250,000 made; structured settlement with present value of $286,000 offered
- plaintiff dismissed case with prejudice on 13th day of trial for no payment and waiver of costs

5641105.1  90000/00007



**January 1996**                    *RGP Orthopedic Appliances v. Atlantic Mutual Insurance Company*

- 13-day trial (San Diego Superior Court)
- insurance bad faith case
- $11,250,000 sought by company and two severely injured judgment creditors for failure to pay $2,000,000 limits of umbrella insurance policy for damages incurred in a very serious automobile accident
- insured asserted exclusion was missing key language due to a clerical error; court finds exclusion unenforceable
- award of $1,225,000 in extra-contractual damages; (defendant insurer had offered $1,400,000 in settlement)

**October 1995**                    *Landers v. State Farm Fire and Casualty Company*

- 29-day trial (Los Angeles Superior Court)
- insurance bad faith case
- $150,000 sought for alleged failure to pay no-fault benefits under a New York insurance policy
- award of $50,000 to plaintiff

**August 1995**                    *Rosenfield v. (Confidential - two defendants)*

- trial (Los Angeles Superior Court - Santa Monica)
- wrongful termination on the basis of sexual orientation settlement during trial; firm's client receives $575,000

**July 1995**                    *Nationwide Insurance Company v. Great American Insurance Company*

- 7-day trial (Los Angeles Superior Court - Santa Monica)
- recovery sought for progressive loss arising out of soil settlement at residence in Pacific Palisades
- believed to be first jury trial after Supreme Court decision in Montrose Chemical Corporation v. Admiral Insurance Company regarding allocation between insurers for continuous loss
- 10-2 jury verdict for client finding defendant insurer should participate in paying loss; $125,000 awarded, including interest

5641105.1  90000/00007



CONFIDENTIAL

| | |
|---|---|
| **December 1994** | *Glick v. State Farm Fire and Casualty Company* |

- 5-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $338,000 sought, plus consequential damages, for business personal property lost in theft and for lost income caused by business interruption
- 8-0 defense verdict for client, State Farm

| | |
|---|---|
| **July 1994** | *Brown v. South Los Angeles Mortuary* |

- 25-day trial (Los Angeles Superior Court - Central Civil West)
- mortuary malpractice case involving 17 plaintiffs who were relatives of a decedent whose remains were mishandled and exposed to insects
- more than $5 million sought for emotional distress and punitive damages
- jury verdict finding firm client only 10 percent responsible (cemetery found 90 percent responsible)
- total award against firm client $97,000 - more than $300,000 had been offered in settlement

| | |
|---|---|
| **April 1994** | *Edison v. Labowe, Labowe & Hoffman* |

- 30-day trial (Los Angeles Superior Court)
- legal malpractice case against firm client
- $2.7 million sought for law firm errors in complicated real estate transaction involving loss of 65 percent interest in a commercial property
- jury verdict for plaintiff for $430,000; reversed on appeal on statute of limitations grounds; plaintiff takes nothing

| | |
|---|---|
| **September 1993** | *International Registered Nurses of America, Inc. v. State Farm Fire and Casualty Company* |

- 1 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $1,424,000 sought, plus consequential damages, for lost business income and failure to pay claim
- judgment in favor of client, State Farm

5641105.1 90000/00007



CONFIDENTIAL

**September 1993**            *Smith v. Battalia, Remax South Bay Realty*

- 3-day binding arbitration per real estate purchase contract
- real estate fraud
- $150,000 sought for misrepresentation in sale of real estate, failing to disclose movement from subsurface soil condition
- judgment in favor of client seller

**March 1993**              *Esters v. State Farm Mutual Automobile Insurance Company*

- 7-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $250,000 sought for five-year delay in paying
- uninsured motorist claim and for unreasonably low offer
- 8-0 defense verdict for client

**September 1992**          *Block v. State Farm Mutual Automobile Insurance Company*

- 6-day trial (Los Angeles Superior Court - Beverly Hills)
- insurance bad faith case
- $100,000 sought for failure to settle uninsured motorist claim and failure to pay medical bills
- 12-0 defense verdict for firm client

**May 1992**                *Shane v. Neil Lloyd & Co., Daniel Monnin*

- 5-day trial (Los Angeles Superior Court - Glendale)
- wrongful death of four-year-old child by drunk driver
- represented employer of drunk driver, good Samaritan who attempted to drive the drunk driver home and his employer
- tried on liability issues only
- motion for non-suit and directed verdict granted for all three firm clients

5641105.1  90000/00007



CONFIDENTIAL

**March 1992**                    *Reid v. Ulysses M. Carbajal, M.D.*

- 8-day trial (Los Angeles Superior Court - Central Civil West)
- medical malpractice action
- unnecessary surgery for acute sinusitis
- $72,000 award for plaintiff client

**January 1992**                  *Stern v. State Farm Mutual Automobile Insurance Company*

- 3-day binding arbitration (JAMS Santa Monica)
- insurance bad faith case
- alleged mishandling of claims re collision and UM coverages
- award for client defendant on all claims

**November 1991**                 *Tucker v. Westminster Memorial Park*

- trial (Orange County Superior Court)
- crematory misfeasance case
- settled for our initial offer of $120,000 during trial

**September 1991**                *Bohall v. ARCS Mortgage, Bank of New York*

- 10-day trial (Los Angeles Superior Court)
- retrial of wrongful termination case
- branch manager fired with cause
- $2 million dollar demand; $2,718 award

**May/June 1991**                 *Proposition 103 Hearings*

- 4 weeks of hearings (San Francisco and Los Angeles)
- cross-examination of Department of Insurance expert witnesses on rate of return, leverage, allowable expense, executive compensation and other issues

5641105.1  90000/00007



CONFIDENTIAL

**January 1991**              *Bohall v. ARCS Mortgage, Bank of New York*

- 10-day trial (Los Angeles Superior Court)
- wrongful termination, defamation and conversion case
- $1.5 million dollar demand; $300,000 offer
- $1.2 million dollar award, including $6,500 punitive damages, new trial motion granted

**October 1990**             *Smoke Island Interiors v. General Accident Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- allegations of unreasonable claims handling and denial of claim for stolen artwork; claim for $180,000 plus consequential and punitive damages
- settled for $17,500 during trial

**June 1990**                *The Austin Company v. J.H. Baxter Company*

- 5-day trial (United States District Court - Los Angeles)
- product defect case
- failure of three-acre roof with a $2.5 million dollar replacement cost allegedly due to corrosion caused by fire retardant chemicals used by J.H. Baxter
- 6-0 defense verdict for our client J.H. Baxter

**May 1990**                 *Blanchard v. State Farm Fire and Casualty Company*

- 10-day trial (Los Angeles Superior Court - Santa Monica)
- insurance bad faith case
- $450,000 sought for failure to provide independent counsel in defense of covered construction defect litigation
- 10-2 defense verdict for our client, upheld on appeal

**February 1990**            *Sykes, et al., v. Associated Farm Management*

- 9-day trial (United States District Court - Los Angeles)
- federal securities law case
- 100+ plaintiffs sought recovery of amounts lost in investments in nine limited partnerships in farmland - grapes, tree fruit, citrus - in California's Central Valley
- $29 million recovery requested; judgment rendered for $8.6 million



**June 1989**         *Aetna Insurance Company v. Centennial Insurance Company*

- 5-day trial (United States District Court - Los Angeles)
- insurance equitable subrogation case
- Aetna sought contribution re two-thirds of $725,000 in defense costs expended in defending underlying patent litigation
- court agreed with our position that two-sevenths was proper allocation and that attorney bills were unreasonably high; upheld on appeal

**February 1989**    *Della Ripa v. Kaiser Hospital*

- 5-day binding arbitration
- medical malpractice case
- $187,000 award for our client for defendant's failure to diagnose "panic disorder"

**November 1988**    *Transtechnology, Inc. v. Allied Signal Corporation*

- 11-day binding arbitration (3 arbitrator panel)
- environmental case
- second ever arbitration to apportion fault for groundwater pollution under California Health and Safety Code our client, Allied Signal, found responsible for 4 percent of response costs of $1.5 million dollars

**June 1988**        *Wolf v. Fisher*

- 6-day trial (Los Angeles Superior Court)
- suit for violation of rent control ordinance and intentional infliction of emotional distress
- 12-0 defense verdict for our clients, property owners

**October 1987**     *Frederick v. Ambassador Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- insurer and parent company sued for failing to defend and indemnify in personal injury case
- client insurer insolvent per Vermont liquidation and dismissed; client employee pays $2,000; parent company, represented by another law firm, suffers $2 million dollar verdict

-13-



CONFIDENTIAL

**September 1987**            *Olson/Hurston v. L.B. Foster Company*

- 8-day trial (United States District Court - Los Angeles)
- product defect case
- two pile drivers suffered multiple leg fractures when a ground release shackle failed and dropped a 900-pound sheet pile
- 6-0 defense verdict for our client, the distributor of the device

**May 1986**            *Noma Corporation v. Centennial Insurance Company*

- 7-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- insured franchisor sought payment of $243,000 in legal fees for defense of covered suits by franchisees and $18,000,000 in consequential damages for failure to defend
- determined that $19,000 was only amount due

**April 1986**            *Shea v. Owen, Century 21 Realty*

- trial/stipulated judgment
- real estate fraud case
- fraudulent trade of primary residence for two unsecured greenhouses
- client plaintiff recovered $115,000 from defendants for fraudulent real estate transaction

**December 1985/**
**January 1986**            *Stotts v. Wallace and Tiernan Division of Pennwalt Corporation*

- 28-day trial (Los Angeles Superior Court)
- product defect case
- client manufacturer's valve cracks exposing plaintiff to chlorine gas and causing serious impairment of lung function
- award $400,000

-14-

CONFIDENTIAL

# EXHIBIT 2

CONFIDENTIAL

## ANDRÉ E. JARDINI'S DEPOSITION AND TRIAL TESTIMONY
## (LAST FIVE YEARS)

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 1 | Centex v. Ad Land | Deposition and Trial | 34-2011-00112151 | Superior Court of California County of Sacramento |
| 2 | Embee v. Safeco Insurance | Deposition | 30-2012-00586683-CU-IC-CXC; 30-2014-00746122-CU-IC-CJC | Superior Court of the State of California for County of Orange |
| 3 | Centex Homes v. Lexington Ins. | Deposition | RIC10010749 | Riverside Superior Court |
| 4 | Lapine v. Elston | Deposition | BC589553 | LASC |
| 5 | Vertical Management v. Simpson | Deposition and Trial | 37-2016-00012625-CU-BC-CTL | Superior Court of California County of San Diego |
| 6 | Segal v. Jenkins | Deposition and Trial | BC603348 | LASC |
| 7 | Markowitz adv. Kurtz | Deposition and Trial | LC103719 | LASC |
| 8 | Nationwide Medical, Inc. v. Scottsdale | Deposition | 2:15-cv-00436-DDP-FFM | US District Court Central District of California |
| 9 | Sanders/Sissler adv. Kurtzman | Deposition and Trial | CGC16 551654 | Superior Court of California County of San Francisco |
| 10 | Javidzad v. Rosen & Associates | Deposition and Trial | BC605808 | LASC |
| 11 | Monster v. Beats | Deposition and Trial | BC595235 | LASC |
| 12 | Kaplan v. Krane & Smith | Trial | BC579940 | LASC |
| 13 | Buchalter Nemer v. Gerson I. Fox | Deposition | R1003172 | JAMS Arbitration |
| 14 | Mesa Water District v. KDC, Inc., et al. | Deposition | 30-2016-00832860-CU-BC-CJC | Superior Court of California County of Orange |
| 15 | White v. Aflalo (McPherson Rane) | Deposition | BC531327 | LASC |
| 16 | First American Specialty adv. Fontana | Deposition | BC658141 | LASC |
| 17 | Regal Assets adv. American Bullion Inc. (Towle, Denison, et al.) | Deposition | 2:14-cv-01873-DDP (ASx) | US District Court Central District of California |

CONFIDENTIAL

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 18 | Internet Brands v. National Union | Deposition | 2:17-cv-02429-MWF-AJW | US District Court Central District of California |
| 19 | Summerland Falls v. Quinn Emanuel | Deposition | 2016-004812-cu-BC-VTA | Superior Court of California County of Ventura |
| 20 | Fluidmaster adv. Fireman's Fund | Deposition | BC560372 | LASC |
| 21 | Berger v. Freidberg | Deposition | 34-2017-00214272 | Superior Court of California County of Sacramento |
| 22 | Fluor Corporation | Deposition | 4:16-cv-00429-ERW | US District Court Eastern District of Missouri Eastern Division |
| 23 | Philadelphia Indemnity v. IEC Corporation | Deposition and Trial | 8:16-CV-295-DOC(AJWX) | US District Court Central District of California |
| 24 | Quinn Emanuel v. William H. Cosby | Deposition | JAMS Ref. 1220056900 | JAMS Arbitration |
| 25 | Piccinini adv. Schapiro-Thorn | Deposition | DR39309 | Monterey County Superior Court |
| 26 | Estate of Guy Abraham | Deposition | YP02195 | LASC |
| 27 | Sarnecky v. Aguirre | Deposition | 37-2017-00025968-cu-PN-CTL | Superior Court of the State of California County of San Diego |
| 28 | Walker v. Diamond Healthcare | Deposition | BC666147 | LASC |
| 29 | Hudson Insurance adv. Unity | Deposition | 2:18-cv-08143-RGK-GJS | US District Court District of California, Western District |
| 30 | Gadinis v. United Services (2018) | Deposition | 37-2018-00015334-cu-UM-CTL | Superior Court State of California County of San Diego, Central District |
| 31 | Dissolution of Marriage of Metzger | Deposition | NC061264 | Superior Court of California County of Los Angeles South District |
| 32 | Quinn Emanuel (Mirra adv. Jordan) | Deposition | 14-01485-GAM-SRF | US District Court District of Delaware |
| 33 | Pech v. Morgan | Deposition and Trial | 18STCV02178 | LASC Central District |

CONFIDENTIAL

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 34 | Averon v. The Crosby & AMS Paving | Deposition | 19-cv-02369-WQH-NLS | USDC Southern District |
| 35 | In Re Marriage of Skylar Peak and Janet Freisen Peak | Trial | 19STFL09382 | LASC |
| 36 | Greenberg Glusker v. Amin S. Lakha | Deposition | 1210036873 (JAMS) | JAMS Arbitration |
| 37 | Fraissl v. Moore | Deposition | BC535745 | LASC |
| 38 | Mark Hughes Family Trust | Deposition | BP 063500 | LASC |
| 39 | Simplot v. McCain | Deposition | 1:16-cv-00449-DCN | US District Court District of Idaho (Boise) |
| 40 | Travelers Insurance v. Salesforce | Deposition | JAMS Ref. 1100111905 | JAMS San Francisco |
| 41 | Golden Pacific Bank v. Kronick, Moskovich, Tiedeman & Girard | Deposition and Trial | 34-2018-00236905 | Superior Court State of California County of Sacramento |
| 42 | Premier Reimbursement Solutions v. Koetsier | Deposition | VCU281481 | Superior Court of the State of California County of Tulare |
| 43 | Dryit Inc. dba Jarvis Restoration v. Allstate Insurance Company | Deposition | 30-2020-01149888-CU-BC-CJC | Superior Court of the State of California County of Orange |
| 44 | Hughes v. Libeu | Deposition and Trial | SCv-261621 | Superior Court of California County of Sonoma |
| 45 | Hakkasan USA Inc. v. Endurance American Specialty Insurance, et al. | Deposition | A-20-816145-B | District Court clarke County, Nevada |
| 46 | Madeline8, LLC, et al. v. Alvaradosmith, APC, et al. | Deposition | 30-2020-01124146-CU-PN-CJC | Superior Court of California County of Orange Central Division |
| 47 | Green Solar Technologies, Inc. v. Raymond McElfish, et al. | Deposition | BC712758 | LASC |
| 48 | Miller Marital Deduction Trust, et al. v. Estate of Mark B. Dubois, et al. | Deposition and Trial | 2:16-cv-01883-SB | US District Court Eastern District of California |

CONFIDENTIAL

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 49 | Google LLC v. Sonos | Deposition | 3:21-cv-07559-WHA | US District Court Northern District of California |
| 50 | Tutor Perini v. First Mercury | Deposition | 2:20-cv-09329-CAS-GJSx.(aco) | US District Court Central District of California |
| 51 | Caruso Affiliated v. Allied World | Deposition and Trial | 21STCV12443 | LASC |
| 52 | Clean & Sober Media, et al. v. HUB International Insurance Services | Deposition and Trial | 21STCV20391 | LASC |
| 53 | Richard Pech v. Thomas E. Morgan, III, et al. | Trial | 18STCV02178 | LASC |
| 54 | Epicgenetics/Gillis v. Gibson, Dunn & Crutcher | Deposition | Ref. No.5210000295 | JAMS |
| 55 | Motavassel v. Mokhtarzadeh | Deposition | 20 STCV02243 | LASC |
| 56 | The Charles Company v. Bryan Cave | Deposition | Ref. No. 1200059383 | JAMS |
| 57 | Barbizon School of San Francisco, et al. v. Putterman Landry & Yu | Deposition | Ref. No. 11300110356 | JAMS |

CONFIDENTIAL

# EXHIBIT 3

CONFIDENTIAL

## OUTLINE OF BACKGROUND AND QUALIFICATIONS
## ANDRÉ E. JARDINI

- Practicing lawyer, principally as a trial attorney, in California since 1976.

- B.A. University of Notre Dame 1973; J.D. Hastings College of the Law 1976; admitted to the State Bar, December 1976.

- Clerkship in 1977 and 1978 in United States District Court in Los Angeles with Judge Robert Firth.

- Admitted to practice in all courts in the State of California, including four United States District Courts and the Ninth Circuit Court of Appeals. Admitted in the District Court for the Eastern District of Michigan.

- Partner at Knapp, Petersen & Clarke, a law firm providing litigation and transactional services to its clients.   Currently serving as President of the firm.

- Founder and President of KPC Legal Audit Services, Inc.

- Trial and arbitration of numerous cases in which the predominant issue was the reasonableness of attorney's fees.

- Since 1986, has personally audited the billings of a large proportion of the major law firms in California, has conducted audits throughout the U.S., and internationally.  More than 1,800 audits performed.

- Has audited billings exceeding cumulatively $2 billion.

- Has been under contract to the State of California (Cal PERS, California Lottery, Attorney General's Office) and numerous other government entities regarding audit services.

- Arbitrator in the Los Angeles County Bar Association Dispute Resolution Services Program regarding attorney/client disputes over legal billings.

- Qualified as an expert witness with regard to reasonableness of attorney's fees issues and ethical and attorney performance issues.

- Testimony as an expert witness at trial and in arbitration concerning attorney fee disputes.

- Experience as an attorney for litigants in matters concerning attorney fee disputes.

CONFIDENTIAL
Outline of Background and Qualifications of André E. Jardini
Page 2

- Practice consists predominantly of trial work. More than 50 jury trials conducted to conclusion.

- Member, American Board of Trial Advocates. (Advocate status.)

- Articles written, seminars conducted and speaking engagements on the subject of reasonableness of attorney's fees and auditing practices.

- Martindale-Hubbell, rated AV, "Preeminent."

- Super Lawyer 2012 – 2020.

- The National Association of Legal Fee Analysis ("NALFA") ranks André E. Jardini as a "Top Attorney Fee Expert," and ranks KPC Legal Audit Services, Inc. as one of nation's top outside legal bill review programs, which follows Best Practices in Legal Fee Analysis.

- Representative cases on appeal:

**Simon v. San Paolo U.S. Holding Co., Inc.** (2005) 35 Cal. 4th 1159
California Supreme Court case establishing Constitutional limits on punitive damages.

**Blanchard v. State Farm** (1991) 2 Cal. App. 4th 345
Case finding no entitlement to independent counsel in construction defect case.

**Kliger v. Superior Court** (1990) 52 Cal. 3d 65
California Supreme Court case establishing parameters for suits for employer conduct in violation of public policy.

**Trope v. Katz (1995)** 11 Cal. 4th 274
Trial testimony in case establishing that attorneys cannot recover fees representing themselves in a fee collection action.

**Lance Camper v. Republic Indemnity** (2001) 90 Cal App. 4th 1151
Trial testimony concerning *Brandt* fees in insurance bad faith case.

3462590.1  90000/00007
Revised  3/21

CONFIDENTIAL

# EXHIBIT 4



CONFIDENTIAL

 **NATIONAL ASSOCIATION OF LEGAL FEE ANALYSIS**
**Specializing in Legal Billing & Attorney Fees**
———————————————— A Network of Experts & Ethics

The National Association of Legal Fee Analysis (NALFA) is a 501(c)(6) non-profit professional association for the legal fee analysis field. Our members provide a range of services on attorney fee and legal billing matters. We serve as the organizing and governing body for the legal fee analysis profession.

Courts and clients turn to us for expertise when attorney fees and expenses are at issue in large, complex cases. NALFA members are fully qualified attorney fee experts, special masters, bankruptcy fee examiners, fee dispute neutrals, and legal bill auditors. All our members follow Best Practices in Legal Fee Analysis.

### NALFA Fact Sheet:

NALFA is an approved 501(c)(6) federal tax-exempt organization under the IRS Code.

NALFA is an A.M. Best Recommended Expert Service Provider (2008-Present).

NALFA has recommended qualified attorney fee experts on legal fee and billing matters ranging from $42,000-$500 million.

Since 2008, NALFA has hosted over 45 different CLE and professional development programs on attorney fees and legal billing topics. Our CLE faculty has included 23 sitting federal judges.

Every year, NALFA announces, "The Nation's Top Attorney Fee Experts".

Every year, NALFA conducts an hourly rate survey of civil litigation in the U.S. This is the nation's largest and most comprehensive survey or study of hourly billing rates in litigation.

NALFA offers a Certificate in Ethical Billing & Reasonable Fees, the nation's first and only certificate of its kind for registered guests of multiple CLE programs.

NALFA has established Best Practices in Outside Legal Fee Analysis, a peer-review driven code of professional conduct for professionals who routinely perform outside legal fee analysis.

NALFA's News Blog covers legal billing and attorney fee issues from across the U.S.

NALFA filed Amicus Briefs in *Worley v. Storage USA, Pipefitters v. Oakley* in California appellate courts and in the landmark ADA case, *Covington v. McNeese State University* in the Louisiana Supreme Court.

NALFA has been cited or quoted by over 20 different media outlets and/or publications: The Wall Street Journal, Bloomberg News, ALM's American Lawyer, The Chicago Tribune, Bloomberg BNA, CNBC, Thomson Reuters, Insurance Journal, Minneapolis-St. Paul Business Journal, Daily Journal, ALM's Daily Business Review, ALM's National Law Journal, FindLaw.com, The Florida Bar Journal, Law 360, Politico, ALM's Law.com, Missouri Lawyers Media, ALM's Critical Mass, Portland Business Journal, Detroit Free Press, and ABA Journal.

NALFA houses a body of scholarship on reasonable attorney fees including surveys, reports, articles, and studies. NALFA also recognizes the nation's most influential scholarship on attorney fees.

NALFA conducts custom design hourly rate surveys for law firms and corporate legal departments. A federal judge cited a NALFA hourly rate survey in his attorney fee award in the *Vortens* class settlement.

CONFIDENTIAL

# EXHIBIT 5

## CONFIDENTIAL
## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW
### Re: All Firms
### Global Fees and Costs Billed

| Firm/Expert | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|
| Altshuler Berzon, LLP | $3,992,687.50 | $230,560.76 | $4,223,248.26 |
| Shartsis Friese, LLP | $2,566,232.50 | $114,159.24 | $2,680,391.74 |
| **Grand Total** | **$6,558,920.00** | **$344,720.00** | **$6,903,640.00** |

CONFIDENTIAL

**ALTSHULER BERZON**

CONFIDENTIAL

## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE
## INSURANCE FEE REVIEW
### Re: Altshuler Berzon, LLP
### Fees and Costs Billed

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| 6/9/2023 | 20230609 | $3,010.00 | $11.11 | $3,021.11 |
| 7/11/2023 | 20230711 | $35,182.50 | $24.95 | $35,207.45 |
| 8/15/2023 | 20230815 | $17,340.00 | $0.00 | $17,340.00 |
| 9/18/2023 | 20230918 | $49,297.50 | $7,557.91 | $56,855.41 |
| 10/9/2023 | 20231009 | $53,910.00 | $203.59 | $54,113.59 |
| 11/8/2023 | 20231108 | $45,312.50 | $34.11 | $45,346.61 |
| 12/14/2023 | 20231214 | $126,217.50 | $31,314.34 | $157,531.84 |
| 1/18/2024 | 20240118 | $154,072.50 | $60,718.87 | $214,791.37 |
| 2/12/2024 | 20240212 | $122,700.00 | $15.40 | $122,715.40 |
| 3/12/2024 | 20240312 | $149,435.00 | $15,071.59 | $164,506.59 |
| 4/11/2024 | 20240411 | $150,970.00 | $19,252.50 | $170,222.50 |
| 5/15/2024 | 20240515 | $380,452.50 | $28,774.46 | $409,226.96 |
| 6/13/2024 | 20240613 | $486,765.00 | $187.46 | $486,952.46 |
| 7/22/2024 | 20240722 | $969,482.50 | $17,341.16 | $986,823.66 |
| 8/14/2024 | 20240814 | $1,030,835.00 | $49,890.52 | $1,080,725.52 |
| 9/12/2024 | 20240912 | $217,705.00 | $162.79 | $217,867.79 |
| **Total** | | **$3,992,687.50** | **$230,560.76** | **$4,223,248.26** |

CONFIDENTIAL

**PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW**

Re:  Altshuler Berzon, LLP
**Index of Billing Personnel**

| Timekeeper | Bar Admittance Date | Rate | Hours By Rate | Total Hours Billed |
|---|---|---|---|---|
| **Partner** | | | | |
| Finberg, James M. | 1984 CA | $1,275.00 | 235.90 | 1,111.70 |
| | | $1,325.00 | 875.80 | |
| Leyton, Stacey | 1999 CA | $1,100.00 | 50.50 | 471.60 |
| | | $1,150.00 | 421.10 | |
| Pitts, P. Casey | 2009 CA | $1,000.00 | 2.70 | 2.70 |
| (3) $1,263.38 Partner Total  (30.03%) | | | | 1,586.00 |
| **Associate** | | | | |
| Baltzer, James | 2020 CA | $675.00 | 979.80 | 979.80 |
| Bass, Kate | 2022 CA | $625.00 | 0.50 | 0.50 |
| Lee, Harold | 2017 CA | $700.00 | 151.10 | 324.00 |
| | | $750.00 | 172.90 | |
| Stender, Talia | 2021 CA | $625.00 | 1,032.20 | 1,032.20 |
| Tholin, Robin | 2022 CA | $675.00 | 0.70 | 0.70 |
| (5) $660.07 Associate Total  (44.26%) | | | | 2,337.20 |
| **Other Billing Personnel** | | | | |
| Davidson, Brett | NA | $350.00 | 34.50 | 34.50 |
| Etter, Arthur | NA | $350.00 | 26.10 | 26.10 |
| Greenberg, Eliana | NA | $350.00 | 137.80 | 137.80 |
| Kostman, N. | NA | $325.00 | 13.70 | 13.70 |
| Laus, A. | NA | $325.00 | 338.90 | 338.90 |
| Mandani, L. | NA | $325.00 | 3.40 | 3.40 |
| Nelson, L. | NA | $325.00 | 59.30 | 59.30 |
| Shively, C. | NA | $325.00 | 520.80 | 520.80 |
| Walls, M. | NA | $325.00 | 10.80 | 10.80 |
| Wang, C. | NA | $325.00 | 207.80 | 207.80 |
| Wenzell, R. | NA | $325.00 | 4.70 | 4.70 |
| (11) $328.65 Other Billing Personnel Total  (25.71%) | | | | 1,357.80 |
| (19) $756.05 All Timekeepers Total | | | | 5,281.00 |

CONFIDENTIAL

## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW

### Re:  Altshuler Berzon, LLP
### Rate Adjustment

| Timekeeper (Original Rate/Adjusted Rate) | | Bar Admittance Date | Hours Billed | Original Fees Billed | Adjusted Fees* |
|---|---|---|---|---|---|
| **Partner** | | | | | |
| Finberg, James M. | ($1,275.00\$475.00) | 1984 CA | 1,111.70 | $1,461,207.50 | $528,057.50 |
| Leyton, Stacey | ($1,100.00\$450.00) | 1999 CA | 471.60 | $539,815.00 | $212,220.00 |
| Pitts, P. Casey | ($1,000.00\$400.00) | 2009 CA | 2.70 | $2,700.00 | $1,080.00 |
| **(3) Partner Total** | | | **1,586.00** | **$2,003,722.50** | **$741,357.50** |
| **Associate** | | | | | |
| Baltzer, James | ($675.00\$300.00) | 2020 CA | 979.80 | $661,365.00 | $293,940.00 |
| Bass, Kate | ($625.00\$275.00) | 2022 CA | 0.50 | $312.50 | $137.50 |
| Lee, Harold | ($700.00\$325.00) | 2017 CA | 324.00 | $235,445.00 | $105,300.00 |
| Stender, Talia | ($625.00\$275.00) | 2021 CA | 1,032.20 | $645,125.00 | $283,855.00 |
| Tholin, Robin | ($675.00\$275.00) | 2022 CA | 0.70 | $472.50 | $192.50 |
| **(5) Associate Total** | | | **2,337.20** | **$1,542,720.00** | **$683,425.00** |
| **Other Billing Personnel** | | | | | |
| Davidson, Brett | ($350.00\$175.00) | NA | 34.50 | $12,075.00 | $6,037.50 |
| Etter, Arthur | ($350.00\$175.00) | NA | 26.10 | $9,135.00 | $4,567.50 |
| Greenberg, Eliana | ($350.00\$175.00) | NA | 137.80 | $48,230.00 | $24,115.00 |
| Kostman, N. | ($325.00\$175.00) | NA | 13.70 | $4,452.50 | $2,397.50 |
| Laus, A. | ($325.00\$175.00) | NA | 338.90 | $110,142.50 | $59,307.50 |
| Mandani, L. | ($325.00\$175.00) | NA | 3.40 | $1,105.00 | $595.00 |
| Nelson, L. | ($325.00\$175.00) | NA | 59.30 | $19,272.50 | $10,377.50 |
| Shively, C. | ($325.00\$175.00) | NA | 520.80 | $169,260.00 | $91,140.00 |
| Walls, M. | ($325.00\$175.00) | NA | 10.80 | $3,510.00 | $1,890.00 |

## CONFIDENTIAL

| Timekeeper (Original Rate/Adjusted Rate) | | Bar Admittance Date | Hours Billed | Original Fees Billed | Adjusted Fees* |
|---|---|---|---|---|---|
| Wang, C. | ($325.00\$175.00) | NA | 207.80 | $67,535.00 | $36,365.00 |
| Wenzell, R. | ($325.00\$175.00) | NA | 4.70 | $1,527.50 | $822.50 |
| (11) Other Billing Personnel Total | | | 1,357.80 | $446,245.00 | $237,615.00 |
| (19) All Timekeepers Total | | | 5,281.00 | $3,992,687.50 | $1,662,397.50 |

| | |
|---|---|
| Original Fees Billed | $3,992,687.50 |
| Adjusted Fees Billed | $1,662,397.50 |
| **Rate Adjustment** | **$2,330,290.00** |
| Avg. Hourly Rate for Adjusted Fees | $314.79 |

CONFIDENTIAL
## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW

### Re: Altshuler Berzon, LLP
### Costs Billed Summary

| Cost Description | Total |
|---|---|
| Courier | $160.85 |
| CyberNarus, LLC | $2,567.50 |
| Digital One Legal Solutions | $776.49 |
| Filing Fees | $435.00 |
| Filing Service | $97.30 |
| JAMS | $180,775.83 |
| Law Offices of Mathew Kumin | $13,880.00 |
| Litigation Supplies | $247.92 |
| Meal Expense | $5,265.57 |
| OnCue Tech | $100.00 |
| Online Legal Research | $1,576.26 |
| Parking Expense | $233.00 |
| Photocopy | $5,101.57 |
| Rogers Joseph O'Donnell | $15,660.00 |
| Secretarial Overtime | $2,346.57 |
| Transportation Expense | $1,013.57 |
| Travel | $323.33 |
| **Total** | **$230,560.76** |

CONFIDENTIAL

# SHARTSIS FRIESE

CONFIDENTIAL

## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE
### INSURANCE FEE REVIEW
### Re: Shartsis Friese, LLP
### Fees and Costs Billed

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| 7/19/2023 | 5477144 | $43,126.00 | $241.96 | $43,367.96 |
| 8/16/2023 | 5478404 | $30,367.00 | $1,028.42 | $31,395.42 |
| 9/20/2023 | 5479656 | $101,601.50 | $179.28 | $101,780.78 |
| 10/19/2023 | 5480947 | $102,843.50 | $13,364.55 | $116,208.05 |
| 11/16/2023 | 5482224 | $103,361.00 | $2,184.31 | $105,545.31 |
| 12/13/2023 | 5483581 | $69,588.00 | $26.37 | $69,614.37 |
| 1/24/2024 | 5484895 | $99,962.00 | $1,871.57 | $101,833.57 |
| 2/15/2024 | 5486164 | $118,732.00 | $6,232.13 | $124,964.13 |
| 3/13/2024 | 5487550 | $123,396.50 | $16,455.33 | $139,851.83 |
| 4/12/2024 | 5488984 | $108,709.00 | $607.48 | $109,316.48 |
| 5/13/2024 | 5491479 | $230,825.00 | $21,730.85 | $252,555.85 |
| 6/24/2024 | 5491726 | $267,359.50 | $14,381.02 | $281,740.52 |
| 7/25/2024 | 5493085 | $475,355.00 | $9,188.68 | $484,543.68 |
| 8/8/2024 | 5494395 | $595,973.00 | $20,989.57 | $616,962.57 |
| 9/10/2024 | 5495797 | $95,033.50 | $5,677.72 | $100,711.22 |
| **Total** | | **$2,566,232.50** | **$114,159.24** | **$2,680,391.74** |

CONFIDENTIAL

## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW

### Re: Shartsis Friese, LLP
### Index of Billing Personnel

| Timekeeper | Bar Admittance Date | Rate | Hours By Rate | Total Hours Billed |
|---|---|---|---|---|
| **Partner** | | | | |
| Cialone, Frank A. | 1994 CA | $875.00 | 312.00 | 832.80 |
| | | $900.00 | 520.80 | |
| Ganjam, Sanjeet S. | 2012 CA | $735.00 | 329.40 | 652.70 |
| | | $765.00 | 323.30 | |
| Mottahedeh, Rafi W. | 2014 CA | $1,100.00 | 1.80 | 1.80 |
| Ward, Robert C. | 1992 CA | $950.00 | 11.50 | 11.50 |
| **(4) $830.04 Partner Total (40.30%)** | | | | **1,498.80** |
| **Counsel** | | | | |
| Draper, Felicia A. | 2006 CA | $735.00 | 158.60 | 979.30 |
| | | $770.00 | 820.70 | |
| Mullin, Mark E. | 2015 CA | $695.00 | 37.40 | 44.90 |
| | | $735.00 | 7.50 | |
| **(2) $761.59 Counsel Total (27.54%)** | | | | **1,024.20** |
| **Associate** | | | | |
| Christopherson, Kathryn S. | 2018 CA | $600.00 | 191.30 | 194.50 |
| | | $615.00 | 3.20 | |
| Morrow, Alexander R. | 2021 CA | $575.00 | 5.40 | 5.40 |
| Van Keulen, Lindsay A. | 2019 CA | $625.00 | 236.50 | 236.50 |
| **(3) $613.35 Associate Total (11.74%)** | | | | **436.40** |
| **Other Billing Personnel** | | | | |
| Berggen, Chris R. | NA | $400.00 | 19.80 | 367.90 |
| | | $425.00 | 348.10 | |
| Blandino, Phil | NA | $390.00 | 6.70 | 125.50 |
| | | $425.00 | 118.80 | |
| Hong, Tyrone H. | NA | $260.00 | 69.20 | 69.20 |
| Hudson, Amanda J. | NA | $400.00 | 4.80 | 4.80 |
| Kalman, Seth | NA | $320.00 | 18.70 | 54.30 |
| | | $340.00 | 35.60 | |
| Swanson, Janet | NA | $200.00 | 137.10 | 137.10 |

CONFIDENTIAL

| Timekeeper | Bar Admittance Date | Rate | Hours By Rate | Total Hours Billed |
|---|---|---|---|---|
| Tahbaz, Michael H. | NA | $215.00 | 0.50 | 0.50 |
| (7) $361.51 Other Billing Personnel Total  (20.42%) | | | | 759.30 |
| (16) $690.09 All Timekeepers Total | | | | 3,718.70 |

CONFIDENTIAL

## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW

### Re: Shartsis Friese, LLP
### Rate Adjustment

| Timekeeper (Original Rate/Adjusted Rate) | | Bar Admittance Date | Hours Billed | Original Fees Billed | Adjusted Fees* |
|---|---|---|---|---|---|
| **Partner** | | | | | |
| Cialone, Frank A. | ($875.00\$450.00) | 1994 CA | 832.80 | $741,720.00 | $374,760.00 |
| Ganjam, Sanjeet S. | ($735.00\$375.00) | 2012 CA | 652.70 | $489,433.50 | $244,762.50 |
| Mottahedeh, Rafi W. | ($1,100.00\$375.00) | 2014 CA | 1.80 | $1,980.00 | $675.00 |
| Ward, Robert C. | ($950.00\$450.00) | 1992 CA | 11.50 | $10,925.00 | $5,175.00 |
| **(4) Partner Total** | | | **1,498.80** | **$1,244,058.50** | **$625,372.50** |
| **Counsel** | | | | | |
| Draper, Felicia A. | ($735.00\$400.00) | 2006 CA | 979.30 | $748,510.00 | $391,720.00 |
| Mullin, Mark E. | ($695.00\$375.00) | 2015 CA | 44.90 | $31,505.50 | $16,837.50 |
| **(2) Counsel Total** | | | **1,024.20** | **$780,015.50** | **$408,557.50** |
| **Associate** | | | | | |
| Christopherson, Kathryn S. | ($600.00\$300.00) | 2018 CA | 194.50 | $116,748.00 | $58,350.00 |
| Morrow, Alexander R. | ($575.00\$275.00) | 2021 CA | 5.40 | $3,105.00 | $1,485.00 |
| Van Keulen, Lindsay A. | ($625.00\$300.00) | 2019 CA | 236.50 | $147,812.50 | $70,950.00 |
| **(3) Associate Total** | | | **436.40** | **$267,665.50** | **$130,785.00** |
| **Other Billing Personnel** | | | | | |
| Berggen, Chris R. | ($400.00\$175.00) | NA | 367.90 | $155,862.50 | $64,382.50 |
| Blandino, Phil | ($390.00\$175.00) | NA | 125.50 | $53,103.00 | $21,962.50 |
| Hong, Tyrone H. | ($260.00\$175.00) | NA | 69.20 | $17,992.00 | $12,110.00 |
| Hudson, Amanda J. | ($400.00\$175.00) | NA | 4.80 | $1,920.00 | $840.00 |
| Kalman, Seth | ($320.00\$175.00) | NA | 54.30 | $18,088.00 | $9,502.50 |
| Swanson, Janet | ($200.00\$175.00) | NA | 137.10 | $27,420.00 | $23,992.50 |
| Tahbaz, Michael H. | ($215.00\$175.00) | NA | 0.50 | $107.50 | $87.50 |

CONFIDENTIAL

| Timekeeper (Original Rate/Adjusted Rate) | Bar Admittance Date | Hours Billed | Original Fees Billed | Adjusted Fees* |
|---|---|---|---|---|
| (7) Other Billing Personnel Total | | 759.30 | $274,493.00 | $132,877.50 |
| (16)  All Timekeepers Total | | 3,718.70 | $2,566,232.50 | $1,297,592.50 |

| | |
|---|---|
| Original Fees Billed | $2,566,232.50 |
| Adjusted Fees Billed | $1,297,592.50 |
| **Rate Adjustment** | **$1,268,640.00** |
| Avg. Hourly Rate for Adjusted Fees | $348.94 |

# CONFIDENTIAL
## PEIFFER WOLFE CARR KANE CONWAY & WISE V. VALLEY FORGE INSURANCE FEE REVIEW
### Re:  Shartsis Friese, LLP
### Costs Billed Summary

| Cost Description | Total |
|---|---|
| BPM, LLP | $23,495.00 |
| Cimplifi | $18,829.50 |
| Digital Mountain, Inc. | $8,150.00 |
| Digital One Legal Solutions | $18,003.07 |
| Federal Express | $477.93 |
| File & ServeXpress, LLC | $956.25 |
| Filing Fees | $66.50 |
| GCA Law Partners LLP | $4,153.50 |
| JAMS | $25,475.00 |
| Lexis | $5,696.79 |
| Meal Expense | $227.47 |
| Messenger | $10.00 |
| Nationwide Legal, LLC | $1,116.00 |
| PACER | $12.40 |
| Purchase - Hard Drive | $456.07 |
| Supplies | $60.13 |
| System One Holdings LLC | $3,784.59 |
| Taxi | $193.15 |
| Trial Materials | $221.60 |
| UPS | $37.39 |
| Westlaw | $2,736.90 |
| **Total** | **$114,159.24** |

CONFIDENTIAL

# EXHIBIT 6

CONFIDENTIAL

# Report Use Considerations

**2023 Real Rate Report**

- Examines law firm rates over time
- Identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)
- Itemizes variables that drive rates up or down

All the analyses included in the report derive from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information, along with the ranges of those rates and their changes over time, highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals.

Clients might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether to modify their pricing approach.

**Some key factors[1] that drive rates[2]:**

**Attorney location** - Lawyers in urban and major metropolitan areas tend to charge more when compared with lawyers in rural areas or small towns.

**Litigation complexity** - The cost of representation will be higher if the case is particularly complex or time-consuming; for example, if there are a large number of documents to review, many witnesses to depose, and numerous procedural steps, the case is likely to cost more (regardless of other factors like the lawyer's level of experience).

**Years of experience and reputation** - A more experienced, higher-profile lawyer is often going to charge more, but absorbing this higher cost at the outset may make more sense than hiring a less expensive lawyer who will likely take time and billable hours to come up to speed on unfamiliar legal and procedural issues.

**Overhead** - The costs associated with the firm's support network (paralegals, clerks, and assistants), document preparation, consultants, research, and other expenses.

**Firm size** – The rates can increase if the firm is large and has various timekeeper roles at the firm. For example, the cost to work with an associate or partner at a larger firm will be higher compared to a firm that has one to two associates and a paralegal.

---

1 David Goguen, J.D., University of San Francisco School of Law (2020) Guide to Legal Services Billing Retrieved from: https://www.lawyers.com/legal-info/research/guide-to-legal-services-billing-rates.html
2 Source: 2018 RRR. Factor order validated in multiple analyses since 2010

CONFIDENTIAL

# EXHIBIT 7

CONFIDENTIAL

# Section I: High-Level Data Cuts

**Cities**
By Matter Type

**2023 - Real Rates for Associate and Partner**                                    **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Richmond VA | Non-Litigation | Associate | 41 | $382 | $539 | $689 | $557 | $505 | $474 |
| Rochester NY | Non-Litigation | Partner | 10 | $414 | $453 | $530 | $477 | $461 | $341 |
| Sacramento CA | Non-Litigation | Partner | 13 | $425 | $527 | $632 | $554 | $534 | $559 |
| | | Associate | 11 | $286 | $353 | $425 | $355 | $341 | $321 |
| Salt Lake City UT | Litigation | Partner | 11 | $348 | $398 | $481 | $398 | $372 | $333 |
| | Non-Litigation | Partner | 43 | $338 | $376 | $471 | $413 | $390 | $363 |
| | | Associate | 12 | $240 | $290 | $300 | $294 | $252 | $247 |
| San Diego CA | Litigation | Partner | 42 | $278 | $438 | $551 | $533 | $533 | $572 |
| | | Associate | 28 | $170 | $240 | $302 | $298 | $271 | $258 |
| | Non-Litigation | Partner | 75 | $385 | $495 | $944 | $655 | $703 | $672 |
| | | Associate | 54 | $226 | $336 | $420 | $359 | $375 | $378 |
| San Francisco CA | Litigation | Partner | 115 | $436 | $750 | $1,124 | $801 | $744 | $712 |
| | | Associate | 76 | $341 | $450 | $718 | $537 | $523 | $517 |
| | Non-Litigation | Partner | 173 | $563 | $796 | $1,035 | $812 | $769 | $755 |

CONFIDENTIAL

# Section I: High-Level Data Cuts

## Cities
By Years of Experience

**2023 - Real Rates for Associate**                               **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|
| **Portland OR** | 3 to Fewer Than 7 Years | 34 | $358 | $410 | $448 | $402 | $389 | $335 |
| | 7 or More Years | 54 | $384 | $476 | $519 | $462 | $462 | $402 |
| **San Francisco CA** | Fewer Than 3 Years | 21 | $432 | $474 | $527 | $488 | $478 | $381 |
| | 3 to Fewer Than 7 Years | 30 | $360 | $500 | $789 | $571 | $503 | $471 |
| | 7 or More Years | 43 | $404 | $517 | $733 | $589 | $553 | $557 |
| **San Jose CA** | 7 or More Years | 17 | $500 | $600 | $1,006 | $787 | $686 | $653 |
| **Seattle WA** | 3 to Fewer Than 7 Years | 14 | $335 | $365 | $432 | $391 | $349 | $329 |
| **Washington DC** | Fewer Than 3 Years | 60 | $432 | $497 | $680 | $556 | $524 | $460 |
| | 3 to Fewer Than 7 Years | 172 | $476 | $617 | $775 | $650 | $573 | $519 |
| | 7 or More Years | 153 | $524 | $699 | $885 | $748 | $720 | $668 |

CONFIDENTIAL

# Section I: High-Level Data Cuts

## Cities
By Years of Experience

**2023 - Real Rates for Partner**                                                    **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|
| Sacramento CA | 21 or More Years | 11 | $456 | $524 | $632 | $562 | $563 | $508 |
| Salt Lake City UT | Fewer Than 21 Years | 17 | $365 | $375 | $412 | $375 | $368 | $334 |
| | 21 or More Years | 22 | $353 | $475 | $533 | $473 | $425 | $392 |
| San Diego CA | Fewer Than 21 Years | 21 | $429 | $477 | $845 | $628 | $603 | $612 |
| San Francisco CA | Fewer Than 21 Years | 69 | $588 | $798 | $1,067 | $830 | $754 | $706 |
| | 21 or More Years | 114 | $580 | $889 | $1,059 | $854 | $803 | $772 |
| San Jose CA | Fewer Than 21 Years | 17 | $736 | $987 | $1,504 | $1,068 | $1,025 | $934 |
| | 21 or More Years | 43 | $688 | $846 | $1,315 | $1,037 | $997 | $991 |
| Seattle WA | Fewer Than 21 Years | 45 | $325 | $543 | $715 | $601 | $530 | $451 |
| | 21 or More Years | 82 | $495 | $616 | $798 | $650 | $629 | $578 |
| St. Louis MO | Fewer Than 21 Years | 22 | $350 | $436 | $498 | $435 | $415 | $424 |
| | 21 or More Years | 46 | $324 | $460 | $583 | $466 | $450 | $434 |
| Tampa FL | Fewer Than 21 Years | 21 | $315 | $348 | $595 | $439 | $428 | $394 |
| | 21 or More Years | 29 | $350 | $540 | $590 | $519 | $485 | $508 |

CONFIDENTIAL

# Section I: High-Level Data Cuts

## Cities
By Matter Type

### 2023 - Real Rates for Associate and Partner

**Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Salt Lake City UT | Associate | 17 | $222 | $277 | $300 | $279 | $255 | $244 |
| San Diego CA | Partner | 97 | $325 | $475 | $885 | $610 | $651 | $640 |
| | Associate | 75 | $224 | $285 | $410 | $336 | $345 | $342 |
| San Francisco CA | Partner | 261 | $500 | $783 | $1,045 | $808 | $760 | $738 |
| | Associate | 189 | $345 | $470 | $691 | $542 | $541 | $552 |
| San Jose CA | Partner | 67 | $684 | $861 | $1,301 | $1,020 | $977 | $957 |
| Seattle WA | Partner | 167 | $455 | $585 | $835 | $640 | $592 | $554 |
| | Associate | 119 | $367 | $457 | $573 | $482 | $429 | $422 |
| St. Louis MO | Partner | 73 | $315 | $436 | $546 | $447 | $425 | $419 |
| | Associate | 17 | $198 | $238 | $250 | $260 | $262 | $253 |
| Syracuse NY | Partner | 10 | $253 | $295 | $350 | $308 | $291 | $239 |
| Tampa FL | Partner | 61 | $345 | $442 | $595 | $493 | $465 | $475 |
| | Associate | 21 | $276 | $300 | $317 | $303 | $302 | $299 |
| Trenton NJ | Partner | 28 | $425 | $545 | $776 | $612 | $556 | $599 |

CONFIDENTIAL

# Section II: Practice Area Analysis

## Insurance Defense – Litigation Only
By City

### 2023 - Real Rates for Associate and Partner

### Trend Analysis - Mean

| City | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|------|---|----------------|--------|----------------|------|------|------|
| **Raleigh NC** | Associate | 19 | $142 | $165 | $170 | $197 | $175 | $191 |
| **Richmond VA** | Partner | 34 | $190 | $195 | $200 | $233 | $301 | $317 |
| | Associate | 24 | $155 | $175 | $200 | $177 | $180 | $181 |
| **Roanoke VA** | Partner | 10 | $164 | $175 | $187 | $187 | $176 | $168 |
| **Salt Lake City UT** | Partner | 21 | $195 | $205 | $246 | $220 | $266 | $205 |
| **San Francisco CA** | Partner | 152 | $220 | $255 | $280 | $317 | $298 | $316 |
| | Associate | 68 | $190 | $210 | $240 | $223 | $224 | $237 |
| **Seattle WA** | Partner | 52 | $213 | $259 | $375 | $326 | $333 | $337 |
| | Associate | 23 | $190 | $200 | $255 | $220 | $219 | $209 |
| **St. Louis MO** | Partner | 41 | $170 | $195 | $197 | $195 | $199 | $186 |
| **Tampa FL** | Partner | 44 | $195 | $215 | $245 | $250 | $204 | $199 |
| | Associate | 45 | $180 | $205 | $260 | $215 | $202 | $197 |
| **Tulsa OK** | Partner | 16 | $162 | $183 | $250 | $206 | $196 | $190 |
| | Associate | 13 | $220 | $250 | $250 | $231 | $228 | $218 |
| **Washington DC** | Partner | 54 | $250 | $524 | $859 | $599 | $625 | $598 |

wolterskluwer.com

CONFIDENTIAL

# Section II: Practice Area Analysis

**Insurance Defense –
Litigation Only**
By Matter Type and YOE

### 2023 - Real Rates for Partner

**Trend Analysis - Mean**

| Years of Experience | Matter Type | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|
| **Fewer Than 21 Years** | Litigation | | | | | | | |
| | | 659 | $175 | $195 | $235 | $235 | $225 | $218 |
| **21 or More Years** | Litigation | | | | | | | |
| | | 1,421 | $175 | $195 | $235 | $223 | $223 | $219 |

CONFIDENTIAL

# Section II: Practice Area Analysis

**Insurance Defense -
Litigation Only**
By Matter Type and YOE

**2023 - Real Rates for Associate**                                                    **Trend Analysis - Mean**

| Years of Experience | Matter Type | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|
| **Fewer Than 3 Years** | Litigation | | | | | | | |
| | | 94 | $162 | $185 | $210 | $198 | $187 | $170 |
| **3 to Fewer Than 7 Years** | Litigation | | | | | | | |
| | | 238 | $162 | $185 | $225 | $257 | $224 | $213 |
| **7 or More Years** | Litigation | | | | | | | |
| | | 373 | $160 | $180 | $206 | $216 | $210 | $207 |

CONFIDENTIAL

# Section II: Practice Area Analysis

### Insurance Defense – Litigation Only
By Firm Size and Matter Type

**2023 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| Firm Size | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| 50 Lawyers or Fewer | Litigation | Partner | 1,398 | $170 | $185 | $220 | $219 | $220 | $210 |
| | | Associate | 949 | $150 | $165 | $190 | $174 | $172 | $170 |
| 51-200 Lawyers | Litigation | Partner | 802 | $180 | $195 | $225 | $221 | $214 | $215 |
| | | Associate | 594 | $160 | $170 | $190 | $180 | $177 | $181 |
| 201-500 Lawyers | Litigation | Partner | 373 | $225 | $245 | $293 | $323 | $305 | $325 |
| | | Associate | 227 | $190 | $220 | $240 | $242 | $235 | $231 |
| 501-1,000 Lawyers | Litigation | Partner | 83 | $230 | $265 | $435 | $406 | $422 | $424 |
| | | Associate | 81 | $200 | $225 | $585 | $402 | $390 | $340 |
| More Than 1,000 Lawyers | Litigation | Partner | 32 | $660 | $1,050 | $1,306 | $1,022 | $1,011 | $961 |
| | | Associate | 53 | $495 | $725 | $965 | $717 | $650 | $611 |

CONFIDENTIAL

# Section IV: In-Depth Analysis for Select US Cities

## San Francisco CA
By Practice Area and Firm Size

### 2023 - Real Rates for Associate and Partner

**Trend Analysis - Mean**

| Practice Area | Firm Size | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Commercial | 501-1,000 Lawyers | Partner | 11 | $575 | $736 | $998 | $809 | $938 | $873 |
| | | Associate | 17 | $360 | $432 | $674 | $547 | $586 | $518 |
| Corporate: Other | 501-1,000 Lawyers | Partner | 24 | $770 | $995 | $1,232 | $1,059 | $990 | $894 |
| | More Than 1,000 Lawyers | Partner | 13 | $931 | $1,080 | $1,305 | $1,147 | $1,102 | $1,039 |
| Corporate: Regulatory and Compliance | More Than 1,000 Lawyers | Partner | 11 | $746 | $829 | $941 | $847 | $781 | $813 |
| | | Associate | 11 | $456 | $503 | $683 | $560 | $519 | $545 |
| Insurance Defense: Other | 201-500 Lawyers | Partner | 38 | $255 | $280 | $285 | $370 | $318 | $356 |

wolterskluwer.com

CONFIDENTIAL

# EXHIBIT 8

CONFIDENTIAL

True ⓥ Value
Partnering Institute

Thomson Reuters Institute

# Law firm rates in 2023

What's working, what isn't, and how to move forward into 2024

 THOMSON REUTERS®

**CONFIDENTIAL**

# Law firm rates in 2023

For most of the past decade, the growth in hourly rates for attorney time has been one of the key drivers of the growth of law firm profitability. In fact, when applying the classic *RULES* framework for professional services firms[1] — which stands for *Rates*, *Utilization*, *Leverage*, *Expenses*, and *Speed* of billing — it is rates, and more broadly their impact on driving revenue, that has been the most highly functional lever for law firms to positively influence their profit outlook.

This special report from the Thomson Reuters Institute and the True Value Partnering Institute, offered at a time when many firms are engaging in rate setting for the coming year, will explore not only the current and historical performance of law firm rates, but will also provide insight into other potential pitfalls that may negatively impact the growth of law firm revenue, and ultimately, profitability.

## Today's growth in a historical context

Before we can illustrate how significant the recent growth in law firm rates has been, it is important to set historical context.



Figure 1: Historical worked rate firm progression

Year-over-year change

Lawyers  Billable time type: non-contingent matters

Source: *Thomson Reuters 2023*

CONFIDENTIAL

Law firm rates in 2023  3

Prior to the advent of the Global Financial Crisis (GFC), law firm worked rates[2] were growing by an average exceeding 6%. There was understandable tumult from the GFC, but rate growth soon stabilized into a pattern of consistent growth ranging from 2.4% to 4.0% all the way until the start of 2020.

It was really the start of the pandemic that marked a turning point. The second quarter of 2020 saw the average law firm post worked rate growth in excess of 5% for the first time since the GFC.[3] Rates cooled again somewhat in 2021 before a dramatic acceleration into 2022 that has continued through to the present.

## Rates performance in the post-pandemic era

While rates have long been a key area of focus for law firms, the importance of rate growth has been thrown into particularly sharp relief in the past few years. This newfound urgency can be explained in one word: *inflation.*

Figure 2:



Source: Thomson Reuters 2023

Starting in 2021 and continuing through 2022, the market experienced a phenomenon it hadn't seen for as long as this data has been tracked. The typical advantage that worked rates had enjoyed over inflation[4] disappeared for a while; and in fact, worked rates and inflation actually inverted, meaning that the effective real value of law firms' rate increases was essentially non-existent.[5]

2   For the purposes of this report, worked rates refer to the agreed upon rates that clients agree to pay a law firm to engage a new matter. Worked rate growth used to be a key indicator of the power of a firm to raise its rates.

3   On that note, it should be seen in 2021 was, at its core, result of time, and a function of where those who were being done by partners rather than more junior lawyers. As the demand to raise rates continue, we saw similar back to lower level headwinds. In 2023, the pace of rate growth continued to cool, though still relative to the advantage.

4   For purposes of this report, we use the metric of Personal Consumption Expenditure (PCE) Core inflation because it is the standard inflation measure in use at the Federal Reserve and because we believe it to be the most reliable indicator of the rate of inflation experienced by law firms as it excludes more volatile aspects of food and energy prices.

5   See, detailed discussion of the cohort and its broader context there; on Inflation and the economy, available at https://www.thomsonreuters.com/news/gwx.

**CONFIDENTIAL**

At the same time, the legal market was experiencing an unprecedented pace of what has been called *demand mobility*.[6] In essence, demand mobility is the shifting of work from one law firm to another, whether as part of a quest for lower costs, greater value, both, or some other advantage. This created a situation in which larger law firms were at risk of losing some share of their client business, while midsize law firms[7] were enjoying an influx of new hours and perhaps were a bit more ready to flex some of their newfound market influence.

This was the backdrop as law firms engaged in their rate-setting exercises for 2023 — and the results are apparent almost immediately.

Figure 2 (*above*) makes it readily apparent that all three segments of law firms felt the need to push the accelerator on their worked rates in 2023. Am Law 100 firms set a new high-water mark for their rate growth in the first half of 2023, with worked rates growing by 7.3% — a marked not topped even in the heady days prior to the GFC.

Likewise, midsize law firms took a more aggressive stance on their rates than at any point since before 2009. These firms grew their worked rates by an average of 5.1% in the first half of 2023, a sharp jump from the 3.8% pace of rate growth for these firms at year-end 2022.

And for their own sake, Am Law Second Hundred firms similarly set a post-GFC benchmark, albeit with a less dramatic jump than their midsize counterparts.

## Figure 3:



Year-over-year change    All segments    ▉ Am Law 100    Am Law Second Hundred    Midsize

Source: Thomson Reuters 2023

6   For purposes of this report, demand (or caseload) is defined as the year-over-year percentage change in the total number of billable hours worked by the law firms in the database...

7   The midsize law firm segment...

CONFIDENTIAL

Even as 2023 rate schedules took effect, the demand picture continued to shift. Midsize law firms continued to enjoy the benefits of mobile demand, growing their average demand by 2.8% while the other two segments struggled to find growth.

Revenue potential — and therefore profit potential — grew in each segment through the mid-year point, but for different reasons. Revenue potential is tracked via a metric called *fees worked*, an analogue for accrual-basis revenue tracked as the change in the product of hours multiplied by rates.

For both segments of the Am Law rankings, growth in fees worked was dependent entirely on growth in worked rates. Midsize law firms, by contrast, had two factors spurring them on to market-leading growth in fees worked. For these firms, strong growth in both demand and rates put them in a position to capitalize on the potential for increased revenue.

## A variation on the *RULES* and its impact on 2023 and beyond

While rates undoubtedly plays an outsized role in driving law firm profitability under the *RULES* rubric, it seems wise to focus on the broader picture of revenue as a substitute of sorts for the first element of *RULES*.

To be sure, rate growth has been a critical driver of revenue growth for many law firms for much of the post-GFC era, a time marked by relatively minimal demand growth. However, rate growth can prove to be an illusory benefit if law firms are unable to actually capture that growth in rates all the way through the client billing process.

Even though it is most common for us to report growth in worked rates, the Thomson Reuters Institute typically tracks rates at four different stages: standard rates, worked rates, billed rates, and collected rates. The latter two are particularly important to the broader revenue picture.

A law firm's ability to convert its worked rates into the rates actually billed to the client is tracked via a metric known as *billing realization*. Similarly, a firm's ability to convert worked rates into ultimate cash collections is tracked via a metric called *collected realization*.

This latter metric — collected realization against worked rates — obviously has tremendous bearing on a law firm's revenue picture.

CONFIDENTIAL



Figure 4: ....

All segments

*Footnote only, billable time type.*                                     *Source: Thomson Reuters 2023*

For most of the 2010s, collected realization against worked rates hovered between 89% and 90% with a relatively predictable pattern of seasonal fluctuation. Then in mid-2019, collected realization started to tick up consistently above 90%. From early 2020 though early 2022, collected realization consistently improved, only to suddenly sour somewhat in mid-2022 through to the present.

So, what changed?

## Understanding the fluctuations of realization

It is tempting to chalk up the fortunes of realization to the whims and behaviors of clients. After all, the legal media is replete with stories of clients pushing back on law firm rates, particularly as many law firms continue to push aggressive rate growth. However, this explanation overlooks a likely more impactful reason.

To better understand the deeper dynamics behind realization, we must more fully explore the broader spectrum of realization.

When looking at declining realization, it is easy to ask, "Why are clients paying less of the rate they agreed to pay?" Examining both billing and collected realization begs another question: "What if the clients never even get a *chance* to pay the rate they agreed to pay?"

Put simply, clients will never be able to pay 100% of the rate they agreed to pay if they're only billed 90% of that agreed-upon rate. Unsurprisingly, clients will take the amount they're billed and work down from there.

CONFIDENTIAL

Law firm rates in 2023   7



Figure 5:

Lawyers; billable time type; non-contingent matters.

Source: Thomson Reuters 2023

## CONFIDENTIAL

In fact, that appears to be exactly what is happening. Looking at the graphs in Figure 5 (*above*), it's apparent that billing and collected realization tend to travel in rough parallel. There is some periodic variability; but in general, as billing realization improves, so too does collected realization.

In fact, in all three law firm segments, billing realization steadily improved from Q2 2020 through the end of 2021, if not into 2022. It is only after billing realization begins to decline do we notice a commensurate drop in collections. This provides a strong foundation to posit that much of the decline in realization is likely due to patterns and practices within the law firms themselves rather than to external forces.

Without a doubt, clients do push back on the invoices they receive. The key question, however, is whether that is a *primary* driver of declining realization. It appears that, for the most part, the answer to that question is *no*.



Figure 6:

☐ Q1 2022    ▨ Q2 2022    ☐ Q3 2022    ☐ Q4 2022    ☐ Q1 2023    ☐ Q2 2023

Gap between worked and billed realization against standard

Source: Thomson Reuters 2023

**CONFIDENTIAL**

## Explaining the gaps in realization

What Figure 6 (*above*) shows is that the gap between worked rates and billed rates as a function of standard rates[8] has been consistently widening since Q1 2022 for every segment of law firms. Read in conjunction with Figure 5, this explains why we see consistently *declining* billing realization over this same time period.

At the same time, the gap between billed rates and collected rates as a function of standard rates has been mostly consistent, showing that client pushback on billed rates has been likewise consistent. While the Am Law 100 law firms saw a slight uptick in the gap and Am Law Second Hundred firms saw a slight downturn in the gap, neither is large enough to overshadow the much larger trend seen in the gaps between worked and billed rates.

In other words, the decline in realization is happening even before the client is billed.

What drives the gap between worked and billed rates? In short, law firm billing behaviors. The specific answer will likely vary among firms, but the apparent result will turn out to be some combination of a softening of billing discipline following the period of pandemic-era bill hawkishness and an increase in the prevalence of pre-bill write-down activity on the part of law firm billing partners.

Notably, discounts offered to engage work don't enter into this particular analysis because those discounts are already factored into the worked rate before the analysis of the gap between worked and billed rates.

It becomes clear that the decline in realization — rather than being driven by client negotiations or pushback — is much more closely related to law firm behavior.

There is good news and bad news in this finding. The bad news is that much of the decline in realization for law firms, and the accompanying negative effect on the *revenue* portion of our *RULES* analysis, has been due to self-inflicted damage on the part of law firms. The good news, on the other hand, is that this

> *Much of the decline in realization for law firms has been due to self-inflicted damage.*

damage is much easier to counter given that it's easier to influence internal behaviors rather than external ones. Put another way, it is far easier for a law firm to place revenue-positive influence on its own lawyers than on its clients.

Convincing clients to act differently when it comes to how they handle their invoices is a daunting task; but convincing lawyers to alter their billing behaviors is much more readily accomplished. In fact, it was done with great success as recently as just a few years ago when realization trended upwards.

---

[8] *[footnote text illegible]*

CONFIDENTIAL

We want to be careful here to state that we are not advising law firms to bill for low-value work that might incur friction with the client. Rather, improving billing practices is a fairly intricate task involving some key steps, including:

coaching partners and rising partners on how their law firm prices their services — not just the rate structures but the value proposition behind those rates so those partners responsible for reviewing pre-bills feel more confident standing behind them;

· ensuring that law firms begin closely tracking not only how much time is being proactively written down at the pre-bill stage, but also *why* that time is being written down;

conducting a thorough analysis of the *why* behind the write-downs to identify patterns of tasks or work types that are more susceptible to being written down; and

looking back at past periods of improved realization to identify both qualitative and quantitative differences in billing practices to determine what changed and how to course correct.

To help with these items, many law firms now employ pricing professionals tasked specifically with helping to improve firm profitability and lawyer understanding of how the firm prices its legal services. The expertise of these professionals can be leveraged to help accomplish these goals and more.

Regarding the third bullet point specifically — areas particularly prone to write-downs are ripe for process improvement. There is a reason this work is being written down more frequently. Lawyers should evaluate how much of the work that is subject to frequent write-downs is really adding value to the outcome for the client. Chances are, it is relatively low-value-added work to begin with. (This is a phenomenon the Thomson Reuters Institute has studied extensively for years.[9])

Among the most common causes of write-downs on a given matter are "correcting or revising an associate's work" and "getting up to speed," whether on a new matter, area of law, or jurisdiction, according to our research conducted of law firm partners and associates. These are not examples of high-value-added work done for a client, rather, they are opportunities to improve how the law firm arrives at final work product by eliminating unproductive worked hours.

Indeed, such improvements can be done without negatively impacting the firm's revenue potential since the time goes largely unbilled anyway. Instead, addressing these issues at their root cause can improve the firm's revenue potential simply because eliminating work that will never be billed anyway creates capacity for more work that will ultimately be billed and paid for.

---

9. [citation text illegible]

**CONFIDENTIAL**

## Figure 7: ... ... ... ... ... ... ... ... the improvement

Closing the gap between worked and billed rates, and the improvement in
collected realization that would potentially follow, can have a notable impact on
law firm revenues.

Let's construct a hypothetical comparison for Law Firm A:

### 2022                                    2023



Average worked rate                    Average worked rate

                                       *based on average worked rate growth YTD*



Collected rate                         Collected rate

*based on Q1 2022 realization rate of 91.3%*    *based on current realization rate of 90.3%*

*Worked-to-collected*                  *Worked-to-collected*
*gap:*                                 *gap: $51.25*

The higher collected rate seems like an improvement,
*but the worked-to-collected gap is widening*



Every 0.1% improvement in realization in our hypothetical
results in additional cash collections of $5.29 per hour

This might seem minimal, but...

Law Firm A has:
100 lawyers x 1700 hours per lawyer x $5.29 per hour

... ... ... ... ... ... ... ...

*Source: Thomson Reuters 2023*

**CONFIDENTIAL**

### The bottom line (pun intended)

Law firms have been quite successful since 2022 at pushing more aggressive worked rate growth, putting them on solid footing for improving revenue outlooks. What likely started as an exercise to try to combat inflation now has set what is looking more like a new standard for rate growth.

However, the opposite end of the revenue picture in our revised *RULES* analysis also needs attention. Declining realization is casting a shadow on an otherwise trendsetting performance.

There may well be a case to be made for pushing for more aggressive rate growth with the intent of sacrificing some small portion of realization. Indeed, looking at Figure 5, that appears to have been a strategy for the Am Law 100 for some time.[10]

> *There may well be a case to be made for pushing for more aggressive rate growth with the intent of sacrificing some small portion of realization.*

Firms looking to take such a strategy must approach it carefully, however. While it is a logical strategy to pursue, it should pursued intentionally and managed carefully. Otherwise, law firms run the risk that more realization may be sacrificed than would otherwise be desirable, particularly if the billing and collection processes are not being closely monitored.

Similarly, just as law firms are setting new standards for rate growth, they should be aware of the standards they are setting for realization. Should rate growth experience another period of cooling, law firms would naturally much rather capture upwards of 91% of the cooler rates rather than 89%.

Law firms that fail to focus on this latter factor run the risk of losing grasp of their most impactful tool — a fuller understanding of rates, from billing to collection — to most positively influence profitability.

10. As the discussion in Figure 5 indicates, Am Law 100 firms have sacrificed more in realization in recent years. At the same, Am Law 100 firms have held their realization higher than the rest of the Am Law 200.

CONFIDENTIAL

## Thomson Reuters

Thomson Reuters is a leading provider of business information services. Our products include highly specialized information-enabled software and tools for legal, tax, accounting and compliance professionals combined with the world's most global news service – Reuters.

For more information on Thomson Reuters, visit tr.com and for the latest world news, reuters.com.

## Thomson Reuters Institute

The Thomson Reuters Institute brings together people from across the legal, corporate, tax & accounting and government communities to ignite conversation and debate, make sense of the latest events and trends and provide essential guidance on the opportunities and challenges facing their world today. As the dedicated thought leadership arm of Thomson Reuters, our content spans blog commentaries, industry-leading data sets, informed analyses, interviews with industry leaders, videos, podcasts and world-class events that deliver keen insight into a dynamic business landscape.

Visit thomsonreuters.com/institute for more details.



## True Value Partnering Institute

The True Value Partnering Institute is dedicated to the learning, networking and professional advancement of legal business professionals that take the lead in driving value. Members are placed into cohorts which "meet" virtually each month and are eligible to participate in cross-cohort groups that collectively explore specialty topics of interest.

Learn more at: https://tvp-institute.com.

## Authors

William Josten
*Legal Marketplace Innovations Strategist*
Thomson Reuters Institute
William.Josten@thomsonreuters.com

Brent Turner
*Director*
Thomson Reuters Advisory Services
Brent.Turner@thomsonreuters.com



Thomson Reuters 2021

CONFIDENTIAL

Directory

Logins  Support  Contact





## Law firm rates — what firms charge for legal work performed — are a strong driver of profitability, yet too many firms don't pay enough attention to the delicate dance of setting rates with clients

For most of the past decade, the growth in hourly rates for attorney time has been one of the key drivers of the subsequent growth in law firm profitability. In fact, 2023 has seen record-setting growth in attorney rates, surpassing even the heady days of the seller's market for legal services that existed prior to the credit crisis of the late 2000s. Yet despite such remarkable progress, potential pitfalls still remain, according to the latest report from the Thomson Reuters Institute, *Law firm rates in 2023: What's working, what isn't, and how to move forward in 2024.*

At the outset, it's important to understand exactly what rates we're talking about. We track law firm rates in four different ways:

    1. *Standard rates* — the headline rates law firms advertise, similar to the rack rate at a hotel

Privacy - Terms

CONFIDENTIAL

2. *Worked rates* — the rates clients agree to pay to engage a law firm on a new matter, typically reflecting a discount off the standard rate

3. *Billed rates* — the rates clients are actually billed by their law firm, after pre-bill adjustments by the law firm called *write-downs*

4. *Collected rates* — the rates clients actually end up paying after reviewing the invoice and making adjustments of their own, commonly called *write-offs*

We most commonly report on worked rates, as that category reflects both the efforts made by law firms to boost their rates as well as clients' willingness to absorb increases.

Through this lens, 2023 has been a remarkable year. All three law firm segments we track — the Am Law 100, Am Law Second Hundred, and Midsize (outside the Am Law 200) law firms — have seen the pace of rate growth far exceed the growth in worked rates even from the end of last year.



Figure 2: worked rate growth by segment

*Source: Thomson Reuters 2023*

Of particular note, through the mid-point of 2023, Midsize law firms had grown their worked rates at a pace 1.3 percentage points higher than their 2022 average. And the Am Law 100 set a new benchmark for rate growth, as their average worked rates grew by 7.3%, a pace not matched in the history of our data set, even prior to 2007.

It would seem that law firms are enjoying essentially unprecedented success in growing their rates. Given that law firm rates have been the single most important driver of increased law firm profitability for most of the past decade — other drivers such as leverage, productivity, or expenses have either remained flat in terms of profitability motion or have actually produced a drag — law firms appear to be poised for another banner year in terms of profitability.

However, that's not the complete picture.

Indeed, rates are a crucial driver of profitability, but only so far as they drive law firm *revenue*. The other key components to revenue are the number of hours a law firm is able to sell — measured by a metric known

**CONFIDENTIAL**

as *demand* — and the percentage of the worked rate that is converted to a collected rate — measured by a metric known as *realization*. Both of these metrics serve to tell a slightly different tale for law firm profit potential.

Indeed, law firm demand has undergone a pattern of shifting, known as *demand mobility*, for much of the past two years, a trend that has favored Midsize law firms at the expense of their larger counterparts. At the same time, every law firm segment has seen their realization percentages decline for at least five consecutive quarters, cutting into profit margins and tarnishing an otherwise strong picture for law firm profits.

This special report from the Thomson Reuters Institute and the True Value Partnering Institute, offered at a time when many firms are engaging in rate setting for the coming year, explores not only the current and historical performance of law firm rates, but also provides deeper insight into these and other potential pitfalls that may negatively impact the growth of law firm revenue, and ultimately, law firm profitability.

*You can download a copy of the Law firm rates in 2023 report by filling out the form below:*

Name *(Required)*

First                                                          Last

Job Title *(Required)*

Company *(Required)*

Email *(Required)*

Country or Province *(Required)*

Select Country                                                                                    ∨

Organization Type

Select Organization Type                                                                        ∨

Zip or Postal Code

[ ] Check here to receive emails about Thomson Reuters products, news, or services that may interest you.

CONFIDENTIAL

BILLING & PRICING      CORPORATE LAW DEPARTMENTS      CORPORATES      LEGAL DEMAND

LEGAL PRACTICE MANAGEMENT      LEGAL REPORTS      LEGAL SPENDING      TRUE VALUE PARTNERING INSTITUTE

## Solutions



## Strategic Insights

Contact us for a free demo and discover how you can reliably monitor your firm against its peers and stay on top of clients' needs to identify new or expanding opportunities that might emerge in 2023 and beyond.

## Featured event

NOV 01, 2023

# The 2023 Law Firm Financial Performance Forum

In November 2023, the Thomson Reuters Institute is proud to present the 2023 Law Firm Financial Performance Forum in the heart ..

Related posts



## Pricing AI-driven legal services: Alternative fee arrangements are almost inevitable

3 Jun 2024 · 6 minute read

CONFIDENTIAL



## Forum: Making alternative fee arrangements work in M&A

30 May 2024 · 9 minute read



## Pricing AI-driven legal services: It's not a question of cost recovery

15 May 2024 · 8 minute read

Law firm rates in 2023: A new report examines the good, the troubling, and what 2024 may hold - Thomson Reuters Institute

CONFIDENTIAL