UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PEIFFER WOLF CARR KANE                CIVIL ACTION NO.
CONWAY & WISE LLP                     2:23-CV-06235

                                      JUDGE SUSIE MORGAN

VERSUS

                                      MAG. JUDGE EVA J.
                                      DOSSIER

VALLEY FORGE INSURANCE
COMPANY                               SECTION: "E"(3)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION

BY VIDEOCONFERENCE OF:

ANDRE E. JARDINI

Thursday, October 24, 2024

3:03 p.m. (CST)

Reported by:

YOLANDA J. PENA, RPR
Certified Court Reporter
No. 2017002 in and for the
State of Louisiana

Page 1

APPEARANCES

FOR THE PLAINTIFF:
PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
(BY: DANIEL CENTNER, ESQ.)
(BY: ADAM WOLF, ESQ.)
935 GRAVIER STREET, SUITE 1600
NEW ORLEANS, LOUISIANA 70112
(504) 605-2234
dcentner@peifferwolf.com
awolf@peifferwolf.com

FOR THE DEFENDANT:
PHELPS DUNBAR LLP
(BY: JEREMY T. GRABILL, ESQ.)
365 CANAL STREET, SUITE 2000
NEW ORLEANS, LOUISIANA 70130
(504) 566-1311
jeremy.grabill@phelps.com

Page 2

INDEX

PAGE

LIST OF EXHIBITS.....................................4

STIPULATION............................................5

EXAMINATION BY:

  MR. CENTNER.......................................6

REPORTER'S PAGE...................................294

REPORTER'S CERTIFICATE..........................295


LIST OF EXHIBITS


Exhibit No. 1.........................................64
  (Expert Report of
  Andre E. Jardini)

Exhibit No. 2.........................................65
  (Expert Report of
  Richard M. Pearl, 9/6/24)

Exhibit No. 3.........................................43
  (NALFA email, 10/23/24,
  The Wall Street Journal Cites
  NALFA Hourly Rate Data)
Exhibit No. 4.........................................155
  (Declaration of Andre E.
  Jardini, Hung V. Vu, D.D.S.,
  10/26/22)

Exhibit No. 5.........................................165
  (Register of Actions)
Exhibit No. 6.........................................225
  (2023 Real Rate Report)

Page 3

LIST OF EXHIBITS (Continued)


Exhibit No. 7.........................................231
  (Expert Report of
  Andre E. Jardini,
  AKH Company, Inc.)


Exhibit No. 8.........................................247
  (Declaration of James M.
  Finberg, Oracle America, Inc.)


Exhibit No. 9.........................................254
  (Order Granting Plaintiff's
  Motion for Attorneys' Fees,
  Costs, and Class Representative
  Service Awards)


Exhibit No. 10.......................................256
  (Laffey Matrix)
Exhibit No. 11.......................................282
  (Declaration of Andre Jardini
  in Support of Tsuburaya
  Production Co. Ltd.'s Motion)

Page 4

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.

All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.

Page 5

2 (Pages 2 - 5)

ANDRE E. JARDINI, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CENTNER:

Q. Mr. Jardini, good afternoon. My name is Daniel Centner. I am an attorney at, and also an attorney representing, the law firm Peiffer Wolf Carr Kane Conway & Wise in a pending litigation in the Eastern District of Louisiana against the company named Valley Forge Insurance Company.

Are you generally familiar with that litigation?

A. I am.

Q. Great. Do you understand that you are here to give deposition testimony in connection with that matter today?

A. That is my understanding.

Q. And am I correct that you have been retained as an expert witness on behalf of the defendant, Valley Forge, in this case?

A. I have been.

Q. I obviously have studied the materials that you provided to us. I'm familiar with your background. I know that you're an attorney that's tried lots and

Page 6

lots of cases and, I'm assuming, taken hundreds, if not thousands, of depositions, so I will spare you the usual ground rules that attorneys typically go over.

The one question I will ask you -- and no offense intended. I'm sure you understand where I'm coming from. I need to simply ask it. Are you under the influence of any drugs, alcohol, or medication that could impact the truthfulness or accuracy of your testimony today?

A. No.

Q. Let's see. Are you aware that there's a trial date set in this matter for December 9th of 2024?

A. I am not aware of the trial date. It might be reflected somewhere in the file, but it wasn't of note to me.

Q. All right. As we sit here right now, do you have plans to attend that trial?

A. If asked, I will.

Q. In your own words, what is the subject of your expert testimony in this case?

A. I was asked to look at the attorneys' fees incurred in the defense of two lawyers and the firm that they went to after their departure from the Levin firm and to assess those fees as to reasonableness questions, most particularly appropriate rates in

Page 7

San Francisco.

Q. Did you produce a report in this case?

A. I did.

Q. Did you review that report in preparation for your testimony today?

A. Yes, I did.

Q. Based on that review, sitting here today, do you believe that report is 100 percent accurate?

A. I don't know of any inaccuracy.

Q. That was my next question. Based on that review, there's nothing in the report that jumped out at you that you'd like to change, is there?

A. No, not on my review. I didn't see anything that I would change.

Q. Do you believe that report fully encapsulates the opinions that you intend to offer in this matter?

A. Ultimately, yes, as to appropriate rate. Since I did the report, I've had the opportunity to see Mr. Richard Pearl -- your expert's report and the related documents to that report and to sit in this morning at his deposition, that I have some, maybe, additional thoughts concerning the issues in my report as a result of that information.

Q. You had reviewed Mr. Pearl's report prior to issuing your report in this matter, hadn't you?

Page 8

A. I don't know that that's the case. I don't recall when I first saw it.

Q. We'll get into that more in detail later.

Let me ask you this. You said you may have some additional thoughts concerning the issues in your report as a result of things you observed through or for Mr. Pearl. Can you let us know what those additional thoughts are?

A. Well, the -- one of the criteria used by Mr. Pearl to affirm that the rates actually charged or that appear on the invoices of the two firms involved, the Altshuler firm and the Shartsis firm -- one of the criteria that he uses are the credentials and the trial experience of the lawyers that were involved. And I have determined that the principal lawyers have negligible trial experience, not extensive trial experience.

Q. When you say the "principal lawyers," who are those folks that you are referring to, sir?

A. The main partners who billed the most at the time. Let me give you the names. At Altshuler, it's James Finberg and Stacey Leyton who billed most of the partner hours. And at Shartsis, it is Frank Cialone or "Cialone," C-i-a-l-o-n-e, and Sanjeet, S-a-n-j-e-e-t, Ganjam, G-a-n-j-a-m, who are the two principal partners

Page 9

3 (Pages 6 - 9)

who billed the most time.

Q. And I believe you indicated before that you have determined that the four individuals you just referenced have negligible trial experience. Is that your testimony?

A. Yes, relatively modest trial experience. Anybody can look it up on Westlaw "Jury Verdicts and Settlement" section under their names, and it'll tell you most every case that you've ever tried. I guarantee you this, if you lose a case, it'll show up there. But -- but aside and apart from that, it's my experience that your trial experience and settlement experience shows up in that -- in that database, and as to these lawyers, it did. But it didn't show any extensive trial experience.

Q. But let's go one lawyer at a time. Let's start with Mr. Finberg. All right? The trial experience that you were able to see for him on the Westlaw tool that you're referencing, how many trials did you see that he had participated in?

A. He had tried one case according to that database. And though 17 hits or items come up, 16 of them are class action settlements, not trials. One case was a class trial that he tried and lost, and that's the only trial that comes up. And that was the

Kelley vs. Board of Trustees of California State University, and that was in 2015 where he -- he along with a number of other lawyers were the plaintiff lawyers, and the defense got a judgment in their favor. That's the only case that shows up.

Q. Mr. Jardini, let me ask you. What are you looking at on your desk there?

A. A list of the cases that I printed out. I didn't think I'd be able to go back and forth to Westlaw while you were asking me questions, so I printed out the section that I'm talking about.

Q. Sure. Can you hold that up so we can take a quick look at it, please?

A. Does this help?

Q. Yes and no. It comes in and out. There we go. I see "Jury Verdicts and Settlements." Then I see some notes on there. Obviously, you're well familiar with this. During a break, I'd like you to provide that to us, please.

A. Sure. No problem.

Q. Okay. Do you have access to a scanner where you're at right now, sir?

A. I'm in my office. Someone will be able to figure it out.

Q. Wonderful. Thank you. Perhaps if you just

email that to your counsel, and he can share that with us?

A. Be happy to.

Q. All right. So we were talking about the negligible trial experience, I believe, that you ascribed to the four principal billing attorneys at issue in this matter. We spoke about Mr. Finberg. What about Ms. Leyton?

A. Ms. Leyton shows one case on the database. I didn't print it out, but you can look it up under "Stacey Leyton." She was third chair in that case and achieved a verdict of $4,358, obviously not a very big case. It's -- it shows, I think, lack of real world experience and trial experience. That's what I have for her.

Q. Great. The third lawyer you referenced, I think this would be the gentleman at the Shartsis firm now, Mr. Cialone?

A. Mr. Cialone at Shartsis has two trials that show up. The first was a case that he brought on behalf of his own firm, so he was a lawyer for himself in essence, against a -- it had to do with employee benefits against a financial company. And he did win, in 2009, 1.3 million on behalf of himself and his firm. And then the second case is a case that he

lost in 2008. He was defending. A free clinic sued his client, which was some kind of a real estate group, for not performing under the partnership interest. Anyway, he lost the case. And that was in 2008. So those are just the two cases that Mr. Cialone had.

Q. And then the final attorney that you referenced was Sanjeet, I believe, at Shartsis Friese?

A. Sanjeet Ganjam. Ganjam, I think, is the last name. And he had one case as the second chair, and he had a plaintiff verdict of $194,508 for his client. They -- it was against a company that failed to install a wireless connection that they were supposed to do. That wasn't much of a case, but that's the case he had.

Q. Great. Let's see how my memory is, sir. I believe I saw that you have tried -- was it 55 jury cases?

A. Yes.

Q. How many -- if you run that report on yourself, do all 55 of those cases come up?

A. Well, they come up. Some of them duplicate, and you probably -- and sometimes it comes up with my exert witness services. Probably you'd get 85 things if you put my name in.

Q. Right.

A. If you have extensive trial experience, it'll

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

be there.

Q. The 85 hits that come up, will that encompass all 55 of the jury cases that you've tried?

A. I haven't tried to do a line by line. I would expect it would; though, I've been doing it for 45 years, and a number of those trials took place before there were computers at all, and so it's possible that early trials aren't there.

Q. Do you have an understanding of what year the computers would have started picking up jury -- jury trials and reporting them to this database?

A. I don't know. In the '90s, I suppose. Early '90s, maybe. That would be -- you'd have to also know when Westlaw started reporting that, but it goes back, you know 30 -- 30 years, let's say. I'm not sure.

Q. Do you know when Jim Finberg started trying cases?

A. I don't know when he started trying cases.

Q. Do you know what data -- which datapoints or data sources this Westlaw report pulls from?

A. Some of it is reported; I know that. And some of it is available -- they scour courts and records for their data in a -- in a systematic way that I don't understand. But it's -- it's not haphazard; it's a careful recitation of what they -- attempting to sell

Page 14

to us as lawyers when they bought their service.

Q. This methodology you're describing, is that something you have personal knowledge of, or are you just surmising what you believe their process may be?

A. I don't have personal knowledge, but I know, from doing some test checks on -- on this site, that it's accurate. For instance, I have a partner that had tried, I'm going to say, 135, maybe 150 cases. And when you run his name, they'll be there.

Q. Does this pick up jury trials and also bench trials, or is it limited to one or the other?

A. "Jury Verdicts and Settlements" is the name, and I think that's what it picks up, jury verdicts and settlements.

Q. So is it your testimony, then, that based off of that, you believe collectively Mr. Finberg, Ms. Leyton, Ms. Cialone, and Sanjeet have no settlements in -- was it three jury trials between them? Is that what you're seeing on that database?

A. No. There's numerous settlements, certainly with Mr. Finberg. He's a plaintiff-side class action lawyer, and those cases settle. That's how they're resolved. Almost none of them go to trial. I did plaintiff-side class action work for 20 years before I hung up my shoes about last year. So I never tried a

Page 15

single one, but two of them I supervised did go to trial. But most of them don't.

And I would say it's almost universally true that once there's a class certification ruling, it determines the case, and the case is settled. So there are -- there are reports of settlements, but my approach was to understand what Mr. Pearl might possibly have been meaning when he said they should get a higher rate because of their trial experience, and then when I looked into it, I found they really don't have much in the way of trial experience.

Q. Did any -- interesting.

Did anything else new come out of your review of Mr. Pearl's deposition today?

A. I thought he was underwhelming on the Real Rate Report. He just had two numbers from a rather comprehensive report from 2023, which is the last available report. And then without saying exactly why he chose the third quartile rate -- largely, I think, because it matched, though it was slightly lower than the -- than the rates by the Altshuler firm. I think you have to look at the data much more carefully than he apparently did.

Q. So we started this discussion by me asking you if you had any additional opinions to offer in this

Page 16

matter beyond those that were offered in your report. And you've indicated now that you believe that the four principal partners on the case, two representing Peiffer Wolf and the two representing Rachel Abrams and Brian Perkins, have negligible trial experience.

That's one of your new opinions, correct?

A. As reported in Westlaw "Jury Verdicts and Settlements" site, yes.

Q. Great. And then the other new opinion you have is that Mr. Pearl is underwhelming. Is that what I understood?

A. I don't think he used the data that was available under the Real Rate Report, and he didn't have credible or really any reasons for choosing the third quartile. The data is broken up by first quartile median and third quartile. Third quartile means that 75 percent of the rates are lower than that, meaning attorneys that fit those criteria -- capable, good attorneys that fit those criteria are having -- have a lower rate. So you have to decide how you're going to use the data, and he did it in a very cursory way, it seemed to me.

Q. Any other opinions besides those that you've just referenced to us, new opinions you've formed since you issued your rate report in this matter?

Page 17

5 (Pages 14 - 17)

A. Yeah. In his -- in his report, he talks about Kang vs. Wells Fargo as supportive of the rates and makes a special point. But it's -- it's a consumer class action, and it brings out the point that class actions have a very different focus on rates than those cases where attorneys bill by the hour to paying clients. Class actions on the plaintiff side is what I'm talking about.

But on the plaintiff side, typically -- and these are lawyers Finberg and Leyton. They have time at Leif Cabraser, you know, which is one of the big plaintiff-side class action firms in the nation. And they settle a case -- let's just pick a number -- for $40 million, and they have big settlements.

And then the question of fees has to be addressed because the court has to approve fees because it comes out of the class settlement. And the way to do that is to claim that you get an appropriate percentage of the fees. The courts in California, at least many of them, now want what they call a lodestar cross-check. That is, what are your rates, and what are the number of hours you have? And then that can be moved one way or another, usually up, by a multiplier.

Anyway, the information that's derived from that process about rates is -- is not in any way,

Page 18

shape, or form the same as what paying clients pay to hourly lawyers. And to use the rates in a consumer class action settlement as justifiable -- justifying rates that should -- that would be paid by a paying client in an hourly case, I think, is just a mismatch of grotesque proportions.

Q. We'll, get more into that later, I think. There's a lot to unpack there.

But for now, suffice to say that the third new opinion you have to offer is that Mr. Pearl's reliance on consumer class actions is a comparator for determining reasonable fees in this case is inappropriate?

A. The one that he made a special case for, Kang vs. Wells Fargo, is an Altshuler case. He uses it to support their rates. Their rates in any of their class action work are not in any way informative of what would be an appropriate rate by an hourly charging attorney.

Q. Let's probe on that for just a moment, I guess. We can -- we can jump ahead.

Why do you say they're not in any way informative of what an appropriate rate would be by an hourly charging attorney?

A. The rates, and the high rates that are claimed

Page 19

here, in an ordinary circumstance, are the subject of negotiation between a law firm and their client. Usually, these rates are at the biggest firms and for the largest clients, and then those rates are applied in a billing process where there's many checks and balances as to what would be reasonable and what would be paid.

In a class action context, none of that exists, so there's no pushback on rate to anybody other -- if the court approves it, it's fine, and there's nobody to say it's too high. I have appeared in those circumstances on occasion, if retained by a defendant, to comment on these points.

But in any event, there's no pushback on the number of hours that are charged or how they were spent. And typically after a settlement, there's an agreement with the defendant that they will not challenge the fees, so it's -- it's a one-way road there for the fees without any resistance. In some cases, the fees are in addition. That's a minority of cases.

But the cases we're talking about, the settlements encompass safe passage agreements as to fees, so nobody is going to be challenging the rate or the hours. That process is not determinative of rates

Page 20

and hours; it's simply a cross-check on the amount of money that would be taken out of the settlement as a percentage. If you're asking for 33 percent, is that appropriate or not? The court can determine. The court may not even want to look at rates and hours; some do. It's just a cross-check to determine that there's not a windfall in fees.

So it's not the same thing. It shouldn't be seen as the same thing. One cannot validate the other. It's not we're all, you know, fishing in the same pool for the same fish; it's completely different. It's a different pond entirely.

Q. I get it. That was thorough. Thank you.

A minute ago, you referenced that -- you said nobody is pushing back on these. Correct me if I'm wrong. But isn't the judge ultimately tasked with approving the fee requests that are made by the plaintiff lawyers in these class action cases?

A. Yes, the judge is. But you have to recognize that these are busy jurists who aren't doing line item reviews of billings and going back and checking rates and so on. They have a sense of what the value is. If your percent -- my experience as a plaintiff lawyer in those cases, if your percentage is appropriate -- one-third, 25 percent, 40 percent, whatever it may

Page 21

6 (Pages 18 - 21)

be -- then it won't make that much difference what the -- what the "rate times hours" number turns out to be. You would be asking for a multiplier if it didn't add up to the right number in any event, especially if it's an important issue as to consumer rights and so on.

And so a judge has the charge of making sure that there's not an excessive draining of the settlement pool from the class but also that the plaintiffs are fairly -- plaintiff-side lawyers are fairly compensated to encourage them to bring these suits. Often these suits are in favor of underrepresented parties, consumers, wage earners that wouldn't be able to bring any individual case because the cases are too small, but electively, they can and that there ought to be a payment for that.

And there are many firms, including the Levin firm and the Altshuler firm, that make their living doing just these kind of cases, so it works. They get paid, but it's not the same analysis of rate as would be supportive of a regular hourly rate in an hourly case.

Q. I certainly understand your position there. But I want to keep exploring this notion that the judges don't engage in a meaningful review of the

Page 22

requested fees.

Would you agree with me that in that instance, when faced with a fee application, the judge needs to serve as a gatekeeper and make sure that the fees that are awarded are reasonable and in accordance with applicable law?

A. Yes. The law -- the law supports your point, and I'm not saying judges disengage. I'm just saying that the "rate times hours" analysis in that circumstance takes a second seat to the percentage of the -- of the fund. And if the percentage of the fund is appropriate, I don't think they're going to have a problem with the rate times the hour, and there's nobody taking a contrary position.

Judges are presented with decision-making all the time. But usually, there's two sides to that -- to an issue, and the judge decides. Here, there's just one side, and then the judge taking care that the -- that the class interests are satisfied. It's usually the percentage that makes a difference. The larger the settlement, the lower the percentage. There's those securities cases, usually in New York, where the -- it might be a billion dollars in settlement. You don't want get one-third of a billion dollars. You get maybe 7 percent or 9 percent.

Page 23

So, you know, it's -- it's -- that's the judgment that judges bring to bear on the issue. And I'm not suggesting that they're not doing it meaningfully. I'm just suggesting that the context doesn't focus then on whether the rate is the appropriate rate in an hourly context.

Q. But earlier, didn't you suggest just that when you said nobody is pushing back. When you said "nobody," I took that to include the judge who was ultimately tasked with overseeing the fee application?

A. Well, forgive me if you misinterpreted me. But "nobody" means no other side. When we're in litigation -- like, you have another side. Mr. Grabill is sitting right over there in a box on my screen, and he's the other side. And if you did something that he wanted -- found objectionable, he would say something. But say he wasn't there, then you could say whatever you wanted, I mean, because nobody decided. So that's what I mean.

Q. So you mean no other parties to the litigation are pushing back on the reasonableness of fees, correct?

A. That's what I mean, yes.

Q. Of course, the class members have the opportunity to comment on the fee applications and

Page 24

offer objections if they're so inclined, correct?

A. Yeah. There's a sub-business in class action work where lawyers, I think, solicit class members in order to put an objection in as to the settlement as a hole or even the fees, perhaps, but usually a settlement as a whole. And then they litigate that for a while, and then they want to get paid out of the class settlement. So, you know, there's many -- there's many birds on the carcass.

Q. And then -- but ultimately, I think we've come full circle. And we agree that at least Andre Jardini's testimony is that judges in the state of California take their gatekeeping roles seriously, and they will undertake a meaningful review of fee applications and class action cases before the court.

Do we agree on that, sir?

A. They are a gatekeeper. Each brings their own skills and approach to the issue. I have judges of all different stripes on these cases when I settle them both in federal cases and in state cases in the complex departments in California. So I wouldn't say there's one size fits all. But yes, that's their obligation, to protect the class.

Q. Sitting here right now, can you identify any judges in any of these consumer class action cases

Page 25

7 (Pages 22 - 25)

you're saying are not accurate comparators who did not adequately discharge their gatekeeping responsibilities, sir?

A. I'm decidedly not going to malign a judge in my state in your deposition.

(Reporter clarification.)

A. I said I'm certainly not go to malign a judge in my state in your deposition, whatever I may feel about them personally. And so I'm not going to give you an answer to that.

BY MR. CENTNER:

Q. So let's ask it a slightly different way here. Sitting here right now, are there any cases that you're aware of on the consumer side where the hourly rate awarded to the plaintiff attorneys was, you believe, the result of the judge not adequately performing their gatekeeping responsibilities?

A. I haven't looked at every case, and I've been in cases that are class action cases where the -- where the fees are separately paid. In the In re Taco Bell case, the plaintiff lawyers wanted 7 million, and they got one million. So, you know, judges are paying attention when somebody pushes back on the fees.

THE REPORTER: I'm sorry, Mr. Jardini. Can you move a little closer to the mic? I'm

Page 26

starting to have trouble hearing you.

THE WITNESS: Okay. I'll do my best.

THE REPORTER: Thank you, sir.

BY MR. CENTNER:

Q. So looking at your answer here, you say you haven't looked at every case. I'm asking you simply: Sitting here today, is there a single case where you believe the judge did not adequately perform his or her gatekeeping responsibilities in approving the fees awarded to a plaintiff class action firm?

A. I don't have any example to give you. But remember, I mean, lawyers are human beings. Judges are human beings. Things like that could happen. I don't have an example to give you.

Q. So if the cases you're saying are not relevant that Mr. Pearl used as a comparator, you can't point to one of those specific cases where you believe the judge failed to exercise his or her gatekeeping responsibilities and ensured that the fees awarded were reasonable, can you?

A. No. What I'm saying is that that process doesn't deliver -- even adequately performed by the most careful judge, doesn't deliver a market rate in hourly cases. It's a completely different thing. And that -- that a judge does a good job doing that,

Page 27

doesn't mean that every lawyer gets that rate who has the same experience as that class action lawyer gets. It's just not the same thing.

Q. Correct me if I'm wrong. But is it part of the judge's charge in assessing a fee application in a class action case to perform that lodestar cross-check?

A. They don't all do it. In federal court, many don't. Locally in Los Angeles, they are doing it in every case. But they -- it's just additional information. It is not a bill that goes out to somebody to pay. It's just additional information that informs the judge about what the right amount of fees is.

Q. And I'm sure you've seen cases where the lodestar cross-check suggested that the percentage of the fee that was requested was too high and the judge reduced the percentage on the basis of the lodestar cross-check, correct?

A. I don't have an example of that. I've been in cases where the lodestar cross-check -- my cross-check was so low that I needed a foreign multiplier to get the percentage amount. That seems like the more logical thing that has to happen. I don't -- I don't know the opposite. It's possible. The judge would have to truly have a dislike for the case for that to

Page 28

happen.

Q. And then for those judges who do perform the lodestar cross-check, part of that, I believe -- correct me if I'm wrong, sir -- is looking at the typical hourly rate charged in the market in similar cases. Am I correct on that?

A. Ostensibly. But again, it's a -- it's a different process, and there's nobody bringing forth survey information or other examples or anything of the kind, so it's just a different thing entirely.

Q. So --

A. It doesn't -- it doesn't set or equate to market rates for hourly work; that's my takeaway. It's -- it doesn't equate, and to use it as something to equate that is -- it means you don't have other information that's better. To me, that's what that means.

Q. You said there's nobody bringing forth survey information or other examples. So what, then, is the basis for your purported expert opinion on this topic?

A. I'm sorry. I'm not following you. They -- the judge typically wouldn't get surveys.

Q. So I believe we've somehow talked passed each other, I think. I asked you a few moments ago for those judges who do perform the lodestar cross-check if

Page 29

8 (Pages 26 - 29)

a component of that analysis is looking at the hourly rates typically charged to the market for similar cases. And I believe your response was "Ostensibly. But again, it's -- it's a different process, and there's nobody bringing forth survey information or other examples or anything of the kind, so it's just a different thing entirely."

Remember that testimony, sir?

A. Right. It's exactly what I just said.

Q. Okay. So my question --

A. There's nobody bringing a survey or anything comprehensive to bear. The judge has a sense of rates and what's appropriate in a class action settlement, which is a very different thing. That's what I'm saying.

Q. So then let me ask you. From an expert witness perspective, what is the basis for the opinions that you're spooling out right now? If there's no objective methodology you can point to, what are you basing your opinions on?

A. The opinion that class action settlements and -- and rates that are mentioned in that context don't have any relation to the hourly rates, that opinion is based on the very process which I've explained to you, I think, at some length of how

Page 30

that -- that occurs and whether there's two sides to a question. There isn't; there's just one side.

Q. Can you point to anyone, other than Andre Jardini, who has taken that position? Can you point me to a treatise or to an article or to anything?

A. I bet if you read Richard Pearl's three-volume secondary source on attorneys' fees and class actions, you'd see exactly this.

Q. We'll talk about Mr. Pearl's volume -- treatise in a minute, which I'm told is amazing, frankly. But let me ask you this, though.

Earlier, I believe you were criticizing Mr. Pearl for using those cases as a relevant comparator here. So I would expect, if I read his book, he would not be sitting there maligning use of those cases as comparators from a fee analysis here?

A. I don't know. Maybe he never thought about it in this way. I mean, I've practiced both as an hourly attorney and as a class action plaintiff attorney, and I'll tell you it's different.

Q. But is that anecdotal, then, based on your 50 years of experience in the industry?

A. I understand the process based on my experience. In every fee petition, I've had to look at what the law requires and how to present the petition.

Page 31

In the rarest of rare cases when I've been on the other side, let's say in class actions, expertise doesn't often come to the fore, but I did have one within the last two years which involved the fees as an extra payment. They settled but left the fee issue open, and the plaintiff lawyers wanted 7 million and got 1 million, and I had opinions about that. So, you know, I've been in -- I've been in the fray on this from every particular angle, and I don't think there's much dispute about this.

Q. So I've been enjoying the parody here. I think this is a good start to the deposition. I got off on a little bit of a tangent here, which is fine. But maybe we can wrap it up with this question.

Sitting here today, can you identify a single case for me where a judge has said, "Mr. Jardini, your opinion that class action settlements are not reasonable comparators for determination of hourly rate structures is, in fact, correct, and I'm adopting it"?

A. Well, I'm pretty sure that the judge from the Eastern District in Fresno in California in the In re Taco Bell employment case discussed rates. I mean, you can't go from 7 million to 1 million without there being a problem with both rate and hours, and so I'm sure that judge determined that the rates being

Page 32

requested were -- were not reflective of an appropriate rate.

Q. Were you involved in that case?

A. I was an expert on behalf of Taco Bell.

Q. So if I read that case, the judge will say, "I've considered the opinions of Mr. Jardini suggesting that class action settlements and the associated fee awards are not appropriate comparators for determination of reasonable hourly rates in other contexts, and therefore, I'm going to reduce the plaintiff fees"? Is that what I'll see?

A. I'm just remembering the result, but the profound reduction suggests to me that rate was discussed. You'd have to read it and see what they exactly said. But I don't -- I don't think there's really any dispute that rates in the class action settlement context are not the same as somebody charging a rate for a Fortune 500 company expecting it to be paid.

Q. All right. And then is that your final answer on that subject, sir?

A. Yes.

Q. All right. Let's go all the way back. Like I said, we got off on a little bit of a rabbit trail there, but it was fun.

Page 33

9 (Pages 30 - 33)

You've been retained as an expert in federal cases before, I assume. Correct?

A. Yes.

Q. About how many?

A. I don't know. Probably 50, maybe more. I've been retained 1,950 times. I've presented depositions or declarations or reports maybe 580 times. A lot of those are federal.

Q. Though, then, I take it you're familiar with Rule 26. Right?

A. Generally, yes.

Q. And then would you agree with me that Rule 26 prescribes certain requirements experts are required to -- or experts need to put in their reports?

A. Yes. And I saw that we had dropped a paragraph on my rate, so forgive me for that. I'm happy to tell you what my rate is.

Q. Please do.

A. $625 an hour.

Q. And that's the rate you are charging for your work in connection with this deposition today, right?

A. It is.

Q. Did you charge a different rate for work incurred in the drafting of your report?

A. No.

Page 34

Q. So flat rate 625, all expert work on behalf of Valley Forge in this case?

A. Yes. I have auditors as well. And my senior auditor, Kay Holmen, helped me in this case, prepared some of the schedules and so on, and her rate is $286 an hour.

Q. Is she an attorney?

A. No. She's a senior auditor.

Q. Would she be an accountant by education, then?

A. No. This is very different than accounting. People ask me that, but it's not something subject to the general rule of accounting principles and so on -- Generally Approved Accounting Principles. It's unique in the world. Kay Holmen has been doing it for approximately 35 years, and that means looking at attorney invoices all day every day for 35 years. That's her skill set, and I don't think anybody has a better one.

Q. Let's go back to something you said a moment ago. I believe you anticipated my question when I was going to ask you why your hourly rate was disclosed. You said, "We ended up dropping that paragraph inadvertently," I believe. Who is "we" in that context, sir?

A. I don't know. Whoever transcribes or prepares

Page 35

the report with me. I don't want to blame any one person. I'll take the blame myself.

Q. Sure. Was it somebody in your office, or was it one of the attorneys you're working with at the Phelps Dunbar firm?

A. It's all done by us, not by anyone else.

Q. Okay. So you believe that one of the people in-house, if you will, at your office inadvertently dropped a rate paragraph?

A. Yes, ultimately me because I -- I didn't know that when I was reviewing and editing the report.

Q. Actually, let's just make sure I'm clear on this. A moment ago, I had said "inadvertently." But just to confirm, was that, in fact, inadvertent, to drop that, or was that an intentional decision, sir?

A. It wasn't intentional. I mean, it's required, and I didn't do it, so it's inadvertent.

Q. So you charge $625 an hour for your expert analysis in this case, correct?

A. Yes.

Q. When you are out on the open market selling your services to clients in arms-length transactions, what rate do you charge those clients?

A. I was a plaintiff-side contingency lawyer until I hung up my trial shoes about a year ago, and I

Page 36

didn't have an hourly rate. I would, though, on occasion, be involved in hourly cases. It would depend on what arrangement there was with the client, which might be a client of one of my partners, for instance, and those rates varied. Probably, they would gather around the 400, $450 an hour range, if I had to try to encapsulate them. They're not $1300 an hour.

Q. Four hundred or $450 as of what year, sir?

A. As of this year. I mean, if I got into one of those cases. As I say, the last 20 years, it would be an exceptional thing. I was doing this expert witness work and consulting on attorneys' fees or handling my own cases, a wide variety of plaintiff-side cases, most of them class actions but not all of them.

Q. So if it's exceptional, there's not really a market for your services as an hourly advocate, correct? You make your living doing other things?

A. Well, at this moment. I mean, I spent the first, at least, 20 years billing by the hour to clients. I could have done that if I had chosen to. I decided it was more fun and exciting and remunerative to be a plaintiff-side contingency lawyer.

Q. That may be the one thing we agree on today, sir.

A. Well, I appreciate the risk-takers, and they

Page 37

10 (Pages 34 - 37)

should be rewarded.

Q. What -- you referenced you spent the first -- I think you said 20 years of your career --

A. Yes.

Q. -- billing by the hour. Twenty-five years, correct?

A. Something like that. There's no clean line of demarcation when I decided to switch sides.

Q. Sure, understood. I'm just asking what year did you start your legal career, sir?

A. I started in 1976. I clerked for two years for a federal judge. I joined a firm in '78, the predecessor firm, in essence, to the firm I'm currently with. I did work as an associate on insurance bad faith cases, insurance coverage cases, and some insurance defense of insureds, and that -- and class action work, oddly enough. We had one major class action during that whole period.

In any event, we formed our firm in 1981, Knapp Petersen & Clarke. I joined and run the firm for them, and I'm still there, and I guess I'm the last man standing because I'm the president. And my practice at the outset was working for insurers at a time when insurers defended most everything, including intellectual property cases, over the decades since the

exclusions had become, we'll say, more robust, and there's fewer things being defended.

But at that time, we were in every kind of cases you could imagine, plus I was trying insurance bad faith cases. I think I tried 20 insurance bad faith cases, mostly for State Farm, and to jury trial and insurance coverage if it might be a related kind of case. So I did that kind of work until I decided that I would do more contingency side work, and that was roughly 20 years, 25 years ago, something like that.

Q. So the early 2000s is the last time that you truly had an hourly market rate; is that fair?

A. Yeah -- well, with exceptions. I mean, as I said, there's not a clean demarcation. I still occasionally did hourly cases right up until the end of my involvement in litigation. So I wasn't a full-time hourly lawyer.

Q. What the highest hourly rate you have charged to a client since you made the switch to being a primarily contingent fee lawyer?

A. I really don't know. I mean, it's -- I mean, given the history and when rates were being set and what they were, people assume that everybody is making over $1,000 an hour, but that wasn't true back a number of years ago. I don't know. Maybe 700. I'm not sure

exactly what it would have been.

Q. The one that you assume was maybe around 700, what type of case would that have been, sir?

A. I don't know. I mean, we were doing a lot of different kinds of cases. It might have been a real estate matter, or I was doing CERCLA cases, believe it or not. And it might have been one of those cases for an owner/operator or transporter. I'm not sure.

Q. About what year would that CERCLA case have been, sir?

A. Oh, I had a number of CERCLA cases over the years. It -- probably the last one, maybe 12 years ago, something like that.

Q. So around 12 years ago, you have at least one recollection of billing around $700 an hour?

A. I don't recall which case or even if that's a correct number. I was just giving a rough estimate as best I could under the circumstances. And I don't even know how I'd go back and look it up.

Q. You've written articles related to attorneys' fee; is that correct?

A. No.

Q. You have not?

A. I have not. I published in the local legal newspaper a few times but not articles like you're

suggesting.

Q. So I'm flipping ahead to a moment now, and I'm happy to show it to you. But you may just know by reference. I'm looking at your outline of "Background and Qualifications." It's one of the exhibits that you cited to your report.

A. Okay.

Q. Do you have a copy of your report there with you, sir?

A. I do.

Q. Any notes on that report that you've made?

A. Not on the report, no.

Q. Do you have any notes in the room with you at all?

A. Yes, I do.

Q. What are those notes?

MR. GRABILL: I'm going to object to that.

Mr. Jardini, you don't have to share that.

MR. CENTNER: What's the basis for the objection, Jeremy?

MR. GRABILL: We're not turning over his notes. You have the report.

MR. CENTNER: Sure. But wouldn't you

11 (Pages 38 - 41)

agree that if he's utilizing them to refresh recollection during the deposition, we're entitled to get them?

MR. GRABILL: You haven't asked that, and I'm not sure I would. But I would say focus on his report, and if you want to fight about his notes, we can talk about that separately.

MR. CENTNER: Well, I'm teeing it up now since it just came up. But I'm certainly happy to focus on his report. We'll spend a lot of time doing that.

BY MR. CENTNER:

Q. But in the meantime, Mr. Jardini -- so I believe we're entitled to the notes that you have in the room there. The gentleman representing you today obviously has taken a different view. We will take that up at a later date. However, for now, I'd like to ask you to preserve those, please, so that in the event we prevail on that, you're able to produce them to us quickly and as they appear in the room right now. Is that fair?

A. I'm not here to determine fairness. I'm going to destroy my notes, if that's what you're asking.

Q. Sure. I guess I can be more precise.

Page 42

Do you agree to not destroy your notes? How's that?

A. I'm not going to destroy my notes.

Q. Okay. Wonderful.

A. It's not really necessarily because you asked me not to; I just don't do that.

Q. All right. So glad you got that out.

(Exhibit No. 3 was marked for identification.)

BY MR. CENTNER:

Q. I'm looking at your report. Exhibit 3, you've got this outline of "Background and Qualifications." Do you recall that?

A. Yes.

Q. So the third bullet point on page 2 says that articles have been written.

A. Okay.

Q. What are those articles?

A. That's the few newspaper articles. Also, I suppose it's -- would encompass PowerPoint presentations when I speak at a law school or something like that.

Q. The newspaper articles you're referring to, what are those, sir?

A. You know, op-eds, I guess what you call it, or case discussions. I discussed the Cassim case one time

Page 43

because it was -- it had to do with what we call Brandt fees, fees that you can recover when you're suing an insurance company.

Q. I'm sorry. I didn't hear that last part, sir. It had to do with?

A. Brandt, B-r-a-n-d-t, fees. Those are fees that an insured can collect against an insurance company if the insurance company wrongly denies coverage.

Q. And what newspaper did you publish it?

A. Los Angeles Daily Journal.

Q. Is that a legal-focused periodical?

A. It is the legal periodical in our community.

Q. So I came up in New York, and they had the New York Law Journal that was, you know, the hot read in the mornings. Is that Los Angeles's equivalent to the New York Law Journal?

A. All the news that's fit to print, especially if somebody did something wrong.

Q. And have you written any of these articles in the past ten years?

A. No, I don't think so.

Q. If you had to ballpark, about how many of these articles have you written?

A. A handful --

Page 44

(Reporter clarification.)

A. A handful, not very many.

BY MR. CENTNER:

Q. You gave us a list of cases in which you've testified either at depositions or trial. I believe that runs through the beginning of this year. Let's make sure we're on the same page there.

Have you testified as an expert at trial in any case in 2024?

A. I don't remember, frankly. I testify relatively frequently, and I try not to remember them after they're over. My role is done after I appear at a deposition or trial. So I don't -- I don't frankly remember. I'd have to search my calendar and be able to give you a better answer, but I don't know as I sit here today. Probably though. I'd have to say the probability is yes.

Q. All right. To be clear, we're talking about trial testimony now, correct?

A. Yes.

Q. Okay. I'd like -- let's have you do that during a break, if you don't mind. I just want to make sure that we have a complete list of all the deposition trial testimony.

A. I think the last trial I testified at -- I'd

Page 45

12 (Pages 42 - 45)

have to look at the list, but it's memorable because I was actually in a hotel room in Venice, Italy, and the trial was ending faster than expected, and I testified from there. The jury did not know where I was, and that was in the fall of 2023. That's probably the last one.

Q. All right. What was that case, sir?

A. I don't remember the name of it.

Q. Do you believe it's listed in the deposition and trial testimony exhibit that you provided to us?

A. Yes.

Q. So do you believe this is current, at least as far as trial testimony goes?

A. I think so, yes.

Q. All right. You said you were in Italy when you did that trial?

A. I happened to be, yes.

Q. Were you on the road last week?

A. Last week? No. I was in Montana over the weekend.

Q. When did you get to Montana?

A. Thursday. Came back Sunday.

Q. What about deposition testimony? Have you testified in depositions this year other than this one of course?

Page 46

A. Yes, I'm sure I have.

Q. And do you believe that all of those depositions are listed on the exhibit that you provided in connection with your report, sir?

A. They should be.

Q. How many depositions do you think you've given this year?

A. Five, maybe.

Q. Do you remember the names of any of those cases?

A. No, I really don't.

Q. What types of work were you doing in those cases?

A. Attorney fee review and opinions.

Q. When you say "attorney fee review," is that the auditing practice you touched on earlier or something else?

A. Auditing of attorneys' fees usually involving issues of reasonableness and often issues of allocation between claims or parties or time or something like that.

Q. You work with an associate attorney -- or there's an attorney at your firm -- I'm not sure what this person's title is -- associate partner or counsel named Devin Bennett correct?

Page 47

A. Devin just recently resigned unfortunately, and I've known Devin since seventh grade.

Q. What was Devin Bennett's hourly rate when he resigned?

A. I don't know. She worked for one of the partners -- one of my partners, Diron Ohanian, O-h-a-n-i-a-n, and it would have been a rate that he set with his clients.

Q. That wasn't something that you had any responsibility for, sir?

A. That is true.

Q. What about a Robert -- is it Brugge, B-r-u-g-g-e?

A. Yes, he's a partner here.

Q. What's his hourly rate?

A. Brugge works doing coverage and other sophisticated insurance litigation. I think it's in the 300s. That's my best recollection.

Q. Do you believe his hourly rate is in the 300s?

A. Yes.

Q. What about Markos Generales?

A. Markos Generales, I don't work with Markos. He works with Mr. Ohanian as well. He would get whatever rates that Diron Ohanian has with his clients.

Q. What type of work does Ohanian do?

Page 48

A. He just closed a $20 million -- no. I'm sorry -- $90 million transaction. He does real estate transactions, litigation for a wide host of work -- different kinds of clients, that kind of thing.

Q. You're the president of the firm right now, correct?

A. Yes, I am.

Q. Is it your testimony under oath that you have no idea whatsoever what the range of rates are that Mr. Ohanian charges his clients for the work that he performs?

A. It's -- it's his clients and his rates. If we have a new client that somebody is bringing in, I might look to see if the rate is appropriate, but once they're existing, I don't really focus on it. So yes, I don't have a encyclopedic memory of everybody's rates.

There's no -- we're not working like Latham & Watkins or something that says if you're a 2019 attorney, you get X per hour, and then you get a raise at the turn of the year. We have negotiated rates with a wide variety of clients in a number of different practice areas, which are themselves quite disparate at different rate structures. So I do not have a encyclopedic memory of everybody's rate with

Page 49

13 (Pages 46 - 49)

everybody's client.

Q. What's the highest rate, sitting here today, that you can recall somebody at your law firm charging for work performed in the year 2024?

A. I don't really know.

Q. So as the president of the law firm, you don't know what the highest hourly rate is that your partners are charging?

A. That's true. I'm much more concerned that the bills that go out get paid and get paid timely. The rates are already agreed.

Q. Do you review those bills before they out?

A. I don't know.

Q. Do you have any datapoints that tell you what the rates the attorneys at your firm are charging?

A. We get reports about collected rates as a general matter -- or the rate as a general matter on billed matters and so on -- or on work matters. That's everybody's rate all mashed together, though.

Q. So based on the reports that you get about collected rates and -- what is the highest rate you can recall an attorney at you firm charging in the year 2024?

A. Those reports don't reflect individual rates, so I don't know.

Page 50

Q. You said -- you said we get reports about collected rates as a general matter. What does that mean, then?

A. If there's eight matters that are all different rates, as an example because there's probably 200 matters -- but if there's eight matters, they have all different rates and a lot of different people working on the case, all who have different rates, you get one rate that shows you what was the -- the overall rate billed firm-wide, the overall work -- work-in-process billed firm-wide and collected firm-wide. So it's not -- it's not any one person's rate. It's everybody, including non-attorneys, in one place.

Q. What's the overall blended rate for your law firm, currently?

A. It varies month to month.

Q. What's the most recent one you can remember?

A. I don't -- I don't recall exactly what it was.

Q. What's the highest one you can remember?

A. If it isn't a problem, I'm not focused on it, so I really (inaudible).

(Reporter clarification.)

A. If it isn't a problem, I'm not focused on it, so I really don't know.

Page 51

BY MR. CENTNER:

Q. As the president of the firm, one of your focuses is on getting money in the door, correct?

MR. GRABILL: I'm just going to object. I mean, it's -- you asked him six times. It's becoming badgering. Just -- I object.

MR. CENTNER: Note the objection.

BY MR. CENTNER:

Q. One of your focuses is getting money in the door, right, Andre?

MR. GRABILL: Object to the form.

A. I don't think of it that way, to tell you the truth. You know, we look at a lot of information, from the management perspective, on performance. Some of it is subjective. It doesn't reduce to getting money in the door, whatever you're trying to reduce the thing to.

Do I look and see, you know, whether accounts receivable is aging or not aging? Yes. Do I look to see if there's -- if there's a problematic client that we need to take some action with? Yes. But I'm not -- I'm not singularly focused on, quote/unquote, "getting money in the door."

BY MR. CENTNER:

Q. But you are focused on getting paid in a

Page 52

timely fashion, right? For example, you want to make sure that the accounts that are owed to you don't progress to aging status, right?

A. You know, it's a business. Like any business, you do the work; you perform the service; good clients pay you; some clients are slow in paying you. It's all part of the process. You know, it's just being in the business of being a lawyer.

Q. Has your firm ever withdrawn from representation due to delays in payment by your clients?

A. I don't know.

Q. So the 50 years you've worked there, you can't recall one way or the other if you've ever withdrawn from representation of a client due to nonpayment?

MR. GRABILL: Object to the form; asked and answered.

A. I don't have a specific recollection of that happening.

BY MR. CENTNER:

Q. Do you agree generally that it's important to get paid for your work in a timely fashion?

A. As a plumber, I guess. I don't -- you know, I mean, we're fine. We've been in business since 1918. We're not going under if somebody is 30 days late. But

Page 53

14 (Pages 50 - 53)

yes, it would be better if they paid within the time frame that's normal. I mean, anybody that's in a business looks at that. I'm sure you do as well.

And we're -- you know, that part of the practice is the running of a business, and we didn't go to law school to learn how to run a little business; we went to law school and became professionals in order to help clients and to win cases for them. And so this whole thing about focusing on the business part of it is ancillary, frankly, to the practice of law.

Q. Interesting. So you referenced plumbers as a trade that's concerned with getting paid in a timely fashion. But your testimony is that your firm is not particularly concerned with getting paid in a timely fashion; is that accurate?

A. You didn't say who you were talking about when you said somebody wants to get paid in a timely fashion, and I raised the possibility that you might be talking about something other than lawyers, so I threw plumbers out there as a part of the answer. That was really a, I mean, somewhat satiric comment on the emptiness of the question.

In any event, as I say, it's a business. You know, the business aspects of it, many of them take care of themselves. We have an office manager that

does a lot of it. I look at it. Yes, you want to get paid of course. But the main aspect of the practice of law is to provide good service in a timely way to clients who need it.

Q. How does a gentleman who's got that view of the world end up becoming an expert focusing on hourly rates? I'm just curious.

A. I'm interested in attorneys' fees and have always been, whichever side of the question is presented. I'm often on the side of the party requesting fees. It's my obligation, I think, when I do this to call it as I see it, you know, and to use data to the extent it exists and to have rational and reasonable opinions based on what is presented.

Q. Pull up Exhibit 2 to your report, please.

A. I don't have all of the exhibits to it. Which one is that?

Q. Exhibit 2 is Andre E. Jardini's deposition and trial testimony for the last five years.

A. I don't have that right in front of me, so just -- you can read me whatever you want to me from it. I'll remember (inaudible) or not.

Q. I tell you what. Why don't we do a screenshare.

A. Okay. That's great.

Q. You should see the first page of the report you issued in this matter now, correct?

A. Yes, I see that.

Q. I'm going to scroll down. Okay. We're going to go to Exhibit 2.

A. Okay.

Q. This is what I'm talking about. Okay?

A. Yes, I know what it is.

Q. All right. Are these cases listed chronologically by the date of your testimony?

A. I believe so. It's possible. I remember being deposed three times in one week. They might have gone in a slightly different order than given, but ideally, the list is added to as new events occur. So yes, I think so.

Q. Sure. So with some exceptions, generally, you know, items 1, 2, 3 reflect testimony given more recently than, you know, items 15, 16, 17; is that fair?

A. No, no, no. The more recent ones are added at the end. So if you go to the very end -- let's see what's there. The Barbizon School is a deposition that I gave. And there may be depositions after that, though. My memory is not good. The list is meant to be updated regularly, so I assume that it has been

updated, but I can't tell just looking at it.

Q. The bottom left of the page -- you could probably see this on your end. There's a date of 1/3/2024. Do you see that?

A. I do.

Q. Is that indicative of the last time this exhibit was updated?

A. That's what it means to me.

Q. So any case that you have given either deposition or trial testimony in the year 2024 is not going to be reflected in this exhibit; is that fair?

A. Theoretically true. If after January 3rd there was a deposition or trial testimony, it isn't here. So I can look to see if there's an updated list and provide it, if you need it.

Q. Yeah, I think that would be great. That's certainly what -- I believe the spirit of what we'll contemplate. It's not the letter.

What was the last deposition you gave?

A. I don't -- I don't recall.

Q. Was it -- was it this month? Was it the month of October?

A. No, it wasn't. It probably wasn't the month of September either. I think probably -- I don't know. Just say August just because it's likely that I gave a

deposition relatively recently. When I send the updated list, it'll be on there, you know, in theory.

Q. Who was your client in that case?

A. I don't recall. I mean, that's why we do a list, really, because there's so many of these things.

Q. How many hours have you spent working on this particular matter, if you had to ballpark?

A. Oh, I don't know. 10 to 14, maybe, something in that range.

Q. Does that include prep for your deposition today?

A. Well, there really wasn't that much in the prep time for deposition. But yes, it would include prep for the deposition.

Q. How long did you spend prepping for today's deposition?

A. Well, I mean, I sat through Richard Pearl's deposition. I -- probably as prep. And then I read my report. So probably .6 or something like that.

Q. Did you review any documents, other than your report of course, in preparation for today's deposition testimony?

A. I have -- I printed out some post-arbitration briefs just to have them available and the complaint, but I didn't really spend any time looking at them.

Page 58

Q. So when you say -- just to make sure we're talking -- talking apples to apples, as the saying goes, the post-hearing briefing you're referring to, would those be the briefs submitted in the Levin Simes vs. Peiffer Wolf arbitration?

A. Yes, that's what they would be.

Q. And the post-hearing briefing, who -- do you recall which party's briefs you reviewed?

A. I think I had previously seen all three briefs. I just -- I think I just -- as I'm looking AT IT now, I just printed out your brief, the Peiffer Wolf brief.

Q. So you printed it out, but you did not read it in preparation for today; is that accurate?

A. If I did, I just -- I just looked at the table of contents.

Q. So you also read the complaint. Would that be the complaint filed in San Francisco Superior Court?

A. Yes, the original complaint in the case. The complaint alleging -- you know, it sounds like a soap opera. But the longtime friend leaving the firm with her boyfriend. I mean, they really did make it into a story, didn't they? And so I read that, at least the starting parts of it. I didn't go through all the various claims.

Page 59

Q. Have you issued invoices to Valley Forge for the work you performed in this case to date?

A. I have not seen an invoice, but that doesn't mean it doesn't exist because I'm not the one who reviews them before they go out. It's reasonably possible that we haven't invoiced yet because we're talking about a relatively recent set of services, so I just don't know.

Q. You agree that the CNA -- I'm going to use CNA and Valley Forge interchangeably today. Is that fair, sir?

A. I don't -- I don't know the relationship. I know Valley Forge is the name of the party.

Q. Sure. I'll represent to you that it has been told to us in numerous depositions that Valley Forge is a subsidiary of CNA. So I'm going to use those two terms interchangeably today. To the extent that impacts answers you're giving, just let me know and specify as to the appropriate entity.

A. Okay. I'll just hear "Valley Forge" when you say "CNA."

Q. Wonderful. Do you believe that CNA owes you the money for the work you performed in this case regardless of the outcome?

A. We have an hourly arrangement, not a

Page 60

contingency arrangement. So I mean, as part of our agreement, we perform services. Obviously, they have the right to look at the invoice and to ask questions or even to challenge entries. That's their right. But my expectation is that they would pay the invoice.

Q. Other than the attorneys at Phelps Dunbar, have you spoken with anybody at your work in this case?

A. Kay Holmen.

(Reporter clarification.)

A. Kay Holmen, K-a-y H-o-l-m-e-n.

BY MR. CENTNER:

Q. I believe you indicated Kay is the individual you worked with on the auditing side of your business, correct?

A. She's the senior auditor there that worked on this particular matter. I have other auditors as well.

Q. What work did Kay do in connection with this matter?

A. She prepared the schedules that are attached to the report and maybe provided me the basic introductory language. It's like a set thing that appears in most every report or declaration.

Q. The opinions that were rendered in there, those are yours alone, however?

A. Yes.

Page 61

16 (Pages 58 - 61)

Q. All right. So other than Phelps Dunbar, other than Kay, who else did you speak with in connection with your work on this matter?

A. No one.

Q. So to confirm, you have not spoken with any of the attorneys at the Altshuler Berson firm, correct?

A. No, I'm not sure they would take my call, but I did not seek out the input.

Q. What about the attorneys at Shartsis Friese? I'm assuming you have the same answer there?

A. Same answer, yes.

Q. Do you know either of those firms just through the course of your career in California?

A. Shartsis, no. This is -- they're a new name to me. Altshuler, they've been around for a long time, and of course, I went to law school in San Francisco. I think they were in existence at that time, even that long ago. So yes, I've heard the name before.

Q. You don't have any friends there, for example?

A. I don't think so. I haven't gone through -- I think they have, like, 29 lawyers. I don't -- I don't remember anybody that I know working there.

Q. Did you speak with anybody at CNA in connection with the work you've done on this case? For example, Kara Egan, Abigail Alfridi, Robert McDade,

Page 62

Jeffrey Cohen, anybody else?

A. No, I have not spoken with any insurance employee.

Q. Tell me about KPC Audit. What is it?

A. KPC Legal Audit, Inc., is a DBA of Knapp Peterson & Clarke. I was doing so much of this work by October of 1991 that I decided to form a DBA to hold out this service as different and unique and to do the work under that auspice even though I'm an employee and director of Knapp Petersen & Clarke, and all the people that work with me on the audit work are also employees of Knapp Petersen & Clarke. It was done for the purpose of setting this set of services separate and unique.

Q. Has KPC been retained in this case?

A. The firm is retained underneath the DBA agency. I think that's how the agreement reads. Let me take a look here. Yeah, KPC Legal Audit Services is retained. They're the --

Q. Were you retained by Phelps Dunbar, or were you retained directly by CNA?

A. My contacts were all with Phelps Dunbar. But let me see. It says here that Phelps Dunbar is the client according to our agreement.

Q. Are you -- and when I say "you," I refer to

Page 63

you or anybody on your team -- performing a claims adjustment work with respect to this particular claim?

A. No, I don't do claims work.

Q. Have you been involved in reviewing any of the invoices submitted by Altshuler Berzon for payment for that payment issue?

A. No. We have looked at the invoices that we have. I think there have been certain interim payments made, but we looked at them, first, for the rate issue, and then we provided some comments, as you have seen in the report, about billing irregularities and unreasonableness that we saw.

Q. But to be clear, CNA, as an entity, is not -- has not retained KPC Audit to actually go through and perform legal audits of these bills as a precondition to issuing payment, correct?

A. No, our role is not to be a participant in that process.

Q. Let's go ahead -- we went to your report earlier. We're going to attach that as Exhibit 1 in globo for the record.

(Exhibit No. 1 was marked for identification.)

BY MR. CENTNER:

Q. I'll probably surmise we'll come back to this today, but for now we're going to move on to Exhibit 2,

Page 64

which I will mark as the Pearl report.

(Exhibit No. 2 was marked for identification.)

BY MR. CENTNER:

Q. You should see that on your screen now.

A. Okay.

Q. Tell me if that's correct when you get a moment, sir.

A. Yes, that's it. That's what's I have.

Q. Great. And this is a report that you looked at -- you've looked at this previously, correct?

A. I have.

Q. And you don't remember this first time that you reviewed it, do you?

A. I really don't. I mean, there's a lot of information that came to me, but I don't remember in what order or when.

Q. Do you know Mr. Pearl personally?

A. I don't know him personally. I mean, I've seen him in cases. I've been in cases -- the same cases that he's been in, let's say, a number of times. I don't know how many exactly. Probably -- I don't know -- half a dozen, a dozen, something like that.

Q. When you say you've been in the same cases, have you been averse to each other?

A. Yes. That would be the relative positions

Page 65

17 (Pages 62 - 65)

that we had in those cases.

Q. When was the last time, that you can recall, that you and Mr. Pearl were involved in a case?

A. Oh, I don't recall. It's -- that's a specific fact that I just really don't know.

Q. What about, does the name Monster vs. Beats ring a bell to you?

A. It's on that list that you just showed me, Exhibit 1.

Q. It was. Do you recall if Mr. Pearl was involved in that case?

A. I don't. But it wouldn't surprise me. That was a big case. You know, that involved Beats by Dr. Dre, and I think some kind of intellectual property with Monster on those -- on those devices.

Q. Who was your client in that case?

A. One of the two. I just don't remember.

Q. Sir, sensitive question. But have you been diagnosed with any memory issues?

A. No. I have a pretty good memory, but, you know, my brain would explode if I had to remember all the details of 1900 retentions over 35 years in the work that I do. I found it to be a constructive approach since my work ends -- when your case is over, I won't remember you either. And it has nothing to do

Page 66

with you. It just -- I'm just going to move on to the next thing, and it can confuse things if you remember details about a certain attorney fee issue or was this the one where the person did this or the person did that. You really have to put them aside and to move on to the next one. Our work is episodic, and it concludes at a very short period after we've done what we do. So there's no point in my remembering all these things. And it is a little out of the norm for you to challenge my memory because it's really quite good.

Q. You did remember, I believe, that the Beats vs. Monster case involved Dr. Dre, right? So there was something independent you recall about that, right?

A. They must have run a million ads, you know, Beats by Dr. Dre. And, you know, you remember some things. You know, I remember that I'm in the Flint water crisis case because it's memorable, you know. There are things like that or -- or that I was in favor of a firm suing Bill Cosby for him to pay his bills. You know, there are certain ones that stick in your mind, but most of them slide past pretty -- just right into the soup and done.

Q. The Beats by Dre case sticks in your mind, but you don't remember who your client is; is that correct?

A. Well, you just showed me a piece of paper, and

Page 67

about the fifth thing down was Monster vs. Beats. So, you know -- and then you asked me a question about it. I saw it about three minutes ago. So that is about the extent to which I know. We could figure it out if it was really important and go find out whose side who was on and what happened and so on, but it's not important to my work in this case.

Q. What about the Flint water case? Who was your client there?

A. AXA. It's a French insurance company.

Q. The Monster vs. Beats case, do you recall if the jury adopted your opinion?

A. I don't know. Sometimes people don't even tell me what happened. I do encourage them to tell me, but I don't know if we did find out or not.

Q. What's your opinion of Mr. Pearl as an expert witness?

A. Well, I don't -- you know, it -- you don't want to encapsulate somebody in three words. I mean, he's a 50-year lawyer. He's made attorneys' fees a specialty of his. He's written a secondary source in three volumes that collects a lot of cases, and so he's done a lot of things. I do know that he's almost exclusively on the side of the person seeking fees and almost never -- and probably, I could say, never, in my

Page 68

experience, found a rate he didn't approve. I mean, I think if -- if Altshuler had had a high rate of 1700, he would have said that was okay. I mean, there's no touchstone for where the -- his approach ends, you know.

So he tends to be on one side. He tends to be approving of rates almost universally. I'm not suggesting he's intellectually dishonest. I'm just saying that's his approach to things, and he doesn't think there are billings problems that he ever wants to comment on. He said that in his deposition. Block billing, I mean -- you know, if you block bill in a bankruptcy case, you don't get paid for anything.

So I mean, you know, courts don't like it. You shouldn't do it. It has ramifications. It's not a -- it's not a wild idea that he doesn't want to deal with it. Too much -- too much staffing. The single biggest reason bills are too high are too many people involved, too much conferencing, too much time spent per event, too many people appearing, like seven people at an arbitration for two different parties. That's 14 people at an arbitration. I always ask myself what's the seventh person on each of those teams going to do unless there's six heart attacks.

I mean, it's just -- you know, at some point,

Page 69

18 (Pages 66 - 69)

you have to have an opinion about reasonableness. What about someone that bills more than 24 hours in a day? I have seen that more than a few times in my life. Do you have no comment about that because you don't want to look at reasonableness? I mean, you have to be open to -- to the fact that billing is a human process by -- by lawyers who are human beings who make mistakes, and some of them bill outrageously because they get paid when they do. So, you know, I just think that you shouldn't be on just one side all the time even if you're really good at what you do on that one side.

Q. Let me ask you a -- in a more straightforward fashion. Do you believe Mr. Pearl is a credible expert witness?

A. I'm not in the business of determining credibility. You should ask your jury at the end of the case if he is or isn't.

Q. But you've both been in the industry for a long time. I'm simply asking -- you've obviously formed an opinion about his work product over the years. You gave us a three-page answer about it. I'm asking if you think he's a credible expert witness.

MR. GRABILL: Object to the form.

A. Again, credibility is a jury issue. How does he present? How does he, you know, defend his

Page 70

positions? How does he prevail against vigorous cross examination. It's in a crucible that that's decided, not by me in deposition. I mean, has he said some things that I've agreed with in the past? Sure. Why not? I mean, you know, I'm not suggesting that he's a hundred percent wrong a hundred percent of the time, and I don't think he'd say the same about me either. So, you know, credibility is to be determined; let's just say that.

BY MR. CENTNER:

Q. You believe he's a qualified expert to talk about attorneys' fees in the state of California?

A. He wouldn't -- he wouldn't be subject to a Daubert motion, if that's what you're asking.

Q. Why not?

A. Well, because the Daubert principles wouldn't permit him to be excluded, I don't think. That's as I understand it.

Q. Let's look at Mr. Pearl's report.

A. Okay.

THE REPORTER: Mr. Centner, can we take five minutes, please?

MR. CENTNER: Absolutely. Let's go off the record right now.

(Recess taken.)

Page 71

BY MR. CENTNER:

Q. Mr. Jardini, during the break, did you speak with anybody about the testimony you're providing here today?

A. I asked my secretary to send you an updated case list -- there's five additional depositions on that list -- and the schedule that lists the cases that Mr. -- I think it was Mr. "Finberg" that was -- he's involved in. Yeah, those are the things that I talked about and had her -- she'll be sending it to Mr. Grabill.

Q. Fantastic. Thank you for that. You anticipated my next question there.

A. Finberg. Sorry.

Q. I'm going to resume the screenshare function here. Okay?

A. Okay.

Q. And I believe we should be back on Richard Pearl's report. You're probably looking at the bottom of page 2 if I've done my job correctly.

A. Okay. I think I see that.

Q. All right. So I want to go over to paragraph 7.

MR. CENTNER: I think we've done this already. But just to be clear, we are

Page 72

attaching this as Exhibit 2.

BY MR. CENTNER:

Q. All right. So I'm looking at paragraph 7 in Mr. Pearl's report, and he says that "Since 1982, the focus of my legal work has been in general civil litigation and appellant practice with an increasing emphasis on attorney fee issues. More recently, my focus has been almost exclusively on matters involving attorney fee issues."

Do you see that?

A. Yes.

Q. In your mind, is there a distinction between the audit work you do and the attorney fee issues Mr. Pearl is describing in his report?

A. It would require me to interpret what he means, but anyone that does legal fee auditing is applying the same set of principles to a set of invoices, reasonable rate times reasonable hours. And there shouldn't be any difference as to how that approach is done.

Q. That's your approach as an auditor, correct?

A. Well, I'm an auditor, an expert, a consultant, an educator. I -- all relating to the issue of attorneys' fees. But attorney fee issues almost always turn on reasonableness questions or allocation

Page 73

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company    www.veritext.com

questions or both.

Q. So sitting here right now, then, do you believe that you and Mr. Pearl both have the same focus with respect to your approach to this case?

A. At a very general level, you know, the 4,000 -- 40,000-foot view, we're both looking at attorneys' fees, but the devil is in the details, how that is done. So I mean, generally speaking, we're both assessing one issue actually, a rate, what's an appropriate set of rates in this case. And then he has an approach to that, and I have an approach to that.

Q. Continuing with paragraph 7 here in Mr. Pearl's report, he says he's lectured and written extensively on attorneys' fee issues. "I have been a member of the California State Bar's attorneys' fees task force and have testified before the State Bar Board of Governors and the California Legislature on attorney fees issues."

Did I read that correctly, sir?

A. It seems like you did.

Q. Have you ever read anything that Mr. Pearl has written? You've referenced his treatise earlier, but let's make the question explicit now. Have you ever read anything that he's written?

A. I have -- I think we have a copy of his

Page 74

treatise in our firm's library, and I have looked at it, at one time or another, either to see what he said about something or to get a quick case cite or something like that. So I don't know what else he's written that I have read. I don't think anything that he's written, I've read, other than his treatise. And that's only parts of the treatise, not all of it.

Q. I'm sorry. I did not mean to cut you off there. Was that your entire answer, sir?

A. That's it.

Q. Have you ever cited Mr. Pearl's treatise as one of the sources you relied upon in connection with your work as an expert witness?

A. No.

Q. Have you -- scratch that.

Are you a member of the California State Bar attorneys' fee task force?

A. I am not.

Q. Do you know what that task force does?

A. I don't know. I mean, I think if they did something that impacted my work, I would know, but I'm not sure. They may be speaking to state statutes.

You know, we just changed our Rule 1.5 in some ways, and I'm sure -- and that has to do with unconscionability of fees. But I'm sure that they want

Page 75

to get input from practicing lawyers, so maybe they had something to do with that. I don't really know, though, it -- it isn't something that I am paying much attention to.

Q. Actually, let me ask you this. Why do you not pay much attention to it?

A. I don't think they -- they're not a legislative body. If they speak -- let's say they spoke to Rule 1.5. It gets adopted, okay. Now it's officially in our Code of Professional Responsibility. Most every jurisdiction has something like Rule 1.5, and I cite to that rule. I wouldn't cite to the California State Bar attorneys' task force. That has no persuasive weight. It's not a formal, citable source for anything that's relevant in the fee world, you know, when you're in a dispute.

You might find an opinion by a judge, for instance, or some part of that Code of Professional Responsibility that's helpful, but I don't -- I don't think their background work on speaking to some changes or something like that would be important.

Q. Do you know anybody other than Mr. Pearl who's a member of that task force?

A. I have no idea.

Q. Mr. Pearl also references that he has

Page 76

testified before the State Bar Board of Governors.

What is the State Bar Board of Governors? Don't forget I'm not a California practitioner.

A. The state bar is in the business of regulating lawyers, okay, from the most basic thing of how much you've got to pay in annual dues to how often your mandatory continuing legal education should be done and in what topic areas to things that impacts things, like certain of our statutes in the Business and Professions Code or the Code of Professional Responsibility.

So the state bar, as an interested party, will -- will take a position as will our California Supreme Court, depending on the what the rule is, and then whatever the topic is, is adopted, not adopted, changed, whatever. And that's when we pay attention, when there's something binding that's happened, not that they're talking about it at the state bar.

Q. Have you ever testified before the State Bar Board of Governors?

A. No, I have not.

Q. Have you ever been invited to come testify before the State Bar Board of Governors?

A. No. I don't know that they have frequent testimony. But no, I have not.

Q. What about the California Legislature? Have

Page 77

20 (Pages 74 - 77)

you ever been requested to come testify before the California Legislature regarding attorney fee issues?

A. No. Those are probably few and far between. There were restrictions on what lawyers could charge in legal malpractice cases and what they could recover, and that was changed within the last year or so. That required some people to come in and say why it should change and why the number 250, which would be 900,000 today, should be some other number as the limit on noneconomic damages. Those kinds of things, they're relevantly few and far between, but I have not done that.

Q. What's the basis for your statement that those type of engagements are relatively few and far between?

A. Because they're just really -- you're talking about the legislature, which means statutes. You don't have new statutes willy-nilly on attorney fee issues. When MICRA -- that's the medical malpractice section -- was being changed, that was a big thing. The plaintiffs' bar in that area wanted a change for many, many years, and that became a hot button issue. But it's relatively rare that there's a new statute of pronouncement that impacts attorneys' fees.

Q. Let's continue working through Mr. Pearl's report. If we look at paragraph 8, he references that

Page 78

he's the author of California Attorney Fee Awards. He defines that as Cal Fee Awards and its accumulative supplements that are published annually since 2011.

Do you see that, sir?

A. Right. He did the third edition, and then he told us he also did the second edition. I bet he did the first edition as well.

Q. Probably a good guess.

This is the treatise you referred to previously, that you have in your office, right?

A. Yes. It's a three-volume secondary source cumulating the various cases.

Q. So look at paragraph 9. Mr. Pearl opines that "Several courts have referred to my CEB treatise as the leading California attorney fee treatise."

Do you see that?

A. Yes.

Q. Do you agree with that statement?

A. I don't know. I don't know that there's any competition, to tell you the truth. So if you're leading and the pack is just one, I mean, you're still leading, I guess.

Q. Then he goes on to list all these different courts that have cited him with approval, right?

A. Right. That's probably his publisher making

Page 79

sure that we all think it's an important thing to buy, in which we did. We bought it.

Q. I'm sorry. How would the publisher influence the materials cited by the judges writing these decision we're seeing here?

A. Well, they -- they want the source to be cited, and then when it is cited, they accumulate all of these things together so you can see them in one place, and then they use it in their advertising. So they have an interest in that.

Q. You're not -- just to be clear, you're not suggesting the publisher somehow influenced the judges to cite the treatise, correct?

A. Why would I say that?

Q. Maybe I misunderstood what you had said earlier, when you referenced how -- fact it was cited in 18 cases was probably due to the publisher.

A. The presentation, like, in this form is something that enhances the publicity of the document and books, and that's why it exists, I think.

Q. When you say the "presentation in this form,' you mean the strength side to the -- I counted, I believe, 18 cases that have referred to him as the leading attorney fee treatise. Correct?

A. I don't know. I didn't count the cases, but

Page 80

if cases have cited to it, I'm sure this is correct.

Q. Have you ever been cited as the leading California attorney fee expert?

A. Well, yes. I mean, the National Association of Legal Fee Analysis has me referenced as a top legal fee expert and though -- and other laudatory comments about me, so it's not a court, but it's a professional group of auditors.

Q. You're a member of that group, correct?

A. Yes.

Q. Do you pay annual dues to be a member of that group?

A. Yes.

Q. Let's focus specifically on courts.

Has a court ever cited you as the leading California attorneys' fees expert?

A. I don't recall. I don't often, as I told you before, get the results of my work and -- no, I couldn't remember it when I was being asked previously. I've now looked up that I had five additional depositions this year, and those were all resulting in some judge somewhere saying something about me, and I won't necessarily know that that's a -- that that's occurred.

Q. That's the information you've compiled and are

Page 81

21 (Pages 78 - 81)

having transmitted over to my friend Mr. Grabill, right?

A. Right. It should be on its way right now.

Q. Let's continue scrolling through Mr. Pearl's opinion here. Going through all the cases that have cited him with approval, there's lots of them. Here we go. 17, "My Opinion," do you see that, sir?

A. (No audible response.)

Q. Mr. Jardini, you still with me?

A. Yes. I'm looking to see that I have it. Just give me a moment.

Q. I'm sorry. I thought you were following along on the screen. I'm not trying to get combative with you, sir. I just wasn't sure that you were looking at it.

A. I have it in front of me. At the bottom of page 10, "My Opinion."

Q. So you're reading a paper copy of Mr. Pearl's report right now, correct?

A. I am.

Q. Okay. So let's look through this. He says, "In my opinion, the hourly rates paid by Peiffer Wolf to defend itself, Ms. Abrams, and Ms. Perkins in the Levin Simes case are entirely consistent with the hourly rates that would be charged in the San Francisco

legal marketplace for similar services."

A quick "yes" or "no," do you agree with that opinion?

A. I do not.

Q. Then he goes on to say, "My opinion is based upon" -- and then he gives a series of enumerated factors, 1 through 9. Do you see that?

A. Yes, I see it.

Q. Number 1 is the very high, quote, "bet the firm," end quote, type of stakes that this case presented for Peiffer Wolf, which made it essential to hire top rate attorneys who could handle the unique issues the Levin Simes case raised.

Do you agree with Item 1 in Mr. Pearl's paragraph 17 here?

A. I don't agree that it supports the rates. They're -- you know, the plaintiff side, Levin -- very disaffected by its long-term-protege partner, the boyfriend, leaving and taking their business. They went out and hired a firm to sue to, you know, for trade secrets and such. That doesn't make it, necessarily, bet-the-firm-type stakes. I mean, they say -- they say that the trade secrets part of the case is worth $6 million. I don't know if it's just self-immolation or what, but if you spend $6 million,

if the fees have been paid to protect against $6 million, you've already lost the bet-the-company case because you've incurred an amount when you still have a defense on the basis that these things weren't really trade secrets after all. They're just the names of Uber drivers or Lyft drivers or rideshare drivers and the like. So, you know, to me, the biggest stretch in this case is to say that this is a profound trade secrets case.

I've been in cases -- the departing employee case, I could think of immediately of three that I've had where the question always is: Was the information a trade secret, or was it readily available in another way? And all sides apparently agree that a lawyer is free to leave a firm and a client is free to choose a lawyer of their choice. So the question here is why you spend $6 million on a case and then try to call it a -- to defend that and call it a bet-your-company case where your real exposure probably isn't even that much.

Q. So what's the -- I think you referenced a moment ago that you believe the trade secrets component of the Levin Simes damage claim is worth approximately $6 million if they prove that claim. Is that accurate?

A. That's what they say, the person they treble, and then say fees and so on. But nobody pays treble

damages in a settlement. If you don't think a case like that would settle within $6 million, if that's their drop dead number on trade secrets, I mean, you don't understand settlements. This isn't a bet-your-company case in that sense. You know, it's always -- it's hypothetically a bet-your-company case. What if the worst of all possible things happen and I -- the firm had a judgment against it for $20 million? I don't know what would happen. In our firm, I think we'd fold up the tent, and I'd start down the street doing the work that I'm doing today, and it wouldn't have that dramatic an impact, necessarily. You have to play it through.

In any event, none of that has happened, and the arguments are very strong. And in every case I've been in, whichever side I've been in on the trade secrets issue, you know, if you can find it on the internet, it ain't a trade secret. There's a very real possibility that trade secrets aren't even involved in this case.

And it's the kind of case, you know, that's motivated more by emotion. I mean, the Levin firm felt very disaffected that their young protege partner sneakily went to another firm and took her boyfriend with her and tried to hire a bunch of other staff, and

they're trying to punish that, obviously, and they're making as big a case out of it as they can. But at the end of the day, is it really a bet-your-company case? Not that would support 6 million in fees. I don't think so.

Q. So what's your understanding of the total damage exposure that Peiffer Wolf has in this case if it were to lose the Levin Simes arbitration?

A. Well, they say that Rachel Abrams owes them about 2.9 million, which they overpaid her, which if she does, she does. If she doesn't, she doesn't. You know, that's separate and apart. The exposure for a -- the trade secrets they stated in their own post-mediation -- or post-arbitration brief, they stated as -- a post-hearing brief, they stated as 6 million travel plus fees.

But -- so you could say -- and this is what I think is the -- is the source of this comment by Mr. Pearl, that it's a $20 million case, but he doesn't -- he's not a litigator. You know, he just knows that somebody wrote that down on a piece of paper. I mean, that's like -- that's like confederate money. That doesn't spend. You've got to win to get it.

And it's a -- it's a very hypothetical

Page 86

exposure, especially when the names of Uber drivers and Lyft drivers -- you know how many Uber cases are out in the world suing them for wage an hour and other issues? Many by many firms. They -- they're not all trade secret. I myself personally sued Uber for -- for workplace issues in San Francisco of all things. So I mean, it's -- it's unlikely, let us put it that way, in a real world context that this is a bet-your-company case. That's what I think.

Q. Documents --

A. Could lose it, but my goodness, don't.

Q. What documents have you reviewed to support your suggestion that in the real world, this is not likely to be a bet-the-company case?

A. I mean, I have each party's summary of everything they ever learned about the case and everything that ever was put before the hearing people and -- and their best take on that, and that's my conclusion after reading all of that, plus I'd read the complaint. But those post-hearing briefs are quite revealing, and your side is thoroughly dismissive about whether these are trade secrets at all. I tend to agree with you. I tend to agree with you that how you sue Uber or Lyft or some rideshare operation is not a trade secret and that clients are free to choose

Page 87

whatever lawyer they want.

Now, look, if they -- if your client started contacting clients of the firm -- Levin firm before they left while they were still partners or even of counsel, that's a problem, but apparently, there's no evidence of that. So I -- you know, this thing that it's suddenly a bet-your-company case because someone puts a number in a complaint or says in their post-hearing brief that that's what the case is worth, that doesn't make that true, you know. I mean, it's an adversary system that we're in. And I don't -- I just don't see it as a bet-your-company case.

I believe -- this is really my thought, that if you've given me $6 million on day one, I think I could have resolved the case, and I think any mediator could have if they would have taken emotion out of the play.

Q. Are you aware that the parties went to a mediation in the middle of the case?

A. I'm sure they did, but as they say, it takes two to tango. But the reality is that both -- before it's all said and done, it will settle within that number, in my view.

Q. Did CNA share any of the Peiffer Wolf or Abrams and Perkins mediation briefs with you?

Page 88

A. No, I don't have anything like that. I mean, that's their aspirational brief. The post-hearing brief, you're trying to convince somebody that's actually heard the evidence that you have a trade secret or that there were conversations that did or didn't happen. And that's much better -- much better source than a mediation brief.

Q. So just to be clear, with respect to this item 1 in paragraph 17 of Mr. Pearl's opinion where he refers to this being a very high bet-the-firm type stakes, you disagree with that, correct?

A. I disagree in several ways. I don't think it was a bet-the-firm type case, and I don't think the issues are unique. Issues are so thoroughly not unique that Shartsis advertises on its website that it's going to handle cases of departing lawyers taking clients. If it's -- if it's unique, how come they've done it so many times before?

Q. Let's focus on one thing at a time. There's lots to unpack here in 17, I understand, but I'm still looking at bet-the-firm right now. Okay?

And to be clear, your testimony that you do not believe this is a bet-the-firm type case is based on your understanding that the damages sought are only $6 million, correct?

Page 89

23 (Pages 86 - 89)

MR. GRABILL: Object to the form.

A. That doesn't quite encapsulate my testimony. I could refer you back, or I could start repeating, and I'll start repeating until you stop me.

The trade secrets are valued by the Levin firm at 6 million and some odd dollars, apparently based on actual testimony at the hearing. They then say they want it trebled, and that's another level of proof that has to be met. And then they say, "We should also get attorneys' fees," I guess on the basis that it's an extraordinary case. All of that is problematic.

And on your side, you say, I think rather convincingly, that the information on how to sue Uber and Lyft is not a trade secret. And I don't know how it could be. And you don't have a decision yet. Usually when I do this, there's a decision already made, and I don't have to interject myself as to my own thoughts of how it's going to go. But it just strikes me that, you know, even if a client left with them that was an Uber driver or Lyft driver or rideshare or somebody like that, why can't you just get another one? You know, I mean, it's -- and line yourself up because there's so many suits against these rideshare-type companies. It's not a one-off.

You know, they're fighting it in legislatures

Page 90

to try -- and against -- and against -- in California, anyway, you have propositions that would make them be employers instead of independent contractors, and a whole host of things happen depending on how you characterize. And that -- or whether you have an arbitration agreement. My case turned on whether or not each driver had an arbitration agreement or if they didn't. And then there was a lawyer from Boston who said, "We're going to sue in every case in an arbitration." And I have 15,000 clients. I mean, this is -- this is well-trod ground. It ain't a trade secret. I mean, it's just not.

BY MR. CENTNER:

Q. Is that your full answer with respect to my "why is this not a bet-the-firm case," sir?

A. And it's not a unique issue because Shartsis talks about a specialty of theirs, attorney departures and formation of competing firms. Sounds kind of familiar. That's been on their website not just because of this case. It's in a whole list of things that they do for lawyers. And guess what? Lawyers sue each other when one leaves and takes the business. It happened in my firm where a partner leave. He of course sued us, which was silly. But nonetheless, it's not unusual, and it's not unique. To call it unique

Page 91

belies a lack of experience in litigation. It isn't (inaudible).

Q. All right. So I don't think I got an answer to my question.

Was the answer you gave me a moment ago your full answer with respect to the bet-the-company portion of my question?

A. Yeah, all the things I've said. I don't -- I mean, I've said a number of things. But yes, all of that in one place is -- is the -- would be the reason that it really isn't.

Q. Okay. Yes or no, do you agree that your subjective view of the merits of the case should impact your analysis of the reasonable rates defense counsel may charge for work on that case?

A. No. I'm -- I looked at the case as presented. I'm just commenting that Richard Pearl has -- has blown the case up into a giant balloon that is incorrect, and I'm thinking his justification is unwarranted. This is litigation of the type that happens a lot, is not unique, and does not require that they hire top-rate attorneys. And by the way, they really didn't because these lawyers are not top-notch trial lawyers; they don't go to trial. They're -- on the Altshuler side, they're great lawyers at what they do, which is class

Page 92

action work, which involves settling class action cases.

They're not -- if you wanted a great trial lawyer, you'd go to a firm like Quinn Emanuel or somebody that really tries a lot of cases and have somebody that used to be an assistant at USA and tried a zillion cases. And that's what -- that's what you'd do if it really was a bet-your-company case. You wouldn't put a class action lawyer who has no trial experience to handle the case.

Q. Your statement that they are not top-notch trial lawyers, that's based on the information you shared earlier that you're currently emailing to Mr. Grabill here, the Westlaw trial search you ran; is that correct?

A. Yes. And just so you know, it's not meant on whether they might be good at it even though they don't do it often or at all; it's the fact that they don't do it often or at all.

Q. Okay. Now we're going to get to where I think you really want to go. Unique issues. I certainly understand you are of believe that these are not unique issues. Let's look at the other side of the coin.

What would be a unique issue?

A. I'm sorry. What would be a unique issue?

Page 93

24 (Pages 90 - 93)

Q. Yeah. Just -- like, you've been doing this for 50 years. Like, what's a unique issue that you think justifies hiring a top-rate attorney?

A. The very word "unique" means it's one of a kind. It is not one of a kind if the Shartsis firm advertises their specialty in handling these kinds of cases. It's not one of a kind if me -- I'm not specialized in that. I'm quite a generalist. I can think, off the top of my head, three different kinds of cases where the employee leaves and is accused of taking information. That is extremely common, whether it's in a law firm or not in a law firm. It's not unique. It's like a divorce, you know. I mean, there's a lot of them.

And to try to make this into something it isn't, I think, in order to justify high rates, I think is a wrong approach. I think you have to look at the case that you have. Is there something unusual about this? What do their partnership agreements say? How is this really a trade secret? Do -- did they really overpay your client -- or not your client, but a client 2.9 million? So she should give it back; she didn't earn it. But, you know, that -- those are not -- those are not really compellingly -- or let's say unique, one of a kind, unicorn-type issues.

Page 94

Q. You referenced divorce as an example of a case that's not unique. But isn't that an overgeneralization? I mean, wouldn't you agree there could be a divorce case that presents unique issues that requires specialized legal representation?

A. There's a lot of divorce cases, including fights over who gets the dog. It could be unique, but I wouldn't spend a lot of money doing it. The bigger-money divorces, obviously lawyers throw more at it. There's a lot more financial issues there, frankly, to tell you the truth, that -- that might be more involuted and -- by parties hiding the ball quite a bit more. I don't know exactly.

It comes in gradations, you know. But this is not a one-off. This is something that happens a lot. I've been to trial in a case for -- for a headhunter firm that placed medical professionals who had a doctor leave and take their whole list of people and hide it behind a -- on his computer behind something that said "recipes." I thought that was compelling, not really. The jury said, "Well, you can find it on the internet they're just names," and you don't win that case. The fees that the lawyer -- it was legal mal case. The fees were not -- the half a million in fees were not collected.

Page 95

But nonetheless, I mean, I did it for a -- for a plastics company that made jet fighter cockpits that were made of glass, plastic actually, and were very sophisticated. And they were just down the street from an international company called PPG, and one guy left PPG and went over to them. And then they got this navy contract worth tens of millions of dollars, and so there was a lawsuit. But they had to show that they actually took and used a different process, which they couldn't do. So that didn't make it unique. It's an employee leaving.

One of my earliest cases was an agent of employers that were also leaving and had the expiration dates of all the policies, so he couldn't have an advantage of going and get renewals for another company. I was running all over the state, getting declarations, and that information was not enough to win. You know, it's because it's just the expiration date of a policy. This is just how you sue Uber, you know. I mean, let's not put too fine a bow on it. It's -- you know, it's not a trade secret. It's not unique, and it doesn't require a highly specialized $1300 lawyer.

Q. Post-hearing briefing that you described earlier, what documents did you look at, if any, from

Page 96

the underlying Levin Simes arbitration?

A. There's a chronology that's attached that gives you everything that the brief cites and the evidence. It's really quite a good distillation of everything. I read the complaint. But by the time of your hearing, obviously things have moved past the allegations in the complaint. And there's two very different views being presented -- three, actually, in those briefs. But it does come down to, really, is -- what is the trade secret.

Q. I'm sorry. You referenced the chronology that's attached. What are you talking about, sir?

A. It's attached to your brief. I think you would know what it was. It's a chronology of the events in the case called Appendix A.

Q. Okay. So that's -- sorry. You lost me because I thought I had asked you what, if anything, you reviewed other than the post-hearing submissions.

A. This is attached to a post-hearing submission. It's --

Q. Okay. I can rephrase.

Other than the post-hearing submissions and the respective attachments thereto, what, if anything, have you looked at from the underlying Levin Simes arbitration?

Page 97

25 (Pages 94 - 97)

A. Complaints. I think that's about it. As I recall, there were no depositions taken. Right, there's no depositions.

Q. Do you do a lot of arbitration work?

A. Do I do a lot of arbitration work? Yes, I actually am an arbitrator quite frequently as well.

Q. Just curious, are the arbitrations you're involved in -- do they typically have depositions or no?

A. Yeah. AAA does. They -- it's like a -- it's really quite parallel to superior court cases, just pursuant to an arbitration agreement.

Q. What forum -- what arbitral forum was this case proceeding in? Do you know?

A. It's probably on the front -- it looks like JAMS.

Q. The complaint you referenced, was that the complaint filed in San Francisco Superior Court, or would that be the statement of claim filed in the arbitration?

A. It's the complaint filed in the superior court on May 5, 2023.

Q. All right. And then the answer you just gave, is that your full and final answer with respect to the question, what materials from the underlying Levin

Page 98

Simes litigation did you consult in connection with preparing your opinions in this case, sir?

A. Well, no. The invoices, those relate to the litigation.

Q. That's a fair clarification, actually.

So the invoices -- when you say that, just so we're all talking turkey here, the invoices that Shartsis Friese issued for its work in defense of Abrams and Perkins, correct? That's one set of invoices you're referring to?

A. Yes.

Q. And then the other would be the invoices that Altshuler Berzon issued in connection with the work it performed defending Peiffer Wolf in connection with the Levin Simes arbitration, right?

A. Yes.

Q. Okay. Other than the materials you've now described, which -- thank you for clarifying -- include the invoices, is that your full and final answer with respect to the materials you looked at from the underlying Levin Simes arbitration in connection with preparing your opinions in this case?

A. Yes, that's all that I recall.

Q. Do you know if the legal chain -- the legal claims in this case changed in between the filing of

Page 99

the complaint and the ultimate statement of claim that was finally filed in the arbitration?

A. I think your side filed a counterclaim; that's additional. So there is some change there. I don't know if they dropped claims or not. And I'd have to compare the complaint to their -- to their post-hearing brief. But the facts are the same, general set of facts is the same.

Q. Other than the counterclaim you referenced, any other -- do you have any awareness of any other legal claims that may have changed from the complaint to the ultimate operative statement of claim in the arbitration?

A. No. I could look at Levin Simes' complaint and compare it to their post-hearing brief, but I haven't done that. So as I sit here right now, I don't know.

Q. Let's keep working our way through Mr. Pearl's paragraph 17. I think we can officially move on to item 2. He says that AB -- you understand that means Altshuler Berzon, correct, sir?

A. Yes.

Q. And SF, we can agree that means Shartsis Friese, right?

A. Yes.

Page 100

Q. He says, "They have very impressive credentials and experience." Do you agree with that characterization?

A. Well, it's -- it needs to be exposed a little bit, an expository answer, because the only lawyers that he claims to have known were Altshuler and the next name -- hold on a second. Two of the partners at Altshuler Berzon -- I think those are the two actually. And those are the only two that he mentions knowing anything at all about and that they're great lawyers and that they -- he's known them for 50 years, except they didn't work on the case. Neither one of them spent one-tenth of one hour on the case. So it doesn't really tell you anything.

So if you say, in general, do the firms have impressive credentials and experience, I mean, generally speaking, it's not an unfair statement. However, the very lawyers that were doing the work and doing the most of the work as partners do not have that kind of impressive credentials and experience, at least trial experience. I mean, I don't want to be dismissive of -- of Mr. Finberg in the arena in which he operates, which is being in very big, very important class action cases that settle and don't go to trial. That does not make him credentialed and experienced in

Page 101

26 (Pages 98 - 101)

this kind of case.

And so calling out that Altshuler Berzon or Finberg or whoever -- and he doesn't mention Finberg -- have a lot of experience of a sort, either they're not involved in this case or they have experience that isn't relevant to this case, I think you have to look at who's doing the work. That's -- when you look at that, you find that these are lawyers of very modest trial experience.

And going to your kind of hearing is the same as a trial in most ways. You know, you're presenting -- there's no case until you put on the case. I'd say that to young lawyers all the time. There's no show until you put on the show. And so you have to do all the things that you do at trial. You have to organize the exhibits and all of that, and you don't have lawyers that have really done it very often. So, you know, I don't think they get premium rates.

Q. So let's just -- I want to go deliberately. I mean, I get your general answer, and I appreciate that. But I just want to make sure the testimony is clear.

So you agree that Jim Finberg at Altshuler worked on this case on behalf of Peiffer Wolf, correct?

A. I'm sorry. Who else? Finberg and who else?

Q. Jim Finberg -- we're going to talk about Jim

only right now.

You agree that Jim Finberg was lead attorney for Peiffer Wolf on this case, correct?

A. He -- he's the attorney that put in the most amount of time, and he's the most experienced. I know that. He's an '84 California admittee, and he billed 1111.7 hours so -- which is twice what Stacey Leyton, L-e-y-t-o-n, billed. So yes, I would say that he is the principal attorney.

Q. And I want to limit your testimony right now to Jim Finberg's credentials. All right? Do you agree that Jim Finberg has impressive credentials and experience?

A. As a class action attorney in very large class actions that all settle, yes. As a trial attorney, no.

Q. What about Stacey Leyton? Same question. Do you believe that Stacey Leyton has very impressive credentials?

A. She doesn't really even have the class action credentials of Finberg. She -- she's tried one case as a third chair, and I'd say that she doesn't have trial credentials to speak of.

Q. What about James Baltzer? What are your thoughts on James Baltzer's credentials, sir?

A. Baltzer is a 2020 associate, and I didn't run

his name as to all the trials he's had. My assumption is that the partners were going to try the case, and Baltzer is not one of them.

Q. What about Frank Cialone? What is your opinion of Frank Cialone's credentials? Are they impressive or no?

A. We're going over to Shartsis now?

Q. Yes, sir.

A. Okay. So he is a 1994 graduate. He -- he did have a couple of good results at trial. But one, he represented himself -- I'm sorry -- yes, he represented himself, the firm, in a case about some employee benefits that should be paid and did prevail. But that's 2009. That's the last case he tried. It's 2024. That's 15 years ago. You know, maybe the address of the courthouse has changed in 15 years. And then his other case, he lost, you know, so -- in 2008. So I don't think he has impressive trial credential.

Q. Got it. And that's your full answer with respect to Frank Cialone's credentials, correct?

A. Right. I'm not suggesting that he can't do the things that clients pay him to do, but trying a lawsuit isn't one of them.

Q. What about Felicia Draper? Same question I pose to you now for the other attorneys. Is Felicia

Draper somebody you believe has impressive credentials and experience?

A. She's of counsel, and she had significant time in the case, but I didn't look up her trial experience. I could. I don't expect that she was going to be the lead trial lawyer, though. That is going to be Cialone.

Q. Got it. Any other Altshuler or Shartsis -- actually, sorry. I forgot.

So that was your full answer with respect to Draper, correct?

A. Yes. He's a 2006 attorney, and he did a lot of the supportive work. Let's call it that.

Q. Let me ask you this. I'm picking up on a pattern here, right. When I ask you about some of these credentials, you immediately start referring to their trial experience.

Would you agree with me that there are other credentials other than trial experience that can be impressive?

A. Right. But we're talking about a case that was going to trial -- or in this case, to a JAMS arbitration. And so you -- you know, there's horses for races. And you know, you don't want an on-motion attorney, you know, or an appellate attorney or a class

action settlement attorney to go in, you know, to the arena, you know, where the crucible -- where the truth will be found. You want somebody that's done that before, that actually has some trial shoes that they can put on and go in, and that isn't the case here. I'm not saying they're not good lawyers, but they don't get premium rates based on their experience.

Q. Let's move up to Item 3 in Mr. Pearl's paragraph 17. He talks about Levin Simes' retention of the Keker Van Nest law firm, one of the Bay Area's most highly-regarded litigation firms, which staffs the case with its associate general counsel, also a high-ranking partner, and a whole team of other very well-credentialed attorneys and staff.

You with me so far, sir? You see where I'm reading from?

A. I'm with you, but I didn't get to finish my comments on number 2.

Q. I'm sorry. Let's get your questions out here. Then we'll go back. So I have a question pending right now.

A. Okay. I understand. I've audited the Keker firm before. I have a reasonably high impression of them in the Bay Area for the work that they do. Doesn't mean they win every case, though. And they

Page 106

can't make something that isn't a trade secret be a trade secret just by their name.

Anyway, on number 2, it says there was relatively lean staffing. Not really. I mean, Altshuler used 19 different people, and Shartsis used 16 different people. So parties with essentially the same interests, who might well cooperate with each other, used 35 different people in the brief period that this case was litigated up through the hearing dates. It's not lean staffing. I mean, I'd have to ask Mr. Pearl, like, "What is heavy staffing?" at this point.

Q. We will absolutely get to that later. I appreciate your eagerness there. I know that was a point of focus in your report.

A. It says that -- in number 2, it says relatively lean staffing, and you moved on before I could comment. So I just wanted it to be in the right place. I don't --

Q. I got it. Again, I'm just telling you we're going to get there later, so, you know, keep the powder dry, as they say.

You reference that you have a -- was it a reasonably high impression of Levin Simes? What's that based on, sir?

Page 107

A. Not of Levin Simes. Of Keker Van Nest.

Q. Oh, my gosh. What a misstatement. I was looking at the wrong thing.

A. Oh, yeah, I --

Q. Of Keker Van Nest. You have a reasonably high impression of Keker. What's that based on?

A. I've audited them before, probably more than a few times, and they've had billing issues like anybody probably has. But I think that they're a very capable litigation firm. I didn't go back and review who these particular people were that they had on the case. Look, if they're that good and they put in one of their top trial lawyers, then you should have a better trial lawyer on your side.

Q. You said you've audited Keker Van Nest before. Have you ever litigated against Keker Van Nest?

A. I'm not sure. You know, I've been in business a long, long time. It's possible, but I don't have any memory of it, as I sit here.

Q. If Keker Van Nest sued your firm, who would you hire to defend you?

A. I don't know. Depends on the case and what was at stake and so on. You know, we have an insurance company that takes, you know -- has opinions about who should be defending us and pays for that. That's my

Page 108

understanding anyway.

Q. So if Keker Van Nest sued you, then, would you just be happy to let the insurance company appoint panel counsel to defend you?

A. Well, it depends. I mean, you know, insurers that -- that defend professional liability -- I mean, when people say "panel counsel," they think it's like A rear-ends C, and that that's all that they can do. There are lawyers -- let's say Lewis Brisbois, just to pick up a name. They do a lot of professional -- I'm auditing. I'm sorry. I shouldn't be too praiseful right now. But they do a lot of professional liability defense, and they're very good at it, and they're -- they're brought into cases by insurance companies. I mean, it's not a pejorative if they -- if they have good lawyers that try a lot of cases and do their best to defend the insured client.

Q. That's the goal, right? Good lawyers who will do their best to defend the insured client?

A. My experience with insurance, that happens most of the time.

Q. I'm sorry, sir. Could you speak up a little bit? I'm having difficulty hearing you.

A. I said that's my experience with insurers. That's what happens.

Page 109

28 (Pages 106 - 109)

Q. Do you know how many attorneys Keker Van Nest had staffed on this case, sir?

A. I haven't seen their invoices. I don't know.

Q. Do you know how long the arbitration hearing lasted in this matter, sir?

A. Ten days.

Q. That's ten hearing days, correct?

A. Yes. That's what you asked. It's ten days.

Q. I was just making sure you weren't including weekends in there. You're very precise, Mr. Jardini.

You said you did not review the bios of any of the Keker Van Nest attorneys who worked on this case against Peiffer Wolf or Abrams and Perkins, correct?

A. That is correct.

Q. Let's move on to Mr. Pearl's Item No. 4. He talks about Keker's vigorous prosecution of their client's positions, including discovery battles and heavy motion practice largely initiated by Keker.

Based on the statements you shared with me earlier about what you did and did not review, I would assume you don't have an opinion with respect to No. 4?

A. Oh, no, that's not correct. The activity of the case doesn't speak to what rate you get. A case could be very active, and you get $200 an hour. It doesn't mean that you get more per hour because the

Page 110

other side does things. Believe me, they billed all the time, thousands of hours. We're not talking about that. We're only talking about the rate they're charging for all those thousands of hours. You don't get to over 6 million in fees without having spent all those hours. So did they spend a lot of hours? Yes, they did. Does that mean they should get a higher rate? No, it doesn't.

Q. So let's put a bow on this. I think this is an important point. Is it your testimony under oath that an adversary's vigorous prosecution of their client's positions in no way, shape, or form impacts the rate analysis applicable to defense counsel?

A. It's a logical disconnect. I mean, whatever rate you're getting -- whatever the fair rate is, you should get that. And then whatever the service that's necessary, if the other side is aggressive or not -- I'm sure they would suggest that your side was overaggressive. That's what I see all the time. And maybe it's not true, or maybe it is true, but it doesn't make a difference. You'll get paid for all of your hours doing this work except on the counterclaim -- but all the hours at a reasonable rate. So why would more hours multiply your rate up? It doesn't.

Page 111

Q. Well, to be clear, when you say more hours, I'm talking about hours spent by your adversary. Is it your -- does that change your answer?

A. No. I mean, believe me, Altshuler spent 5,218 hours -- 281 hours, and on top of that, Shartsis spent 3,718 hours. So you have almost 80 -- more than 8500 hours, so you're doing all the things that you would do to fight whatever they're doing. That doesn't mean you get a higher rate because they're active. I just don't understand even the logic of that.

Q. Okay. Let's shift gears for a moment now, and I want to talk about your work in this case. All right? So I'm going to stop sharing Pearl's report, at least for the moment.

When were you retained as an expert in this matter, roughly? Do you recall?

A. The end of August and by the first or second week of September, we had a retainer agreement in place and were doing our work.

Q. What is the formal scope of your expert work in this matter?

A. Initially, to look at all the circumstances of this case and to assess reasonable rates in the community for these lawyers in this case. And then because there were evident significant billing issues,

Page 112

I also commented on those.

Q. So you commented on those. But ultimately, are those opinions that you will offer at trial of this matter, or will your opinions be focused on the reasonable rates in the community problem that you described in the first part of your answer?

A. Well, the first part of my work was to do the rate analysis, and if I'm asked about their billing practices, I'll comment about those as well.

Q. As we sit here right now, do you believe that billing practices are an issue in this matter?

A. Well, they always are if reasonableness is an issue. I mean, we've got -- I guess, really, I didn't add together very well. This is .3 less than 9,000 hours in this case, which multiplies up to over $6 million. And you're -- you know, you're looking at a case where, what's the real exposure? What are the trade secrets worth if they really are trade secrets?

And there's -- there's two datapoints that don't line up there. And having seven timekeepers from each of the firms, that makes 14 different people at the arbitration, that just jumps off the page as being an unreasonable level of staffing. They billed for -- well, I'd say it all in my report. I'm not going to repeat it here. But the issues that we found, I

Page 113

29 (Pages 110 - 113)

stated. I do admit that wasn't a complete audit, and it wasn't our first assignment, but it was evident from what we looked at, and so I did comment about it.

Q. So you commented on it. But were you asked to issue an expert opinion on that issue?

A. Well, I did. So I mean, I can't remember if we floated the idea that there's all these billing issues as well. I mean, since this time, I've learned that there's this counterclaim, and certainly, you know, I mean, this is a counterclaim where -- where your firm is trying to actually -- affirmative relief from -- from the Levin firm. And it's just not going to ever be the case that an insurance company is going to pay you to sue somebody. That's not the nature of insurance. It's to protect you from being sued. That's a very simplistic way of saying it, but there's actual language in most policies that would say just that.

So there's also that issue. There was time spent in that way. It's not segregated, though. It's all been dumped in the same pile as if it's just going to be paid no matter what, even though it's not payable under any circumstances, and it ought to have been segregated. And that's even something I've learned since the report.

Page 114

Q. Isn't it true that in the past, you've taken the position that work performed on an affirmative claim is, in fact, compensable by an insurance company if it overlapped with work in connection with the defense in the case?

A. Well, that's a whole host of things that could be in play. Sometimes suing a third party to lateral off the fault of some of the damages is really part of the defense, and I have no issue with that. Or sometimes it's a formal type of cross complaint -- we call it a cross complaint -- for the plaintiff's own negligence, which was really put in issue by an affirmative defense. There are circumstances where that's true, but we -- that's not what you-guys are doing, though. You're suing separately for separate conduct -- conduct to recover for damages. It's -- it's in your brief.

Q. And your statement -- again, just to confirm, that statement you just gave is based solely on your review of the parties' post-hearing briefing, correct?

A. Well, Peiffer Wolf's brief. They say what they're doing and what they're seeking to recover, and they tell the panel that that's what they want, and it's -- and it's based on a counterclaim for affirmative relief, and it's not the flip side or the

Page 115

mirror image of what's been happening in the case.

It's -- it's part of the unclean hands defense, but it's really for liability for intentional inference with contractual relations and with prospective economic relations, liable for defamation, false statements, and liable claims as well as under unfair competition law. Those are new, fresh, and different affirmative claims for damages, and that's not covered by insurance.

Q. Other than reading the post-hearing briefing, you did not do any independent analysis to determine whether the issues presented by the counterclaims overlap with issues associated with the defense of the case, correct?

A. I don't know how better to answer you. You're seeking affirmative damages. There's no other part of the case where you're seeking affirmative damages. Are some of the -- are some of the people the same people? Yeah, but they do different things. So, you know, having an arguable, quote/unquote, "overlap," whatever you mean by that, doesn't decide the question. What decides the question is, what are you doing? You're seeking damages for separate independent acts, like liable. You know, that's not part of the case itself. For the first part -- first case or the Levin case.

Page 116

Q. So again, I get where you're coming from there. My question was simply: Other than reading the post-hearing briefing, did you do any independent analysis to support the opinion you just shared?

A. No. I understood your position from your brief, and it's enough for my opinion.

Q. Let's go back now to the different opinions -- the opinion or opinions that you're offering, right. One of them, obviously, is that you do not believe that hourly rates that are being charged by either Altshuler Berzon or Shartsis Friese are reasonable for this particular case. That's one of your opinions, correct?

A. Yes, that's true.

Q. And then what other formal opinions, if any, are you planning to offer at the trial of this matter?

A. Well, I told you most, maybe not all, of my points of disagreement with Richard Pearl and his level of analysis, so there is that. And then I have opinions about staffing and a number of very specific billing issues as described in the later pages of my report. So I would just incorporate all of those things in my report in answer to this rather than repeat that.

Q. Bear with me. I'm sure you've been here before. We covered a lot of ground earlier than

Page 117

30 (Pages 114 - 117)

anticipated, so I'm simply -- what's the word -- streamlining some of my questions. This is for your benefit, Andre.

A. I will let you take as much time as you want to do that. I have no problem with it.

MR. GRABILL: You want to take just a quick break? I could use a restroom break.

MR. CENTNER: Let's do it. Five minutes, please.

(Recess taken.)

MR. CENTNER: Back on the record.

BY MR. CENTNER:

Q. Mr. Jardini, in the course of your professional career, have you ever been retained to -- have you ever been retained by an insurance company?

A. Yes. I was retained quite frequently by insurers in the early part of my career.

Q. And would that be to perform defense work?

A. Various things. I was mostly doing insurance coverage, coverage litigation, and insurance bad faith litigation, including trial. Occasionally, I would be called upon to defend an insured in unusual kinds of cases, either products liability case, intellectual property case, a whole host of different things that were being insured at the time. But the ultimate

Page 118

paying party in those years was an insurance company.

Q. You've been retained directly by insurance companies to do coverage or other work, right? That's part of your insurance company experience, right?

A. Right. That's the first 20, 25 years or so. After that, I took great pleasure in suing insurance companies on behalf of policyholders, including going to trial in insurance bad faith cases. So I've been on both side with insurers.

Q. Got a great bad faith case here, don't you think?

A. No.

MR. GRABILL: Object to the form.

BY MR. CENTNER:

Q. Wanted to see if you'd slip up there, Andre.

A. No. I mean, I'm not -- I'm not examining that. I don't know really much about what the coverage issues are. You'll have to argue that for yourself.

Q. And you've also been retained by insurance companies to defend insureds in certain circumstances, correct?

A. It wasn't the most of what I did, but it did happen in the earlier years of my career, yes.

Q. All right. Did you ever serve as panel counsel?

Page 119

A. Well, anybody that defends an insured would be approved by an insurer, so I did work for State Farm, employers of -- I don't know, probably 50 different insurers at one time or another. And so yeah, I mean, I was approved by them. If you want to say that's on a panel, I guess that's what it is.

Q. So when you say you were approved by them, I get that, right. They had to approve the retention. But were you ever on -- and forgive the terminology, if it's not precise here -- you know, a list of preferred firms that they liked to work with, and they'll proactively reach out to you and assign you cases?

A. Yes. The firm -- our firm would be called upon to defend an insured, let's say, and I would be selected if I was the right person to do the work on that case. And we were on some kind of a list where it was appropriate that we be chosen by the insurance company.

Q. This would all be prior to the early 2000s when you had the epiphany and started suing insurance companies as opposed to representing them; is that correct?

A. I don't know about epiphany. I was transitioning to a contingency based practice, and that was one of the kinds of contingency cases that I would

Page 120

accept at that time. And I even went to trial in federal court a number of times on behalf of policyholders against insurers.

Q. Have you ever been hired by CNA before this case?

A. I don't know. I don't think so. The firm might have done some work with them in the earliest years, but I really don't know. And you've already told me they have a number of other companies under their umbrella. So -- and they're not a current client; I'm sure of that.

Q. Are you familiar with something known as the Cumis statute?

A. Yes.

Q. What is that, sir?

A. Cumis is a shorthand way of referring to a case, San Diego Navy Federal Credit Union vs. Cumis Insurance Society. And in that case -- though it wasn't the first case to do it, it's the first case that was widely recognized. The court allowed for independent counsel to be chosen if there was a conflict between the insured and the insurer such that the lawyer who was chosen by the insured could effect the coverage question.

I always thought it was incorrectly decided,

Page 121

31 (Pages 118 - 121)

but it became the law, and it set off a whole sequence of events that leads me to being in this seat today. There became a thing known as Cumis lawyers, and before there was a statute governing rate, those Cumis lawyers became a force of nature. They litigated cases by naming each other's clients back and forth and multiplying up the fees, and I was retained often in those days, in the '80s, to look at those fees, some of which were fraudulent and some of which were criminal. And I don't say that lightly. These are criminal prosecutions that went through to verdict on the fraud that was happening.

In any event, it led to the passage of 2860 of the civil code, which limits rates to the rates customarily paid by an insurer to its own counsel. And it didn't solve all the problems because hours are still unregulated in any way by that statute. But yes, Cumis became a major thing in litigation and insurance litigation in the state of California.

Q. You agree that the statute you referred to that allows the insurers to limit the rates paid to Cumis counsel -- we agree that statute is not relevant to this case, correct?

A. It's not up to me to decide. I've been involved that your judge has so decided. In which

Page 122

case, I abide by that of course. It's not my decision. You're in Louisiana, and I'm sitting here in California. But the underlying case was in California. I don't know what the right answer to that is. But you already have a ruling about it, so there's no need to ask me about it.

Q. But the methodology that you used to arrive at what you believe to be the reasonable rates payable to defense counsel in this case, that methodology did not depend in any way, shape, or form on the Cumis statute, correct?

A. That's true.

Q. And would you agree with me that there's no language in the policy issued to Peiffer Wolf that would allow CNA or Valley Forge to limit the amounts it pays to defense counsel to what we're referring to as Cumis rates?

A. I don't have any way to answer that. I've not looked at the policy. I will say this. It wouldn't usually be there, but I don't know. There's a lot of different insurance policies in the world. I just don't have any information for you on that.

Q. What is NALFA?

A. National Association of Legal Fee Analysis. It's a professional group of attorney fee auditors.

Page 123

Their charge is to educate, to compile information, to provide continuing legal education and provide a forum for attorney fee auditors to talk to each other and -- and to read cases that they -- that they find nationwide and to set standards, by the way, on how audits should be done. So it's a professional organization for legal fee auditors.

Q. Are you personally a member of that organization?

A. I am.

Q. What are the criteria to become a member?

A. I'm not sure there's, like, an insurance requirement, like the American Board of Trial Advocates or something, that, I think, if you're interested in attorney fee issues, you're probably welcome under the tent regardless of who you are.

Q. So I went to their website yesterday to get some additional information about them, and technology being what it is, I received an email from them this morning. I don't even remember signing up for that.

A. I think you should join immediately.

Q. I did think there was something interesting in there I just want to show you quickly and get your thoughts on, though. Fire up the screenshare here. Just give me a second. All right.

Page 124

As you can see, my story checks out. They sent this to me yesterday. These were just images. I'll represent to you there's nothing of any substance there. They just didn't print up.

A. Okay.

Q. All right. So we see "The Wall Street Journal Cited NALFA Hourly Data." Do you see that?

A. I don't see it here, but I've got the same email, so I think I read it when it came in.

Q. I had one additional button to hit. But now --

A. There -- there it is.

Q. This is the same email that you probably received yesterday, correct?

A. Yes.

Q. Okay. So my question for you is: One of the sources that you cite in your report is the -- I think it's Wolters Kluwer's Real Rate Report, correct?

A. Yes.

Q. Does NALFA publish a similar type of report or compilation of attorney fee data in the state of California?

A. It's not just in the state of California, and they do have data. It's not as robust because it doesn't have as many participants, I'll call them that,

Page 125

32 (Pages 122 - 125)

or as much data. It's useful, though. I've used it before, and it can be of use. I don't think -- and they're like anybody that talks about rates. It gets eyeballs on your story if you see somebody billing $2500 an hour. It's like, you know, man bites dog.

Q. So I think -- was that a "yes," NALFA does publish attorney fee data in some way, shape, or form?

A. They do have a rate survey, yes.

Q. And then is -- do they, I guess, subdivide or group their survey into state-specific inquiries, for example?

A. I don't believe so. If so, it gets too fragmented to be useful. But if -- it's useful information. They break it down by what they call regular cases versus complex cases and a host of other ways that gives you information about rates generally. I don't know if it's useful in every case, but -- and they have -- they haven't been doing it for as long as the Real Rate Report.

Q. Why did you not cite anything from NALFA in connection with your work in this case?

A. I don't think it's as good a survey. Real Rate Report, if you -- I think I said it in my report. If not, I'll say it here. In our federal courts, it's been favorably cited, like, 258 times. It's an

Page 126

accepted rate report because it breaks down fees by location, type of case, size of firm, experience of lawyers, and so on. It has a host -- and whether you're partner, associate, or other.

And so it has a host of criteria of variables that impact rate. Smaller firms get lesser rates than bigger firms, just absolutely a truth, and it's true across the board. There may be an exception here or there, but it's generally dramatically true. In fact, if you look at Am Law data, the top ten firms in -- the top 100 -- mind you, the top 100 in size -- top ten firms have significantly higher rates than 90 to 100, you know. And you say like, "Well, they're top 100 firm, you know, size in the whole nation. They should have the same rates." They don't. So, you know, it makes a huge impact, you know, these variables, so they have to be meaningfully applied as best you can in the case that you have.

Q. You've cited NALFA hourly rate data in connection with prior work you've done, haven't you?

A. On occasion, it has been useful, yes.

Q. So why would you cite it in those other occasions if you don't believe it's as robust as the Real Rate Report?

A. It's useful for what it does. And it may be

Page 127

in a particular case, in a particular location, it's useful. Sometimes Real Rate Report -- I mean, it's supposed to be every state, every place, you know, but I've testified in 37 different states, and sometimes the -- you know, if you have -- if you have responses from six attorneys, I don't care how many ways you break it down. I'm not sure that that's helpful.

Q. So what are some of the instances where you believe NALFA would be more useful than the Real Rate Report?

A. I don't really have a general opinion about that. I mean, I have looked at the data on occasion. I've found it to be useful on occasion. If it's -- if there's something better, I'll use something better.

Q. Did you consult the NALFA hourly rate data in connection with your work on this case at all?

A. No. But in the same period, I probably did three or four other reports or declarations, so I was looking at all kinds of stuff, all kinds of data, and probably including NALFA. But I didn't look at it specifically with this case in mind.

Q. What are some other sources of hourly rate data? And backing up for a moment, we've obviously got the Real Rate Report we're talking about now. We've got NALFA. What are some others that you've cited in

Page 128

the past, sir?

A. I got in trouble about 20 years for using AALM report because it's so anecdotal. It's what's wrong really, with a lot of what Richard Pearl says. You know, you have "Well, here's a case that did this, and here's another case that did that." That's not particularly useful unless you can vouch for that being every case of all the fees so you can see where they all land. And of course, he's never done that.

In any event, there's TyMetrix, T-y hyphen Metrix, M-e-t-r-i-x. There's Adjusted Laffey Matrix, isn't location-specific but type of case-specific. But some people use it. There's -- there's -- the National Law Journal used to have one. I don't think it's current now, but it's self-reported. It's only relating to the top 250 firms, and then only about half of them ever respond, but I don't find it particularly useful. There -- there may be others that aren't coming to mind, but there's a goodly number of them.

Q. Over the course of your career, you've cited each of those different sources in connection with different reports that you've issued, right?

A. I've discussed them at least, I mean, for sure. Whether I relied on them or not depends on the case, but I've certainly discussed every one of those.

Page 129

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

Q. You've relied on the Laffey Matrix before, correct?

A. If that's the right measure, I will use Laffey, yes.

Q. What is the right measure for use of Laffey?

A. Well, Laffey doesn't break down specifically by location. It's a Washington D.C.-based matrix. And you can adjust it by cost of living-type adjustments which don't have to do with rates, so it's already got, kind of built in, an issue there, which may or may not be important. But -- and also, it doesn't break down by -- it breaks done by years of experience but nothing else. It doesn't break down by size of firm, complexity of case. And it's really why Real Rate Report is better; it breaks down the data by so many important variables that do make a difference.

Q. Let's go back to this exhibit for just a moment here. I'm going to highlight the second paragraph. The second sentence in this paragraph says that lawyers hourly rates rose almost 9 percent in the first half of 2024. Is that consistent with your observations?

A. I've read studies about that, and in fact, the Real Rate Report details percentage increases that occur year to year. The thing that surprised me was

Page 130

during COVID, rates were still rising. You know, still -- they've already risen, if you're looking at the 2023 report, and -- and those are the rates that are delivered from that.

They could have gone up again depending on the firm. Not every firm has the luxury of raising rates regularly. That's really an Am Law 100 kind of practice where every January, the rates go up for everybody, and then as people change positions, the rates go up again. Rates can go up several times a year, and if you have mega clients, Fortune 500-type clients that want your services, may in fact have one of your lawyers on their board. They are okay with that. It's a marketplace but not everybody gets a raise.

Q. Let me ask you this. The lawyers' hourly rates rising almost 9 percent the first half of 2024, you said that's really kind of an Am Law 100 thing, I believe is what your testimony said. To be clear, have you observed rates charged by firms outside of the Am Law 100 raising -- rising over the first ten months in 2024?

A. So you misunderstood. Am Law 100 has -- typically, those firms have the practice of raising rates every January and then again during the year when

Page 131

there's a change in position. They may or may not have had a 9 percent raise. It's -- this is a -- this is a compilation by somebody at Wells Fargo I know nothing about or what they did. They surveyed large firms, it says. And so if you survey large firms, you're going to get big rates. I mean, if you surveyed small firms, you'll get smaller rates, and you'll also get less increases. A firm like ours, it's very difficult to get a 9 percent increase in a year, much less every year. You know, it depends on who your clients are.

Q. Let's go back to something you referenced a minute ago. You indicated that one of the issues with Richard Pearl's report, in your opinion, is that it's anecdotal. Did I understand that correctly?

A. It is anecdotal, except right at the very end, he has a paragraph or two about the Real Rate Report. "Anecdotal" meaning there's a case; this is the award. And, oh, wait, here's another case, and here's the award and on and on and on. And that's anecdotal because it's not meant to be all the cases and all the rates, only the ones that are selected to be given as information.

And then if you look at the kinds of cases, you'd say, "Well, okay. Wait a minute. This isn't the same kind of case. This is a consumer class action.

Page 132

That's not the same kind of case," or "This is a completely different firm size," or "This is not even the same location." I think -- you know, having the anecdotal report that's driven only by the number -- and then -- even then the number, very often, is lower than the number that's being sought in this case. So which one are we supposed to believe? How are we supposed to take that? I don't think it's particularly useful to do that.

Q. So one definition of the word "anecdote" is an account regarded as unreliable or hearsay. Would you agree with me that the reported cases Mr. Pearl cites in his opinion are objective datapoints that anybody with a Westlaw subscription can look at and see exactly what they say?

A. Well, if you want limited information, which is just a number and often a number lower than the number he's vouching for here, then that's what you will get. And I consider that anecdotal. I think that that's not the only definition of "anecdotal." It means told as a tale, you know, one by one but not in a cumulative summarized way that makes sense.

Q. So your view is that reported cases are anecdotal; is that correct?

A. Sure. I mean, why doesn't he report on the

Page 133

34 (Pages 130 - 133)

guy that got 250 an hour and line that up with all the other cases? You think that case doesn't exist? They do. I don't think it's helpful to just cherry-pick all the $1,000 cases.

And again, even those cases aren't as high as -- in many cases, aren't as high as the rates being sought here. So what are we supposed to take from that? What does that support? Does that mean in every other case, those exact rates get applied? I mean, to me, that logic, it doesn't make sense.

Q. At some point, when you have all these objective datapoints, wouldn't you agree those inform you as to the current state of the market?

A. If you had all the datapoints, you'd have a better case to make than just selectively putting some of the datapoints out.

Q. You don't see any utility in looking for cases that you deem analogous using those as relevant comparators?

A. I didn't see analogous cases. I saw just any case with a big number. But, you know, I mean, he has -- he has his approach. I don't agree with it. And I don't think it has value to cherry-pick the cases with a big number.

Q. You don't think you've done the exact same

Page 134

thing on the other side of the coin?

A. I don't think so. I tried to use rate as an issue, and it isn't always an issue. I try to find data that's more inclusive of the whole world rather than some little part of it.

Q. You said that you've testified as an expert -- I think this was in your report, actually -- almost 600 times between in-court testimony and deposition testimony; is that correct?

A. You have to include declarations.

Q. Okay.

A. A lot of what we do are prevailing party cases. One side loses; they have to pay the other side's fees either by statute or contract. And on regular motion time, maybe a few million dollars will change hands, and we will look at the fees in those cases. So a lot of it is declarations. But yes, also depositions, also arbitrations, and also trials. And my best estimate is 580. But it's probably more than that.

Q. Are you aware that a court in the Central District of California has called your conclusions ridiculous, absurd, and deeply flawed?

A. If you're calling Cyclone case, people throw that out as if it's meaningful. There's a long story

Page 135

that attaches to it. It's 12 years ago, and the issue there was an allocation between claims that they won on trademark, one, and claims that they didn't win on trademark, seven. And the facts were different in each one, and I segregated out the amount of time, and the magistrate judge didn't agree with that approach.

If I'm in between the magistrate and the decision that he wants to make, so be it. But I thought that the pejorative language was not warranted, especially under circumstances -- this is Ropers Majeski, who has an auditor as one of their partners, Gerry Knapton. And when he saw my report, they immediately removed $350,000 from their fee request.

So was that a successful or unsuccessful event? I guess people want to use the language of Andrew Wistrich to say that it was unsuccessful. The judge didn't agree with me. Look, we're in litigation, you know. I mean, the people that fight me don't like my answers, and it's bear knuckles. Maybe you will be too at trial, and you will throw all this stuff at me, and I will respond in due course.

But I don't think it lands, really, given that of the critical matters, what a judge is or somebody is, that "I don't believe this, so I'm not going to do it," it's usually a handful, five or six,

Page 136

and they are outweighed -- and I said it in a declaration just this week -- outweighed 50 to 1; 50, five-oh, to 1 on favorable versus unfavorable. And in a litigated contract where one side wins and one side loses, 50 to 1 isn't bad.

Q. You have a very good recollection of the Cyclone case, don't you?

A. It's thrown up all the time. You think it makes a big difference. You know, one judge says one thing 12 years ago on an issue that isn't even an issue in your case. I mean, I didn't do an allocation in your case, nor did you, by the way, which you should have. I don't understand why that would be important as to my opinions as to rate in this case.

Q. When you say you didn't do an allocation in this case, what does that mean?

A. I wasn't asked to allocate between counterclaim services and non-counterclaim services. One you might be able to recover, at least the reasonable amount of, and the other, you shouldn't recover at all. And so that's an allocation.

Q. You said you were not asked to do that, correct?

A. No. I didn't know about the counterclaim until after my report, but I do have an opinion that

Page 137

35 (Pages 134 - 137)

you should have -- you should have allocated and separated those services. In essence, you're asking an insurance company to pay you to sue somebody for damages when you have to know that that's not a legitimate claim. So I think you should remove it from your claim.

Q. Other than the Cyclone case, are you aware, sitting here today, of any other courts that have called your conclusions ridiculous, absurd, or deeply flawed?

A. Not those words. I think that's Judge Wistrich -- other people have disagreed with my opinions, but that's -- that's the nature of litigation. Also, audit opinions are often multifaceted. Sometimes they'll agree on my staffing point, but they won't agree on my vague billing point or my block billing point or whatever. So it's a nuts and bolts kind of thing when you're doing auditing.

Q. What relevance, if any, did California Rule of Professional Conduct 1.5 have in connection with your analysis in this case?

A. Well, those are background factors that are existing in all cases. For instance, the time and labor required, that's -- that's No. -- 1.5, No. 12. The experience, reputation, and ability of the lawyers,

Page 138

I've talked about that. The novelty and difficulty of the questions involved and the skill requisite to perform the legal services, I've talked about that. The amount involved and the result of obtained -- you don't have a result yet, but the amount involved in fees against what's being claimed is disproportionate. So there's a few of them that are relevant here, and I have talked about that.

Q. All right. So I think that the simple answer is you believe that Rule 1.5 does factor into your analysis as background factors. That was your term, correct?

A. They're factors that apply not just in California but in most every jurisdiction, I'm sure, including in Louisiana. Most have the ABA version of the Rule 1.5. It's very similar. Or if it's federal common law, it'll be the Kerr factors in the Ninth Circuit or the Johnson factors in the Fifth Circuit.

In any event, there's no place that doesn't look at these criteria. I was asked about it in a case where I'm testifying in Alabama, and they say, "Well, Mr. Jardini, you're not from Alabama, so how can you possibly opine about the fees of a lawyer in Alabama?" And they have the same criteria. They have the same ethical duties on billing. They have the same

Page 139

everything. And so I took that position that I'm perfectly credentialed, as I have several times before testifying in Alabama.

Q. Let's look at the factors here in paragraph 21 of your report. Is that on the screen?

A. I have it. You don't have to put it on the screen.

Q. So if you have it, I'll put it up just to make sure everybody who wants to follow along can follow along. All right.

Twenty-one, sub 1, "Whether the lawyer engaged in fraud or overreaching in negotiating or setting the fee." Have you seen any evidence that either of those things occurred here?

A. No. That -- No. 1 and No. 2 were added recently when they redid the rule. They're not going to be applicable unless you have a blatant fraud, which doesn't exist here.

Q. Item 3, "The amount of the fee in proportion to the value of the services performed." That's something you touched on earlier. You believe --

A. Yes.

Q. You believe the amount of the fee is disproportionate to the value provided; is that right?

A. Yes. I mean, I thought -- as I've discussed,

Page 140

these fees top over 6 million. Even after my rate reduction at almost 3 million, which is a sizable amount for a no-deposition arbitration for ten days -- you know, if you do nothing else about the case than that, you'd say, "I think there might be a problem at 3 million." And I think there probably is with staffing and other things. But nonetheless, this factor does apply.

Q. Well, you realize that you're giving numbers applicable to two different firms, right? And you're presenting in this conversation as if one firm billed that much money. You understand that's not accurate, right?

A. Right. I've broken it down separately. And, you know, in a case in which the commonality between the parties could be very evident, most of the time lawyers would enter into some kind of a joint defense agreement so that they wouldn't be spending $6 million in a case that doesn't warrant the spending of $6 million. I didn't see that that was occurring. There were really -- everybody doing everything all at once, to quote the title of a recent movie.

Q. Are you aware that CNA determined there was a conflict of interest between Peiffer Wolf and Abrams and Perkins and approved the splitting of the file?

Page 141

36 (Pages 138 - 141)

A. I don't know. Usually, the way that happens is the lawyers say that there's a conflict, and then if they had said there wasn't, you'd add that to your long list of things to sue them for. So I don't know what they decided or didn't decide. And it doesn't matter. They're separate parties, and there may be some potential conflict of some kind and maybe even one that impacts coverage. But you can still have a joint defense agreement between parties who have a very -- a common set of interests.

Q. And that's not an opinion that you put into your report, I don't think. Is it?

A. It's generally in the back half of the report when we're talking about the amount of the fees and the billing issues. Seven people of each firm at the arbitration, that's a part of it.

Q. But is one of your opinions faulting Peiffer Wolf and Abrams/Perkins for having separate counsel?

A. No. It's my opinion they should have cooperated so it didn't cost as much and take 9,000 hours, which is, you know, five full attorney years and one attorney working all day every day for five years to accomplish this. I think it's inherent in the situation, if you have a client's interest in mind, to try to stem the bleeding. There may or may not be a

Page 142

judgment, but there will always be fees. So you should work on things you can work on, which is to control the fees.

Q. So in Andre Jardini's expert opinion, independent parties with conflicts of interest should work together in the name of saving legal fees; is that correct?

MR. GRABILL: Object to the form, Dan.

A. That's an overbroad statement, but it happens all the time every day. And responsible attorneys do just that. They cooperate where they can; they keep their powder dry where they can't.

BY MR. CENTNER:

Q. What did you look at to inform your opinion that Shartsis Friese and Altshuler Berzon did not adequately cooperate, as you put it?

A. Well, the bills show them each doing everything. I mean, why would they each have seven people there if they were cooperating? Why wouldn't the person that was putting up the exhibits for everybody to see be able to do it for both of them instead of having two of them. I mean, it's indicated also by the gross number of hours that has been billed by each of them, though it's many more by Altshuler. But nonetheless, that number of hours shows that

Page 143

they're not cooperating together.

Q. So should Altshuler Berzon have also read Rachel Abrams and Brian Perkins post-hearing brief? I mean, where does it stop, Andre?

A. I didn't say that. They're separate parties, though I have to say, their briefs read very similarly. They obviously consulted with each other to some extent, but they wouldn't say things that were completely off the reservation. So yes, they each submitted a separate brief. But should they work together? They could, yeah.

Q. Now I think you're contradicting what you said before because if I understood what you just said correctly, you believe their post-hearing briefing -- which if I recall, are the only things you looked at from the underlying arbitration -- does, in fact, reflect cooperation. Which is it?

MR. GRABILL: Object to the form. He said he looked at the invoices too.

A. I'm just saying they made the same points. They each billed completely for it all. They didn't save any time, but they each made the same points.

(Reporter clarification.)

A. They each made the same points. It didn't save any time because they each separately made the

Page 144

same points.

BY MR. CENTNER:

Q. How do you know it didn't save any time? How do you know it wouldn't have taken them longer than reflected on the bills but for the cooperation you seem to think they had?

A. Well, it's my impression, based on my review of the bills and the total time spent by each firm, that they -- that they didn't save time. I mean, someone could come forward and say, "No, we did. We wrote half of theirs, and they just gave a few inserts in our." But I don't think that's true.

Q. Did you look at any of the -- any of the filings whatsoever that were filed in the Levin Simes arbitration other than the post-hearing briefing?

A. The complaints.

Q. That's right. How many -- how many motions for injunction were filed? Do you know?

A. I don't know how many were -- I would typically look at the -- the court's index, but I didn't. But, you know, my issue was rates. You know, and only the obvious billing issues were mentioned in my report.

Q. How can you call something an obvious billing issue if you haven't seen the underlying work product?

Page 145

37 (Pages 142 - 145)

For example, how can you look at Altshuler's invoice for November of 2023 and take the position that the rates were excessive when you haven't actually looked at the work product they generated?

A. Work product doesn't impact the rate. Would they have done a lesser work product for $250 an hour, pull their punches and have less pages, make fewer arguments, make worse arguments? The rate has nothing to do with that they did. That has to do with how much time they spent and how many people were involved.

Look, between the two firms, they had 35 different people working on the case. You know, in my work, the single biggest driver of excess fees is excessive staffing. Those numbers in this case are a testament to excessive staffing. And I know it's split in two firms, but 19 and 16 are the number of people in each firm that worked on the case.

Q. Isn't it true that a --

A. I'm not quite done.

And then they -- they exacerbated it by using multiple people for every event, including seven people at arbitration, each of them. So there's 14 people addressing those issues of is it a trade secret or not. You know, at some point it's just over the top.

Q. Have you ever been part of a trial team with

more than one person on it?

A. I usually was a lone gun at trial. On occasion, I would have a second person there. Sometimes it was a younger attorney for training purposes; sometimes it was a partner who had a better relationship or longer relationship with a client. But of the 55 cases that I tried to jury verdict, I would say a great majority of them were me alone. And in the -- in the cases where I was defending, I thought it made the right impression, especially to the jury, you know. You're -- we don't need seven lawyers to fight this bogus claim that we're -- we're facing.

But, you know, I understand that in the modern -- this isn't even a jury trial; it's an arbitration, which is much less demanding, relaxed rules of evidence, usually, better able to control scheduling, and a lot of things that make it much easier than a jury trial. And if I can do a jury trial with one person, I don't know why I need 14.

Q. If this case landed on your desk, would you have gone toe to toe with Keker Van Nest by yourself? Yes or no?

A. I don't know. That didn't happen, and that -- it was never going to happen, and I have no idea.

Q. Is that something you would consider? You

would go stand toe to toe with 14 other people in the courtroom on the other side? Just you and your Redweld?

A. What I usually say about that on staffing questions is it's not a war. I mean, there's not going to be an active warfare happening. They can only have one person talk at a time. If you have the right things to say and you're the one person on your side, why is that less effective than their one person talking? What are the other six people doing? So no, I just think fewer is more reasonable. I'm not saying it has to be one. And I don't have an opinion about that, but it doesn't have to be seven, and it doesn't have to be 7 times 2.

Q. You said you've tried 55 cases. I mean, let's be realistic here. Surely, you know that more goes into a trial than simply being the person at the lectern addressing the courtroom. There's motions. There's discovery. There's preparing the outlines. You know the stuff very, very well.

It's truly your position that one person here could have handled all of that against Keker Van Nest in this case?

A. I didn't say that one person should have done that; I just said fewer than 35 people could've done

that.

Q. Show many people, Andre?

MR. GRABILL: I'm going to object.

A. I tell you what. You could -- you could make a reasonable model with one partner, one associate, and one paralegal. And that -- and if you needed more help on a particularly compelling preliminary injunction motion on short time, you could get one of your on-motion people to jump in. But you just don't need 35 people.

BY MR. CENTNER:

Q. Aren't you being a little bit disingenuous? If you look at your paragraph 68, a lot of the timekeepers you're including in this list of 35 -- there's a Katie Bass billed a .5. Wow. There's a Robin Tholin with a .7. There's Rafi Mottaheden --

MR. CENTNER: Sorry, Ms. Pena. I'll get you the spelling later.

BY MR. CENTNER:

Q. -- with 1.8. Do these people really count for this as part of your 35?

A. Well, 35 are the number of people that you're seeking recovery for. If you wanted to limit it to people with more than X number of hours, it would still be too many people. Choose people more than a

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

100 hours at Altshuler. It's 11. So, you know, it's -- that's 11 people contributing a -- very sizable hours.

This case didn't last that long, you know. It's not like people are leaving. I mean, the whole Altshuler billing -- the first bill went out in June of 2023, and the last bill went out in September of 2024. We're talking about 15 months. You know, it's -- there's no reasonable reason for that many people.

Q. Andre, we're talking about 15 months from file to trial, aren't we?

A. Right. It's not a long period of time. Some cases last seven or eight years.

Q. Right. But there's a lot of work condensed in that small period. This wasn't one of your consumer class action cases where you file, you survive a motion to dismiss 24 months later, you serve some written discovery, you settle, and you get preliminary approval in the fifth year, correct? There's a lot of more work to be done here.

A. I don't -- I don't know that that's the case. And it's -- the meaning of class action lawyers like your -- I guess, your lawyers, the Altshuler lawyers, that's not what they do. They fight hard to win those class action cases. And I've defended class actions,

Page 150

and there's all kinds of things, Pick Up Stix, settlement approaches. There's -- you don't think there's injunctive relief in motions that happen in those cases? They do. So, you know, I don't think that that it's warranted, to have that many people working that many hours, but that's just my opinion.

Q. To be clear, I do primarily class action work. I'm not casting excursions. But I was talking about the Vu case, V-u, that you were involved in, that I think lasted four years between filing to approval, and you-guys put 52 hours in.

I was distinguishing a case like that, where very little work was done over a long period of time, from what we're talking about with respect to Levin Simes. You agree that's a meaningful distinction, don't you?

A. Well, the example you give of a class action case -- could you send some my way where you have to only do 50 hours of work and you get paid at the end of the entire settlement? Because that's not the way it works.

Q. Sure. You know what? Let's pull one up right now because I think it was the way it worked for you in at least one of your cases.

That's your name at the top of this document,

Page 151

right?

A. Right.

Q. And then --

A. There was a lot of different lawyers working on this case, you know, not just me.

Q. Yeah, I see three different firms there. Now, that's okay for them, but not for Altshuler and Shartsis, correct?

A. I'm not sure what you're asking. We had to support class action fees and the people that worked on the case. Each put in a declaration about how much time they spent. I don't think I was the moving person on this case. I was somewhat tangential to the event.

Q. But it was okay for the plaintiffs in this case to have three sets of lawyers? Yes or no?

A. Yeah, they probably only had five lawyers in total on the whole case.

Q. Okay.

A. It's not 30 -- it not 35 lawyers.

Q. Actually, I misspoke. We've got -- one, two, three, four, five different firms -- four different firms in this case, at least five lawyers?

A. One of them is the referring firm that didn't do anything.

Q. You give them a fee, didn't you?

Page 152

A. I'm sorry?

Q. Did you give them a fee for not doing anything?

A. I don't remember anything about the case, but they could get a referral fee, in theory, anyway.

Q. That's ethical in California?

A. It is.

Q. Okay. Anyway, so here's your declaration in guess you were moving for fees in this case after all, right. You look at paragraph 6. We've got a copy of a pro forma bill from your firm's billing system concerning all time spent in connection with this matter reflecting 52 hours total spent prosecuting the action, and you cited the Laffey Matrix here, right, and you sought a fee of $40,000.

Do you see that?

A. I do. I'm one of the attorneys. The other two firms spent a heck of a lot more time than me. As I told you, I was somewhat supervisory, I'd call it, in that case, if I remember correctly.

Q. Why did you bill at all if they were doing the heavy lifting? Wouldn't it have been more efficient to have a joint prosecution agreement and let them do the work?

A. No. I did the work. I was the person who was

Page 153

39 (Pages 150 - 153)

giving advice to attorneys that -- that might need it, and it was valuable to the case. There's nothing wrong with that.

Q. You were not a lone wolf in this case, were you?

A. It's not a trial.

Q. And here, we -- I think we referenced this before. Here, when you were looking for fees, you were happy to cite the Laffey Matrix in California, right?

A. I did in this case. I thought it was useful. Remember, we're getting a percentage of the -- of the settlement.

Q. But you would never go into the Central District of California and apply for a rate that you did not think is reasonable, would you?

A. I don't know what you're asking. Past that, I told you over a great, long period that class actions are totally different. They're not the same at all as billing hourly, and all of your attempts to compare the two, I would say the same thing. Apples and oranges, they don't relate. They still don't relate. I'll refer you back to my testimony at some great length earlier today.

Q. I hear your testimony. I don't agree with it, but I understand your point. Let's look at --

Page 154

MR. CENTNER: By the way, we're going to attach this, Ms. Pena, as Exhibit 4.

(Exhibit No. 4 was marked for identification.)

BY MR. CENTNER:

Q. So this is the Exhibit 1 to your declaration. We see that your billing instructions have an estimated fee of $1 million with a net fee per hour of a $1,000, right?

A. That's aspirational. When we open the case, what's the case worth? How much will we be paid at the end of case if we get a settlement that will support it?

Q. Would you -- aspirational, but you still believe it was ethical to aspire to that amount, correct?

A. Aspirational and ethical are two different concepts, so I don't understand your question.

Q. Okay. Well, do you see anything wrong, from an ethical perspective, with you aspiring to achieve rates of $1,000 per hour in connection with your work in the Vu case?

A. This is an internal financial document at the firm. Should we take the case? What's -- what could happen? Is it a favorable result? If it is a favorable result, what likely amount might we be paid,

Page 155

has nothing to do with anything except internally to our firm.

Q. Why is Andre Jardini entitled to $1,000 an hour for a TCPA case and Shartsis Friese entitled to $450 an hour for going toe to toe with Keker Van Nest?

A. I wrote a whole report about it. I suggest you read it.

Q. Correct me if I'm wrong, sir. But I don't think that the Vu case made its way into your report; I don't think there's any reference in there whatsoever to you seeking a blended firm rate of $786 per hour?

A. I think my testimony previously today about the difference between class action cases -- when you don't bill a client, they don't pay a rate, you can write down anything you want in your internal document. It isn't going to -- to somebody that's going to look at it and say you should pay that or not pay that.

It's not the same thing at all, and it's not what is reflected on the Real Rate Report, which by the way, your own expert uses, okay, and he has to also recognize that class action cases are different. I know he miscites to some as supportive of the rate, but I think you have to recognize that the whole system of how lawyers get paid -- you do it for a living, and you know this to be true. The way to get paid is not to

Page 156

send somebody a bill and have them pay it.

Q. This distinction you're drawing, then, you're saying if there's an arms-length transaction where you and I agree that I will pay you X dollars an hour for legal services and then I, in fact, pay it, that's evidence of reasonableness, right? That's what you're saying?

A. No. And by the way, you're not asking the firm to pay these lawyers or they're not asking you to pay the lawyers, you're asking a third-party insurance company to pay them. And the issue, then, becomes what is a reasonable rate, and that's what this is all about.

So no, I'm not saying that. And that may actually be not the law, but nibbling around the edge of the law in the Seventh Circuit. Nowhere else in this country that payment of the bill in that arms-length transaction is evidence of anything in terms of reasonableness.

Q. All right. That's your testimony under oath for right now, correct?

A. Yeah. I haven't reneged on my -- to tell the truth, and I still am.

Q. Can you speak up a little bit, sir? You're fading. I'm sorry.

Page 157

40 (Pages 154 - 157)

A. I said I recognize that I'm still under oath, and I haven't reneged on that at any point in this deposition. You don't have to keep asking me.

Q. Just making sure we're all on the same page.

A. That's the first page. I hope we're past that.

Q. Sir, we're on the Vu declaration, actually.

MR. GRABILL: He meant asking if he's under oath, Dan.

BY MR. CENTNER:

Q. You said that "By the way, you're not asking the firm to pay these lawyers or they're not asking you to pay the lawyers, you're asking a third-party insurance company to pay them."

Do you remember saying that a moment ago, sir?

A. That's what your whole case is about, so yes, of course.

Q. You realize, though, that if Peiffer Wolf loses this case, it still spent the money paying those lawyers, right? We agree on that?

A. I don't have any information about payment by anybody of anything. You'll have to testify at the hearing about that.

Q. Did you ever ask for that?

A. I do know that the insurance company has made

Page 158

certain payments. I don't know how much. I do not know if -- if Altshuler or Shartsis have been paid by you or by the individuals or not.

Q. But my question was, did you ever ask for that information?

A. No, I didn't ask that. I mean, I don't think anybody knows that. But you know, but you have to tell us, if you know.

Q. If -- I guess we'll assume for purposes of this question since you don't know the answer one way or the other,

Assuming Peiffer Wolf was indeed paying these bills each month, would that be indicia of the reasonableness of the fees to you, Mr. Jardini?

A. Nowhere else but the Seventh Circuit, no. You still have to meet the standard of the rate being reasonable. You don't get any rate that you want, no matter what. The two firms -- indicative that rates are highly variable, as your expert says they are -- have different rates. One is a 1300 at the high end, and one is at 875. They're in the same case. So obviously, rates are not casting stones, so they have to be decided. And that's what this is about.

Q. Right. They need to be reasonable, correct? Can we agree on that standard?

Page 159

A. Yes, they have to be reasonable.

Q. And datapoints actually paid are indicia of reasonableness. We agree on that?

A. No.

Q. No? Okay.

A. Again, that's the -- it's a different type of (inaudible) case, but it's in the Seventh District. This rebuttable presumption point, it's not the law where you are or where I am.

Q. Do you ever take a contrary position to that in the Ninth Circuit, sir?

A. That there's a rebuttal presumption of reasonableness?

Q. Yes.

A. I don't think so.

Q. Have you ever cited the fact that fees were actually paid as evidence of reasonableness in a case pending in the Ninth Circuit?

A. I don't know.

Q. You don't remember that?

A. I don't remember that.

Q. The location -- let's go back to our 1.5 factors for a minute, okay.

Do we agree that the location of a litigation is a relevant factor in assessing what a reasonable

Page 160

rate for that case is?

A. It has nothing to do with Rule 1.5, but location is a factor.

Q. Okay. That's a factor that we agree you incorporated into your methodology, right, but it's not for Rule 1.5; is that fair?

A. Rule 1.5 doesn't say anything about location.

Q. Did I ask you -- I'm sorry.

Did you know how many lawyers Keker Van Nest had working on this case? Did I ask you hat already?

A. If you didn't, I don't know. And I really -- it doesn't matter to my analysis. If they had six more lawyers, can you now charge 1800 an hour? I don't think it makes that kind of a logical leap.

Q. Do you know how many pages of documents were produced in discovery in the Levin Simes case?

A. I don't know. They spent a lot of hours looking at them. I'm sure that they put it all down in their bills. It doesn't affect the rate, though.

Q. I asked if you knew how many documents there were, and I think your answer was you don't know. Correct?

A. I said a few more things than that. I'll rely on my last answer.

Q. You said other things that were not relevant,

Page 161

41 (Pages 158 - 161)

so I'm just going --

A. Make your motion at the appropriate time, but I'm not going to foreclose myself from saying what, I think, are important things.

Q. What if there were more than a million documents in the case? Would that suggest to you the matter was complex and required attorneys who bill at higher rates than what you're proposing, sir?

A. I guess you're saying that if the number of documents goes up, the rates should go up correspondingly, and I think that that's so wrong I don't know where to start. If you agreed to take the case and bill 250 an hour and there were a million documents, you still agreed to take the case at 250 an hour, if that's what your situation is. It's a little bit different. But that's the -- to make the point that you're still going to look at the documents. You billed the 9,000 hours. I'm sure you did look at the documents. But you don't get a higher rate for that; you don't go from 1300 to 2500.

What if there were 10 million? I was in a case with 10 million documents, an intellectual property case in San Jose. I was in favor of the fees, but I didn't say the rates should go up because there was 10 million documents.

Page 162

Q. You cited that as one of the factors supporting the overall reasonableness of the fee that Quinn Emanuel was paying to champion on their behalf, correct?

A. I don't remember if it was Quinn Emanuel or not, number 1. Number 2, the hours that were spent is a different issue than rates. They're two different things, so the number of documents did not impact the rate.

Q. You agree, generally, that as the case gets more complex, you need better lawyers to handle that case?

A. I don't know. That's too general a question. I don't think this case -- obviously, it didn't need high caliber lawyers. They hired lawyers that don't have much trial experience. That was their choice. They went all the way through the proceeding. Some result will come out of it, eventually. So no, I don't think that in this case that you can make that argument.

Q. Do you agree that location of a case is a relevant part of a calculus, correct? We talked about that maybe three minutes ago.

A. More than once. I haven't changed my thought on that.

Page 163

Q. Let's get a baseline. I want to talk about California, where you live, all right.

Would you agree with me that hourly rates in San Francisco will typically be more than hourly rates in Bakersfield; is that accurate?

A. As an overall point, I suppose, but it doesn't inform me very well about what should happen in either of those jurisdictions. Generally speaking, there are more very large international thousand-plus lawyer firms in San Francisco, and those firms get very high rates, and Bakersfield just doesn't have those firms.

Q. The hourly rates in Los Angeles and San Francisco, are they generally equivalent in terms of what's charged, what's viewed as reasonable?

A. Los Angeles has a sizable number of these large international multi-office thousand-plus lawyer firms, and so the rates in Los Angeles for those kinds of firms are high, and they're high in San Francisco as well. I think that, in general, they're very similar. There may be certain kinds of cases where there's a difference, but from my distant perspective without any facts about the case or the firm, I'd say roughly equivalent.

Q. I want to jump up to paragraph 26 of your report. And feel free to either look at the screen or

Page 164

look at the paper you have. It doesn't matter it me, sir.

A. Okay. I'm there.

Q. I'm actually looking at 26 and 27, listing the materials you reviewed, right?

A. Right.

Q. All right. You reference a register of actions for the underlying matter in San Francisco's Superior Court. Do you see that?

A. Yes. That refreshes my recollection that I did look at the court's index.

Q. I'm going to pull that document up now. I want to make sure I've got the same document that you wrote that you looked at.

Do you see a Superior Court of California case information sheet on your screen, sir?

A. Yes. And that would go up to the point where the case was sent to arbitration at JAMS, and then the -- it'll be truncated. It doesn't have everything.

MR. CENTNER: So Ms. Pena, let's attach this as Exhibit 5, please.

(Exhibit No. 5 was marked for identification.)

BY MR. CENTNER:

Q. So this is something you looked at and you referenced looking at in your report in connection with

Page 165

42 (Pages 162 - 165)

forming your opinion, correct, sir?

A. Yes, that's correct. I did look at it.

Q. And as you pointed out, this document jumps from the motion to compel arbitration up until this post-arbitration case management filings earlier in the month of October, right?

A. Right. You have to come back from the arbitration. And the court keeps an active case number, and so you have to report back. And somebody has to get a judgment at some point.

Q. If one of your opinions is that the rates that were -- or the hours -- I'm sorry, the hours that were billed was excessive, how do you support that if you didn't actually look at any of the work product or evidence of that work product that was generated in the arbitration?

A. There's very billing-specific points that I make in my report. If I was doing a full-on audit, I would review and evaluate every pleading that Altshuler or Shartsis prepared and evaluate it as to the reasonable number of hours and compare it to the total number of hours that they billed, which is what arbitrators in the arbitrations are supposed to do. But I didn't add that as my charge. So I made some comments about staffing, some comments about other

Page 166

specific billing issues, but that doesn't substitute for a complete audit.

Q. In the absence of having had the opportunity to do that complete audit, do you still feel comfortable opining that hours charged for specific tasks were excessive?

A. I have certain issues that I raised. One is the number of people at the arbitration. Another is the work on the counterclaim. Another is overhead activities, like load documents, billed for that -- or they bill for that. Organized documents, created password-protected folders, those kinds of things, filing document organization and other clerical things, excessive conferencing, which I think we saw, and vague entries. The whole entry being such as "Correspondence." That's it, the whole entry. Those are the only things -- and that there's block billing. All of these things, I referenced, and then some cost items that seemed like real overhead that ought not to have been passed on.

Those are the only things I looked at. I didn't look at work product and have an opinion about the value of the work product or the number of reasonable hours for work product. If I did that, I think with that many people involved and that many

Page 167

hours involved, it wouldn't surprise me that there were excessive hours, but I don't have the information about that now.

Q. Back on this docket sheet on Exhibit 5 -- or register of actions. I utilized the wrong term. I'm sorry, sir. Do you still see that?

A. Yes.

Q. Did anything about -- let me scratch that. This docket sheet, in any way, shape, or form, inform any of the opinions you have in this case?

A. Well, I mean, one thing is that it isn't a complete record of everything that was done because the parties left the jurisdiction of -- that would have allowed for us to see everything they filed on this document, and then they came back, I assume, after the arbitration was over. They had a lot of case management conferences and did case management statements. That's just the court keeping track of the case. And there may be a few other motions in here. But this didn't tell me whether the time spent is reasonable or not reasonable.

Q. So this --

A. It's just general background information.

Q. General background that doesn't impact your opinions one way or the other, correct, sir?

Page 168

A. Didn't impact rate, that's for sure.

Q. Let's go back to your report again. So we're going on Exhibit 2. I'm looking at paragraph 28, where you describe the subject action. Do you see that?

A. Yes.

Q. Where did this language come from? Did you write that on the basis of your review of the complaint, or did somebody write that for you?

A. I wrote it based on my review of whatever we had been provided. I mean, by the time we were involved, people summarized case in almost everything that they do. It's, like, the first paragraph of everything. So it's kind of the agreed set of intentions by the parties.

Q. Going down to paragraph 30 for a moment, we've got a reference to certain schedules that were prepared that you've attached as an exhibit. Do you see that?

A. Yes.

Q. Is that the material you referenced earlier that was prepared by Kay in your office?

A. Some of it. Some of it would be prepared (inaudible).

(Reporter clarification.)

A. Some of it. That is just objective information. I don't mean to minimize it, but if it's

Page 169

43 (Pages 166 - 169)

objective information, an assistant auditor might have compiled it or assisted in compiling it.

BY MR. CENTNER:

Q. Did you bill for the time that Kay spent putting these schedules together?

A. We bill for all our time whether it's a senior auditor, myself, or assistant auditor.

Q. Paragraph 33, it refers to your opinion that defense counsel is seeking rates that are excessive, especially given the nature of the services and the level of experience of the attorneys. Further, their top-heavy staffing means that much of work was performed by high rate attorneys at the exclusion of more appropriate staffing.

Do you see that language, sir?

A. I do.

Q. What's -- what's the standard, in your opinion, for top-heavy staffing?

A. It's -- I guess depends on the case, really. But we say in here how much time was spent at the highest levels, and it's evident, for instance, in the Shartsis index of billing personnel. Partners and of counsel, who are essentially partner rates, billed more than two-thirds of all the time, and if that happens, obviously, it's at the higher rates. And things that

Page 170

could have been done at a lower rate weren't done at a lower rate.

So that's -- and the same is true in a different way with Altshuler. They had 30 percent partners, 44 percent associates, and the paralegals were -- there's a lot of documents, meaning there's a lot of room for paralegal work, and they really didn't use the paralegals to that high of an extent. Neither firm did.

And if you kick all the work, including document review, up to the highest levels, it costs more. You should understand that I don't make a reduction or have a rate opinion based on this, but it is a fact that we saw based on how they rate themselves as to the level of people doing the work.

MR. CENTNER: I'm not sure how long we've been going. Is anybody up to for break? I'm happy to take a moment as well.

THE WITNESS: May I inquire? What is your intent as to the length of this? I have only your interest in mind since I think you're three hours later than me.

MR. CENTNER: It's unfortunate they wanted to start so late, sir, because I have quite the outline to continue to work through.

Page 171

You have to understand you're the superstar in this case.

THE REPORTER: Would you like to go off the record?

MR. CENTNER: Yes.

(Recess taken.)

BY MR. CENTNER:

Q. Let's go back to your report, which is Exhibit 2, sir. We're still looking at that. I'm on paragraph 35 right now. I'm looking at your description of Altshuler's overall average rate for all time spent as a, quote, "astronomical $756.05 per hour, inclusive of attorneys and non-attorneys alike."

Do you see that?

A. Yes.

Q. Is it true that in the Vu case, you applied for a blended rate for your firm in excess of the amount you call astronomical here?

A. I don't remember. That's a class action, a different situation.

Q. So let's do the math quickly here. I'm going to jump back over to Exhibit 4. This was your declaration in the Vu case. I'll take out my calculator. I'll represent to you these numbers are correct.

Page 172

So if we take a -- if we take the $40,472.07 you're seeking and divide by 52, you get a blended rate of 778, and I'll represent that's true. Is that astronomical, sir?

A. Most of that time is mine, and it's not a staffing issue. If you were to try to do apples to apples, you're in a case which billed over $6 million and had over 9,000 hours, including thousands of hours by the partners, and that's why the overall average rate -- it's not a fair point of comparison to have a case where I did most of the work and the rate is slightly about the same. And it's not the same kind of case.

I mean, even if what you said were true, somebody could complain about my average rate, if that were an issue. It isn't an issue because it's two completely separate things.

Q. That goes back to the distinction between a class action case and an arms-length hourly rate case like -- that you've talked about at length tonight, correct?

A. Not entirely. Also, you're talking about 52 hours instead of 9,000 hours, and you're talking about one or two people, whatever the number is that are on that invoice, and not, you know, 35 people. So

Page 173

44 (Pages 170 - 173)

it's a completely different -- it's different in type; it's different in scale; it's different in rate; it's different in analysis. It's different because it's a class action. There's nothing the same or similar or comparable, and I reject the notion that there is.

Q. So you don't believe the rates that you applied for in the Vu case in the Central District of California were astronomical in light of the explanation you just provided; is that correct, sir?

A. Nobody said my rates were inappropriate in that case, and they weren't. But it's not the same thing.

Q. Right. But I'm simply -- I'm focusing on these three words right here, "an astronomical $756.05 per hour." I guess that's five words. To be clear, you acknowledge in the Vu case the blended rate you submitted on behalf of your firm is higher than 756.05, correct? Do you agree with that?

A. No. You did a quick calculation, whatever. If it is, it is; if it isn't, it isn't. It's totally irrelevant at this point. Average rate is an issue when you have multiple billing personnel, like you have in this case, at each firm, by the way, and when you do that and you use all higher-cost people instead of lower-cost people, this drives a very, very high rate.

Page 174

This is in the top ten of average rates that I have ever seen, okay. It's not a close question. I mean, it's very high. That's why I say astronomical. It is. You don't see them higher than that. And I'm talking about blue blood law firms in Los Angeles or San Francisco or New York or wherever you're going to be talking about.

If you use lower-cost people to the right extent, your average rate will be lower. If you don't, it'll be too high. This is a staffing issue, okay. It's not an absolute rate issue, which you're trying to make this out to be. You staffed incorrectly at Altshuler and Shartsis, and it led to excessive overall average rates even at the rates that were being charged, which are themselves too high.

Q. You charged higher rates in the Vu case, right?

A. There's no staffing issue in the Vu case. I don't understand your comparison. If you want to compare two numbers -- 6 is higher than 5; 2 is higher than 1. So what? It doesn't have any relevant impact to too much staffing and using too many high-level people, okay. That's the issue on average rate, not what the actual rate is. It's they're using too many people and at too-high rates and not using lower-cost

Page 175

people. That's the problem.

Q. That's your methodology; that's what you rely on to arrive at this label of "astronomical"?

A. The average rate is astronomical for the reasons I stated, and it's a measure of staffing and how the staffing -- using higher-cost people.

Q. You billed most of the work for your firm on the Vu case we looked at, right? That was your time we looked at?

A. I have no idea. I know I was a minor part of it, and the Falvey firm and the Boyamian firm did most of the work. I'm at the highest level of just being involved if they had a question. I'm not sure -- you'd have to compare all three firms and all the rates and everything else if you had a staffing issue, which you don't, so it's two different things.

Q. The time sheet that you should see on your -- I'm going to share the Vu declaration again. Bear with me here. It should arrive in just a second.

So you see page 91 -- or doc 91-3, page 12 of 22, on your screen, sir?

A. I do.

Q. So I'm looking at the timekeepers here. I've got Andre Jardini. You were a partner at this time, right?

Page 176

A. I was.

Q. And K.L. Miles, is that a partner of yours?

A. Yes.

Q. Is that Galadzhyan?

A. I don't know.

Q. N. G-l-a-d-z-h-y-a-n?

A. I don't know.

Q. And then D.R. Parker. Do you recognize D.R. Parker?

A. He's a paralegal, yeah.

Q. Here, we've got 52 hours of which 47.3 were performed by partners. Is that top-heavy in your book, sir?

A. No, there's no issue with that. It's a class action settlement, number 1. Number 2, I'm one of three firms. We did a very minor amount of the work. It's next to nothing, really, in the realm of what that case was about. It doesn't drive any conclusion whatsoever. I hope this isn't your best line of questioning.

Q. I'm enjoying it.

A. Are you? Are you?

Q. Who should review documents in a complex litigation? Paralegals or associates?

A. Depends on the case.

Page 177

45 (Pages 174 - 177)

Q. Who do you believe should have reviewed documents in this case?

A. I didn't analyze that issue.

Q. I don't think we fully fleshed this out earlier. So we're still on this Exhibit 4, the Vu declaration. I want to go back through. We talked about the Laffey Matrix before, and you explained to us what it is. I'm not sure if I asked you.

Why specifically do you believe it was an appropriate reference point to put in your sworn declaration to the federal court in Los Angeles in connection with this fee application?

A. I don't remember.

Q. Do you think the Laffey Matrix would be appropriate for the work that was done in the Levin Simes arbitration?

A. Nobody is applying it, so apparently not. Your guy didn't apply it.

Q. Did you consider applying it?

A. It doesn't -- it doesn't really have a location variable or a type of case variable. It has a limited purpose. I might use it in a case for 52 hours. I wouldn't think about it for 9,000 hours.

Q. The Laffey rates are much higher than the rates that you relied on from the Real Rate Report,

Page 178

correct?

A. Depends on which rate it is. They're all over the place.

Q. Okay. That's fair. We'll get back there. Let's go to 37 of your report. You state that "The high rates which are claimed are in excess of reasonable rates for attorneys in this community and similar litigation." Do you see that, sir?

A. I do.

Q. What's the relevant community in this context?

A. Where the case was venued.

Q. So that would be San Francisco, California?

A. That's where the case was venued.

Q. Well, do you know the answer to that?

A. I just told you the answer to that.

Q. I'm sorry. I'm having difficulty hearing you. I thought you were asking me if that's where the case was venued.

A. No. I wouldn't ask you that.

Q. So we agree you are aware you know the case was venued at San Francisco, right?

A. I think we all are aware of that.

Q. So then we look about -- we look at the next three words in the sentence. It's "similar litigation." What do you consider to be similar

Page 179

litigation to the Levin Simes action, sir?

A. Departing employee, alleged trade secret-type litigation. That's the kind of case it is. So pretty straight down the middle kind of litigation, nothing particularly unusual about it. It's not a patent infringement case, for instance.

Q. Is a patent infringement case unique?

A. Well, I guess it depends on the case. I've litigated patent cases, and I thought they were unique and difficult.

Q. What made them unique?

A. Patent -- well, they're like each other, so they're not unique. But you have to get the records from the patent office, which is usually about four feet tall. You have to read scientific articles about obviousness and prior art and other issues that might be impacting the determination of whether or not there's an infringement or not. And it's highly complex, and it's well known that the cost of patent litigation is significantly higher than this kind of "lawyer leaves firm" litigation.

Q. Paragraph 38, it looks like you take issue with some work, such as loading documents into a document review database for review by attorneys.

Do you see that?

Page 180

A. The description of those kinds of entries and many more like them are indicative that the firm was billing for things that ought not to have been billed at all that are part of the overhead of the firm and not to be charged to a client. You shouldn't pay for it.

Q. Have you ever worked with an electronic document review database?

A. Yes.

Q. Can you name three of them for me?

A. No.

Q. Can you name one?

A. I don't -- I don't know. I mean, I've had different ones at different times.

Q. What is the process for loading documents into a litigation review platform?

A. It depends on the case. You could -- you could do addressee versus author. You can go by date, by subject. You can put it -- you can code it by keywords, or you can just do feeding it into a machine, which is what they're doing.

Q. Andre, I'm sorry. Can you speak up a little bit? It's get quiet again. I'm sorry.

A. I was finished.

Q. So I didn't hear you, but I think the court

Page 181

46 (Pages 178 - 181)

reporter did. You said, "It depends on the case. You can do addressee versus author. You can go by date, by subject. You can code it by keywords, or you can just do it by feeding it into a machine, which is what they're doing."

Is that the gist of your testimony?

A. When you have your entire description as "load documents," that is what you're suggesting is what you are doing.

Q. What did you do to verify that?

A. I read the language.

Q. So you didn't call up anybody and say, "Hey, what did this entail?" right? You just made an assumption based on the two words you saw on the billing invoice item?

A. The lawyers have an obligation under our business and professions code to clearly state the basis of the bill, and if you put in a vague entry like that, you're subject to whatever interpretation is logical from a person reading it. If you were doing more than, quote, "load documents," coding it, doing something else, something that required your brain, you should say that, but they didn't say that. Any judge or any auditor would call that into question. It happens every day.

Page 182

Q. What about an author -- I'm sorry. What other an auditor who had an understanding of how he discovered platforms work?

A. I don't know what you're talking about. You're saying something about somebody that knows something about something? I don't really know what you're asking.

Q. No. I don't think I said "something" at all, but I can rephrase the question.

I said -- you're last statement to me was "Any judge or any auditor would call that into question. It happens every day."

A. Yes, I agree with that.

Q. And then I'm saying, what about an auditor who had an understanding of how e-discovery platforms work? Don't you think they know what "load documents" means?

A. "Load documents" need to be defined since it doesn't define itself. Okay? And anybody that was reading that would say that just means you're putting the document into the machine, and there's no brain power that's involved. If you're doing more than that, you should say you're doing more than that. That's the obligation of the person billing. You want somebody to pay for it, make it worth what they're going to pay.

Q. To be clear, do you think "load documents"

Page 183

means somebody has a, like, big ream of paper, and they're standing there and feeding it into some sort of a machine? Is that what you think it entails?

A. That's a fair interpretation if you don't provide further information.

Q. See, I would suggest to you that belies a complete lack of understanding of how e-discovery works and how it's worked for the past 20 years.

MR. GRABILL: That a question?

A. I think you have a profound misunderstanding of the level of detail that has to be put in a bill. Whatever you think they were doing, they didn't tell me what they were doing.

BY MR. CENTNER:

Q. You weren't hired to audit these bills, were you?

A. I was hired to speak to the rate issue, as we've discussed.

Q. You were hired to speak to the reasonableness of the fees, right, the hourly fees? That's what you were hired to do, and you've offered gratuitous comments on the hourly rates -- I'm sorry, gratuitous comments on the hours expended, right?

A. Your question is garbled, but I think I'll straighten it out for you. I'm looking at fees. I saw

Page 184

a lot of billing issues as well.

Q. Right. But you were hired to look at fees, weren't you?

A. Rates were the main issue, but I saw a lot of billing issues as well.

Q. But CNA never once said, "Hey, Andre, we want you to look at the billing issues," did they?

A. I never talked to CNA.

Q. CNA is not relying on you to audit these bills on behalf of CNA, is it?

A. I don't know what's in their mind. I haven't talked to them.

Q. You understand the scope of your engagement to be opining on the reasonable hourly rate charged in San Francisco for similar litigation, correct?

A. Yes, and to comment as appropriate on other billing issues that we see.

Q. Such as the taking issue of the description of "loading documents" as referenced in paragraph 38, correct?

A. Yes. Those are just examples. There's many, many more, perhaps even more there.

Q. Sure. We'll go through your report and see what you had to say about those as we progress here.

Correct me if I'm wrong, but nowhere in your

Page 185

47 (Pages 182 - 185)

report do you discuss the impact on the hourly rate analysis that the firm representing the plaintiff or the claimant has, correct?

A. You're saying because Keker and Van Nest was there, you get to charge higher rates? Is that --

Q. No. I'm asking more generally right now. As a -- again, we'll get there. We're going to go in stages. Okay?

As a general matter, do you talk about whether the firm representing the party averse to Peiffer Wolf has any impact on hourly rates, yes or no?

A. I don't see the relation between those two things. Say they hired somebody other than -- say they hired -- I don't know -- Latham & Watkins or somebody. Okay. I mean, you don't get to increase your rate because of who they hired.

Q. See, that's the disconnect. Explain this to me, Andre. You know, if somebody is coming at you with a high-powered law firm with lots of smart people looking to put you out of business, you don't think you need to respond in kind?

A. You mean raise your rates? No, I don't think you raise your --

Q. I'm not saying raise your rates. I'm saying don't hire the dude who bills $175 an hour in the

office next to the Walmart.

A. Well, they didn't hire that person. And by the way, there may be such people that would have been quite able to handle the case. I don't think we should demean people because of their race, but they didn't hire that person. They just hired people that don't deserve the rates that they're claiming.

Q. That's good. That's based on the perceived lack of trial experience you testified to earlier, right?

A. A whole host of reasons that are in my report, but part of it is that.

Q. Did you do a judicial clerkship?

A. Did I do a judicial clerkship?

Q. Yes.

A. I did.

Q. With who?

A. Robert Firth.

Q. That's right. A district court judge, correct?

A. In the Central District of California, that's correct.

Q. Do you know whether any of the attorneys involved in the defense of Altshuler Berzon -- sorry. Do you know whether any of the Altshuler

Berzon or Shartsis Friese attorneys clerked for the United States Supreme Court?

A. I don't know if they did or they didn't.

Q. You wouldn't care about that, though, would you?

A. I'm sure it's a wonderful thing for them, but you don't get a higher rate than the case justifies just based on that.

Q. You're kidding me? You don't think Supreme Court clerks deserve higher rates than somebody who doesn't have a Supreme Court clerkship under their belt. That's your testimony?

A. Well, which one of these people do you think were that such person, and what rate did they get? I suspect if it's not one of the main partners, they didn't get a higher rate.

Q. That's something you should know. You're the gentleman sitting here, claiming these folks are inexperienced and not qualified and don't deserve the rates they charged. If you don't know, I'm not going to tell you. Read their files.

A. I think you're just arguing now.

Q. Let's start talking about this Real Rate Report. Sound good?

A. If you have a question, I'll answer it.

Q. Can you see paragraph 40 and 41 on the screen here?

A. Yes.

Q. Wonderful. We touched on this earlier, but let's get the testimony in a nice neat package.

Why did you choose the Real Rate Report as the basis for your opinions in this case?

A. For the reasons stated in paragraph 42, which you've just highlighted.

Q. "Because it's one of the few available surveys that consider multiple defining criteria relevant to rates, including the location in which the case is venued"?

A. You read the correctly.

Q. Then it says, "The report identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role, partner, associate, or paralegal."

Is this a complete statement of the reasons that you opted to rely on the Real Rate Report as your methodology for your opinions in this case?

A. I think we also talk about the 285 cases favorable in citing the Real Rate Report in the Ninth Circuit.

Q. Are those just anecdotal, though? I mean,

earlier, you told me you don't like to look at cases for these things.

A. I don't think you understand what I'm saying.

Q. I'm trying, my friend. You told me earlier that cases are anecdotal; they don't tell the whole story.

A. What's anecdotal is Mr. Pearl choosing rates in certain cases, unrelated cases that have nothing to do with this case or a different kind of case and so on, and just saying, "There was a rate in this case. Why don't you consider it as the reasonable rate?" That's anecdotal.

A court saying, "We think the Real Rate Report is a valid and important tool to analyze rates," is not anecdotal. It's is court decisions. We live and die with court decisions, and that's -- that's them finding that the Real Rate Report is a good report. And by the way, Richard Pearl thinks the same. He used the same one. He just used the wrong numbers, but he used the Real Rate Report, if you read his report, which I'm sure you have.

Q. So I'm skipping ahead to paragraph 43 right now. And this is you criticizing Mr. Pearl's methodology. You state that he uses "selected rates from dissimilar law firms from unrelated cases from

Page 190

uninvolved attorneys and the like."

Do you see that?

A. I don't mention him at all. I'm just saying that that kind of approach -- which by the way, Mr. Pearl used -- is not a good way to determine rates for the reasons stated.

Q. So are the 18 courts we counted earlier that had called Mr. Pearl the leading expert in California on fee issues -- are they all wrong?

A. I don't really know the context in which his star was being burnished, but I would think that you would not agree if he said, "I'm infallible," and I don't think he is. I think he chose the wrong rates, and I think he tries to justify rates that are the rates that are actually billed. I mean, it doesn't even make any sense when one firm is at 1300 and one firm is at 875 and they both get the same opinion. Well, which one is reasonable?

Q. In your mind, is there a specific dollar amount that's reasonable? Is 450 reasonable and 451 not reasonable? Or is it a range?

A. You have to have -- at the end of crunching all the data that you have available to you, you have to have an opinion. And the opinion is a specific rate; it's not a range because a range is not useful in

Page 191

this work. You have to come to a specific opinion.

But the end of the rate analysis, applying the rates that I have chosen, you end up with about 3 million in fees, a very sizable amount for this litigation I would submit to you. And I think it's self-validating in a way that the total is what it is at the rates that I have chosen.

Q. What do you mean by that, "it's self-validating"?

A. It's a lot of money for a ten-day arbitration without depositions.

Q. Again, you're making that assertion literally not having looked at one page of anything generated in the underlying arbitration other than the post-hearing briefing, correct?

A. Well -- and the chronology. I mean, you can see the case is about who talked to clients when and whether the information that was gleaned in whatever way it was is somehow a trade secret, which is a stretch, as you know and as you've argued. But the -- that's it. I mean, it's really -- it's not brain surgery here. I mean, it's fact-driven.

And, you know, unfortunately, the Levin firm was very miffed that a young protege that they brought along, made to be partner in only four years and then

Page 192

put her in the name -- put the name of her -- and then that person goes to a competitor and then starts contacting clients, either properly or not. It was the debate in the arbitration. Turns out, there wasn't any evidence that it was done improperly, it appears, at least as to the briefs. Anyway, I mean, that's not that complicated. I mean, that's where we are in this case.

Q. And as a certified auditor, you are comfortable making assertions that the number of hours expended in the case were excessive, not withstanding the fact you did not look at one piece of paper generated in the actual arbitration, yes or no?

A. I'm -- I don't know of any certification for auditors, so I can't agree with your characterization of me as a, quote/unquote, "certified auditor." And the specific comments that I made with regard to hours are based on very specific billing issues, not having reviewed the pleadings. Look, I could have, if somebody hired me to do it, read the pleadings and likely would have found they used too many people and billed too many hours, but that wasn't part of my charge.

Q. I didn't mean to misstate that a certification was required for auditing. I assume there would be

Page 193

one, but point taken that there's not.

A. That's fine.

Q. Let's look at paragraph 44 now where you're talking about the key factors that drive rates under the Real Rate Report. Okay? You reference firm -- I'm going to go in reverse order.

You reference firm size. How does that drive the rates, sir?

A. Firm size is a very important factor in rates. As I was explaining before, if you took the rates of the top 100 firms in size, meaning the firms that do have the highest rates, they do, in the nation, and you looked at the rates for the top ten of those and -- you would have rates 1500 an hour and so on depending on the year. And then you got down to number 90 to 100, you'd find partner rates at 700.

It's dramatic, the falloff in rates based on firm size. And these are firms in the top 100 that dwarf the firms that are involved in this case, Altshuler and Shartsis. So it's immutable as a datapoint that firm size impacts rates. The smaller the firm, the lower the rates.

Q. But why is that?

A. They have less overhead. That's the main thing. They pay less to their lawyers. So it may or

may not be true in Altshuler's case because they're splitting up the proceeds from large class actions, and they depend on that to get paid. So it isn't really about what their salaries are.

But in the firms that actually do hourly work, they pay more for their staff. They pay more for their people. They pay more for their lawyers, and they have more overhead, typically. And they have clients, generally speaking, that are larger and more used to paying higher fees and higher rates who want to hire the biggest firm and are willing to pay them 1500-plus an hour or even 2500 if you read NALFA and that one case they found.

So you -- you do have higher rates -- anyway, it doesn't matter what the reason is, though I think those are the reasons. It is true that larger firms charge higher rates and smaller firms have lower rates.

Q. You believe that's an appropriate methodology, correct?

A. It's a factor of the factors that go into assessing rate, and everybody knows that that looks at -- that looks at data.

Q. Let me ask you this. Surely you know the firm Boies Schiller, correct? You're familiar with them?

A. Yes, I am. David Boies, yeah.

Page 195

Q. And they have -- I looked it up the other day -- I think, 150-ish attorneys. Any reason to disagree with that?

A. No. They started out as -- to be a boutique, and then they're creeping their way back up to be a mega firm. So I don't know. What are they? They're somewhere in between.

Q. Right. And they hire top talent. You would agree with that? I mean, former Supreme Court clerks, and they're great litigators. You agree with that statement?

A. They actually have trial attorneys, yeah.

Q. They actually have trial attorneys.

You know Wilson Elser? Are you familiar with that firm?

A. I am.

Q. They have, what, like a 1,000 lawyers?

A. Yes. But they're rates are significantly lower.

Q. So there's a question, right? Boies Schiller is, what, one-tenth of the size of Wilson Elser, but you're saying they could command the higher rates, correct?

A. Is one of the factors. And Wilson Elser has a completely different client profile, including a lot of

Page 196

insurance companies, so it's a completely different practice. I mean, you have to look at what kind of case you're dealing with, not just size. But it is true, though, that, by and large and across the board, you can't be challenged, really. Larger firms, higher rates; smaller firms, lower rates. And we're dealing with, in this analysis, a smaller firm.

Q. Has a court ever -- in the case that you've been involved in, has a court ever opined that basing rates off of attorney head count at a firm is not a sound methodology?

A. Nobody is doing that. I say it's a factor. It's just the way it is. I mean, the marketplace is exactly that among lawyers who bill by the hour. The larger firms charge more and -- as a rate, and the smaller firms charge less as a rate. I mean, you know, the court can agree or disagree that that's -- you can't disagree with facts. I mean, I just don't understand the question.

Q. Well, earlier, we talked about the Cyclone case. You remember that one, right?

A. That was an allocation issue. Yes.

Q. Okay. So now I'm asking have you ever been involved in a case where a court said your reference to attorney head count as a factor in assessing the

Page 197

50 (Pages 194 - 197)

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company          www.veritext.com

reasonableness of rates is not appropriate?

A. I don't recall it. If you have some example, I'm sure you're misreading it.

Q. So you're sure I'm misreading it?

A. Pretty sure, yeah. Because I don't think that's an appropriate conclusion, or you're not stating it correctly, one or the other.

Q. Rule 1.5 does not reference firm size. We established that earlier, correct?

A. When you ask the same questions over and over, it takes longer. I'll refer to my previous answer.

Q. What about the Johnson factors? What are those?

A. They're very similar to the Rule 1.5 factors.

Q. Who uses the Johnson factors to assess the reasonableness of attorney fees?

A. I forget if it's the Fifth Circuit or 11th Circuit, but one of those.

Q. Do you know whether the Johnson factors reference firm size as one of the factors to consider in making a reasonable fee determination?

A. We're talking about two different things. We're talking about a survey of actual rates and rules that apply to lawyers as to what is or isn't reasonable when they bill. And nobody's factors -- Johnson

Page 198

factors, Kerr factors, Rule 1.5 factors -- in any state reference only firm size. That is not a thing that's considered in determining either your unconscionability or reasonableness for the purposes of ethical determinations and so on.

But in the real world in which we all live, large firms have higher rates, smaller firms have lower rates. And when you're talking about what's the marketplace, you have to recognize that.

Q. Earlier in your report, you said that you are guided by California Rule of Professional Conduct 1.5, correct, as part of your analysis?

A. We already talked about that. I'll just refer to my previous answer.

Q. Well, how do you reconcile the answer you just gave me with the testimony you gave me earlier, that Rule 1.5 was part of your analysis?

A. I don't even know what you're talking about.

Q. You told me that we're talking about two different things, a survey of actual rates and rules that apply to lawyers as to what's reasonable or isn't reasonable when they bill. So you're distinguishing between the survey and the rule you've cited in your report about assessing the reasonableness of fees?

A. I don't know how many different disparate

Page 199

concepts you can smash in one little cup. But let me tell you this --

Q. Literally just read your answer to you.

A. I'm telling you you don't know how to understand words. There is no reason for size of firm to be in Rule 1.5. That isn't the question of reasonableness. You can be reasonable with a million lawyers, and you can be reasonable with one lawyer. It's not a measure of reasonableness. So why have it in the rule? If you're suggesting that because it isn't in the rule, nobody can consider it in the real world in which rates are charged, you have to pay attention.

Q. Need a minute to calm down, Mr. Jardini? You seem upset.

A. I don't.

MR. GRABILL: You're asking him the same questions over and over. He's going to respond to you like this. He's fine. Keep asking them. You're on the clock.

MR. CENTNER: I'm asking him if he wants to break. He's giving me disparate answers. I'm trying to sort through all of that.

THE WITNESS: They're not disparate, and you're just maybe purposefully -- I don't

Page 200

know -- misunderstanding. You're thinking that the size of the firm is a question of ethical concern, like somehow big firms are unethical and little firms are not. I have no idea where you're coming from. This is just preposterous, but keep asking. It's your time.

MR. CENTNER: This all looks great in my deposition transcript, Andre.

THE WITNESS: It doesn't really. I wouldn't want to look like you in that transcript.

BY MR. CENTNER:

Q. So here's, I think, the meat of the analysis. We'll get to it four hours in here, whatever we're at.

The Real Rate Report distinguishes rates assessed in different types of litigation. You agree with that?

A. Yes.

Q. And you selected insurance defense as the appropriate framework for assessing reasonable rates incurred in connection with the Levin Simes litigation; is that right?

A. You could like that. The rates are higher for whatever reason in San Francisco than ordinary

Page 201

51 (Pages 198 - 201)

litigation rates. But yes, it is an insurance defense type of case. It doesn't mean A rear-ends C. It's defended by an insurer. It's a "he said, she said" kind of a case. So yes, it is insurance defense.

Q. But does the Real Rate Report define "insurance defense"?

A. Probably. I don't remember specifically. You can read it if you like.

Q. Isn't that important to your methodology, knowing that if -- knowing that you're utilizing the proper framework in the report here?

A. It was the most appropriate category of the categories that are designated by the Real Rate Report.

Q. Walk me through that. How did you make the determination that insurance defense was the most appropriate category?

A. It's higher than general litigation. It is specifically an insurance case that's being defended by an insurer. It's a case involving facts that have to be determined, like insurance cases typically are or can be, like a liable case or something like that. You even made it into a liable case.

So it's an insurance defense type of case, looked at that way broadly. A lot of lawyers say, "Oh, insurance defense. That means you're going to be

Page 202

paying people 175 an hour." Look at the rates in the Real Rate Report, and you'll see that I'm on the right path here.

Q. So the factors that you relied on when you labeled this as an insurance defense case for purposes of assessing rates under the Real Rate Report are, one, that it's defended by an insurer, correct? That's one of the factors?

A. I just told you all the factors.

Q. I want to make sure I have all of them. Okay? So let's go back now and make sure I have them all and that there are no others. You know how this works. You've been doing this for 80 years.

MR. GRABILL: You can read the transcript. I'm going to object to that. That's a waste of time. You can read --

MR. CENTNER: You don't get to tell me what to do on this, brother. I can ask whatever questions I want. No speaking objections.

MR. GRABILL: No. No, you can't.

MR. CENTNER: I want to make sure I have all of his opinions. That's what you do in an expert deposition.

MR. GRABILL: You can't badger him, and

Page 203

you can't repeat the same question and try to mischaracterize his testimony.

MR. CENTNER: And I'm asking him now if that's his complete answer.

BY MR. CENTNER:

Q. Here's what I understood from your answer. Okay? I want to know how you landed on this as the appropriate reference point under the Real Rate Report.

MR. GRABILL: He told you.

BY MR. CENTNER:

Q. One, it's defended by an insurance company. We agree on that, right?

A. I will stand on my previous testimony which you can read anytime you want, and you can repeat it to yourself all you want. And I don't have any other factors other than the ones I've just mentioned to you about insurance defense.

Q. One of the factors that you gave me was there are factual issues that need to be determined. Isn't that the case in almost every litigation that's ever filed?

A. Some of them turn more on complicated legal questions. That's not true here.

Q. Okay. So you -- any case where factual determinations need to be made is potentially properly

Page 204

categorized as insurance defense. Are you prepared to make that broad of an assertion?

A. I think you just need to read my previous answer. Not try --

Q. I didn't understand you. Please speak up.

A. You have to read my previous answer and not try to mischaracterize it.

Q. So the answer you gave me a moment ago, just so we're on the same page, that is the entire analysis that you undertook to determine that insurance defense is the appropriate category under the Real Rate Report. Is that right?

A. I gave you the reasons to use that section of the report, how they break it out. And those are the reasons.

Q. That's all of them? There are no others? You're not going to show up at trial and come up with something that wasn't in that paragraph you read to me earlier, correct?

A. I told you everything that I could tell you about this point, and I don't have anything else to tell you.

Q. Over the course of your 50 years in practice, have you developed an understanding of what "insurance defense" means?

Page 205

52 (Pages 202 - 205)

A. It means different things to different people. In this case, it's a category in a particular survey that fits this case better than any other category.

Q. Why does it fit better than any other category?

A. Because it's the kind of case it is. It's for the reasons I told you.

Q. The only reasons you gave me are that there are factual issues to be determined and there is an insurance company defending?

A. Yeah, that isn't exactly correct. So I disagree with you.

Q. You said that's not exactly correct?

A. I just said it wasn't correct.

Q. What's not correct about that?

A. It's just not correct.

Q. What's wrong with it?

A. It's an unfair summary.

Q. Then correct it.

A. No. You have to ask me a question.

Q. What was wrong with the summary that I provided?

A. It's incorrect.

Q. What was incorrect about it, Mr. Jardini?

A. I refer back to my previous testimony.

Page 206

Q. I will read you your previous testimony.

A. And take your time --

Q. I do appreciate you being so difficult here. This is very professional of you.

I said, "How did you make the determination that insurance defense was the most appropriate category?" You said, [As read]: "It's higher than general litigation. It is specifically an insurance case that's being defended by an insurer. It's a case involving facts that have to be determined, like insurance cases typically can be, like a liable case or something like that. You made it into hey liable case. It's an insurance defense type of case, looked at that way broadly. A lot of lawyers say, 'Oh, insurance defense. That means you're going to be paying people 175 an hour.' Look at the rates in the Real Rate Report, and you'll see I'm on the right path." That's your answer.

So let's ask it this way. That is a complete statement of all opinions you relied on when you chose insurance defense as the appropriate category under the Real Rate Report within which to perform your analysis, correct?

A. It's the best category in the report that fits this case the best.

Page 207

Q. What did you do to rule out other cases -- or to rule out other categories? I'm sorry.

A. It's not a contract case in the way that they're -- out of all the different categories that they have. It doesn't fit those. It fits this best.

Q. Let's talk about what the Real Rate Report includes within the definition of "insurance defense." Okay? Do you agree that a car accident case, car driver A rear-ends driver B -- that would fall within the category of insurance defense?

A. If they get rates from those lawyers, it would probably be included there, or it could be included under general litigation. Those rates, for whatever reason, in the report are lower.

Q. What about a basic medical malpractice case? Would that be something that could potentially fall under the insurance defense umbrella, in your view?

A. I can't recall. I think they may have -- they may have other tort liability or something like that, kind of category. So I don't remember.

Q. This is the 2023 Real Rate Report. This is what you utilized in connection with developing your opinions in this case, correct?

A. That's the front page of it, yes.

Q. Would you like to scroll through the whole

Page 208

thing?

A. No.

Q. There's our last page.

2023 is the year that you used, correct?

A. The last year available.

Q. Earlier, we talked about panel counsel. Remember that discussion?

A. Vaguely. Why don't you ask me a question.

Q. Do you know whether the insurance defense rates reflected in the Real Rate Report include firms that have been brought on as panel counsel?

A. I'm not sure. Possibly, though the rates in that category seem higher than typical insurance rates.

Q. So what would you do to determine whether those rates include panel counsel rates or not?

A. I'm using a survey and using the category that most closely fits the circumstances, just like Mr. Pearl did.

Q. Mr. Pearl didn't use insurance defense, did he?

A. I'm not sure what he used. He wasn't very clear about it.

Q. Do you know that CNA has two panel firms in California that handle what CNA believes are similar type of cases to what we have here, one of them being

Page 209

53 (Pages 206 - 209)

Wilson Elser, the other one being Gordon Rees? Were you aware of that fact?

A. I have looked at the entire lists that they produced to you and their interrogatory response and their reservation of rights letter, all of which have different rates for different firms for different things. So I don't know if what you're saying is correct or not correct. But there is a rate for every firm, and it's on a piece of paper somewhere. And I don't need to guess if we have that piece of paper in front of us.

Q. I think that was something you claimed to have looked at in connection with the -- your -- or the materials you looked at to prepare your report. You looked at the rate sheet for panel firms. It's $305 an hour, right? You remember that?

A. No, that is -- that is not correct. There's a sheet with multiple different rates, and some of them are much higher than that.

Q. Is it your testimony that those reflect panel rates?

A. They reflect rates that were paid. That's my understanding, for whatever reason, and I looked at that.

Q. Right. But is it -- do you have an

Page 210

understanding as to whether those are panel counsel rates?

A. What do you mean by "panel counsel rates"?

Q. So CNA -- Mr. McDade -- did you read Mr. McDade's deposition transcript, sir?

A. No, I did not.

Q. Do you know who Bob McDade is?

A. I didn't read his deposition transcript.

Q. Right. But do you know who he is?

A. You just told me he's related to CNA. But yes, he's related to CNA.

Q. Do you know what his role is at CNA?

A. He's an employee of some kind.

Q. Do you know what his title is?

A. No.

Q. Do you know what his responsibilities are?

A. No.

Q. Mr. McDade told me that CNA has two firms on its panel in the state of California that handle defense work for claims asserting damages for advertising injury or personal injury as defined under the CNA policy. Is that something you were aware of?

A. No. I thought you weren't going to be permitted to apply panel rates. I'm not sure where you're going with this. We're looking at market rates,

Page 211

not panel rates.

Q. And what I'm asking you is: Do you know definitively whether the Real Rate Report includes panel rates within the datapoints that make up the ranges they give for insurance defense litigation? Do you know that one way or the other?

A. The Real Rate Report doesn't reveal whose rates they are. They wouldn't say, for instance, "Oh, and by the way, we included Wilson Elser. So pay attention everybody." They don't tell you. It's a survey. It's anonymous. It's meant to be factual about what's actually paid in the community for similar cases. It's not panel rates.

Q. So I asked if you know definitively that it does not include panel rates. Do you?

A. The Real Rate Report doesn't reveal whose rates that they're counting, only the categories of rates. And they tell you that they do it in an assiduous way and include all rates that they have knowledge about, however they acquire that knowledge. And it's --

Q. So it's possible they could --

A. I'm sorry. I'm not quite done.

Q. I'm sorry. It's quiet, and I couldn't hear you. Let's calm down.

Page 212

A. I'm not -- I just want you to understand that you shouldn't interrupt me when I'm about to tell you something that you need to know.

Q. I thought you were done speaking. Go ahead and finish your answer, sir.

A. I'm trying to.

The way that they compile their information and categorize it is found to be -- by at least 285 courts, to be an appropriate and reliable report on rates which can be depended upon by those who are trying to assess what's a reasonable rate in a particular case in a particular community, which is what I did, the way you're supposed to do it.

And what they include or don't include or getting behind it or trying to challenge it, you are running up against 285 learned justices and judges who say it's a good way to look at rates. So I'll follow them and not you trying to say whether Wilson Elser was counted or not.

Q. I don't know what you're saying. My question was simply: Do you know whether the Real Rate Report includes panel rates in the survey of data that comprises the rates they give for insurance defense? And it sounds like the answer is "no," you don't know?

A. It's a reliable study, as many courts have

Page 213

54 (Pages 210 - 213)

found. I don't know why you think you're going to get behind it by saying they include panel rates.

Q. I don't doubt that it's a reliable study. What I doubt is that you picked the proper category within which to assign the rates. And I'm asking now what your methodology was for choosing that. And in particular, I'm asking if you can rule out the fact that panel rates went into that and artificially depressed the rates that you selected. Your answer is "no"?

A. Well, you're assuming the panel rates are lower than the rates in -- that are reported there depending on what quartile, and that turns out not really to be true. I mean, panel rates are higher than you think, including the rates paid by CNA.

Q. The fact remains, you do not know, one way or the other, whether panel rates do or do not go into the data that the Real Rate Report compiles in arriving at its insurance defense datapoints, correct?

A. Nobody knows because they don't tell us, and nobody knows if it has the impact that you're suggesting of suppressing rates or increasing rates or having no impacts. So I don't know where that's going. I think I chose the right category.

Q. Let's look at page 223 of the Real Rate

Page 214

Report. This is an appendix. You didn't produce this as one of the exhibits to your report even though you included excerpts from the Real Rate Report. Why is that?

A. I didn't cite to this. I wanted to cite to the very sections -- it's a several hundred-page report. I put the relevant sections.

Q. You don't think -- I'm sorry. Finish. I thought you were done.

A. And I think that's appropriate. If you wanted to read it, it's perfectly available to you, and you found it. It's no big deal.

Q. Is it publicly available?

A. If you buy it. You just wanted to get it for free, I guess. I think you should buy it. That's their business.

Q. So we've got a methodology here. Is it your testimony that the methodology that informs the different categories we see in the Real Rate Report was not relevant to your opinions in this case?

A. I'm familiar with all of this, and I chose the right category.

Q. Why was this not properly categorized as a commercial dispute?

A. Because it isn't a commercial dispute.

Page 215

Q. What's a commercial dispute?

A. Well, it usually involves the purchase and sale of goods. It could be other things as well. It could be anything other -- that isn't real estate that is commercial in nature. You're going to say that a law firm is a commercial dispute? I mean, come on. That's not even close.

Q. Why isn't it close? When I see two businesses suing one another, I think commercial litigation is a fair umbrella to put that in. Tell me why I'm wrong.

A. These are two attorneys leaving a firm and competing. There's nothing for sale there at all. It's not commercial.

Q. Was there a breach of contract claim in the complaint that you read?

A. There's a breach of their partnership agreement alleged. That does not make it a commercial breach of contract case. I mean, you know, why don't you just keep stuffing a square peg in a round hole.

Q. Why don't you give me an answer as to why it's not appropriate as opposed to just sitting here, trying to mock me?

A. I don't know. It's an easy target maybe. I don't know. But I just think that -- I just think that it's so obvious -- and I told you what a commercial

Page 216

dispute is, and it isn't a commercial dispute. Nobody is buying or selling anything.

So I mean, you know, it's also not an antitrust case. You want to jump ahead? It's not an employment and labor case even though they were employees. Oh, my goodness. It's not -- it's not an environmental case. Okay. It's not a finance case. So it just isn't these other things.

Q. These terms that we're looking at here aren't defined anywhere in the Real Rate Report, are they?

A. I don't know. You have the report. You can look it up.

Q. You relied on it. You're the one who's sitting here extolling its virtues and how 285 courts have, you know, put this up as the bible of attorney fee reasonableness. And you can't tell me if it has definitional sections?

A. Well, it's actually about rates, not reasonableness. But rates have been sourced in this document and courts have approved it, and I'm okay with that. I'll buy that. I'll take their word for it.

Q. Right. I'm asking you simply if it includes definitions for the terms we're looking at in the appendix here.

A. And I told you I don't know. You have the

Page 217

55 (Pages 214 - 217)

report, and you can read it yourself.

Q. Okay. What did you do to rule this out as a "general/other" subcategory of the commercial?

A. It's not a commercial case. I mean, just look at it for just a second without those glasses on that you appear to be wearing. It's not a commercial case. Nobody is buying or selling a good.

Q. So that's the definition you're ascribing to what a commercial case is, right? It has to involve the buying or selling of a good?

A. That's what commerce is.

Q. Okay. Corporate partnerships and joint ventures, how did you rule that out?

A. It's not a corporate case.

Q. Why not, though? Other than you saying it's not a corporate case, what objective datapoints can you point to to say, "Here's why it's not a corporate case"?

A. Well, maybe flip it around. Why is it a corporate case? What corporation is involved? Two attorneys left a law firm and competed, and they went to another law firm. It's not a corporate case. It's not about who helms what part of a corporation or what the bylaws happen to say or whether somebody followed the rules for corporate -- any of the corporate laws

Page 218

that would apply. It just isn't a corporate case.

Q. All right. That's your final answer on that, sir?

A. Right. It's not a corporate case.

Q. Employment and labor. What did you do to rule out this as being an employment-related dispute subject to the rates for employment labor?

A. Look at the examples. Is it a wrongful termination case or a wage case or a union relations case? Or how about an immigration case? It's none of these things, and it's not -- I mean, they happen to be employees, and one of them was a partner. That doesn't make it an employment case.

It's about leaving the firm and taking clients, if you did it appropriately or you didn't and whether there's some kind of trade secret involved or not. That's the case. It's not about employment. Well, some little minor part of it is. One of the clients apparently was overpaid $3 million, which is an astonishing fact, but that's what they say.

Q. All right. So employee misconduct, you don't believe is a relevant comparator here?

A. No.

Q. Okay. Let's look at insurance defense for a moment, which is the category you selected, right?

Page 219

A. Right. It has professional liability. It has general/other. It has all of the categories there that -- that would tend to make me believe this is the closest analog to what we have.

Q. Let's go line by line like you did up here with employment when you referenced, for example, it wasn't an immigration case.

Is it an auto and transportation case?

A. No.

Q. Is there a personal injury claim or a wrongful death claim involved?

A. Well, in the personal injury way that insurance is defined, yes. But not how they probably mean it.

Q. What about product and product liability? Any products here?

A. No.

Q. Property damage. Was this a property damage case?

A. No.

Q. Toxic tort. Not a toxic tort, obviously, right?

A. No.

Q. You understand what kind of insurance policies at issue here, whether it's a professional liability or

Page 220

a general liability policy?

A. I don't know. I'm not analyzing the insurance part of it. But it is a professional liability type of case, though. I mean, that's a good fit for it and general/other, which is so many things that are defended by insurers that wouldn't fit into these other more specific categories. I think it's a good fit.

Q. So general/other under "insurance defense" is a better fit than, say, general/other under "commercial," right?

A. Well, general/other and understanding that you have professional liability. And that's really what we're talking about. What are professional duties in a law firm? Can you violate your agreement, breach your fiduciary duty, contact clients and try to steal them? That's really the stuff of professional liability.

Q. Would it surprise you that CNA denied coverage outright under the professional liability policy in this case?

A. I'm not speaking to insurance. I'm speaking to what kind of case defines the facts of this case. Insurance policies are defined on very specific terms in a policy, which is, by the way, agreed between an insurer and the insured. This doesn't impact that. This is a completely separate and different analysis.

Page 221

56 (Pages 218 - 221)

Again, you're cramming together two things that are unrelated.

Q. CNA doesn't consider it professional liability claim, but you do for purposes of utilizing the insurance defense rates in the Real Rate Report?

A. I don't know what they -- what position they took. I have no idea if what you're saying is correct. I've told you why insurance defense is the appropriate category. It is the closest to this case.

Q. What about medical malpractice? Would that fall under professional liability?

A. I don't know if there's a separate section for that or not.

Q. What about legal malpractice? Would that fall under professional liability?

A. Probably. It's a pretty broad umbrella for what we're talking about there.

Q. You read the complaint, the Levin Simes file, correct?

A. I did.

Q. And are you -- you saw the references in there to improper solicitation letters, I presume?

A. They do make a lot of factual allegations that they needed to ultimately prove. But yes, there is some talk that they did inappropriately advise the

Page 222

clients in the letter as to what their real choices were.

Q. Why would marketing and advertising not be something worth considering here?

A. You think that's advertising? Okay. I just think you're stretching here. It has nothing to do with marketing and advertising.

Q. General liability. Why is this not a general liability trial?

A. Well, general liability is a bit more of a catchall. And if you want, we can use those rates. They're lower than insurance defense rates. But I didn't think it was as good a fit looking at the categories there.

Q. Again, I'm asking for the reasoning behind your decision that insurance defense was a better fit than general liability.

A. I just told you all the reasons, and now you're going through a bunch of other categories that I don't think are a good fit. It's not about asbestos, for instance or a consumer-related claim. I mean, maybe your clients had some kind of consumer-related claim, but that's not what the case is about.

This as a liability? Product liability as a general concept, personal injury and wrongful death,

Page 223

I mean, these are all categories under general liability. It's a catchall. It's a catchall. If you have a better category, you should use it. And by the way, the rates are lower for general liability.

Q. Sure. I'm not disputing that. I'm simply attempting to understand the process you went through in determining that insurance defense was the appropriate category here.

A. I told you everything I can.

Q. Define "professional liability" as the term appears in the Real Rate Report.

A. I'm sorry. I didn't hear that.

Q. I'm sorry. Can you define the term "professional liability" as it appears in the Real Rate Report here?

A. The import of the words, to me, is liability by a professional. It could be an engineer. It could be a lawyer, like in this case. It could be a doctor, I suppose. I'm not sure. But it's a professional's liability, that somebody had a duty to do or not do something. Like, for instance, a lawyer's ethical duties about contacting clients, that's professional liability.

Q. But if the insurer were not involved in this case as the party funding a portion of the defense, you

Page 224

would not have used this category; is that fair?

A. I don't know. I think it fits the circumstances under professional liability, and I don't know that professional liability appears anywhere else. So whether it's titled "Insurance Defense" or it's just titled "Professional Liability," that's the right category.

Q. Jump up to page 221.

MR. CENTNER: By the way, I don't think we've done this yet. Ms. Pena, we're going to attach this report, which is the Real Rate Report, as Exhibit 6.

(Exhibit No. 6 was marked for identification.)

THE WITNESS: You should be careful about posting that because it's protected by copyright.

MR. GRABILL: Dan, I should have said earlier. My understanding is that this deposition, like all the others, are going to be designated confidential. Is that right?

MR. CENTNER: We've got a process in the protective order for going through -- and we've agreed to designate by certain pages. So I think the way it works -- like, we just gave you-guys, earlier this week, a --

Page 225

57 (Pages 222 - 225)

Let's go off the record for a minute, Ms. Pena.

(Recess taken.)

MR. CENTNER: Let's go back on the record.

Jeremy, you had something you wanted to add?

MR. GRABILL: We just talked about confidentiality off the record. And my understanding is that we're designating this, in the interim, as -- this deposition in its entirety as confidential, and then we'll follow up with page/line designations.

MR. CENTNER: And can we agree to work together in good faith on that with the Daubert deadline coming up?

MR. GRABILL: Yeah. We just need to do the same thing with Mr. Pearl. Like I said, you-all designated Mr. Pearl's entire deposition as confidential this morning, and I'm doing the same thing with Mr. Jardini's deposition.

MR. CENTNER: Understood. All right. Let's go back into the questioning here.

BY MR. CENTNER:

Page 226

Q. So I'm on page 221 of the report, Doc, and we're still in the appendix methodology section.

Do you see this note on insurance litigation, sir?

A. Yes.

Q. And the folks at Wolters Kluwer are saying that to improve comparability, they removed data related to insurance company defense litigation for all analyses unless noted otherwise. "Insurance litigation tends to be less expensive than other types of litigation as it is typically more repetitive and less complex."

Do you agree with that second sentence I just read?

A. Yeah, general -- I mean, auto accidents, that kind of thing, tend to be paid at a lower rate. And part of the reason for that is there's more of it, that kind of case, and it is usually less complex -- not necessarily. It could be a horrible brain injury and require multiple doctors on each side, and it depends on the case. But as a general statement, they also drop out any rates that don't align with their general real rate data, so it's not artificially suppressed by calling it insurance defense. I think that the numbers bear that out.

Page 227

Q. Can you elaborate on that? You said, "As a general statement, they also drop in rates that don't align with their general real rate data." What does that mean?

A. Well, they say this, one paragraph over from where you are, "Any line items with an hourly rate that did not align closely with the real rate are not loaded to the reference database." So they have a way of excluding outlier rates, is the way I understand that. So they're going to get more reliable data by excluding the super low rates and so on.

Q. Got it. And you believe that the fact that they exclude these line items with an hourly rate that did not align closely with the real rate -- you believe that provides further support for your selection of insurance defense as the proper Real Rate Report framework here?

A. No. I'm just saying that it adds to the echoed opinions by 285 judges that this is reliable and they have a reliable way to exclude outlier data, which is what they're saying there. And also, they don't suppress the rates in the insurance defense category by including, you know, State Farm auto or something like that.

Q. Well, do you know that for a fact, or that's

Page 228

your assumption based on the sentence you just read to me?

A. Well, they say that. "We removed data related to insurance company defense litigation unless noted otherwise." So they -- what they're doing is taking out the repetitive less complicated cases. Like, if you were defending the bus company in some town and the bus company was paying you $85 an hour, that's not going to be in here.

Q. Is it your testimony that they exclude those simpler types of cases you're describing even from the insurance defense data they're compiling?

A. That's what they just -- that's what you just read. I mean, I'm just reading English. If they say they did that, I'll take them at their word.

Q. See, I read -- I'm sorry.

A. The rates bear that out. The rates are not, quote/unquote, you know, "auto accident rates."

Q. I read this to say that when they give you the overarching rates for a particular city and what the, you know, litigation rates are for partners or associates, they're excluding insurance litigation from that analysis completely because it's so low. That's how I read that. You have a different read of it?

A. Yes, I do. They exclude the low-end cases,

Page 229

58 (Pages 226 - 229)

quote, "for all analyses unless noted otherwise." That's not just what you said. I mean, for everything, they exclude it. It does not suppress the rates. If they say it doesn't, it doesn't. They make a special point to say it doesn't so that you can't come along, or someone like you, and say, "Hey, you called it insurance defense; therefore, it must be really too low of a rate." It isn't. They exclude that stuff. It's not in there.

Q. What's excluded exactly?

A. The rates for less complex and repetitive litigation. I mean, traditional -- what a lot of people think is the universe of insurance defense litigation, which is a narrow view of the world, but that's what people think.

Q. And so your read of this paragraph is that even the insurance defense category we're looking at down here excludes the very low rate type of work you just described. That's your read of those two pages?

A. Exactly what they say, and the numbers bear it out.

Q. Okay. You provided opinions in other cases where a carrier was funding a portion of the defense, correct?

A. Yes.

Page 230

Q. And isn't it true that in at least one of those cases, you took the position that rates that were significantly higher than what the Real Rate Report allows for insurance defense cases were reasonable in that case?

A. I don't know. Every case is different, different location, different kind of case, different lawyers. I don't know which case you're talking about.

Q. All right. AKH, does that ring a bell?

A. The name rings a bell, but I don't remember the facts of the case.

Q. Let's pull this up. This is a report you issued in AKH Company versus Universal Underwriters Insurance Company. Do you recall this matter in the District of Kansas?

A. I have to say no, I don't remember. I have to say I've never set foot in the state of Kansas, so obviously, it was mailed in somewhere.

Q. I'm going to --

MR. CENTNER: Let's attach this as Exhibit 7, please, Ms. Pena.

(Exhibit No. 7 was marked for identification.)

BY MR. CENTNER:

Q. So paragraph 1, you can see the description here, "Opinion testimony concerning the reasonableness

Page 231

and appropriate allocation of attorneys' fees incurred by Paul Hastings in defending claims in the case of AKH Company vs. Reinalt-Thomas Corporation d/b/a Discount Tire in Central District, California."

Do you see that?

A. Yes.

Q. Does that refresh your recollection as to the work you did in this case?

A. No. If you'll show me a little more, maybe I'll remember it.

Q. Sure. So this is, I think, similar to what we saw in your report here. I don't think we need to look at it. There's your discussion about KPC.

A. What year is this? Do you know?

Q. So this report --

A. It looks like it was April of 2019.

Q. That's when it was filed. The report may have been issued, I would assume, earlier in that year, but probably -- let's see if there's a date on it. I'll scroll down.

A. That's okay. I just wanted to get what time in history we're talking about.

Q. All right. So you actually executed this report in September of 2015.

A. Okay.

Page 232

Q. All right. So here, you're retained by Paul Hastings. You agree with that?

A. Was I retained by Paul Hastings?

Q. Yes.

A. I don't know if they retained me or some -- one of the clients retained me. I'm not sure.

Q. And you generally recall that you were here to opine that the rates charged by Paul Hastings were reasonable?

A. Yeah. Paul Hastings is a major international law firm, and this is a big case, so it's a different circumstance than what we're dealing with in our case. But they all are different. I mean, you have to look at them with that in mind.

Q. So similar to what you told me before, this case involves an insurance company who is defending the insured in whole or in part, correct?

A. It appears that it was a dispute over what's an appropriate rate, and the insurance company wanted to have a lower rate than was being charged. It looks like they used the National Law Journal survey, which is -- it only surveys the largest firms. That's one problem with it. But there were less surveys available back in 2015.

National Law Journal surveys the 250 largest

Page 233

59 (Pages 230 - 233)

firms in the nation, of which, maybe half of them respond, and then they usually respond by a range of rates, not individual rates. So it's -- it's data, but I mean, I -- I wouldn't use NLJ today when we have something like the Real Rate Report available.

Q. Was the Real Rate Report around back in 2015?

A. I don't think so. I don't think so. At least, it wasn't available to me.

Q. So here, you went to the NLJ, and you looked at firms that you believe were comparable to Paul Hastings in size, prestige, and reputation.

Do you see that?

A. Yeah, but these are among the largest firms in the nation, some of them with over 2,000 lawyers. Again, size being reflective of rates, there being a direct correlation between size and rates. And this is a -- apparently a sophisticated case involving a very prestigious law firm of significant size, and so I had an opinion about rates, comparing it to what rates there were in the National Law Journal survey. None of those rates in the NLJ survey, then or now, would be applicable in this case.

Q. Why is that?

A. We're not dealing with one of the 250 largest firms in the nation. We're dealing with relatively

Page 234

tiny firms by comparison.

Q. Did you compare firms that you would consider peer firms to Altshuler Berzon or Shartsis Friese in attempting to arrive at a reasonable rate for that?

A. Not in the way that you asked the question. I'm applying a survey. So one of the factors is size, so I am comparing it to firms of similar size.

Q. But you did not go out and attempt to find a peer firm with -- in terms of size, prestige, or repetition like you did in the Paul Hastings report, correct?

A. Well, it's hard to do in your case because you have people at both firms that don't have any trial experience. And what if there's a 29-lawyer firm where they have the best trial lawyer in the whole state? What do I do with that? I would have to assume that person doesn't work on the case. I mean, it's not as easy as just finding some corresponding firm. They're not stamped out, like cookie-cutter. So that's why we have surveys that have rational data, you know, that's verifiable on these categories.

Q. And in this particular case -- and I realize that every case is different. But in this particular case, you took the opinion that rates up to $900 per hour for Paul Hastings for work performed in Central

Page 235

District, California, were reasonable as of 2015, right?

A. For that firm in that case, it's one of the largest firms in the nation. Paul Hastings' absolutely stellar reputation -- again, completely different circumstance than this case. But, you know, you can pull one of these Richard Pearl -- throw a number up and say it has to be that number. I just think it's -- you know, you have to have factors and like versus like, not just a number from somewhere. But if you think this is validating, 980 for your guys, it doesn't.

Q. But why didn't you utilize insurance defense rates in assessing Paul Hastings' reasonable rate in this case?

A. I don't know. I mean, there might have been rulings about that. If this was a 2860 case, their rates would apply, insurance company rates would apply. It's a very strong statute, and they're our civil code. But apparently, for some reason, it didn't apply. And so now, you're in marketplace of what does a downtown Los Angeles firm, like Paul Hastings, charge in a case like this. Yes, it would charge rates like this, you know, higher rates.

Q. So if you were to look at this particular case

Page 236

right now, would you utilize insurance defense rates to assess the reasonableness of what Paul Hastings is claiming?

A. I haven't used insurance defense rates in this case. I don't think this case that involves AKH is anything related to insurance defense, really. I'd have to look and see what it was about exactly. But I think it's -- it has complexity, and it has firm size, that if you use Real Rate Report, it would probably deliver higher rates than you have in this case.

Q. But you say you did not use insurance defense rates in this case?

A. I did not. I mean, I used the insurance defense category from the 2023 Real Rate Report which states candidly that it excludes low-end insurance defense. So in the category of insurance defense, under professional liability or other, it's applicable; those rates are applicable. But you're trying to suggest I'm trying to impose auto accident rates on the case, which is, of course, not true, which I've explained to you many, many times already today.

Q. So here on line 25, you're talking about large downtown San Francisco law firms, right? And you're saying those rates are not "probative." Do you see that?

Page 237

60 (Pages 234 - 237)

A. Probative. But yes, I do see that. Sorry for the typo on "Francisco."

Q. It happens.

What's a large firm, a small firm, a medium firm in the book of Jardini? I mean, what are the numerical thresholds for moving from small to medium to large?

A. Well, the Real Rate Report has large as over a 1,000 lawyers, and they then -- they have under 50, I think, as well, as a category. I'd have to look again, but it's -- the large is really, really large, I mean, dwarfing the size of the firms -- two firms involved here. And those rates are obviously not probative.

Q. When you say that you have -- looking at paragraph 50 now. You say that you've conducted legal audits of such firms in major cases. You say the magnitude of those matters is far different than is involved here?

A. That's true.

Q. What do you base that statement on?

A. I mean, the cases. I mean, I had a case in Idaho involving patents for a potato cutter. And so what could that be worth? That patent case involved rights worth $100 million. I mean real $100 million exposure, not made-up numbers and -- multiplied by

Page 238

three and so on. Just a baseline of 100 million.

We're talking about enormous cases involving companies that we've all known and heard. Google versus Sonos, another case I was in. I mean, just the biggest cases by the biggest companies with the most at stake who hire the biggest firms. And Altshuler wants the same rates. I mean, it doesn't make any sense.

Q. Sitting here today, do you know for a fact that the rates Altshuler charges are, in fact, equivalent to the large firms you're talking about right now?

A. Well, some of the -- some of the rates for the biggest partners have gone past $2,000, but a lot of the partner rates at those firms are still in the range of 1300 to 1700. So yes, I think that they're seeking rates that are customarily charged by the largest firms. I mean the mega international firms, the Fortune 500 clients that are more than a 1,000 people and have an international presence. That's not what we're dealing with. We're dealing with a firm that does consumer class action, you know, and has 29 people. I mean, it's two different things.

Q. Do you know whether Altshuler Berzon was discounting its invoices issued to Peiffer Wolf?

A. I have prepared a total fees and cost billed

Page 239

schedule for each of the two firms. The information on that schedule is taken from the face of the invoices and, I believe, represents the amount that they claim they want to collect from the insurance company, the amount and ultimately, when you look behind it, the number of hours.

So I don't know internally whether they did some discounting or not. I'd have to go back to the invoices if they showed on the face of the invoice -- usually, if so, we would have a column that showed discounts, so I suspect that there's nothing on the face of the invoices that shows a discount.

Q. So I'll represent to you for purposes of this question that there is something on the invoices reflecting a 25 percent discount. So if we do the math, if you take a $1,325-an-hour rate and you discount that by 25 percent, you come up with 993.75.

Will you take my word on that, Andre?

A. That the math is correct? Well, anybody can check it when they have a minute to do it. I'm just going to look at the face of the invoice and see if what you're saying shows the discount or doesn't show it.

Q. Sure. I think it's actually on the last page of each of -- if you -- and I don't want to mislead you

Page 240

and have you looking at the first page only. It may be on the first page. I also remember it being on the last page?

A. It's not on every invoice, so it's not -- it's not an across-the-board 25 percent discount.

(Reporter clarification.)

A. It's not on the early invoices because there's no discount at all on those. It may turn up later, but I don't think you can apply it across the board because I don't think that's what happened.

BY MR. CENTNER:

Q. But you did review those invoices, right?

A. By the time -- I'm looking now. By the time you get to April of 2024, I see there is a 25 percent discount. So maybe at a certain point in time, they started doing it. And let's see which number -- I think we have as the number on our fees and cost billed -- yeah, we have the gross number, not the discounted number, I think. Anyway, it's something that can be documented when someone has more time.

Q. So if you want to accurately capture the actual amounts billed and paid, you need to incorporate that discount into your supporting documents, correct?

A. Well, I don't know about paid. But billed, that's true. So let's see. The total due after

Page 241

61 (Pages 238 - 241)

discount for May 15th -- no. We have the gross number on the fees and costs billed schedule, not the discounted number.

Q. That's inaccurate as it currently sits, at least with respect to the billed number, correct?

A. The fees are then less than the amount on our total fees and costs billed schedule.

Q. What does that do to your opinions or your analysis that the rates that Altshuler Berzon is charging?

A. Nothing. You just apply the rate reduction to the lower number; that's all. The rate reduction would be the same.

Q. Right. But I guess you would agree now that your statement that the Altshuler Berzon firm is attempting to charge rates to Peiffer Wolf that are commensurate with some of the largest law firms in the world is not necessarily accurate anymore in light of this discount, correct?

A. No. Their rate is still 1300. Then they just give a discount. They didn't discount the rate. They discounted the net amount after applying the rate. So, you know, I think they still charged the 1300, and then maybe there was some blow-back from your firm about yeah, from whoever, saying that "That's too much," or

Page 242

"It's getting too high. We need a discount." So there is a discount.

And I don't know what the terms of that discount are, if it's just holding back for a period or if it's a forever discount. I really don't know. But what it does do is to -- it can be computed. But the total amount billed would be reduced, and then the rate discount would be applied to the lower number. And the rates would be the same rates because that's how you would do that.

Q. So earlier, we looked, for example, at the categorization of Altshuler's blended rate as astronomical. Looking now at the distinction between gross amounts billed as reflected in your supporting documents and actual amounts billed, that number is no longer accurate, right? It will decrease once you factor in this 25 percent discount?

A. Well, it's not an across-the-board 25 percent discount, but it's calculable. But even if it was a 25 percent discount, the average rate is still high because of the use of more higher-price people than lower-price people. If everybody goes down 25 percent, you're still using more higher-price people than lower-price people. That doesn't change. So it's really just an adjustment as to the number, not to the

Page 243

point.

Q. Does that concern you that you looked through 16 months', approximately, worth of Altshuler Berzon invoices and did not notice that discount being applied?

A. No. We have to look at the gross number anyway for doing most of the things that we do in audit work, and we would apply the discounted amount at some point to -- to give credit because it's not an amount that was going to be paid, at least not currently paid. I don't know what the deal is with the discount.

Q. You weren't doing audit work in this particular case, correct?

A. Well, we handle every case the same way. So yes, we were. We were preparing schedules of the same sort that we would apply and we prepare in every case.

Q. How did that not get caught?

A. Well, it did get caught. I knew that I had been informed that there were discounts. I don't have that tabulated because they were haphazardly applied. Someone can go back and sharpen a pencil and figure that out. It doesn't impact the rate analysis.

Q. You think it belies a lack of attention to detail?

A. I would say no, it does not.

Page 244

Q. Why not?

A. Because it doesn't.

Q. What are the reasons you're offering in support of your statement that missing 25 percent discounts on multiple invoices does not suggest a lack of attention to detail?

A. They're not missed. The total number of hours is correct. The rate that would be applied against that total number of hours in our rate analysis is correct. The net number that we come up with is -- is almost 3 million. That's correct, regardless of what was billed through to the client. And we don't know the terms of that discounts. Sometimes things are just deferred, not forgiven.

So I think what we did is appropriate. We always take the gross amount and deal with the discount issue if there is one later. And here, because of reasonableness questions are not part of the analysis, it didn't come up. But you're suggesting we didn't know there was a discount and that suggests that we didn't look at the invoices, and both of those things are a hundred percent wrong.

Q. How did you know there was a discount?

A. On the face of the bills, and I was informed somewhere along the road, either by Kay Holmen or

Page 245

62 (Pages 242 - 245)

somebody else, that there were discounts.

Q. Earlier, didn't you tell me that the discount was not apparent on the face of the bills?

A. I don't believe I said that. But if I did, that's incorrect. They are apparent on some of the bills, not all of the bills. Some bills, there's no discount.

Q. Back to your report, paragraph 49. You are continuing to distinguish the rates that Mr. Pearl uses from the rates that you believe are appropriate, and one of the distinguishing factors you cite is the statement that the rates he looks at are charged to Fortune 500 clients and very often extraordinarily complex and important litigation. Do you see that?

A. I see the paragraph, and I'll stick by the language that's in the paragraph, not your characterization.

Q. Okay. What is very important litigation?

A. Complex and important litigation involves very large issues and very complicated issues that -- many of them are legal in nature or mixed fact and legal and require the highest level of performance. Who said what to what client before they left just doesn't reach that level.

Q. So if a lawsuit has the potential to bankrupt

Page 246

a company and require it to shut its doors, is that lawsuit not important, at least to that company?

A. Oh, everybody thinks their case is extremely important. Levin wouldn't have brought the suit to whatever the merits of it may be unless they felt betrayed and thought it was important. And then defending that while you're trying to set up the office of a new firm in a new town would seem important to the lawyers, but it doesn't drive the rate up to downtown San Francisco firm rates.

Q. Do you believe it was reasonable for Peiffer Wolf to treat the Levin Simes litigation as important litigation?

A. I don't know. They're making a business decision on how to defend, and they're going to -- they're going to -- between the two firms -- and I assume Peiffer is paying for both firms. They're going to pay something, like, $6 million, and it's not over yet. And, you know, at some point, you have to kind of think, what's this case about, and what's really the legitimate exposure in the case?

And the subjective notion by somebody with an interest, even a lawyer, that it's important doesn't define the rate you get. You know, I think all my clients are important. I think all their cases are

Page 247

important when I litigated cases. That doesn't mean I can charge through the roof for those services.

Q. Let's pull up another exhibit. We're going to mark this as Exhibit 8.

THE REPORTER: I'm sorry, Mr. Centner. I'm going to need another five minutes when it's good for you.

MR. CENTNER: We can go right now. That's fine.

(Recess taken.)

MR. CENTNER: We're going to attach a new exhibit. This will be Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MR. CENTNER:

Q. This is a declaration submitted by Jim Finberg in the Superior Court of the State of California, County of San Mateo. Can you see that on your screen, sir?

A. Yes.

Q. Have you ever been to San Mateo County?

A. I have.

Q. That's outside of San Francisco, correct?

A. It is.

Q. Do you know Judge Raymond Swope?

A. I don't.

Page 248

Q. And you recognize this is a declaration submitted by Jim Finberg, who is one of the attorneys at Altshuler we've been talking about for the last 5 hours and 24 minutes?

A. That's his name.

Q. This is a fee application that Mr. Finberg submitted on October 7th of 2024. Do you see that?

A. Yes.

Q. All right. And it looks like this is a class action case against Oracle, right? Do you see that?

A. I don't. Oh, yeah. The caption says it's a class action against Oracle.

Q. And I bet you're going to say that you don't think the rates awarded in this case have anything to do with our case because this is a class action and it's apples to oranges, right?

A. I don't know. You're scrolling through quite quickly. If Mr. Finberg is justifying rates after a class action settlement, it isn't an analogous situation at all, as I've gone on at length about.

Q. I remember that testimony. I'm not trying to revisit it. I'm just giving you some context for a discussion. This is a motion to approve fees after a class action settlement. I want to go down to paragraph 42 in this declaration, the reasonableness of

Page 249

63 (Pages 246 - 249)

Altshuler's rates.

And then Jim states in paragraph 42, "The current commercial hourly rates for Altshuler attorneys, clerks, paralegals who billed time in this case are as follows." Then he sets out the $1,325, which is the same you've seen in the invoices you looked before the discount is applied, right?

A. Well, no. I mean, it's not really correct. He billed at $1,275 for a while, and then he billed at 1,325. He gave himself a raise.

Q. We looked before and at how rates across the market have been increasing over '23 and '24, right?

A. I don't know why the raise was made, and I'd have to look back to see why it was made.

Q. You agree that, in general, the market rates have gone up by about -- what was it -- 9 percent from '23 to '24? We saw that in the NALFA email?

A. No. The -- that email talks about the rates at the largest firms. Altshuler isn't the largest firm. So he says that this is a commercial hourly rate, which I think is somewhat misleading because their firm does plaintiff-side class action work. They don't really do commercial cases. They get paid by the hour. So I'm not sure what he means by that.

It's a current commercial hourly rate. I

Page 250

don't think that's their business model at all. In any event, these are -- these are rates that he's just asking for and -- which he calls commercial rates, which I don't think is correct. And it's in a class action in a settlement, completely different situation. And it's higher than at least one of the rates that he claims in this case.

Q. What are you basing your belief that Altshuler does not do commercial hourly work on? What is that belief based on?

A. Well their website. I mean, they say who they are and what they do. Let's look at the current cases and victories. They're all class actions. They're not -- I mean, one way or another, they're public-interest kind of cases. They're not commercial cases in the sense they're charging someone an hourly rate. They're contingency cases.

And the whole list of cases is on their website. It's over four pages long. And they're all that kind of case where you expect to be paid out of the settlement or because there's a statute that allows for fees. They're not representing, at least most typically, a paying client -- a currently paying client.

Q. So in this declaration, Jim says -- and this

Page 251

is a sworn declaration. "Under the commercial hourly rates set forth in the chart above are my firm's current commercial billing rates and are supported by our extensive and specialized experience in discrimination class actions like this one."

A. But that's not a commercial case. A discrimination class action is not a commercial case, so it's like internally inconsistent. He's asserting that it's a commercial rate, as if he charged somebody that amount and they paid them, and that's not what they do. That's not -- that's not how they run their firm. They're class actions and/or cases in which fees are paid pursuant to statute, like discrimination statutes in our state. So they're not commercial rates. I don't know why he thinks that they're commercial rates.

Q. I'm looking at paragraph 45 in his dec now where he says, "My current commercial hourly rate is 1325 per hour. I have billed and been paid for many hundreds of hours at that rate this year."

Who do you believe is in a better position to understand Altshuler Berzon's business model? Jim Finberg or you?

A. A few hundred hours in a year in which, say, 2,000 hours are billed, that means most of his time is

Page 252

not billed commercially. It's a smattering of a few little things that are commercial, as opposed to what they really do, which is the thing that this declaration concerns, which is a class action case.

So I don't know. I mean, I think it's overemphasizing that aspect of the practices. At a minimum, it's overemphasizing that aspect of the practice, saying there's 100 hours in a year. Come on. That's two weeks. I mean, you know, the rest of the time is spent on class actions.

Q. It says many hundreds of hours at that rate. So "many" could be 1900. It could be --

A. If it was 1900, he would say that. I mean, to me, it's an act of willful omission, not to say how many hours. Because if you say, hey, I had 50 hours billing at this rate to some dude, that's not very persuasive. So we say hundreds of hours at this rate as if that's how you made your living. It isn't. They make their living by these class action cases. And they're very remunerative. Anyway, I just don't think representing that as a commercial rate is appropriate.

Q. Again, you're basing that belief off of your review of Altshuler's website, right?

A. There's a significant amount of detail. There's three or four pages. I was just looking at

Page 253

64 (Pages 250 - 253)

it while we were talking. And every one of them, I think, as I was scrolling through, are public-interest cases in which you're paid out a class settlement or some kind of combined case settlement or that you get paid by statute, like discrimination or something like that.

That's what they do. They don't -- they don't bill in a -- in a commercial -- you mean like -- we were talking about commercial, like somebody selling something to somebody else. He's not in that kind of a case. There's not a single one of those mentions. He wouldn't be in the commercial section properly, wouldn't be in the commercial section of the Real Rate Report. It just -- it's just the wrong word. It just rubs me the wrong way a little bit because it's the wrong word.

Q. Do you agree, though, that Jim Finberg is in a better position to tally up the number of hours he's billed to clients in the year 2024 than you are?

A. Yeah. If he actually told us the amount, it would be even more persuasive, but he didn't. And to me, it's an omission of some importance.

But anyway, as I told you, there's nobody going to be combatting these fees. There's nobody on the other side saying, how dare you, you're not a

Page 254

commercial lawyer. It'll get through to the Court on these terms, calling himself a commercial lawyer when he really isn't. But so be it. I mean, this is a class action case, and it's totally different and not supportive in any way, shape, or form of rates in an hourly case.

Q. Do you have any concrete datapoints you can point to that refute Mr. Finberg's sworn statement that he was billed and paid for many hundreds of hours at a rate of $1,325 per hour in 2024?

A. Look at what he does for a living and look at what his firm does, and there's not a single mention, that I saw anyway, of a commercial case, like this guy stole all the widgets without paying for them and we had to sue him. There's nothing commercial at all in what they're doing. It's consumer public-interest class actions and really nothing else. Maybe some (inaudible) and things like that. And important issues. It's good work. You should do it, but it's not commercial litigation. It just isn't.

Q. That's your final answer on that, sir?

A. That's what they put out to the world, and I'm part of the world.

Q. Let's look at another exhibit.

MR. CENTNER: We'll mark this as 9.

Page 255

(Exhibit No. 9 was marked for identification.)

BY MR. CENTNER:

Q. And just in case there was any doubt, this is Judge Swope in San Mateo County granting the application for attorneys' fees and determining that it's fair, reasonable, and appropriate under both the percentage and lodestar methods. Do you see that, sir?

A. I see the percentage-of-the-fund method, and lodestar cross-check is also part of it. Okay.

Q. All right. And we see here on page 3, line 21, we've got Judge Swope saying that class counsels' hourly rates are reasonable, right?

A. Right. Given his substantial experience in complex class actions and employment discrimination. However, those are not the subject matter of the cases of the bills we're looking at in this case. He's in a professional liability case with somebody leaving a firm and either stealing or not stealing clients. It's not the same thing. Also, it's a class action.

I mean, what the judge started with was the percentage of the fund. Once that's okay, everything is okay. Because he's asking for 8 million and some-odd -- he's going to get it because of the percentage of the fund is appropriate and that's just the way it works. And he's got a lodestar cross-check.

Page 256

He has got a value on the lodestar of 17 million and -- over seven years. So they put enough out there for the judge to say, yeah, you can have the 8 million as a percentage of the fund.

But you wouldn't get it unless you had the right percentage in the amount that you've accomplished for the class. You wouldn't get it just by throwing your bills in there and saying, "Pay me 17 million." That doesn't work. So if you looked at it that way, if the lodestar value is 17 million and they've got 8 million, they've got half their rate, the way you look at it, anyway. They got half their rate in this case.

Q. So I get how you're reading this, but we can agree that the language in line 21 begins with "Class counsels' hourly rates are reasonable particularly given class counsels' substantial experience in complex class actions and employment discrimination litigation."

That's what the order says, right?

A. So they got half their hourly cross-check. Okay, great. I mean, so their rates should be half what they were. And they'd still be okay because they get the 8 million as a percentage of the fund. But they don't get the 17 million that they billed or they

Page 257

65 (Pages 254 - 257)

claimed to have, the value of their work.

So I don't know. I just think it's not a datapoint that's of any use in the work in this case.

Q. Let me pull up one more exhibit that I should have attached earlier but I didn't.

(Exhibit No. 10 was marked for identification.)

BY MR. CENTNER:

Q. We talked about your work in the Vu case. And there I think you said, under those particular circumstances, reference the Laffey Matrix was appropriate. The Laffey Matrix is accessible via -- and it's a web page, right? I don't think it's a printed publication.

Does this look like Laffey Matrix to you?

A. Yeah. It was formulated in Washington D.C. by the attorney general's office in public interest cases. It's only really applicable in that jurisdiction, but there's some gimmicky ways you can apply it in other jurisdictions using various Department of Labor costs and alterations in the number. So these aren't the numbers that would be applicable in California. You have to do a complicated -- complicated calculation.

Anyway, it's marginally useful; let me put it that way. But if you have a better survey, like the Real Rate Report, like I use and Mr. Pearl uses, you

Page 258

should use that.

Q. The complicated adjustments you're talking about to utilize the Laffey Matrix outside of the D.C. area, isn't it true that that actually results in an upward adjustment for cases litigated in San Francisco?

A. I'm not sure about San Francisco. In Los Angeles, it's about a 1.9 upward adjustment. In any event, it's -- it's not the best way to know what market rates are since it never looked at a single rate in San Francisco or Los Angeles or Kansas City or anywhere else in the world and never looked at a single rate there about what somebody was charging and what might be reasonable under the circumstances.

It doesn't speak to what kind of case is involved, and so it's really, you know, a very general kind of overview looking at rates on some kind of a nationwide basis. Courts today are not very happy about it. They don't like it.

Q. Are you familiar with any California jurisprudence accepting use of the Laffey Matrix?

A. Not recently. I mean, if there's better, you should use better. And you're subject to attack if you use something that has as many holes in it as the Laffey Matrix.

Q. Let's go back to your report. We're going to

Page 259

jump down to paragraph 65. So this is -- for the record, we're back on Exhibit 1. I'm sorry. This is your report, Mr. Jardini. We're on paragraph 65, which is on page 13. You've got a reference to the Real Rate Report's description of San Francisco rates for insurance defense litigation. Do you see that?

A. Yes.

Q. All right. We've got quartiles: first, median, and third. I'm not a mathematician, but do you agree that what we're seeing here represents the middle 50 percent of --

A. No.

Q. -- billing entries submitted by firms that participated 25 percent or below this first quartile, 25 percent or above this first quartile?

A. I see what you're saying. Yes, that's correct. Weirdly, Richard Pearl chooses rates even higher than the third quartile rates in this category. I don't understand his thinking, but that's what he did.

Q. So this is -- I didn't -- at first, looking at your report, I thought that you thought insurance defense was the appropriate category to utilize here. That's the long discuss we had when we looked through the Real Rate Report appendix, right? You believe

Page 260

insurance defense is the appropriate category here?

A. That's one category. Then you have to look at firm size, and you have to look at the actual type of case, and then you have to look at years of experience, and you have to factor all these things together. You're just looking at -- if you look at just this rather crude chart from the survey -- insurance defense partner, associate, done -- I mean, any case, whatever it is, it's not as useful as using some of the other datapoints that you have that more particularly tailor the ultimate opinion.

Q. If we look just -- this is your report, right, so looking at the chart that you inserted here. So if we look at partner rates for insurance defense litigation in San Francisco, we see the third quartile is 981, right?

A. Yeah. I mean, you're just reading numbers. I don't think it should apply, but that's a number that's in that box.

Q. Look, I'm not trying to be difficult. I'm not trying to fight with you. We had our moments before. I'm asking now -- I'm genuinely confused because I thought, looking at paragraph 44, that you said insurance defense was the appropriate real rate framework to utilize?

Page 261

66 (Pages 258 - 261)

A. Right. But if you look at just that particular box, it doesn't account for firm size, meaning that those numbers include the largest firms in San Francisco, which we are not dealing with. Okay?

So that's -- that's a very important factor that isn't considered by just looking at insurance rate and defense rates across the board and nothing else. It doesn't matter what size firm, doesn't matter what kind of case, particularly of complexity. And we know for a fact that firms less than 50 have significantly lower rates, and we know for a fact that lower -- that people with less experience have lower rates. And there's other datapoints that impact the choice of rate.

So you could, I guess, in a meat cleaver kind of way, just choose 535 and 385. Okay. I'm not that far off from that, but that doesn't account for firm size.

Q. Why you go with numbers in the first quartile as opposed to the median and third quartile? What's your methodology supporting --

A. Why would Richard Pearl use the third quartile or 75 percent of rates in that area or less? I would say that if you're -- if you're ahead of 25 percent of the rates for that kind of case and for a firm your

Page 262

size, that's an appropriate datapoint for choosing a rate because it's not a complex case. It's a fact-driven case. Who said what to whom, when did you take the information, what information did you take, is it really a trade secret? And it's really a lot about "who said what to whom at what time" kind of case.

And so I would put that in the lowest quartile because it's that kind of case and then adjust for size. You need to adjust lower than that because the size is much, much smaller than the biggest firms. And the difference by size is demonstrated in one of the previous charts that take you from -- if you go from more than 1,000 -- let's say the median, generally speaking, in insurance defense -- more than 1,000 people, you get $1,050 an hour. But if you go down to less than 50 for a partner, you get 185 an hour. It's a dramatic difference based on firm size. And that's insurance defense also.

So you have to account for all of those circumstances in choosing an appropriate rate. There's a bit of an art to that, but I put the rates out with specificity across both firms in two schedules that show exactly what we did and how we did it.

Q. So would you agree that if the case were properly categorized to something other than insurance

Page 263

defense -- I understand you dispute that. But if the judge were to find the case was properly categorized to something other than insurance defense under the Real Rate Report, the overall litigation rates in San Francisco would be the relevant framework?

A. If you have overall litigation rates instead of -- they're lower. I mean, it's -- I don't know why you'd want that, but they're lower than the insurance defense rates.

Q. They are in some areas and they're not in others, right? You have the third quartile on 1124.

A. Well, for associates, it's 718, which is lower than 835. And in the first quartile, they're lower. So I think that insurance defense is -- is the logical -- even though the rates are lower for general overall litigation. If you want to argue for that, then the rates would be lower.

Q. It would be higher in some cases but lower in others, right?

A. An overall basis, the first quartile level, they're both lower, so they would be lower, period.

Q. If you use the third quartile for partners, they'd be higher. We can agree on that, right?

A. I wouldn't use the third quartile. There's nothing about this case that would put it in that

Page 264

stratosphere.

Q. So we agree that the datapoints that make up the Real Rate Report are anonymous, right? You don't have the ability to peek behind the curtain and get a sense, for example, as to the average complexity of the case that goes into the methodology, do you?

A. You have to assess that on -- on the merits of the case itself, which we talked about at some great length. It's not particularly complex. It's certainly not legally complex. It is, in the world of employee leaves and competes, a garden variety type of case. It happens all the time. But Mr. Pearl thinks it's unique, and it just didn't.

I mean, there's -- there's many, many such cases, and that's the nature of capitalism. People are free to leave. They're not enslaved to their employer. They can go somewhere else if they want to. They can contact clients. There's a way that that's appropriate to do that. So, you know, it's not a super-complicated, high-end, "need a big downtown San Francisco law firm at the highest rates" type of case. It just isn't.

Q. It's unique to Peiffer Wolf, though, right?

A. I don't know what you mean by that. Did it happen to them before or after? I have no idea.

Page 265

67 (Pages 262 - 265)

Q. So if Peiffer Wolf views this as a bet-the-company lawsuit, doesn't that rise to the level of important or unique, at least as Peiffer Wolf is concerned?

A. You're talking about a subjective intent. I'm going to pay more than this case is worth because I'm afraid. I mean, I don't think you can ask somebody else to embody your fear and pay the higher rate.

Q. As we sit here today, can you name a firm in San Francisco that you believe would have done an adequate job representing Peiffer Wolf in the Levin Simes matter that the rates you've opined would be reasonable?

A. I could do that research and get back to you. I'd have to look at see what rates people are currently charging and what the names of those firms are.

Believe me, there's trial attorneys in San Francisco that would do this case for 456 an hour, 475 an hour. Believe me, that's the case. And these are actual trial attorneys that have been to trial many, many times. They don't necessarily have to be David Boies, you know, in whatever cases he's involved in.

So I don't have a name for you right now, but I'm convinced beyond convincing that there's many such

Page 266

people that would do the case at these rates --

Q. And you believe --

A. -- and be more credentialed to do it.

Q. So you said "and be more credentialed to do it"?

A. Right, that actually have tried cases. I mean more than one, that kind of thing, and more within the last ten years.

Q. And do you believe that these firms you think you could find would have the manpower to go toe to toe with Keker Van Nest?

A. Sure. I mean, litigation is litigation, you know. If somebody is doing too much or over the top, there's always a decision-maker that you can go to and put an end to it. Otherwise, you know, that's the stuff of litigation. Oh, my God, he sent me another request for production of documents. Well, welcome to everybody's life that does this for a living. That's what we do for every day of our lives; we go to depositions, except there weren't any depositions in this case. And we go to a hearing, and we put exhibits in front of the arbitrators and make the arguments that there's no trade secrets and be done with it.

Q. So you referenced previously the summary you put together. Here it is. So this is paragraph 68 of

Page 267

your report, correct? And this is where we see, I believe, the summary you just talked about, right, where you list all the timekeepers. You list the hours they billed at for their original rate that, on the other side on the slash before the closed paren, you have what you believe is an appropriately adjusted rate, correct?

A. Yes.

Q. How did you arrive at 475 per hour for Jim Finberg?

A. I considered all the datapoints for all the reasons from the Real Rate Report that are actually rates charged by people. I didn't reduce them down to 175, you know, as some of the general litigation would be, but I thought that was an appropriate rate that was consistent with the first quartile analysis under the Real Rate Report.

Q. So let's unpack that. So you started with the data provided by the Real Rate Report, correct which would be one of these charts up here?

A. Yes, starting with the one on firm size with the firms of their size, at least the Altshuler firm, at the lowest level of rates. I considered that. And then I considered years of experience and the information, and then I considered overall litigation

Page 268

rates. Though they weren't directly applicable, I looked at it. And then I considered San Francisco rates for insurance defense litigation, in light of all of that previous information, and made some reasoned judgments on what the appropriate rate should be.

Q. What were the reasoned judgments?

A. In the first quartile of Real Rate Report data for insurance defense litigation, it has to be adjusted for firm size because it includes all the biggest firms. It has to be reduced for firm size. And then it should be looked at for level of complexity, which puts it in the first quartile. And when you do that, you know that it has to be in the first quartile but less than 535 per partner and less than 385 for an associate.

And obviously I'm not going to reduce it 90 percent, which firm size data would indicate. But I made an adjustment for firm size, which I think is -- as I say, it's immutable fact that large firms charge higher rates and small firms charge lower rates. I reduced it for that reason marginally, and then I applied those rates across all the timekeepers.

Q. So you started with the -- let me make sure I followed. You started with this as a baseline, right? And then you adjusted downward because this encompasses

Page 269

68 (Pages 266 - 269)

datapoints of all sizes of firms, ranging from less than 50 to at least over 1,000, right? So you adjusted downward from there?

A. If you look at the less than 50 and 1,000, the disparity in rates is like 10 to 1 in certain areas, or something like that. It's probably 8 to 1. I wasn't going to reduce it to 1/8. I made a marginal reduction because it's not clear how many big firms are involved. But they are involved. There's no doubt because they're included and they're not excluded and they would be in that category. So there needs to be an adjustment, so I did make that adjustment.

Q. Did you use any sort of mathematical formula to do that? Or just went with what felt right based on your experience?

A. In the expert witness business, ultimately every opinion is a judgment, and this is a judgment based on my experience and all of this information and the case itself. It's my best judgment under the circumstance.

There's no -- there's no one rate out there written on a tablet that's handed down. Even if you look at Richard Pearl's, he has got rates all over the place: lower, higher, everywhere. There's no one rate. You have to make a reasoned judgment as to what rates

Page 270

should be based on the information that's available.

Q. Then if I understood you correctly, the assumption that the first quartile rates is appropriate is based on your belief that the Levin Simes action is not complex, correct?

A. It isn't complex. And it's a fact pattern that has played out many, many times in many, many cases. It's a kind of a case -- did he abuse me in that code room or did he not, that kind of a case. It involves a few witnesses and a few documents as to that. And, of course, the damage questions are more complicated, that there are experts that were retained for that. But yeah, that's the reason -- generally speaking, the reason why I used the first quartile.

Q. How were you able to gauge your perceived complexity of the Levin Simes action against complexity of the other cases utilized to fill in these insurance defense litigation rates in San Francisco?

A. Again, it's judgment. I know what the case is about because the parties have all fully explicated what exactly they're alleging and what exactly they want to have happen in their post-hearing briefing. And because it's not complicated, I thought that if you were getting paid more than 25 percent of similar practitioners -- that is similar practitioners in firms

Page 271

of a similar size -- that would be appropriate, that you shouldn't be, for instance, getting more than 75 percent of everybody else, that somehow you've risen to the top of the pile, not if you're lawyers without really solid trial experience in this kind of case. The kinds of cases we look at with Altshuler are not like this at all. They're not trials.

So, you know, I mean, there's a learning curve that may affect hours, but I think also it's a statement of what should a lawyer with that level of experience in this kind of case receive per hour.

Q. You think that the quality of the counsel representing Levin Simes warrants any sort of upward adjustment from the first quartile to the median quartile? Does it make the matter more complex?

A. No. I mean, your point seems to be that they are doing a lot of things. Okay. Well, welcome to litigation. I mean, that doesn't have an impact on rate at all. They're doing all the work. They're billing all the hours. They're doing what they need to do. You don't get a higher rate because you're doing the work.

Q. Isn't there an argument to be made that they're doing the things better than most would, for example, writing better quality motions?

Page 272

A. Well, you know, the ultimate result will depend on their trial skills, not their writing skills, necessarily. I'm assuming competence. I'm not assuming incompetence or lesser competence. Why would you assume that 25 percent of lawyers who are getting lesser rates than San Francisco are incompetent? They're not. They're just as competent.

I mean, also, you know, the kinds of motions and things we're talking about here, it's just marshalling the facts to bring to bear on the relatively well-established legal principles.

Q. So we talked about complexity of the case. What about -- you previously talked about the experience of the attorneys, and in particular, you focused on trial experience, correct? That was another one of the factors you considered in ultimately adjusting downward from the first quartile numbers we see here?

A. I did consider where they should fit, and it goes into the first quartile number itself. The downward adjustment is for size of firm.

Q. Skill and reputation, as a general matter, those are part of the analysis here in determining where the attorneys fall quartile-wise, right?

A. Well, I agree with Richard Pearl. Credentials

Page 273

69 (Pages 270 - 273)

and trial experience is what he considered. I would consider the same. Reputation is -- is a difficult thing to get your arms around, but trial experience isn't. And so I think I'm trying to be as objective as possible and not -- I'm really shooting from the hip but finding a datapoint and having a reason to move one way or the other from that datapoint.

Q. Correct me if I'm wrong, but you first looked at the Westlaw tool that recites Altshuler's and Shartsis' trial experience today in connection with the Pearl deposition, correct?

A. No, no, no. I may have printed it today, but I -- I looked at that sometime ago. It's not today.

Q. And it's your testimony that you had looked at it in connection with developing the opinions we see here in your report?

A. I always look at people's trial experience. I may not have printed it out at the time, but I have the sense of running four names and finding out that there's not a lot of trial experience here. Because you were going to ask me about it sometime last week, I printed out some of it, not all of it. But -- so that you could look at it if you wanted to.

Q. If we look at the rates that you determine are reasonable here, we see 475 for Jim Finberg and 450 for

Page 274

Stacey Leyton, correct?

A. Yes.

Q. So why is CNA currently paying less than the amount their expert has now determined is reasonable?

A. I'm not here to talk about insurance issues or claims or people's positions. People have legal positions of all kinds for all reasons, but it's beyond the purview of my deposition here today.

Q. You don't have an opinion as to the propriety of CNA's actions one way or the other, correct?

A. I don't know what positions the parties in general have taken, where they are on that, how much money has been paid or advanced by anybody in any direction. I'm looking at the issue that's presented in my report and only that.

Q. The issue in your report that we're looking at right now is what you believe a reasonable hourly rate is, correct?

A. Yes. And the other billing issues that I mentioned in the ensuing pages.

Q. I'm looking at paragraph 67 of your report.

A. Yes.

Q. And I think this summarizes some of what you just walked through. You say that "I believe that these rates are fair and appropriate for each

Page 275

timekeeper given their level of experience, the firm, the nature of the litigation, and the venue." I'll go in reverse order.

The venue, of course, is San Francisco, right? That's the market that you utilized and cited in these tables we looked at, correct?

A. Correct.

Q. And then the nature of litigation is insurance defense, which was the starting point for your analysis, right?

A. And the very kind of case it was, departing employee steals clients, as the centerpiece of it.

Q. Then the firm, that is -- I guess, are experience and the firm somewhat intertwined here? That's you looking at their credentials, their trial experience, their ability to handle this particular case in determining where on the spectrum you believe that puts them?

A. No. The firm means the size of the firm.

Q. Okay. That's right. And that's right because you looked and you noted there are -- here it is. This is based on the head count, correct?

A. The size of the firm, yes.

Q. All right. And then experience would be where trial experience comes in, right?

Page 276

A. That's a good marker for experience, yes.

Q. Does Altshuler's reputation in the market factor in at all? Or is that in your mind, a subset of experience inquiry?

A. I know they're a plaintiff side, consumer public interest, class action type law firm that does almost all of their work on a contingency basis. I know that. They're not in the marketplace establishing their rate and having people pay their rate and so on. I mean, I know what kind of firm it is.

It's different with Shartsis. They have some professional liability experience including previous cases in which lawyers have departed the firm and taken clients.

Q. Would that have warranted an upward adjustment for Shartsis?

A. No. They don't really have extensive trial experience -- or very little trial experience.

Q. Do you believe that the experience they do have -- I think you referenced previously they advertised it on their website as a practice area, right?

A. I'm sorry. I'm not following you.

Q. Sure. I guess I'm backing up for a moment. If memory serves, I believe you said that when you

Page 277

70 (Pages 274 - 277)

looked at Shartsis's website, you saw that they advertise prior experience in this type of case, departing employees taking trade secrets with them, correct?

A. They phrase it this way: "Attorney departures, formation of competing firms." That's, I think, a fairly concise description of what's happening in this case.

Q. But because they don't have the trial experience, according to you, what they're describing on their website does not warrant any sort of adjustment above the first quartile rate that you started with, correct?

A. For the same reasons that I've given (inaudible).

(Reporter clarification.)

A. The kind of case is the determining factor than lowered by firm size.

BY MR. CENTNER:

Q. What do you think would be an appropriate case that would justify a third quartile rate?

A. Certainly a case much more sophisticated, legally complex than this case. I mean, there's any number of cases. I'm not going to formulate some imaginary case that would meet my standard. I'd look

Page 278

at whatever case it was and assess it on its merits.

Q. Let me ask a similar question for the median quartile. Are you able to formulate a paradigm case that you believe would fall in the median quartile for insurance defense litigation?

A. Not a formula. It depends on the circumstances of the case involved and who the people are that are working on it.

Q. Have you ever utilized the Real Rate Report San Francisco rates for insurance defense litigation in another report that you've worked on?

A. Probably. I don't have a specific recollection, as I sit here today.

Q. So I'll ask this anyway.

Do you recall which quartile you would have used in those other cases?

A. (Inaudible.)

(Reporter clarification.)

A. I'd have to look at any report that was done, if there was such a case, and see what the decision was. I can't revive it from my memory now.

BY MR. CENTNER:

Q. But a moment ago when I asked if you were able to formulate a paradigm case for the median quartile, you said no, I'm not going to -- I'll paraphrase. You

Page 279

said no, it would depend on the circumstances of the case involved and who the people are that are working on it.

The reference to the people that are working on it, does that refer to their trial experience and the particular type of case involved?

A. Yes. Your questioned was asked of the third quartile, just to correct you. Yes, that would be a factor. I would apply all the same factors I applied in this analysis.

Q. So 475 for Finberg. Would a rate of 485 for Finberg be reasonable?

A. You can argue for a penny here or a penny there. As I say, it's a judgment call. I do note, though, that most of his time was billed not at 1275 but 1357, which means that the reduction is undercounted by about $110,000. That's on me. Or something like that. Maybe not all of the hours but some of the hours should have been reduced from 1357. So this number already accounts for some of his hours being paid at 557. And again, that's on me.

Q. I didn't follow that last part. I'm sorry. This already accounts for some of his hours being paid at 575?

A. Okay. James Finberg billed at two different

Page 280

rates. He billed at 1275. And this takes the reduction of the difference between 475 and 1275. However, he only spent 235.9 hours at that rate. He spent 875.8 hours at 1325. So if that rate were applied to those hours, it would be a higher amount paid to him, would be one way to look at it. You get credit for 525 instead of 457, if you follow me, because the reduction is made against 1275 and not against 1325. The reduction would be higher if the accurate rate was used there.

We used one rate, his lowest rate, which is benefit to him. I just saw that as I was looking at this, and it would have been -- it would have been a bigger adjustment to the fees if those 800 some-odd hours were accounted at 1357 and then reduced to 475.

Q. This number I'm highlighting here would have been higher, correct?

A. Not by 100. But it would have been 50 times 800, so about 40,000 or something like that.

Q. Are you familiar with a body of Ninth Circuit case law that restricts the use of submarkets as the appropriate analysis for fee calculations?

A. I really don't know what you're asking. If you give me a case to read, I'll read it but not tonight.

Page 281

71 (Pages 278 - 281)

Q. Sure. I wouldn't want to use my remaining record time for that anyway, Mr. Jardini.

Prison Legal News vs. Schwarzenegger, is that a case you've read?

A. I'd have to look at it. I don't remember the name. Schwarzenegger is a name that's quite familiar in other contexts.

Q. Former governor?

A. Former Screen Actors Guild president, former action movie star, and former Mr. Olympia.

Q. So sitting here today, though, you are not aware of any potential limits imposed by the jurisprudence on the use of submarkets as a basis for evaluating reasonable rates by submarkets? By submarkets, I mean something like insurance defense or toxic tort or prison litigation.

A. The way you presented that, I'm highly dubious there's a case that says you can't use this Real Rate Report, which 285 Ninth Circuit courts, including the Central District, including the Northern District, have approved. And then there's some case that says you can't use insurance defense? I don't believe it.

Q. Do you know if all of the 285 cases we looked at used the insurance defense? Or are they using the general litigation?

Page 282

A. They used the appropriate rates for the case that was involved, as I am assuming that the Schwarzenegger case used the appropriate, not inappropriate, category. And it looks like -- you're scrolling so fast. It looks like somebody is using the Laffey Matrix. I'm not sure this is particularly relevant.

Q. I think here they rejected the use of the Laffey Matrix?

A. I'm not surprised.

Q. This is the language I was referring to, Andre, where it says, "Although the state officials urge us to look only to the rates charged by other attorneys involved in prison litigation, the proper scope of comparison is not so limited, but rather extends to all attorneys in the relevant community engaged in equally complex federal litigation no matter the subject matter."

Is that a line of jurisprudence you've ever considered?

A. No. This is a PLRA case. PLRA cases are prison cases where fees are, in fact, limited by law. And the question here was does the PLRA apply or not apply. I'm pretty sure the PLRA is not a partner case and that this has no impact whatsoever on the case,

Page 283

none. It's not a PLRA case. There's not a statute limiting rates. You're not arguing against a statute limiting rates. We're talking about a survey that sets rates appropriately in the community, which is exactly what they're talking about. Attorneys in the relevant community engaged in the same kind of litigation, exactly what we're doing in this case, both myself and Mr. Pearl.

Q. That's your full answer on that, sir?

A. Yeah. I think this is kind of silly, really.

Q. Let's pull up another exhibit.

MR. CENTNER: We can mark this as Exhibit 11.

(Exhibit No. 11 was marked for identification.)

BY MR. CENTNER:

Q. This is a declaration you submitted in 2018 in support of a motion for attorneys' fees filed by -- how did you pronounce that, sir? Tsuburaya?

A. I have no idea.

Q. Was that your client in this case?

A. I was probably contacted by Quinn Emanuel.

Q. How many cases have you done for Quinn Emanuel?

A. Six or eight, maybe, something like that.

Q. Do you recall in this case you took the

Page 284

position that rates of up to -- I think it was $960 per hour were reasonable in this particular circumstance?

A. Yeah. Quinn is really a top-notch, big international firm with a lot of lawyers that actually go to trial. They pride themselves on going to trial. They have acquired a lot of assistant U.S. attorneys before they even get to Quinn Emanuel, tens and tens of trials. They are usually in big cases. They've got a client that's agreed to their fees. That's usually when I'm hired. They've agreed to the fees. They've agreed to the terms of the retention. There's no reason to dispute rate when the client has already agreed to the rate, so it's kind of a completely different situation. It looks like they were -- they were looking at maybe were there billing issues. I didn't see billing issues.

Also, Quinn Emanuel inoculates itself from certain billing issues by putting expressly those issues in their fee agreement. For instance, they will say we will be permitted to block bill and you shall not object to block billing and so -- and other issues like that. So really, there's very little to talk about in terms of reasonableness questions.

And rate is agreed. These are all collection actions, like Quinn Emanuel and big-time cases. And

Page 285

72 (Pages 282 - 285)

the client has agreed to the rates. There's no dispute about it. It's not some third party being asked to pay.

Q. In this case, Peiffer Wolf has agreed to (inaudible).

(Reporter clarification.)

BY MR. CENTNER:

Q. In this case, Peiffer Wolf has agreed to pay rates to Shartsis and to pay rates to Altshuler, correct, sir?

A. Yeah. But the insurance company hasn't agreed. It doesn't make it reasonable to collect it from a third party. They weren't there when y'all were talking about what rates you charge or whether you had a discount or not have a discount and why you spend $6 million in a case that might not be worth that much. They're a stranger to all of that.

So no, they didn't agree to the rates, and that's why we're talking about rates, because you're trying to get the insurance company to pay rates that are higher than reasonable.

Q. Do you believe the fact that Peiffer Wolf agreed to those rates before it had any indication the insurance company would reimburse it a dime for what it spent is evidence of the market reasonableness of those

Page 286

rates?

A. Not in our jurisdiction. The Seventh Circuit has adopted kind of a -- I'll call it a rebuttable presumption. Even there, you can challenge it after the fact. But they say if it's an arm's length transaction and paid, that that is a rebuttable presumption. But nobody -- I can guarantee you nobody in any other circuit or any other court that I'm aware of has ever adopted that rule. And you're suggesting it to me as the rule here, and it isn't.

Q. What about the fact that Peiffer Wolf issued payment on those invoices before it had anything indication that the insurance company would contribute even a dime towards its defense? Is that evidence of the reasonableness of the hourly rates?

A. No. Again, you're trying to impose the law, the mode of jurisdiction. It's never been adopted. In fact, it has been formally rejected in most jurisdictions that have considered it.

So no, I would say you have to look at the case. Is this a reasonable rate or is it not a reasonable rate? That's what we're doing.

Q. That's the Taco Bell case by Judge Posner, right?

A. Yes.

Page 287

Q. Are you aware that was cited with approval by a federal district court in Louisiana?

A. No. But, you know, I'll look at whatever authority you have. I don't think that makes the rates reasonable.

Q. So let's look at what you put in your sworn declaration in this Quinn Emanuel case. I'm going to up paragraph 39. The last sentence in paragraph 39, you say, "Of significance is the fact that the fees incurred by Quinn Emanuel and the various experts have been paid by TPC. Payment by the client is an important test of the economic marketplace than lends evidence to the hours spent and rates charged by counsel."

So here, at least, you were citing payment by the client as evidence of reasonable rates charged by counsel, correct?

A. I think this is a dispute between Quinn Emanuel and the client, as I understand it. So I think that's a very different circumstance.

Q. This is a fee application. I think a prevailing party, a fee application.

A. Show me the front page again. I can't believe that, necessarily. It's a motion for fees. They're seeking it against who, though? Okay. Well, all

Page 288

right. So maybe it's asking a third party -- I really can't tell. What year this is?

Q. This was submitted by you, sir, in 2018.

A. Right. I don't really remember the circumstances. But yes, I made -- the point I was making that in this case under these circumstances, it's a factor. And it's not a rebuttal of presumption.

Q. Let's look at paragraph 54 of this declaration -- actually 53, I'm sorry.

You cite the fact that the client and Quinn Emanuel faced a well-funded and capable opponent. Do you think that factor was present in the Levin Simes action?

A. This doesn't relate to rates, when you're trying to squeeze it into a case about rates. This is about the total number of hours. And so I don't think that has any relevance whatsoever. You don't get a higher rate because the other guy is well funded.

Q. Okay. Paragraph 57, you said, "The case was document-intensive. Quinn Emanuel reviewed over 25,000 documents and ultimately produced almost 18,000 documents."

Earlier you gave me 10 million as a comparator for a complex case. Here you're saying 25,000 is document-intensive. Can you explain that discrepancy?

Page 289

73 (Pages 286 - 289)

A. They're both document-intensive. One is way more intensive. Obviously, a patent case will have way more documents. This is a complex case too. This is not a cookie-cutter case that happens over and over again, like the Levin case. This is international. It required looking at an interpretation of Japanese documents. I mean, come on. This is completely different and more complicated than what we're dealing with in this case.

Q. Have you ever seen -- you said -- you keep saying the Levin Simes action is cookie cutter. Have you ever personally been involved in a similar action?

A. Yeah. We had a departing partner at our firm that sued us, you know. We got insurance defense from that -- for that. But it's the same thing, who has the right to clients.

Yes, I have had -- in my legal malpractice case, although it did involve a headhunter, it involved a suit against lawyers for their -- for their work in the case, their malpractice in not pursuing the guy who took the documents and put them on his computer under the code "recipes."

In any event, this actual circumstance, whether I was personally involved in it or not -- and I have been in similar departing-employee cases, as I

Page 290

mentioned to you before. It's not an unusual case. And certainly among lawyers, it's not an unusual case.

Q. That's what I'm trying to flush out, sir, is what's the factual basis for your statement that it's not an unusual case? So I posed a question to you about personal experience.

What else can you point to as an objective corroboration of your statement that this is -- the Levin Simes action is not an unusual case?

A. Because I'm familiar with the kinds of litigation that occur between lawyers. It's talked about. It's like the thing lawyers like to talk about the most. You know, Bob left Joe's firm, took the clients. It happens all the time. It's not unusual. And so I think it's part of the fabric of being a litigator in this community for as long as I have been, that those cases recur.

Q. Are you saying it happens -- lawyers leaving and taking clients happens all the time? Or lawyers leaving, taking clients and scorched-earth litigation ensuing happens all the time?

A. Litigation ensues very frequently. Lawyers don't like it when a partner leaves and takes files or clients, and so there is litigation. It's not unusual.

Page 291

THE WITNESS: Where are we on the timeline?

MR. CENTNER: Pardon me?

THE WITNESS: I'm asking where are we on the timeline?

MR. CENTNER: Meaning how much time is left in your deposition?

THE WITNESS: Where are we on the timeline as far as the seven hours?

MR. CENTNER: We can go off the record for a moment.

(Recess taken.)

BY MR. CENTNER:

Q. Mr. Jardini, you have emailed or are in the process of transmitting over to Mr. Grabill the documents we talked about earlier, correct?

A. That has been done.

MR. CENTNER: All right. I flipped through my outline. I don't think I have anything left to cover that we haven't covered. It has been an interesting experience. I thank you for your time. I look forward to potentially seeing you in December.

THE WITNESS: Great. I appreciate your

Page 292

professionalism.

MR. CENTNER: Let's go off the record.

(This proceeding was concluded at 10:25 p.m. CST on October 24, 2024.)

Page 293

74 (Pages 290 - 293)

REPORTER'S PAGE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, (CCR #2017002), Registered Professional Reporter (RPR #970346), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

YOLANDA PENA, CCR, RPR

Page 294

---

Peiffer Wolf Carr Kane Conway & Wise LLP v. Valley Forge Ins. Co.

Andre Jardini Job No. 6972146

ERRATA SHEET

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____

Andre Jardini                    Date

Page 296

---

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that ANDRE E. JARDINI, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing 294 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript, accompanied by my digital signature or original signature and original raised seal on this page.

Prairieville, Louisiana, this 25th day of October, 2024.

YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346

Page 295

---

Peiffer Wolf Carr Kane Conway & Wise LLP v. Valley Forge Ins. Co.

Andre Jardini 6972146

ACKNOWLEDGEMENT OF DEPONENT

I, Andre Jardini, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Andre Jardini                    Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Page 297

<acj@kpclegal.com>

October 25, 2024

Peiffer Wolf Carr Kane Conway & Wise LLP v. Valley Forge Ins. Co.

DEPOSITION OF: Andre Jardini 6972146

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 298

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[& - 2]

| & | | | |
|---|---|---|---|
| **&** 1:4 2:4 6:9 38:20 49:18 63:6,10,12 186:14 296:1 297:1 298:3 | 161:2,6,7 198:8,14 199:1 199:11,17 **1.5.** 76:9 139:16 200:6 **1.8.** 149:20 **1.9** 259:7 | **1275** 280:15 281:1,2,8 **13** 260:4 **1300** 37:7 96:23 159:20 162:20 191:16 239:15 242:20 242:23 | 106:9 257:1,8 257:10,25 **1700** 69:2 239:15 **175** 186:25 203:1 207:16 268:14 |
| **0** | **1/3/2024** 57:4 | **1325** 252:19 | **18** 80:17,23 |
| **06235** 1:4 | **1/8** 270:7 | 281:4,9 | 191:7 |
| **1** | **10** 4:10 58:8 82:17 162:21 | **135** 15:8 | **18,000** 289:21 |
| **1** 3:12 32:7,23 56:17 64:20,22 66:9 83:7,9,14 89:9 137:2,3,5 140:11,15 155:5,7 163:6 175:21 177:15 231:24 260:2 270:5,6 **1,000** 39:24 134:4 155:7,20 156:3 196:17 238:9 239:18 263:13,14 270:2,4 **1,050** 263:15 **1,275** 250:9 **1,325** 240:16 250:5,10 255:10 **1,950** 34:6 **1.3** 12:24 **1.5** 75:23 76:11 138:20,24 139:10 160:22 | 162:22,25 258:6 270:5 289:23 **10/23/24** 3:17 **10/26/22** 3:20 **100** 8:8 127:11 127:11,12,13 131:7,18,21,23 150:1 194:11 194:15,18 238:24,24 239:1 253:8 281:18 **10:25** 293:3 **11** 4:12 150:1,2 284:13,14 **110,000** 280:17 **1111.7** 103:7 **1124** 264:11 **11th** 198:17 **12** 40:12,14 136:1 137:10 138:24 176:20 | **1357** 280:16,19 281:15 **14** 58:8 69:21 113:21 146:22 147:19 148:1 **1434** 294:6 295:12 **15** 56:18 104:15,16 150:8,10 **15,000** 91:10 **150** 15:8 196:2 **1500** 194:14 195:11 **155** 3:19 **15th** 242:1 **16** 10:22 56:18 107:6 146:16 244:3 **1600** 2:5 **165** 3:21 **17** 10:22 56:18 82:7 83:15 89:9,20 100:19 | **1800** 161:13 **185** 263:16 **19** 107:5 146:16 **1900** 66:22 253:12,13 **1918** 53:24 **194,508** 13:10 **1976** 38:11 **1981** 38:19 **1982** 73:4 **1991** 63:7 **1994** 104:9 |
| | | | **2** |
| | | | **2** 3:14 43:14 55:15,18 56:5 56:17 64:25 65:2 72:20 73:1 100:20 106:18 107:3 107:16 140:15 148:14 163:6 169:3 172:9 175:20 177:15 |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

**[2,000 - 40]**

**2,000** 234:14 239:13 252:25
**2.9** 86:10 94:22
**20** 15:24 37:10 37:19 38:3 39:5,10 49:1 85:8 86:19 119:5 129:2 184:8 297:15
**200** 51:6 110:24
**2000** 2:11
**2000s** 39:11 120:19
**2006** 105:12
**2008** 13:1,4 104:17
**2009** 12:24 104:14
**2011** 79:3
**2015** 11:2 232:24 233:24 234:6 236:1
**2017002** 1:24 294:3 295:23
**2018** 284:16 289:3
**2019** 49:19 232:16
**2020** 103:25
**2023** 3:23 16:17 46:5 98:22 131:3 146:2 150:7 208:21 209:4

237:14
**2024** 1:15 7:12 45:9 50:4,23 57:10 104:15 130:21 131:17 131:22 150:7 241:14 249:7 254:19 255:10 293:4 295:18 298:2
**21** 140:4 256:11 257:15
**22** 176:21
**221** 225:8 227:1
**223** 214:25
**225** 3:23
**23** 250:12,17
**231** 4:3
**235.9** 281:3
**24** 1:15 70:2 150:17 249:4 250:12,17 293:4
**247** 4:5
**25** 21:25 39:10 119:5 237:22 240:15,17 241:5,14 243:17,18,20 243:22 245:4 260:14,15 262:24 271:24 273:5 298:2

**25,000** 289:20 289:24
**250** 78:8 129:16 134:1 146:6 162:13 162:14 233:25 234:24
**2500** 126:5 162:20 195:12
**254** 4:7
**256** 4:10
**258** 126:25
**25th** 295:18
**26** 34:10,12 164:24 165:4
**27** 165:4
**28** 169:3 294:5
**281** 112:5
**282** 4:12
**285** 189:22 213:8,16 217:14 228:19 282:19,23
**286** 35:5
**2860** 122:13 236:17
**29** 62:21 235:14 239:21
**294** 3:7 295:5
**295** 3:8
**2:23** 1:4

**3**

**3** 1:8 3:16 43:8 43:10 56:17 106:8 113:14

140:19 141:2,6 192:4 219:19 245:11 256:10
**3,718** 112:6
**30** 14:15,15 53:25 152:19 169:15 171:4
**300s** 48:18,19
**305** 210:15
**33** 21:3 170:8
**35** 35:15,16 66:22 107:8 146:11 148:25 149:10,14,21 149:22 152:19 172:10 173:25
**350,000** 136:13
**365** 2:11
**37** 128:4 179:5
**37:2554** 295:4
**38** 180:22 185:19
**385** 262:16 269:14
**39** 288:8,8
**3:03** 1:15
**3rd** 57:12

**4**

**4** 3:3,19 110:15 110:21 155:2,3 172:22 178:5
**4,000** 74:6
**4,358** 12:12
**40** 18:14 21:25 189:1

Page 2
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

**[40,000 - 900]**

**40,000** 74:6 153:15 281:19
**40,472.07** 173:1
**400** 37:6
**41** 189:1
**42** 189:8 249:25 250:2
**43** 3:16 190:22
**44** 171:5 194:3 261:23
**45** 14:6 252:17
**450** 37:6,8 156:5 191:20 274:25
**451** 191:20
**456** 266:18
**457** 281:7
**47.3** 177:11
**475** 266:19 268:9 274:25 280:11 281:2 281:15
**485** 280:11
**49** 246:8

**5**

**5** 3:4,21 98:22 149:15 165:21 165:22 168:4 175:20 249:4
**5,218** 112:4
**50** 31:22 34:5 53:13 68:20 94:2 101:11 120:3 137:2,3 137:5 151:19

205:23 238:9 238:15 253:15 260:11 262:10 263:16 270:2,4 281:18
**500** 33:18 131:11 239:18 246:13
**504** 2:6,12
**52** 151:11 153:13 173:2 173:23 177:11 178:23
**525** 281:7
**53** 289:9
**535** 262:16 269:14
**54** 289:8
**55** 13:15,19 14:3 147:7 148:15
**557** 280:21
**566-1311** 2:12
**57** 289:19
**575** 280:24
**580** 34:7 135:19

**6**

**6** 3:6,23 58:19 83:24,25 84:2 84:17,23 85:2 86:4,15 88:14 89:25 90:6 111:5 113:16 141:1,18,20

153:10 173:7 175:20 225:12 225:13 247:18 286:16
**600** 135:7
**605-2234** 2:6
**625** 34:19 35:1 36:18
**64** 3:12
**65** 3:14 260:1,3
**67** 275:21
**68** 149:13 267:25
**6972146** 296:2 297:2 298:4

**7**

**7** 4:3 23:25 26:21 32:6,23 72:23 73:3 74:12 148:14 149:16 231:21 231:22
**700** 39:25 40:2 40:15 194:16
**70112** 2:6
**70130** 2:11
**718** 264:12
**75** 17:17 262:23 272:3
**756.05** 172:12 174:14,17
**778** 173:3
**78** 38:12
**786** 156:11

**7th** 249:7

**8**

**8** 4:5 78:25 248:4,12,13 256:22 257:3 257:11,24 270:6
**80** 112:6 203:13
**800** 281:14,19
**80s** 122:8
**835** 264:13
**84** 103:6
**85** 13:22 14:2 229:8
**8500** 112:6
**875** 159:21 191:17
**875.8** 281:4

**9**

**9** 4:7 23:25 79:13 83:7 130:20 131:17 132:2,9 250:16 255:25 256:1
**9,000** 113:14 142:20 162:18 173:8,23 178:23
**9/6/24** 3:15
**90** 49:2 127:12 194:15 269:17
**900** 235:24

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[900,000 - actions]**

| | | | |
|---|---|---|---|
| **900,000** 78:8 | 110:13 141:24 | **accounted** | 21:18 25:2,15 |
| **907346** 295:23 | 142:18 144:3 | 281:15 | 25:25 26:19 |
| **90s** 14:12,13 | **absence** 167:3 | **accounting** | 27:10 28:2,6 |
| **91** 176:20 | **absolute** | 35:10,12,13 | 30:13,21 31:19 |
| **91-3** 176:20 | 175:11 | **accounts** 52:18 | 32:17 33:7,16 |
| **935** 2:5 | **absolutely** | 53:2 280:20,23 | 38:17,18 52:21 |
| **960** 285:1 | 71:23 107:13 | **accumulate** | 93:1,1,9 |
| **970346** 294:4 | 127:7 236:4 | 80:7 | 101:24 103:14 |
| **980** 236:11 | **absurd** 135:23 | **accumulative** | 103:19 106:1 |
| **981** 261:16 | 138:9 | 79:2 | 132:25 150:16 |
| **993.75.** 240:17 | **abuse** 271:8 | **accuracy** 7:8 | 150:22,25 |
| **9th** 7:12 | **accept** 121:1 | 298:8 | 151:7,17 |
| | **accepted** 127:1 | **accurate** 8:8 | 152:10 153:14 |
| **a** | **accepting** | 15:7 26:1 | 156:13,21 |
| | 259:20 | 54:15 59:14 | 169:4 172:19 |
| **aaa** 98:10 | **access** 11:21 | 84:23 141:12 | 173:19 174:4 |
| **aalm** 129:2 | **accessible** | 164:5 242:18 | 177:15 180:1 |
| **ab** 100:20 | 258:11 | 243:16 281:10 | 239:21 249:10 |
| **aba** 139:15 | **accident** 208:8 | **accurately** | 249:12,15,19 |
| **abide** 123:1 | 229:18 237:19 | 241:21 | 249:24 250:22 |
| **abigail** 62:25 | **accidents** | **accused** 94:10 | 251:5 252:7 |
| **ability** 138:25 | 227:15 | **achieve** 155:19 | 253:4,19 255:4 |
| 265:4 276:16 | **accompanied** | **achieved** 12:12 | 256:19 271:4 |
| 295:7 | 295:16 | **acknowledge** | 271:16 277:6 |
| **able** 10:18 11:9 | **accomplish** | 174:16 | 282:10 289:13 |
| 11:23 22:14 | 142:23 | **acknowledge...** | 290:11,12 |
| 42:20 45:14 | **accomplished** | 297:3 | 291:9 295:14 |
| 137:19 143:21 | 257:6 | **acquire** 212:20 | **actions** 3:22 |
| 147:16 187:4 | **accordance** | **acquired** 285:6 | 18:5,7 19:11 |
| 271:15 279:3 | 23:5 | **act** 253:14 | 31:7 32:2 |
| 279:23 | **account** 133:11 | **acted** 295:11 | 37:14 103:15 |
| **above** 252:2 | 262:2,17 | **action** 1:4 | 150:25 154:17 |
| 260:15 278:12 | 263:19 | 10:23 15:21,24 | 165:8 168:5 |
| 297:7 298:5 | **accountant** | 18:4,12 19:3 | 195:2 251:13 |
| **abrams** 17:4 | 35:9 | 19:17 20:8 | 252:5,12 |
| 82:23 86:9 | | | |
| 88:25 99:9 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[actions - agree]**

253:10 255:17
256:14 257:18
275:10 285:25
**active** 110:24
112:9 148:6
166:8
**activities**
167:10
**activity** 110:22
**actors** 282:9
**acts** 116:23
**actual** 90:7
114:17 175:24
193:13 198:23
199:20 241:22
243:15 261:3
266:20 290:23
**actually** 9:10
36:12 46:2
64:14 74:9
76:5 89:4 96:3
96:9 97:8 98:6
99:5 101:8
105:9 106:4
114:11 135:7
146:3 152:20
157:15 158:7
160:2,17 165:4
166:14 191:15
195:5 196:12
196:13 212:12
217:18 232:23
240:24 254:20
259:4 267:6
268:12 285:4

289:9
**adam** 2:5
**add** 22:4
113:14 142:3
166:24 226:7
**added** 56:14,20
140:15
**addition** 20:20
**additional** 8:22
9:5,8 16:25
28:9,11 72:6
81:20 100:4
124:18 125:10
**additions** 297:6
**address** 104:16
**addressed**
18:16
**addressee**
181:18 182:2
**addressing**
146:23 148:18
**adds** 228:18
**adequate**
266:11
**adequately**
26:2,16 27:8
27:22 143:16
**adjust** 130:8
263:8,9
**adjusted**
129:11 268:6
269:8,25 270:2
**adjusting**
273:17

**adjustment**
64:2 243:25
259:5,7 269:18
270:12,12
272:14 273:21
277:15 278:12
281:14
**adjustments**
130:8 259:2
**admit** 114:1
**admittee** 103:6
**adopted** 68:12
76:9 77:14,14
287:3,9,17
**adopting** 32:19
**ads** 67:14
**advanced**
275:13
**advantage**
96:15
**adversary**
88:11 112:2
**adversary's**
111:11
**advertise** 278:2
**advertised**
277:21
**advertises**
89:15 94:6
**advertising**
80:9 211:21
223:3,5,7
**advice** 154:1
**advise** 222:25

**advisory**
295:12
**advocate** 37:16
**advocates**
124:13
**aej** 298:1
**affect** 161:19
272:9
**affirm** 9:10
**affirmative**
114:11 115:2
115:13,25
116:8,16,17
**afraid** 266:7
**afternoon** 6:6
**agency** 63:17
**agent** 96:12
**aggressive**
111:17
**aging** 52:19,19
53:3
**ago** 21:14
29:24 35:20
36:13,25 39:10
39:25 40:13,14
62:18 68:3
84:21 92:5
104:15 132:12
136:1 137:10
158:15 163:23
205:8 274:13
279:23
**agree** 23:2
25:11,16 34:12
37:23 42:1

**[agree - amounts]**

| | | | |
|---|---|---|---|
| 43:1 53:21 | 225:23 285:9 | **alleged** 180:2 | 235:3 239:6,9 |
| 60:9 79:18 | 285:10,11,13 | 216:17 | 239:23 242:9 |
| 83:2,14,16 | 285:24 286:1,4 | **alleging** 59:20 | 242:15 244:3 |
| 84:14 87:23,23 | 286:8,12,23 | 271:21 | 249:3 250:3,19 |
| 92:12 95:3 | **agreement** | **allocate** 137:17 | 251:8 252:22 |
| 100:23 101:2 | 20:17 61:2 | **allocated** 138:1 | 268:22 272:6 |
| 102:22 103:2 | 63:17,24 91:6 | **allocation** | 286:9 |
| 103:11 105:18 | 91:7 98:12 | 47:19 73:25 | **altshuler's** |
| 122:20,22 | 112:18 141:18 | 136:2 137:11 | 146:1 172:11 |
| 123:13 133:12 | 142:9 153:23 | 137:15,21 | 195:1 243:12 |
| 134:12,22 | 216:17 221:14 | 197:22 232:1 | 250:1 253:23 |
| 136:6,17 | 285:19 | **allotted** 298:15 | 274:9 277:2 |
| 138:15,16 | **agreements** | **allow** 123:15 | **amazing** 31:10 |
| 151:15 154:24 | 20:23 94:19 | **allowed** 121:20 | **america** 4:6 |
| 157:4 158:20 | 298:14 | 168:14 | **american** |
| 159:25 160:3 | **ahead** 19:21 | **allows** 122:21 | 124:13 |
| 160:24 161:4 | 41:2 64:19 | 231:4 251:21 | **amount** 21:1 |
| 163:10,21 | 190:22 213:4 | **alterations** | 28:12,22 84:3 |
| 164:3 174:18 | 217:4 262:24 | 258:20 | 103:5 136:5 |
| 179:20 183:13 | **ain't** 85:18 | **altshuler** 9:12 | 137:20 139:4,5 |
| 191:12 193:15 | 91:11 | 9:21 16:21 | 140:19,23 |
| 196:9,10 | **akh** 4:4 231:9 | 19:15 22:18 | 141:3 142:14 |
| 197:17 201:17 | 231:13 232:2 | 62:6,15 64:5 | 155:14,25 |
| 204:12 208:8 | 237:5 | 69:2 92:24 | 172:18 177:16 |
| 226:14 227:13 | **alabama** | 99:13 100:21 | 191:20 192:4 |
| 233:2 242:14 | 139:21,22,23 | 101:6,8 102:2 | 240:3,5 242:6 |
| 250:15 254:17 | 140:3 | 102:22 105:8 | 242:22 243:7 |
| 257:15 260:10 | **alcohol** 7:7 | 107:5 112:4 | 244:8,9 245:16 |
| 263:24 264:23 | **alfridi** 62:25 | 117:10 143:15 | 252:10 253:24 |
| 265:2 273:25 | **align** 227:22 | 143:24 144:2 | 254:20 257:6 |
| 286:18 | 228:3,7,14 | 150:1,6,23 | 275:4 281:5 |
| **agreed** 5:3 | **alike** 172:13 | 152:7 159:2 | **amounts** |
| 50:11 71:4 | **allegations** | 166:19 171:4 | 123:15 241:22 |
| 162:12,14 | 97:7 222:23 | 175:13 187:24 | 243:14,15 |
| 169:13 221:23 | | 187:25 194:20 | |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company    www.veritext.com

**[analog - appears]**

**analog** 220:4
**analogous**
  134:18,20
  249:19
**analyses** 227:9
  230:1
**analysis** 22:20
  23:9 30:1
  31:16 36:19
  81:5 92:14
  111:13 113:8
  116:11 117:4
  117:18 123:24
  138:21 139:11
  161:12 174:3
  186:2 192:2
  197:7 199:12
  199:17 201:14
  205:9 207:22
  221:25 229:23
  242:9 244:22
  245:9,18
  268:16 273:23
  276:10 280:10
  281:22
**analyze** 178:3
  190:14
**analyzing**
  221:2
**ancillary** 54:10
**andre** 1:13 3:13
  3:19 4:4,12 6:1
  25:11 31:3
  52:10 55:18
  118:3 119:15

  143:4 144:4
  149:2 150:10
  156:3 176:24
  181:22 185:6
  186:18 201:9
  240:18 283:12
  295:3 296:2,24
  297:2,4,12
  298:4
**andrew** 136:16
**anecdotal**
  31:21 129:3
  132:14,15,17
  132:19 133:4
  133:19,20,24
  189:25 190:5,7
  190:12,15
**anecdote**
  133:10
**angeles** 28:8
  44:11 164:12
  164:15,17
  175:5 178:11
  236:22 259:7
  259:10
**angeles's** 44:16
**angle** 32:9
**annual** 77:6
  81:11
**annually** 79:3
**anonymous**
  212:11 265:3
**answer** 5:10
  26:10 27:5
  33:20 45:15

  54:20 62:10,11
  70:21 75:9
  91:14 92:3,5,6
  98:23,24 99:19
  101:5 102:20
  104:19 105:10
  112:3 113:6
  116:15 117:22
  123:4,18 139:9
  159:10 161:21
  161:24 179:14
  179:15 188:25
  198:11 199:14
  199:15 200:3
  204:4,6 205:4
  205:6,8 207:18
  213:5,24 214:9
  216:20 219:2
  255:21 284:9
**answered**
  53:17
**answers** 60:18
  136:19 200:22
**anticipated**
  35:20 72:13
  118:1
**antitrust** 217:4
**anybody** 10:7
  20:9 35:17
  54:2 61:7
  62:22,23 63:1
  64:1 72:3
  76:22 108:8
  120:1 126:3
  133:13 158:22

  159:7 171:17
  182:12 183:18
  240:19 275:13
**anymore**
  242:18
**anytime** 204:14
**anyway** 13:4
  18:24 91:2
  107:3 109:1
  153:5,8 193:6
  195:14 241:19
  244:7 253:20
  254:23 255:13
  257:12 258:23
  279:14 282:2
**apart** 10:11
  86:12
**apparent** 246:3
  246:5
**apparently**
  16:23 84:14
  88:5 90:6
  178:17 219:19
  234:17 236:20
**appear** 9:11
  42:21 45:12
  218:6
**appeared** 20:11
**appearing**
  69:20
**appears** 61:22
  193:5 224:11
  224:14 225:4
  233:18 294:20

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[appellant - areas]

| | | | |
|---|---|---|---|
| **appellant** 73:6 | 219:1 236:18 | 195:18 198:1,6 | **approximately** |
| **appellate** | 236:18,20 | 201:21 202:12 | 35:15 84:22 |
| 105:25 | 241:9 242:11 | 202:16 204:8 | 244:3 |
| **appended** | 244:8,16 | 205:11 207:6 | **april** 232:16 |
| 297:7 | 258:18 261:18 | 207:21 213:9 | 241:14 |
| **appendix** 97:15 | 280:9 283:23 | 215:10 216:21 | **arbitral** 98:13 |
| 215:1 217:24 | 283:24 | 222:8 224:8 | **arbitration** |
| 227:2 260:25 | **applying** 73:17 | 232:1 233:19 | 58:23 59:5 |
| **apples** 59:2,2 | 178:17,19 | 245:15 246:10 | 69:21,22 86:8 |
| 154:20 173:6,7 | 192:2 235:6 | 253:21 256:6 | 86:14 91:6,7 |
| 249:16 | 242:22 | 256:24 258:11 | 91:10 97:1,25 |
| **applicable** 23:6 | **appoint** 109:3 | 260:23 261:1 | 98:4,5,12,20 |
| 111:13 140:17 | **appreciate** | 261:24 263:1 | 99:15,21 100:2 |
| 141:10 234:22 | 37:25 102:20 | 263:20 265:19 | 100:13 105:23 |
| 237:17,18 | 107:14 207:3 | 268:15 269:5 | 110:4 113:22 |
| 258:17,21 | 292:25 | 271:3 272:1 | 141:3 142:16 |
| 269:1 298:7,14 | **approach** 16:7 | 275:25 278:20 | 144:16 145:15 |
| **application** | 25:18 66:24 | 281:22 283:1,3 | 146:22 147:15 |
| 23:3 24:10 | 69:4,9 73:20 | **appropriately** | 165:18 166:4,5 |
| 28:5 178:12 | 73:21 74:4,11 | 219:15 268:6 | 166:8,16 167:8 |
| 249:6 256:5 | 74:11 94:17 | 284:4 | 168:16 178:16 |
| 288:21,22 | 134:22 136:6 | **approval** 79:24 | 192:10,14 |
| **applications** | 191:4 | 82:6 150:18 | 193:4,13 |
| 24:25 25:15 | **approaches** | 151:10 288:1 | **arbitrations** |
| **applied** 20:4 | 151:2 | **approve** 18:16 | 98:7 135:18 |
| 127:17 134:9 | **appropriate** | 69:1 120:8 | 166:23 |
| 172:16 174:7 | 7:25 8:17 | 249:23 | **arbitrator** 98:6 |
| 243:8 244:5,20 | 18:18 19:18,23 | **approved** | **arbitrators** |
| 245:8 250:7 | 21:4,24 23:12 | 35:13 120:2,5 | 166:23 267:22 |
| 269:22 280:9 | 24:6 30:13 | 120:7 141:25 | **area** 78:20 |
| 281:5 | 33:1,8 49:14 | 217:20 282:21 | 106:24 259:4 |
| **apply** 139:13 | 60:19 74:10 | **approves** 20:10 | 262:23 277:21 |
| 141:8 154:14 | 120:17 162:2 | **approving** | **area's** 106:10 |
| 178:18 198:24 | 170:14 178:10 | 21:17 27:9 | **areas** 49:23 |
| 199:21 211:24 | 178:15 185:16 | 69:7 | 77:8 189:16 |

Page 8
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[areas - astronomical]

264:10 270:5
arena 101:22 106:2
arguable 116:20
argue 119:18 264:16 280:13
argued 192:20
arguing 188:22 284:2
argument 163:20 272:23
arguments 85:15 146:8,8 267:22
arm's 287:5
arms 36:22 157:3,18 173:19 274:3
arrangement 37:3 60:25 61:1 295:10
arrangements 295:10
arrive 123:7 176:3,19 235:4 268:9
arriving 214:18
art 180:16 263:21
article 31:5 294:6 295:12
articles 40:20 40:25 43:15,17 43:18,22 44:20

44:24 180:15
artificially 214:8 227:23
asbestos 223:20
ascribed 12:6
ascribing 218:8
aside 10:11 67:5
asked 7:18,21 29:24 42:4 43:5 52:5 53:16 68:2 72:5 81:19 97:17 110:8 113:8 114:4 137:17,22 139:20 161:20 178:8 212:14 235:5 279:23 280:7 286:2
asking 11:10 16:24 21:3 22:3 27:6 38:9 42:24 70:19,22 71:14 138:2 152:9 154:16 157:8,9,10 158:3,8,11,12 158:13 179:17 183:7 186:6 197:23 200:17 200:20,21 201:6 204:3 212:2 214:5,7 217:22 223:15

251:3 256:22
261:22 281:23
289:1 292:4
aspect 55:2 253:6,7
aspects 54:24
aspirational 89:2 155:9,13 155:16
aspire 155:14
aspiring 155:19
asserting 211:20 252:8
assertion 192:12 205:2
assertions 193:10
assess 7:24 112:23 198:15 213:11 237:2 265:7 279:1
assessed 201:17
assessing 28:5 74:9 160:25 195:21 197:25 199:24 201:21 203:6 236:14
assiduous 212:19
assign 120:12 214:5
assignment 114:2
assistant 93:6 170:1,7 285:6

assisted 170:2
associate 38:14 47:22,24 103:25 106:12 127:4 149:5 189:17 261:8 269:15
associated 33:7 116:13
associates 171:5 177:24 229:22 264:12
association 81:4 123:24
assume 34:2 39:23 40:2 56:25 110:21 159:9 168:15 193:25 232:18 235:16 247:17 273:5
assuming 7:1 62:10 159:12 214:11 273:3,4 283:2
assumption 104:1 182:14 229:1 271:3
astonishing 219:20
astronomical 172:12,18 173:4 174:8,14 175:3 176:3,4 243:13

Page 9
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

[attach - awards]

| | | | |
|---|---|---|---|
| attach 64:20 155:2 165:20 225:11 231:20 248:11 | 81:3 91:17 94:3 103:2,4,9 103:14,15 105:12,25,25 106:1 123:25 | 187:23 188:1 191:1 196:2,12 196:13 216:11 218:21 232:1 249:2 250:4 | august 57:25 112:17 |
| attached 61:19 97:2,12,13,19 169:17 258:5 298:10,12 | 124:3,15 125:21 126:7 142:21,22 | 256:5 266:17 266:20 273:14 273:24 283:14 283:16 284:5 | auspice 63:9 author 79:1 181:18 182:2 183:1 |
| attaches 136:1 | 147:4 197:10 197:25 198:16 | 284:17 285:6 | authority 288:4 295:4 |
| attaching 73:1 | 217:15 258:16 | audible 82:8 | auto 220:8 227:15 228:23 |
| attachments 97:23 | 278:5 295:13 295:14 | audit 63:4,5,11 63:18 64:14 73:13 114:1 | 229:18 237:19 |
| attack 259:22 | attorneys 4:8 7:3,21 12:6 | 138:14 166:18 167:2,4 184:15 | available 14:22 16:18 17:13 58:24 84:13 |
| attacks 69:24 | 17:18,19 18:6 26:15 31:7 | 185:9 244:7,12 | 189:10 191:23 209:5 215:11 |
| attempt 235:8 | 36:4 37:12 | audited 106:22 108:7,15 | 215:13 233:23 234:5,8 271:1 |
| attempting 14:25 224:6 235:4 242:16 | 40:20 47:18 50:15 51:13 55:8 61:6 62:6 | auditing 47:16 47:18 61:13 73:16 109:11 | 298:6 |
| attempts 154:19 | 62:9 68:20 71:12 73:24 | 138:18 193:25 | average 172:11 173:9,15 174:21 175:1,9 |
| attend 7:17 | 74:7,14,15 75:17 76:13 | auditor 35:4,8 61:15 73:21,22 | 175:14,23 176:4 243:20 |
| attention 26:23 76:4,6 77:15 200:13 212:10 244:23 245:6 | 78:23 81:16 83:12 90:10 92:22 104:25 106:14 110:1 | 136:11 170:1,7 170:7 182:24 183:2,11,14 193:9,16 | 265:5 averse 65:24 186:10 |
| attorney 6:7,8 6:25 13:6 19:19,24 31:19 31:19 35:7,16 | 110:12 128:6 143:10 153:17 154:1 162:7 170:11,13 | auditors 35:3 61:16 81:8 123:25 124:3,7 193:15 | award 132:17 132:19 awarded 23:5 26:15 27:10,19 249:14 |
| 47:14,15,22,23 49:20 50:22 67:3 73:7,9,13 73:24 74:18 78:2,17 79:1 79:15 80:24 | 172:13,13 179:7 180:24 | audits 64:15 124:6 238:16 | awards 4:9 33:8 79:1,2 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[aware - believe]

| | | | |
|---|---|---|---|
| **aware** 7:11,13 26:14 88:18 135:21 138:7 141:23 179:20 179:22 210:2 211:22 282:12 287:8 288:1 | 240:8 242:24 243:4 244:21 246:8 250:14 259:25 260:2 266:14 | 77:18,22 78:20 | 264:20 277:7 282:13 291:4 |
| | | **bar's** 74:15 | **bass** 149:15 |
| | **background** | **barbizon** 56:22 | **battles** 110:17 |
| | 6:24 41:4 | **base** 238:20 | **bay** 106:10,24 |
| | 43:11 76:20 | **based** 8:7,10 | **bear** 24:2 30:12 |
| | 138:22 139:11 | 15:15 30:24 | 117:24 136:19 |
| | 168:23,24 | 31:21,23 50:20 | 176:18 227:25 |
| **awareness** 100:10 | **backing** 128:23 277:24 | 55:14 83:5 89:23 90:6 93:12 106:7 | 229:17 230:20 273:10 |
| **awolf** 2:7 | **bad** 38:14 39:5 | 107:25 108:6 | **beats** 66:6,13 |
| **axa** 68:10 | 39:5 118:20 | 110:19 115:19 | 67:11,15,23 |
| **b** | 119:8,10 137:5 | 115:24 120:24 | 68:1,11 |
| **b** 44:6 48:13 208:9 232:3 294:6 | **badger** 203:25 | 130:7 145:7 169:9 171:13 171:14 182:14 187:8 188:8 | **becoming** 52:6 55:6 |
| | **badgering** 52:6 | | **beginning** 45:6 |
| | **bakersfield** 164:5,11 | | **begins** 257:15 |
| **back** 11:9 14:14 21:15,21 24:8,21 26:23 33:23 35:19 39:24 40:19 46:22 64:24 72:18 90:3 94:22 106:20 108:10 117:7 118:11 122:6 130:17 132:11 142:13 154:22 160:22 166:7,9 168:4,15 169:2 172:8,22 173:18 178:6 179:4 196:5 203:11 206:25 226:4,24 233:24 234:6 | **balances** 20:6 | 193:18 194:17 229:1 251:10 263:17 270:14 270:18 271:1,4 276:22 | **behalf** 6:20 12:21,24 33:4 35:1 102:23 119:7 121:2 163:3 174:17 185:10 |
| | **ball** 95:12 | | |
| | **balloon** 92:18 | | |
| | **ballpark** 44:23 58:7 | **baseline** 164:1 239:1 269:24 | |
| | **baltzer** 103:23 103:25 104:3 | **basic** 61:20 77:5 208:15 | **beings** 27:12,13 70:7 |
| | **baltzer's** 103:24 | **basing** 30:20 197:9 251:8 253:22 | **belief** 251:8,10 253:22 271:4 |
| | **bankrupt** 246:25 | | **belies** 92:1 184:6 244:23 |
| | **bankruptcy** 69:13 | **basis** 28:17 29:20 30:17 41:21 78:13 84:4 90:10 169:7 182:18 189:7 259:17 | **believe** 8:8,15 10:2 12:5 13:7 13:15 15:4,16 17:2 26:15 27:8,17 29:3 29:23 30:3 |
| | **bar** 74:16 75:16 76:13 77:1,2,4,11,17 | | |

Page 11
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[believe - billed]**

| | | | |
|---|---|---|---|
| 31:12 35:20,23 | **believes**  209:24 | 86:3 87:8,14 | **biggest**  20:3 |
| 36:7 40:6 | **bell**  26:20 | 88:7,12 89:10 | 69:18 84:7 |
| 42:15 45:5 | 32:22 33:4 | 89:13,21,23 | 146:13 195:11 |
| 46:9,12 47:2 | 66:7 231:9,10 | 91:15 92:6 | 239:5,5,6,13 |
| 48:19 56:11 | 287:23 | 93:8 249:13 | 263:10 269:9 |
| 57:17 60:22 | **belt**  188:12 | 266:2 | **bill**  18:6 28:10 |
| 61:12 67:11 | **bench**  15:10 | **betrayed**  247:6 | 67:19 69:12 |
| 70:13 71:11 | **benefit**  118:3 | **better**  29:16 | 70:8 150:6,7 |
| 72:18 74:3 | 281:12 | 35:18 45:15 | 153:11,21 |
| 80:23 84:21 | **benefits**  12:23 | 54:1 89:6,6 | 156:14 157:1 |
| 88:13 89:23 | 104:13 | 108:13 116:15 | 157:17 162:7 |
| 93:22 103:17 | **bennett**  47:25 | 128:14,14 | 162:13 167:11 |
| 105:1 111:1 | **bennett's**  48:3 | 130:15 134:15 | 170:4,6 182:18 |
| 112:4 113:10 | **berson**  62:6 | 147:5,16 | 184:11 197:14 |
| 117:9 123:8 | **berzon**  64:5 | 163:11 206:3,4 | 198:25 199:22 |
| 126:12 127:23 | 99:13 100:21 | 221:9 223:16 | 254:8 285:20 |
| 128:9 131:19 | 101:8 102:2 | 224:3 252:21 | **billed**  9:20,22 |
| 133:7 136:24 | 117:11 143:15 | 254:18 258:24 | 10:1 50:18 |
| 139:10 140:21 | 144:2 187:24 | 259:21,22 | 51:10,11 103:6 |
| 140:23 144:14 | 188:1 235:3 | 272:24,25 | 103:8 111:1 |
| 155:14 174:6 | 239:23 242:9 | **beyond**  17:1 | 113:23 141:11 |
| 178:1,9 195:18 | 242:15 244:3 | 266:25 275:7 | 143:23 144:21 |
| 219:22 220:3 | **berzon's** | **bible**  217:15 | 149:15 162:18 |
| 228:12,14 | 252:22 | **big**  12:12 18:11 | 166:13,22 |
| 234:10 240:3 | **best**  27:2 40:18 | 18:14 66:13 | 167:10 170:23 |
| 246:4,10 | 48:18 87:18 | 78:19 86:2 | 173:7 176:7 |
| 247:11 252:21 | 109:16,19 | 101:23 132:6 | 181:3 191:15 |
| 260:25 266:10 | 127:17 135:19 | 134:21,24 | 193:22 239:25 |
| 266:17,19 | 177:19 207:24 | 137:9 184:1 | 241:18,22,24 |
| 267:2,9 268:2 | 207:25 208:5 | 201:3 215:12 | 242:2,5,7 |
| 268:6 275:17 | 235:15 259:8 | 233:11 265:20 | 243:7,14,15 |
| 275:24 276:17 | 270:19 295:7 | 270:8 285:3,8 | 245:12 250:4,9 |
| 277:19,25 | **bet**  31:6 79:6 | 285:25 | 250:9 252:19 |
| 279:4 282:22 | 83:9,22 84:2 | **bigger**  95:9 | 252:25 253:1 |
| 286:22 288:23 | 84:18 85:5,6 | 127:7 281:14 | 254:19 255:9 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

**[billed - broad]**

| | | | |
|---|---|---|---|
| 257:25 268:4 | 186:25 245:24 | **bob**  211:7 | 118:7,7 126:14 |
| 280:15,25 | 246:3,6,6,6 | 291:13 | 128:7 130:6,11 |
| 281:1 | 256:16 257:8 | **body**  76:8 | 130:13 171:17 |
| **billing**  12:6 | **binding**  77:16 | 281:20 | 200:22 205:14 |
| 20:5 37:19 | **bios**  110:11 | **bogus**  147:12 | **breaks**  127:1 |
| 38:5 40:15 | **birds**  25:9 | **boies**  195:24,25 | 130:12,15 |
| 64:11 69:12 | **bit**  32:13 33:24 | 196:20 266:22 | **brian**  17:5 |
| 70:6 108:8 | 95:13 101:5 | **bolts**  138:18 | 144:3 |
| 112:25 113:8 | 109:23 149:12 | **book**  31:15 | **brief**  59:11,12 |
| 113:11 114:7 | 157:24 162:16 | 177:12 238:5 | 86:14,15 88:9 |
| 117:20 126:4 | 181:23 223:10 | **books**  80:20 | 89:2,3,7 97:3 |
| 138:16,17 | 254:15 263:21 | **boston**  91:8 | 97:13 100:7,15 |
| 139:25 142:15 | **bites**  126:5 | **bottom**  57:2 | 107:8 115:17 |
| 145:22,24 | **blame**  36:1,2 | 72:19 82:16 | 115:21 117:6 |
| 150:6 153:11 | **blatant**  140:17 | **bought**  15:1 | 144:3,10 |
| 154:19 155:6 | **bleeding** | 80:2 | **briefing**  59:3,7 |
| 166:17 167:1 | 142:25 | **boutique**  196:4 | 96:24 115:20 |
| 167:17 170:22 | **blended**  51:15 | **bow**  96:20 | 116:10 117:3 |
| 174:22 181:3 | 156:11 172:17 | 111:9 | 144:14 145:15 |
| 182:15 183:23 | 173:2 174:16 | **box**  24:14 | 192:15 271:22 |
| 185:1,5,7,17 | 243:12 | 261:19 262:2 | **briefs**  58:24 |
| 193:18 252:3 | **block**  69:11,12 | **boyamian** | 59:4,8,10 |
| 253:16 260:13 | 138:17 167:17 | 176:11 | 87:20 88:25 |
| 272:20 275:19 | 285:20,21 | **boyfriend** | 97:9 144:6 |
| 285:15,16,18 | **blood**  175:5 | 59:22 83:19 | 193:6 |
| 285:21 | **blow**  242:24 | 85:24 | **bring**  22:11,14 |
| **billings**  21:21 | **blown**  92:17 | **brain**  66:21 | 24:2 273:10 |
| 69:10 | **blue**  175:5 | 182:22 183:20 | **bringing**  29:8 |
| **billion**  23:23,24 | **board**  11:1 | 192:21 227:19 | 29:18 30:5,11 |
| **bills**  50:10,12 | 74:17 77:1,2 | **brandt**  44:1,6 | 49:13 |
| 64:15 67:19 | 77:19,22 | **breach**  216:14 | **brings**  18:4 |
| 69:18 70:2 | 124:13 127:8 | 216:16,18 | 25:17 |
| 143:17 145:5,8 | 131:13 197:4 | 221:14 | **brisbois**  109:9 |
| 159:13 161:19 | 241:5,9 243:18 | **break**  11:18 | **broad**  205:2 |
| 184:15 185:9 | 262:7 295:9,12 | 45:22 72:2 | 222:16 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[broadly - case]**

**broadly** 202:24 207:14
**broken** 17:15 141:14
**brother** 203:18
**brought** 12:20 109:14 192:24 209:11 247:4
**brugge** 48:12 48:16
**built** 130:10
**bullet** 43:14
**bunch** 85:25 223:19
**burnished** 191:11
**bus** 229:7,8
**business** 25:2 53:4,4,8,24 54:3,5,6,9,23 54:24 61:13 70:15 77:4,9 83:19 91:22 108:17 182:17 186:20 215:16 247:14 251:1 252:22 270:16
**businesses** 216:8
**busy** 21:20
**button** 78:21 125:10
**buy** 80:1 215:14,15 217:21

**buying** 217:2 218:7,10
**bylaws** 218:24

**c**

**c** 2:1 9:24 109:8 202:2
**cabraser** 18:11
**cal** 79:2
**calculable** 243:19
**calculation** 174:19 258:22
**calculations** 281:22
**calculator** 172:24
**calculus** 163:22
**calendar** 45:14
**caliber** 163:15
**california** 11:1 18:19 25:13,21 32:21 62:13 71:12 74:15,17 75:16 76:13 77:3,12,25 78:2 79:1,15 81:3,16 91:1 103:6 122:19 123:3,3 125:22 125:23 135:22 138:19 139:14 153:6 154:9,14 164:2 165:15 174:8 179:12 187:21 191:8

199:11 209:24 211:19 232:4 236:1 248:16 258:21 259:19
**call** 18:20 43:24 44:1 55:12 62:7 84:17,18 91:25 105:13 115:11 125:25 126:14 145:24 153:19 172:18 182:12 182:24 183:11 280:14 287:3
**called** 96:5 97:15 118:22 120:13 135:22 138:9 191:8 230:6
**calling** 102:2 135:24 227:24 255:2
**calls** 251:3
**calm** 200:14 212:25
**canal** 2:11
**candidly** 237:15
**capable** 17:18 108:9 289:11
**capitalism** 265:15
**caption** 249:11
**capture** 241:21

**car** 208:8,8
**carcass** 25:9
**care** 23:18 54:25 128:6 188:4
**career** 38:3,10 62:13 118:14 118:17 119:23 129:20
**careful** 14:25 27:23 225:14
**carefully** 16:22
**carr** 1:4 2:4 6:8 296:1 297:1 298:3
**carrier** 230:23
**case** 6:21 7:20 8:2 9:1 10:9,10 10:21,24 11:5 12:9,11,13,20 12:25,25 13:4 13:9,13,13 16:5,5 17:3 18:13 19:5,12 19:14,15 22:14 22:22 26:18,21 27:6,7 28:6,9 28:25 32:16,22 33:3,5 35:2,4 36:19 39:8 40:3,9,16 43:25,25 45:9 46:7 51:8 57:9 58:3 59:19 60:2,23 61:7

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

[case - case]

| | | | |
|---|---|---|---|
| 62:24 63:15 | 116:1,14,17,24 | 162:6,13,14,22 | 213:12 215:20 |
| 66:3,11,13,16 | 116:25,25 | 162:23 163:10 | 216:18 217:4,5 |
| 66:24 67:12,17 | 117:12 118:23 | 163:12,14,19 | 217:7,7 218:4 |
| 67:23 68:7,8 | 118:24 119:10 | 163:21 164:22 | 218:6,9,14,16 |
| 68:11 69:13 | 120:16 121:5 | 165:15,18 | 218:18,20,22 |
| 70:17 72:6 | 121:17,18,19 | 166:5,8 168:10 | 219:1,4,9,9,10 |
| 74:4,10 75:3 | 121:19 122:23 | 168:16,17,19 | 219:10,13,17 |
| 82:24 83:10,13 | 123:1,3,9 | 169:11 170:19 | 220:7,8,19 |
| 83:23 84:3,8,9 | 126:17,21 | 172:2,16,23 | 221:4,19,21,21 |
| 84:11,17,18 | 127:2,18 128:1 | 173:7,11,13,19 | 222:9 223:23 |
| 85:1,5,6,15,20 | 128:16,21 | 173:19 174:7 | 224:18,25 |
| 85:21 86:2,3,7 | 129:5,6,8,12,25 | 174:11,16,23 | 227:18,21 |
| 86:19 87:9,14 | 130:14 132:17 | 175:16,18 | 231:5,6,7,8,11 |
| 87:16 88:7,9 | 132:18,25 | 176:8 177:18 | 232:2,8 233:11 |
| 88:12,15,19 | 133:1,6 134:2 | 177:25 178:2 | 233:12,16 |
| 89:13,23 90:11 | 134:9,15,21 | 178:21,22 | 234:17,22 |
| 91:6,9,15,20 | 135:24 137:7 | 179:11,13,17 | 235:12,17,22 |
| 92:13,15,16,18 | 137:11,12,14 | 179:20 180:3,6 | 235:23,24 |
| 93:8,10 94:18 | 137:16 138:7 | 180:7,8 181:17 | 236:3,6,15,17 |
| 95:2,4,16,22,23 | 138:21 139:20 | 182:1 187:4 | 236:22,25 |
| 97:15 98:14 | 141:4,15,19 | 188:7 189:7,12 | 237:5,5,10,12 |
| 99:2,22,25 | 146:12,14,17 | 189:21 190:9,9 | 237:20 238:21 |
| 101:12,13 | 147:20 148:23 | 190:10 192:17 | 238:23 239:4 |
| 102:1,5,6,12,13 | 150:4,21 151:9 | 193:8,11 | 244:13,14,16 |
| 102:23 103:3 | 151:12,18 | 194:19 195:1 | 247:3,20,21 |
| 103:20 104:2 | 152:5,11,13,15 | 195:13 197:3,8 | 249:10,14,15 |
| 104:12,14,17 | 152:17,22 | 197:21,24 | 250:5 251:7,20 |
| 105:4,21,22 | 153:4,9,20 | 202:2,4,18,19 | 252:6,7 253:4 |
| 106:5,11,25 | 154:2,4,10 | 202:21,22,23 | 254:4,11 255:4 |
| 107:9 108:11 | 155:9,10,11,21 | 203:5 204:20 | 255:6,13 256:3 |
| 108:22 110:2 | 155:23 156:4,9 | 204:24 206:2,3 | 256:16,17 |
| 110:12,23,23 | 158:16,19 | 206:6 207:9,9 | 257:13 258:3,8 |
| 112:12,23,24 | 159:21 160:7 | 207:11,12,13 | 259:14 261:4,8 |
| 113:15,17 | 160:17 161:1 | 207:25 208:3,8 | 262:9,25 263:2 |
| 114:13 115:5 | 161:10,16 | 208:15,23 | 263:3,6,8,24 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

**[case - centner]**

264:2,25 265:6
265:8,11,22
266:6,18,19
267:1,21
270:19 271:8,9
271:19 272:5
272:11 273:12
276:11,17
278:2,8,17,20
278:22,23,25
279:1,3,7,20,24
280:2,6 281:21
281:24 282:4
282:18,21
283:1,3,21,24
283:25 284:1,7
284:20,25
286:4,8,16
287:21,23
288:7 289:6,15
289:19,24
290:2,3,4,5,9
290:18,20
291:1,2,5,9
**cases** 7:1 11:8
13:5,16,19
14:3,17,18
15:8,22 18:6
20:20,21,22
21:18,24 22:15
22:19 23:22
25:15,19,20,20
25:25 26:13,19
26:19 27:15,17
27:24 28:14,20

29:6 30:3
31:13,16 32:1
34:2 37:2,10
37:13,13 38:15
38:15,25 39:4
39:5,6,15 40:5
40:6,7,11 45:4
47:10,13 54:8
56:9 65:19,19
65:20,23 66:1
68:22 72:7
78:5 79:12
80:17,23,25
81:1 82:5
84:10 87:2
89:16 93:2,5,7
94:7,10 95:6
96:12 98:11
101:24 109:14
109:16 118:23
119:8 120:12
120:25 122:5
124:4 126:15
126:15 132:20
132:23 133:12
133:23 134:2,4
134:5,6,17,20
134:23 135:13
135:17 138:23
147:7,9 148:15
150:13,16,25
151:4,24
156:13,21
164:20 180:9
189:22 190:1,5

190:8,8,25
202:20 207:11
208:1 209:25
212:13 229:6
229:11,25
230:22 231:2,4
238:16,21
239:2,5 247:25
248:1 250:23
251:13,15,16
251:17,18
252:12 253:19
254:3 256:15
258:16 259:5
264:18 265:15
266:22 267:6
271:8,17 272:6
277:13 278:24
279:16 282:23
283:21,22
284:22 285:8
285:25 290:25
291:17
**cassim** 43:25
**casting** 151:8
159:22
**catchall** 223:11
224:2,2
**categories**
202:13 208:2,4
212:17 215:19
220:2 221:7
223:14,19
224:1 235:21

**categorization**
243:12
**categorize**
213:8
**categorized**
205:1 215:23
263:25 264:2
**category**
202:12,16
205:11 206:2,3
206:5 207:7,21
207:24 208:10
208:20 209:13
209:16 214:4
214:24 215:22
219:25 222:9
224:3,8 225:1
225:7 228:22
230:17 237:14
237:16 238:10
260:18,23
261:1,2 270:11
283:4
**caught** 244:17
244:18
**ccr** 294:3,24
295:23,23
**ceb** 79:14
**centerpiece**
276:12
**centner** 2:4 3:6
6:5,7 26:11
27:4 41:21,25
42:9,13 43:9
45:3 52:1,7,8

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

**[centner - choice]**

52:24 53:20 61:11 64:23 65:3 71:10,21 71:23 72:1,24 73:2 91:13 118:8,11,12 119:14 143:13 145:2 149:11 149:17,19 155:1,4 158:10 165:20,23 170:3 171:16 171:23 172:5,7 184:14 200:21 201:8,13 203:17,22 204:3,5,10 225:9,21 226:4 226:14,23,25 231:20,23 241:11 248:5,8 248:11,14 255:25 256:2 258:7 278:19 279:22 284:12 284:15 286:7 292:3,6,10,13 292:18 293:2

**central** 135:21 154:13 174:7 187:21 232:4 235:25 282:20

**cercla** 40:6,9 40:11

**certain** 34:13 64:8 67:3,20 77:9 119:20 159:1 164:20 167:7 169:16 190:8 225:23 241:15 270:5 285:18

**certainly** 15:20 22:23 26:7 42:10 57:17 93:21 114:9 129:25 265:9 278:22 291:2

**certificate** 3:8 295:1,15

**certification** 16:4 193:14,24

**certified** 1:24 193:9,16 294:2 295:2 298:16

**certify** 295:3,5 295:8,11,13

**chain** 99:24

**chair** 12:11 13:9 103:21

**challenge** 20:18 61:4 67:10 213:15 287:4

**challenged** 197:5

**challenging** 20:24

**champion** 163:3

**change** 8:12,14 78:8,20 100:4 112:3 131:9 132:1 135:16 243:24 296:4,7 296:10,13,16 296:19

**changed** 75:23 77:15 78:6,19 99:25 100:11 104:16 163:24

**changes** 76:20 294:11 297:6 298:9

**characterizati...** 101:3 193:15 246:17

**characterize** 91:5

**charge** 22:7 28:5 34:23 36:18,23 78:4 92:15 124:1 161:13 166:24 186:5 193:23 195:17 197:15 197:16 236:22 236:23 242:16 248:2 269:19 269:20 286:14

**charged** 9:10 20:15 29:5 30:2 39:18 82:25 117:10 131:20 164:14

167:5 175:15 175:16 181:5 185:14 188:20 200:12 233:8 233:20 239:16 242:23 246:12 252:9 268:13 283:13 288:13 288:16

**charges** 49:10 239:9

**charging** 19:18 19:24 33:18 34:20 50:3,8 50:15,22 111:4 242:10 251:16 259:12 266:16

**chart** 252:2 261:7,13

**charts** 263:12 268:20

**check** 18:21 21:1,6 28:6,15 28:18,20,20 29:3,25 240:20 256:9,25 257:21

**checking** 21:21

**checks** 15:6 20:5 125:1

**cherry** 134:3 134:23

**choice** 84:16 163:16 262:13

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[choices - class]

| | | | |
|---|---|---|---|
| **choices** 223:1 | 233:12 236:6 | **civil** 1:4 5:5 | **clarke** 38:20 |
| **choose** 84:15 | 270:20 285:2 | 73:5 122:14 | 63:6,10,12 |
| 87:25 149:25 | 288:20 290:23 | 236:19 294:6,7 | **class** 4:9 10:23 |
| 189:6 262:16 | **circumstances** | 295:12 | 10:24 15:21,24 |
| **chooses** 260:17 | 20:12 40:18 | **claim** 18:18 | 16:4 18:4,4,7 |
| **choosing** 17:14 | 112:22 114:23 | 64:2 84:22,23 | 18:12,17 19:3 |
| 190:7 214:6 | 115:13 119:20 | 98:19 100:1,12 | 19:11,17 20:8 |
| 263:1,20 | 136:10 209:17 | 115:3 138:5,6 | 21:18 22:9 |
| **chose** 16:19 | 225:3 258:10 | 147:12 216:14 | 23:19 24:24 |
| 191:13 207:20 | 259:13 263:20 | 220:10,11 | 25:2,3,8,15,23 |
| 214:24 215:21 | 279:7 280:1 | 222:4 223:21 | 25:25 26:19 |
| **chosen** 37:20 | 289:5,6 | 223:23 240:3 | 27:10 28:2,6 |
| 120:17 121:21 | **citable** 76:14 | **claimant** 186:3 | 30:13,21 31:7 |
| 121:23 192:3,7 | **cite** 75:3 76:12 | **claimed** 19:25 | 31:19 32:2,17 |
| **chronologica...** | 76:12 80:13 | 139:6 179:6 | 33:7,16 37:14 |
| 56:10 | 125:17 126:20 | 210:12 258:1 | 38:16,17 92:25 |
| **chronology** | 127:22 154:9 | **claiming** 187:7 | 93:1,9 101:24 |
| 97:2,11,14 | 215:5,5 246:11 | 188:18 237:3 | 103:14,14,19 |
| 192:16 | 289:10 | **claims** 47:20 | 105:25 132:25 |
| **cialone** 9:23,24 | **cited** 41:6 | 59:25 64:1,3 | 150:16,22,25 |
| 12:18,19 13:5 | 75:11 79:24 | 99:25 100:5,11 | 150:25 151:7 |
| 15:17 104:4 | 80:4,7,7,16 | 101:6 116:6,8 | 151:17 152:10 |
| 105:7 | 81:1,2,15 82:6 | 136:2,3 211:20 | 154:17 156:13 |
| **cialone's** 104:5 | 125:7 126:25 | 232:2 251:7 | 156:21 172:19 |
| 104:20 | 127:19 128:25 | 275:6 | 173:19 174:4 |
| **circle** 25:11 | 129:20 153:14 | **clarification** | 177:14 195:2 |
| **circuit** 139:18 | 160:16 163:1 | 26:6 45:1 | 239:21 249:9 |
| 139:18 157:16 | 199:23 276:5 | 51:23 61:9 | 249:12,15,19 |
| 159:15 160:11 | 288:1 | 99:5 144:23 | 249:24 250:22 |
| 160:18 189:24 | **cites** 3:17 97:3 | 169:23 241:6 | 251:4,13 252:5 |
| 198:17,18 | 133:12 | 278:16 279:18 | 252:7,12 253:4 |
| 281:20 282:19 | **citing** 189:23 | 286:6 | 253:10,19 |
| 287:2,8 | 288:15 | **clarifying** | 254:3 255:4,17 |
| **circumstance** | **city** 229:20 | 99:18 | 256:11,14,19 |
| 20:1 23:10 | 259:10 | | 257:7,15,17,18 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[class - coming]

277:6
clean  38:7
  39:14
clear  36:12
  45:18 64:13
  72:25 80:11
  89:8,22 102:21
  112:1 131:19
  151:7 174:15
  183:25 209:22
  270:8
clearly  182:17
cleaver  262:15
clerical  167:13
clerked  38:11
  188:1
clerks  188:10
  196:9 250:4
clerkship
  187:13,14
  188:11
client  13:2,10
  19:5 20:2 37:3
  37:4 39:19
  49:13 50:1
  52:20 53:15
  58:3 63:24
  66:16 67:24
  68:9 84:15
  88:2 90:19
  94:21,21,21
  109:17,19
  121:11 147:6
  156:14 181:5
  196:25 245:12

246:23 251:23
  251:24 284:20
  285:9,12 286:1
  288:11,16,19
  289:10
client's  110:17
  111:12 142:24
clients  18:7
  19:1 20:4
  36:22,23 37:20
  48:8,24 49:4
  49:10,12,22
  53:5,6,11 54:8
  55:4 87:25
  88:3 89:16
  91:10 104:22
  122:6 131:11
  131:12 132:10
  192:17 193:3
  195:8 219:15
  219:19 221:15
  223:1,22
  224:22 233:6
  239:18 246:13
  247:25 254:19
  256:18 265:18
  276:12 277:14
  290:16 291:14
  291:19,20,24
clinic  13:1
clock  200:20
close  175:2
  216:7,8
closed  49:1
  268:5

closely  209:17
  228:7,14
closer  26:25
closest  220:4
  222:9
cna  60:9,9,16
  60:21,22 62:23
  63:21 64:13
  88:24 121:4
  123:15 141:23
  185:6,8,9,10
  209:23,24
  211:4,10,11,12
  211:18,22
  214:15 221:17
  222:3 275:3
cna's  275:10
cockpits  96:2
code  76:10,18
  77:10,10
  122:14 181:19
  182:3,17
  236:19 271:9
  290:22 294:7
  295:12
coding  182:21
cohen  63:1
coin  93:23
  135:1
collect  44:7
  240:4 286:12
collected  50:16
  50:21 51:2,11
  95:25

collection
  285:24
collectively
  15:16
collects  68:22
column  240:10
combative
  82:13
combatting
  254:24
combined
  254:4
come  10:22
  13:19,20 14:2
  16:13 25:11
  32:3 64:24
  77:21 78:1,7
  89:17 97:9
  145:10 163:18
  166:7 169:6
  192:1 205:17
  216:6 230:5
  240:17 245:10
  245:19 253:8
  290:7
comes  10:25
  11:15 13:21
  18:17 95:14
  276:25
comfortable
  167:5 193:10
coming  7:6
  117:1 129:19
  186:18 201:5
  226:16

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                     www.veritext.com

[command - complaint]

| | | | |
|---|---|---|---|
| **command** 196:22 | **commercially** 253:1 | 232:3 233:16 233:19 236:18 | **compensated** 22:11 |
| **commensurate** 242:17 | **common** 94:11 139:17 142:10 | 240:4 247:1,2 266:2 286:11 | **competed** 218:21 |
| **comment** 20:13 24:25 54:21 | **commonality** 141:15 | 286:20,24 287:13 | **competence** 273:3,4 |
| 69:11 70:4 86:18 107:18 | **community** 44:13 112:24 | **comparability** 227:7 | **competent** 273:7 |
| 113:9 114:3 185:16 | 113:5 179:7,10 212:12 213:12 | **comparable** 174:5 234:10 | **competes** 265:11 |
| **commented** 113:1,2 114:4 | 283:16 284:4,6 291:16 | **comparator** 19:11 27:16 31:14 219:22 | **competing** 91:18 216:12 278:6 |
| **commenting** 92:17 | **companies** 90:24 109:14 | 289:23 | **competition** 79:20 116:7 |
| **comments** 64:10 81:6 | 119:3,7,20 120:21 121:9 | **comparators** 26:1 31:16 | **competitor** 193:2 |
| 106:18 166:25 166:25 184:22 | 197:1 239:3,5 | 32:18 33:8 134:19 | **compilation** 125:21 132:3 |
| 184:23 193:17 | **company** 1:8 4:4 6:10,11 | **compare** 100:6 100:15 154:19 | **compile** 124:1 213:7 |
| **commerce** 218:11 | 12:23 13:11 33:18 44:3,8,8 | 166:21 175:20 176:14 235:2 | **compiled** 81:25 170:2 |
| **commercial** 215:24,25 | 68:10 84:2,18 85:5,6 86:3 | **comparing** 234:19 235:7 | **compiles** 214:18 |
| 216:1,5,6,9,13 216:17,25 | 87:8,14 88:7 88:12 92:6 | **comparison** 173:10 175:19 | **compiling** 170:2 229:12 |
| 217:1 218:3,4 218:6,9 221:10 | 93:8 96:2,5,16 108:24 109:3 | 235:1 283:15 | **complain** 173:15 |
| 250:3,20,23,25 251:3,9,15 | 114:13 115:3 118:15 119:1,4 | **compel** 166:4 | **complaint** 58:24 59:17,18 |
| 252:1,3,6,7,9 252:14,16,18 | 120:18 138:3 157:11 158:14 | **compelling** 95:20 149:7 | 59:19,20 87:20 88:8 97:5,7 |
| 253:2,21 254:8 254:9,12,13 | 158:25 204:11 206:10 227:8 | **compellingly** 94:24 | 98:17,18,21 100:1,6,11,14 |
| 255:1,2,13,15 255:20 | 229:4,7,8 231:13,14 | **compensable** 115:3 | |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[complaint - constructive]**

115:10,11
169:8 216:15
222:18
**complaints**
98:1 145:16
**complete** 45:23
114:1 167:2,4
168:12 184:7
189:19 204:4
207:19 295:9
297:8
**completely**
21:11 27:24
133:2 144:9,21
173:17 174:1
196:25 197:1
221:25 229:23
236:5 251:5
285:13 290:7
**complex** 25:20
126:15 162:7
163:11 177:23
180:19 227:12
227:18 230:11
246:14,19
256:14 257:17
263:2 265:9,10
271:5,6 272:15
278:23 283:17
289:24 290:3
**complexity**
130:14 237:8
262:9 265:5
269:11 271:16
271:16 273:12

**compliance**
295:8,11
**complicated**
193:7 204:22
229:6 246:20
258:22,22
259:2 265:20
271:12,23
290:8
**component**
30:1 84:21
**comprehensive**
16:17 30:12
**comprises**
213:23
**computed**
243:6
**computer**
95:19 290:21
**computers** 14:7
14:10
**concept** 223:25
**concepts**
155:17 200:1
**concern** 201:3
244:2
**concerned** 50:9
54:12,14 266:4
**concerning**
8:22 9:5
153:12 231:25
**concerns** 253:4
**concise** 278:7
**concluded**
293:3

**concludes** 67:7
**conclusion**
87:19 177:18
198:6
**conclusions**
135:22 138:9
**concrete** 255:7
**condensed**
150:14
**conduct** 115:16
115:16 138:20
199:11
**conducted**
238:15
**confederate**
86:22
**conferences**
168:17
**conferencing**
69:19 167:14
**confidential**
225:20 226:12
226:20
**confidentiality**
226:9
**confirm** 36:14
62:5 115:18
**conflict** 121:22
141:24 142:2,7
**conflicts** 143:5
**confuse** 67:2
**confused**
261:22
**connected**
295:14

**connection**
6:16 13:12
34:21 47:4
61:17 62:2,24
75:12 99:1,13
99:14,21 115:4
126:21 127:20
128:16 129:21
138:20 153:12
155:20 165:25
178:12 201:22
208:22 210:13
274:10,15
**consider**
133:19 147:25
178:19 179:25
189:11 190:11
198:20 200:11
222:3 235:2
273:19 274:2
**considered**
5:11 33:6
199:3 262:6
268:11,23,24
268:25 269:2
273:16 274:1
283:20 287:19
**considering**
223:4
**consistent**
82:24 130:21
268:16
**constructive**
66:23

Page 21
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

**[consult - correct]**

| | | | |
|---|---|---|---|
| **consult** 99:1 | **contingency** | **convince** 89:3 | **correct** 6:19 |
| 128:15 | 36:24 37:22 | **convinced** | 17:6 21:15 |
| **consultant** | 39:9 61:1 | 266:25 | 24:22 25:1 |
| 73:22 | 120:24,25 | **convincing** | 28:4,18 29:4,6 |
| **consulted** | 251:17 277:7 | 266:25 | 32:19 34:2 |
| 144:7 | **contingent** | **convincingly** | 36:19 37:17 |
| **consulting** | 39:20 | 90:13 | 38:6 40:17,21 |
| 37:12 | **continue** 78:24 | **conway** 1:4 2:4 | 45:19 47:25 |
| **consumer** 18:3 | 82:4 171:25 | 6:9 296:1 | 49:6 52:3 56:2 |
| 19:2,11 22:5 | **continued** 4:1 | 297:1 298:3 | 61:14 62:6 |
| 25:25 26:14 | **continuing** | **cookie** 235:19 | 64:16 65:6,10 |
| 132:25 150:15 | 74:12 77:7 | 290:4,11 | 67:24 73:21 |
| 223:21,22 | 124:2 246:9 | **cooperate** | 80:13,24 81:1 |
| 239:21 255:16 | **contract** 96:7 | 107:7 143:11 | 81:9 82:19 |
| 277:5 | 135:14 137:4 | 143:16 | 89:11,25 93:15 |
| **consumers** | 208:3 216:14 | **cooperated** | 99:9 100:21 |
| 22:13 | 216:18 | 142:20 | 102:23 103:3 |
| **contact** 221:15 | **contractors** | **cooperating** | 104:20 105:11 |
| 265:18 | 91:3 | 143:19 144:1 | 110:7,13,14,22 |
| **contacted** | **contractual** | **cooperation** | 115:20 116:14 |
| 284:21 | 116:4 295:11 | 144:17 145:5 | 117:12 119:21 |
| **contacting** 88:3 | **contradicting** | **copy** 41:8 | 120:22 122:23 |
| 193:3 224:22 | 144:12 | 74:25 82:18 | 123:11 125:14 |
| **contacts** 63:22 | **contrary** 23:14 | 153:10 298:16 | 125:18 130:2 |
| **contemplate** | 160:10 | **copyright** | 133:24 135:9 |
| 57:18 | **contribute** | 225:16 | 137:23 139:12 |
| **contents** 59:16 | 287:13 | **corporate** | 143:7 150:19 |
| **context** 20:8 | **contributing** | 218:12,14,16 | 152:8 155:15 |
| 24:4,6 30:22 | 150:2 | 218:17,20,22 | 156:8 157:21 |
| 33:17 35:24 | **control** 143:2 | 218:25,25 | 159:24 161:22 |
| 87:8 179:10 | 147:16 | 219:1,4 | 163:4,22 166:1 |
| 191:10 249:22 | **conversation** | **corporation** | 166:2 168:25 |
| **contexts** 33:10 | 141:11 | 218:20,23 | 172:25 173:21 |
| 282:7 | **conversations** | 232:3 | 174:9,18 179:1 |
| | 89:5 | | 185:15,20,25 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company   www.veritext.com

**[correct - covered]**

| | | | |
|---|---|---|---|
| 186:3 187:20 187:22 192:15 195:19,24 196:23 198:9 199:12 203:7 205:19 206:11 206:13,14,15 206:16,19 207:23 208:23 209:4 210:8,8 210:17 214:19 222:7,19 230:24 233:17 235:11 240:19 241:23 242:5 242:19 244:13 245:8,10,11 248:22 250:8 251:4 260:17 268:1,7,19 271:5 273:15 274:8,11 275:1 275:10,18 276:6,7,22 278:4,13 280:8 281:17 286:10 288:17 292:16 295:7 297:8 **corrections** 297:6 **correctly** 72:20 74:19 132:14 144:14 153:20 189:14 198:7 271:2 | **correlation** 234:16 **corresponden...** 167:16 **corresponding** 235:18 **correspondin...** 162:11 **corroboration** 291:8 **cosby** 67:19 **cost** 130:8 142:20 167:18 174:24,25 175:8,25 176:6 180:19 239:25 241:17 **costs** 4:9 171:11 242:2,7 258:19 **could've** 148:25 **counsel** 12:1 47:24 88:5 92:14 105:3 106:12 109:4,7 111:13 119:25 121:21 122:15 122:22 123:9 123:16 142:18 170:9,23 209:6 209:11,15 211:1,3 272:12 288:14,17 295:13,14 | **counsels** 256:12 257:16 257:17 **count** 80:25 149:20 197:10 197:25 276:22 **counted** 80:22 191:7 213:19 **counterclaim** 100:3,9 111:23 114:9,10 115:24 137:18 137:18,24 167:9 **counterclaims** 116:12 **counting** 212:17 **country** 157:17 **county** 248:17 248:20 256:4 **couple** 104:10 **course** 24:24 46:25 55:2 58:21 62:13,16 91:24 118:13 123:1 129:9,20 136:21 158:17 205:23 237:20 271:11 276:4 **court** 1:1,24 18:16 20:10 21:4,5 25:15 28:7 59:18 77:13 81:7,15 | 98:11,18,21 121:2,20 135:8 135:21 165:9 165:15 166:8 168:18 178:11 181:25 187:19 188:2,10,11 190:13,15,16 196:9 197:8,9 197:17,24 248:16 255:1 287:8 288:2 294:2 295:2 **court's** 145:20 165:11 **courthouse** 104:16 **courtroom** 148:2,18 **courts** 14:22 18:19 69:14 79:14,24 81:14 126:24 138:8 191:7 213:9,25 217:14,20 259:17 282:19 **cover** 292:20 **coverage** 38:15 39:7 44:9 48:16 118:20 118:20 119:3 119:17 121:24 142:8 221:17 **covered** 116:9 117:25 292:21 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[covid - date]**

| | | | |
|---|---|---|---|
| **covid** 131:1 | **cross** 18:21 | **cursory** 17:21 | **data** 3:18 14:19 |
| **cramming** 222:1 | 21:1,6 28:6,15 28:18,20,20 | **curtain** 265:4 | 14:20,23 16:22 |
| **created** 167:11 | 29:3,25 71:1 | **curve** 272:8 | 17:12,15,21 |
| **credential** 104:18 | 115:10,11 | **customarily** 122:15 239:16 | 55:13 125:7,21 |
| **credentialed** | 256:9,25 | **cut** 75:8 | 125:24 126:1,7 |
| 101:25 106:14 | 257:21 | **cutter** 235:19 | 127:10,19 |
| 140:2 267:3,4 | **crucible** 71:2 | 238:22 290:4 | 128:12,15,19 |
| **credentials** | 106:2 | 290:11 | 128:23 130:15 |
| 9:13 101:2,16 | **crude** 261:7 | **cv** 1:4 | 135:4 191:23 |
| 101:20 103:11 | **crunching** | **cyclone** 135:24 | 195:22 213:22 |
| 103:12,18,20 | 191:22 | 137:7 138:7 | 214:18 227:7 |
| 103:22,24 | **cst** 1:15 293:3 | 197:20 | 227:23 228:3 |
| 104:5,20 105:1 | **cumis** 121:13 | | 228:10,20 |
| 105:16,19 | 121:16,17 | **d** | 229:3,12 234:3 |
| 273:25 276:15 | 122:3,4,18,22 | | 235:20 268:19 |
| **credibility** | 123:10,17 | **d** 3:1 44:6 | 269:7,17 |
| 70:16,24 71:8 | **cumulating** | 177:6 232:3 | **database** 10:13 |
| **credible** 17:14 | 79:12 | **d.c.** 130:7 | 10:22 12:9 |
| 70:13,22 | **cumulative** | 258:15 259:3 | 14:11 15:19 |
| **credit** 121:17 | 133:22 | **d.d.s.** 3:20 | 180:24 181:8 |
| 244:9 281:7 | **cup** 200:1 | **d.r.** 177:8,9 | 228:8 |
| **creeping** 196:5 | **curious** 55:7 | **daily** 44:11 | **datapoint** |
| **criminal** 122:9 | 98:7 | **damage** 84:22 | 194:21 258:3 |
| 122:10 | **current** 46:12 | 86:7 220:18,18 | 263:1 274:6,7 |
| **crisis** 67:17 | 121:10 129:15 | 271:11 | **datapoints** |
| **criteria** 9:9,13 | 134:13 250:3 | **damages** 78:10 | 14:19 50:14 |
| 17:18,19 | 250:25 251:12 | 85:1 89:24 | 113:19 133:13 |
| 124:11 127:5 | 252:3,18 | 115:8,16 116:8 | 134:12,14,16 |
| 139:20,24 | **currently** 38:13 | 116:16,17,23 | 160:2 212:4 |
| 189:11 | 51:16 93:13 | 138:4 211:20 | 214:19 218:16 |
| **critical** 136:23 | 242:4 244:10 | **dan** 143:8 | 255:7 261:10 |
| **criticizing** | 251:23 266:15 | 158:9 225:17 | 262:13 265:2 |
| 31:12 190:23 | 275:3 | **daniel** 2:4 6:7 | 268:11 270:1 |
| | | **dare** 254:25 | **date** 7:12,13 |
| | | **dashes** 294:10 | 42:18 56:10 |
| | | 294:14 | |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company                          www.veritext.com

**[date - defense]**

57:3 60:2
96:19 181:18
182:2 232:19
296:24 297:12
**dates** 96:14
107:10
**daubert** 71:14
71:16 226:16
**david** 195:25
266:22
**day** 35:16,16
70:2 86:3
88:14 142:22
142:22 143:10
182:25 183:12
192:10 196:2
267:19 295:18
297:15
**days** 53:25
110:6,7,8
122:8 141:3
**dba** 63:5,7,16
**dcentner** 2:7
**dead** 85:3
**deadline**
226:16
**deal** 69:16
215:12 244:11
245:16
**dealing** 197:3,6
233:12 234:24
234:25 239:20
239:20 262:4
290:8

**death** 220:11
223:25
**debate** 193:4
**dec** 252:17
**decades** 38:25
**december** 7:12
292:24
**decide** 17:20
116:21 122:24
142:5
**decided** 24:18
37:21 38:8
39:8 63:7 71:2
121:25 122:25
142:5 159:23
**decidedly** 26:4
**decides** 23:17
116:22
**decision** 23:15
36:15 80:5
90:15,16 123:1
136:8 223:16
247:15 267:14
279:20
**decisions**
190:15,16
**declaration**
3:19 4:6,12
61:22 137:2
152:11 153:8
155:5 158:7
172:23 176:18
178:6,11
248:15 249:1
249:25 251:25

252:1 253:4
284:16 288:7
289:9
**declarations**
34:7 96:17
128:18 135:10
135:17
**declare** 297:4
**decrease**
243:16
**deem** 134:18
**deemed** 297:6
**deeply** 135:23
138:9
**defamation**
116:5
**defend** 70:25
82:23 84:18
108:21 109:4,6
109:17,19
118:22 119:20
120:14 247:15
**defendant** 2:9
6:20 20:13,17
**defended** 38:24
39:2 150:25
202:3,18 203:7
204:11 207:9
221:6
**defending** 13:1
99:14 108:25
147:9 206:10
229:7 232:2
233:16 247:7

**defends** 120:1
**defense** 7:22
11:4 38:16
84:4 92:14
99:8 109:13
111:13 115:5,9
115:13 116:3
116:13 118:18
123:9,16
141:17 142:9
170:9 187:24
201:20 202:1,4
202:6,15,23,25
203:5 204:17
205:1,10,25
207:6,13,15,21
208:7,10,17
209:9,19
211:20 212:5
213:23 214:19
219:24 221:8
222:5,8 223:12
223:16 224:7
224:25 225:5
227:8,24
228:16,22
229:4,12 230:7
230:13,17,23
231:4 236:13
237:1,4,6,11,14
237:16,16
260:6,23 261:1
261:7,14,24
262:7 263:14
263:18 264:1,3

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company        www.veritext.com

**[defense - details]**

264:9,14 269:3 269:8 271:18 276:9 279:5,10 282:15,22,24 287:14 290:14
**deferred** 245:14
**define** 183:18 202:5 224:10 224:13 247:24
**defined** 183:17 211:21 217:10 220:13 221:22 294:5 295:12
**defines** 79:2 221:21
**defining** 189:11
**definition** 133:10,20 208:7 218:8
**definitional** 217:17
**definitions** 217:23
**definitively** 212:3,14
**delays** 53:10
**deliberately** 102:19
**deliver** 27:22 27:23 237:10
**delivered** 131:4
**demanding** 147:15

**demarcation** 38:8 39:14
**demean** 187:5
**demonstrated** 263:11
**denied** 221:17
**denies** 44:8
**denote** 294:19
**denoted** 294:18
**departed** 277:13
**departing** 84:10 89:16 180:2 276:11 278:3 290:13 290:25
**department** 258:19
**departments** 25:21
**departure** 7:23
**departures** 91:17 278:6
**depend** 37:2 123:10 195:3 273:2 280:1
**depended** 213:10
**depending** 77:13 91:4 131:5 194:14 214:13
**depends** 108:22 109:5 129:24 132:10 170:19

177:25 179:2 180:8 181:17 182:1 227:20 279:6
**deponent** 297:3
**deposed** 56:12
**deposition** 1:11 5:4,12 6:16 8:21 16:14 26:5,8 32:12 34:21 42:2 45:13,23 46:9 46:23 55:18 56:22 57:10,13 57:19 58:1,10 58:13,14,16,18 58:21 69:11 71:3 135:8 141:3 158:3 201:9 203:24 211:5,8 225:19 226:11,20,22 274:11 275:8 292:7 295:10 298:4
**depositions** 7:2 34:6 45:5 46:24 47:3,6 56:23 60:15 72:6 81:21 98:2,3,8 135:18 192:11 267:20,20
**depressed** 214:9

**derived** 18:24
**describe** 169:4
**described** 96:24 99:18 113:6 117:20 230:19
**describing** 15:2 73:14 229:11 278:10
**description** 172:11 181:1 182:7 185:18 231:24 260:5 278:7
**deserve** 187:7 188:10,19
**designate** 225:23
**designated** 202:13 225:20 226:19
**designating** 226:10
**designations** 226:13
**desk** 11:7 147:20
**destroy** 42:24 43:1,3
**detail** 9:3 184:11 244:24 245:6 253:24
**details** 66:22 67:3 74:7 130:24

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                         www.veritext.com

**[determination - discourse]**

**determination**
32:18 33:9
180:17 198:21
202:15 207:5
**determinations**
199:5 204:25
**determinative**
20:25
**determine** 21:4
21:6 42:23
116:11 191:5
205:10 209:14
274:24
**determined**
9:15 10:3
32:25 71:8
141:23 202:20
204:19 206:9
207:10 275:4
**determines**
16:5
**determining**
19:12 70:15
199:3 224:7
256:5 273:23
276:17 278:17
**developed**
205:24
**developing**
208:22 274:15
**devices** 66:15
**devil** 74:7
**devin** 47:25
48:1,2,3

**diagnosed**
66:19
**die** 190:15
**diego** 121:17
**difference** 22:1
23:20 73:19
111:21 130:16
137:9 156:13
164:21 263:11
263:17 281:2
**different** 18:5
21:11,12 25:19
26:12 27:24
29:8,10 30:4,7
30:14 31:20
34:23 35:10
40:5 42:17
49:4,22,24
51:5,7,7,8
56:13 63:8
69:21 79:23
94:9 96:9 97:8
107:5,6,8
113:21 116:8
116:19 117:7
118:24 120:3
123:21 128:4
129:21,22
133:2 136:4
141:10 146:12
152:4,6,21,21
154:18 155:16
156:21 159:20
160:6 162:16
163:7,7 171:4

172:20 174:1,1
174:2,2,3,3
176:16 181:14
181:14 190:9
196:25 197:1
198:22 199:20
199:25 201:17
206:1,1 208:4
210:6,6,6,18
215:19 221:25
229:24 231:6,7
231:7,7 233:11
233:13 235:23
236:5 238:17
239:22 251:5
255:4 277:11
280:25 285:14
288:20 290:8
**difficult** 132:8
180:10 207:3
261:20 274:2
**difficulty**
109:23 139:1
179:16
**digital** 295:16
**dime** 286:24
287:14
**direct** 234:16
**direction**
275:14 295:6
**directly** 63:21
119:2 269:1
**director** 63:10
**diron** 48:6,24

**disaffected**
83:18 85:23
**disagree** 89:11
89:12 196:3
197:17,18
206:12
**disagreed**
138:12
**disagreement**
117:17
**discharge** 26:2
**disclosed** 35:21
**disconnect**
111:14 186:17
**discount** 232:3
240:12,15,17
240:22 241:5,8
241:15,23
242:1,19,21,21
243:1,2,4,5,8
243:17,19,20
244:4,11
245:16,20,23
246:2,7 250:7
286:15,15
**discounted**
241:19 242:3
242:22 244:8
**discounting**
239:24 240:8
**discounts**
240:11 244:19
245:5,13 246:1
**discourse**
294:10

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[discovered - doing]

discovered 183:3

discovery 110:17 148:19 150:18 161:16 183:15 184:7

discrepancy 289:25

discrimination 252:5,7,13 254:5 256:14 257:18

discuss 186:1 260:24

discussed 32:22 33:14 43:25 129:23,25 140:25 184:18

discussion 16:24 209:7 232:13 249:23

discussions 43:25

disengage 23:8

dishonest 69:8

disingenuous 149:12

dislike 28:25

dismiss 150:17

dismissive 87:21 101:22

disparate 49:23 199:25 200:22 200:24

disparity 270:5

disproportion... 139:6 140:24

dispute 32:10 33:16 76:16 215:24,25 216:1,6 217:1 217:1 219:6 233:18 264:1 285:12 286:1 288:18

disputing 224:5

dissimilar 190:25

distant 164:21

distillation 97:4

distinction 73:12 151:15 157:2 173:18 243:13

distinguish 246:9

distinguishes 201:16

distinguishing 151:12 199:22 246:11

district 1:1,2 6:10 32:21 135:22 154:14 160:7 174:7 187:19,21 231:15 232:4 236:1 282:20

282:20 288:2

divide 173:2

divorce 94:13 95:1,4,6

divorces 95:9

doc 176:20 227:1

docket 168:4,9

doctor 95:17 224:18

doctors 227:20

document 80:19 151:25 155:22 156:15 165:12,13 166:3 167:13 168:15 171:11 180:24 181:8 183:20 217:20 289:20,25 290:1

documented 241:20

documents 8:20 58:20 87:10,12 96:25 161:15,20 162:6,10,14,17 162:19,22,25 163:8 167:10 167:11 171:6 177:23 178:2 180:23 181:15 182:8,21 183:16,17,25

185:19 241:23 243:15 267:17 271:10 289:21 289:22 290:3,7 290:21 292:16

dog 95:7 126:5

doing 14:5 15:6 21:20 22:19 24:3 27:25 28:8 35:14 37:11,17 40:4 40:6 42:12 47:12 48:16 63:6 85:11,11 94:1 95:8 101:18,19 102:7 111:22 112:7,8,19 115:15,22 116:22 118:19 126:18 138:18 141:21 143:17 148:10 153:2 153:21 166:18 171:15 181:21 182:5,9,20,21 183:21,22 184:12,13 197:12 203:13 226:21 229:5 241:16 244:7 244:12 255:16 267:13 272:17 272:19,20,21 272:24 284:7

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[doing - either]

287:22
**dollar** 191:19
**dollars** 23:23
23:24 90:6
96:7 135:15
157:4
**door** 52:3,10,16
52:23
**doors** 247:1
**dossier** 1:7
**double** 294:10
294:13
**doubt** 214:3,4
256:3 270:9
**downtown**
236:21 237:23
247:9 265:20
**downward**
269:25 270:3
273:17,21
**dozen** 65:22,22
**dr** 66:14 67:12
67:15
**drafting** 34:24
**draining** 22:8
**dramatic** 85:12
194:17 263:17
**dramatically**
127:9
**draper** 104:24
105:1,11
**drawing** 157:2
**dre** 66:14 67:12
67:15,23

**drive** 177:18
194:4,7 247:9
**driven** 133:4
192:22 263:3
**driver** 90:20,20
91:7 146:13
208:9,9
**drivers** 84:6,6
84:6 87:1,2
**drives** 174:25
**drop** 36:15
85:3 227:22
228:2
**dropped** 34:15
36:9 100:5
**dropping** 35:22
**drugs** 7:7
**dry** 107:22
143:12
**dubious** 282:17
**dude** 186:25
253:16
**due** 53:10,15
80:17 136:21
241:25 294:9
**dues** 77:6 81:11
**duly** 6:2 295:4
**dumped** 114:21
**dunbar** 2:10
36:5 61:6 62:1
63:20,22,23
**duplicate** 13:20
**duties** 139:25
221:13 224:22

**duty** 221:15
224:20
**dwarf** 194:19
**dwarfing**
238:12

e

**e** 1:8,13 2:1,1
3:1,13,19 4:4
6:1 9:24,24,24
48:13 55:18
61:10 103:8
129:11 183:15
184:7 295:4
296:3,3,3
**eagerness**
107:14
**earlier** 24:7
31:12 47:16
64:20 74:22
80:16 93:13
96:25 110:20
117:25 119:23
140:21 154:23
166:5 169:19
178:5 187:9
189:4 190:1,4
191:7 197:20
198:9 199:10
199:16 205:19
209:6 225:18
225:25 232:18
243:11 246:2
258:5 289:23
292:16

**earliest** 96:12
121:7
**early** 14:8,12
39:11 118:17
120:19 241:7
**earn** 94:23
**earners** 22:13
**earth** 291:20
**easier** 147:18
**eastern** 1:2
6:10 32:21
**easy** 216:23
235:18
**echoed** 228:19
**economic** 116:5
288:12
**edge** 157:15
**editing** 36:11
**edition** 79:5,6,7
**eds** 43:24
**educate** 124:1
**education** 35:9
77:7 124:2
**educator** 73:23
**effect** 121:23
**effective** 148:9
**efficient** 153:22
**egan** 62:25
**eight** 51:4,6
150:13 284:24
**either** 45:5 57:9
57:24 62:12
66:25 71:7
75:2 102:4
117:10 118:23

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                           www.veritext.com

[either - established]

135:14 140:13 164:7,25 193:3 199:3 245:25 256:18
elaborate 228:1
electively 22:15
electronic 181:7
elser 196:14,21 196:24 210:1 212:9 213:18
email 3:17 12:1 124:19 125:9 125:13 250:17 250:18
emailed 292:14
emailing 93:13
emanuel 93:4 163:3,5 284:21 284:23 285:7 285:17,25 288:7,10,19 289:11,20
embody 266:8
emotion 85:22 88:16
emphasis 73:7
employed 295:14
employee 12:22 63:3,9 84:10 94:10 96:11 104:12 180:2 211:13 219:21 265:10 276:12

290:25
employees 63:11 217:6 219:12 278:3
employer 265:17
employers 91:3 96:13 120:3
employment 32:22 217:5 219:5,6,7,13,17 220:6 256:14 257:18
emptiness 54:22
encapsulate 37:7 68:19 90:2
encapsulates 8:15
encompass 14:2 20:23 43:19
encompasses 269:25
encourage 22:11 68:14
encyclopedic 49:16,25
ended 35:22
ends 66:24 69:4 109:8 202:2 208:9
engage 22:25

engaged 140:11 283:17 284:6
engagement 185:13
engagements 78:14
engineer 224:17
english 229:14
enhances 80:19
enjoying 32:11 177:21
enormous 239:2
enslaved 265:16
ensues 291:22
ensuing 275:20 291:21
ensured 27:19
entail 182:13
entails 184:3
enter 141:17
entire 75:9 151:20 182:7 205:9 210:3 226:19
entirely 21:12 29:10 30:7 82:24 173:22
entirety 226:12
entitled 42:3,15 156:3,4
entity 60:19 64:13 295:10

entries 61:4 167:15 181:1 260:13
entry 167:15,16 182:18
enumerated 83:6
environmental 217:7
epiphany 120:20,23
episodic 67:6
equally 283:17
equate 29:12 29:14,15
equivalent 44:16 164:13 164:23 239:10
errata 298:10 298:12,13
erroneous 294:21
especially 22:4 44:18 87:1 136:10 147:10 170:10
esq 2:4,5,10
essence 12:22 38:13 138:2
essential 83:11
essentially 107:6 170:23
established 198:9 273:11

Veritext Louisiana – CRLA/goDEPO  cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[establishing - exhibit]**

**establishing** 277:8

**estate** 13:2 40:6 49:2 216:4

**estimate** 40:17 135:19

**estimated** 155:6

**ethical** 139:25 153:6 155:14 155:16,19 199:4 201:3 224:21

**eva** 1:6

**evaluate** 166:19,20

**evaluating** 282:14

**event** 20:14 22:4 38:19 42:19 54:23 69:20 85:14 122:13 129:10 136:15 139:19 146:21 152:13 251:2 259:8 290:23

**events** 56:14 97:15 122:2

**eventually** 163:18

**everybody** 39:23 51:13 131:9,14 140:9 141:21 143:21

195:21 212:10 243:22 247:3 272:3

**everybody's** 49:16,25 50:1 50:19 267:18

**evidence** 88:6 89:4 97:4 140:13 147:16 157:6,18 160:17 166:15 193:5 286:25 287:14 288:13 288:16

**evident** 112:25 114:2 141:16 170:21

**exacerbated** 146:20

**exact** 134:9,25

**exactly** 16:18 30:9 31:8 33:15 40:1 51:19 65:21 95:13 133:14 197:14 206:11 206:13 230:10 230:20 237:7 263:23 271:21 271:21 284:4,7 294:21

**examination** 3:5 6:4 71:2

**examined** 6:2

**examining** 119:16

**example** 27:11 27:14 28:19 51:5 53:1 62:19,25 95:1 126:11 146:1 151:17 198:2 220:6 243:11 265:5 272:25

**examples** 29:9 29:19 30:6 185:21 219:8

**except** 5:9 101:11 111:22 132:15 156:1 267:20

**exception** 127:8

**exceptional** 37:11,15

**exceptions** 39:13 56:16

**excerpts** 215:3

**excess** 146:13 172:17 179:6

**excessive** 22:8 146:3,14,15 166:13 167:6 167:14 168:2 170:9 175:13 193:11

**exciting** 37:21

**exclude** 228:13 228:20 229:10

229:25 230:3,8

**excluded** 71:17 230:10 270:10

**excludes** 230:18 237:15

**excluding** 5:6 228:9,10 229:22

**exclusion** 170:13

**exclusions** 39:1

**exclusively** 68:24 73:8

**excursions** 151:8

**executed** 232:23

**exercise** 27:18

**exert** 13:22

**exhibit** 3:12,14 3:16,19,21,23 4:3,5,7,10,12 43:8,10 46:10 47:3 55:15,18 56:5 57:7,11 64:20,22,25 65:2 66:9 73:1 130:17 155:2,3 155:5 165:21 165:22 168:4 169:3,17 172:9 172:22 178:5 225:12,13 231:21,22 248:3,4,12,12

**[exhibit - fact]**

| | | | |
|---|---|---|---|
| 248:13 255:24 | 92:1 93:10 | 75:13 81:3,6 | 113:17 238:25 |
| 256:1 258:4,6 | 101:2,16,20,21 | 81:16 112:15 | 247:21 |
| 260:2 284:11 | 102:4,5,9 | 112:20 114:5 | **expressly** |
| 284:13,14 | 103:13 105:2,4 | 135:6 143:4 | 285:18 |
| **exhibits** 3:3,10 | 105:17,19 | 156:20 159:19 | **extends** 283:16 |
| 4:1 41:5 55:16 | 106:7 109:20 | 191:8 203:24 | **extensive** 9:16 |
| 102:16 143:20 | 109:24 119:4 | 270:16 275:4 | 10:15 13:25 |
| 215:2 267:21 | 127:2 130:12 | **expert's** 8:19 | 252:4 277:17 |
| **exist** 60:4 134:2 | 138:25 163:16 | **expertise** 32:2 | **extensively** |
| 140:18 | 170:11 187:9 | 189:16 | 74:14 |
| **existence** 62:17 | 189:16 235:14 | **experts** 34:13 | **extent** 55:13 |
| **existing** 49:15 | 252:4 256:13 | 34:14 271:12 | 60:17 68:4 |
| 138:23 | 257:17 261:4 | 288:10 | 144:8 171:8 |
| **exists** 20:9 | 262:12 268:24 | **expiration** | 175:9 |
| 55:13 80:20 | 270:15,18 | 96:13,18 | **extolling** |
| **expect** 14:5 | 272:5,11 | **explain** 186:17 | 217:14 |
| 31:14 105:5 | 273:14,15 | 289:25 | **extra** 32:4 |
| 251:20 | 274:1,3,10,17 | **explained** | **extraordinarily** |
| **expectation** | 274:20 276:1 | 30:25 178:7 | 246:13 |
| 61:5 | 276:14,16,24 | 237:21 | **extraordinary** |
| **expected** 46:3 | 276:25 277:1,4 | **explaining** | 90:11 |
| **expecting** | 277:12,18,18 | 194:10 | **extremely** |
| 33:18 | 277:19 278:2 | **explanation** | 94:11 247:3 |
| **expended** | 278:10 280:5 | 174:9 | **eyeballs** 126:4 |
| 184:23 193:11 | 291:6 292:22 | **explicated** | **f** |
| **expensive** | **experienced** | 271:20 | **fabric** 291:15 |
| 227:10 | 101:25 103:5 | **explicit** 74:23 | **face** 240:2,9,12 |
| **experience** 9:14 | **expert** 3:13,15 | **explode** 66:21 | 240:21 245:24 |
| 9:16,17 10:4,6 | 4:3 6:20 7:20 | **exploring** | 246:3 |
| 10:12,12,13,15 | 29:20 30:16 | 22:24 | **faced** 23:3 |
| 10:18 12:5,14 | 33:4 34:1 35:1 | **exposed** 101:4 | 289:11 |
| 12:14 13:25 | 36:18 37:11 | **expository** | **facing** 147:12 |
| 16:9,11 17:5 | 45:8 55:6 | 101:5 | **fact** 32:19 |
| 21:23 28:2 | 68:16 70:13,22 | **exposure** 84:19 | 36:14 66:5 |
| 31:22,24 69:1 | 71:11 73:22 | 86:7,12 87:1 | 70:6 80:16 |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

**[fact - feeding]**

93:18 115:3
127:9 130:23
131:12 144:16
157:5 160:16
171:14 192:22
193:12 210:2
214:7,16
219:20 228:12
228:25 239:8,9
246:21 262:10
262:11 263:3
269:19 271:6
283:22 286:22
287:5,11,18
288:9 289:10
**factor** 139:10
141:8 160:25
161:3,4 194:9
195:20 197:12
197:25 243:17
261:5 262:5
277:3 278:17
280:9 289:7,12
**factors** 83:7
138:22 139:11
139:13,17,18
140:4 160:23
163:1 194:4
195:20 196:24
198:12,14,15
198:19,20,25
199:1,1,1
203:4,8,9
204:16,18
235:6 236:9

246:11 273:16
280:9
**facts** 100:7,8
136:4 164:22
197:18 202:19
207:10 221:21
231:11 273:10
**factual** 204:19
204:24 206:9
212:11 222:23
291:4
**fading** 157:25
**failed** 13:11
27:18
**fails** 298:15
**fair** 39:12
42:22 56:19
57:11 60:10
99:5 111:15
161:6 173:10
179:4 184:4
216:10 225:1
256:6 275:25
**fairly** 22:10,11
278:7
**fairness** 42:23
**faith** 38:15
39:5,6 118:20
119:8,10
226:15
**fall** 46:5 208:9
208:16 222:11
222:14 273:24
279:4

**falloff** 194:17
**false** 116:6
**falvey** 176:11
**familiar** 6:12
6:24 11:17
34:9 91:19
121:12 195:24
196:14 215:21
259:19 281:20
282:6 291:10
**fantastic** 72:12
**far** 46:13 78:3
78:11,14
106:15 238:17
262:17 292:9
**fargo** 18:2
19:15 132:3
**farm** 39:6
120:2 228:23
**fashion** 53:1,22
54:13,15,18
70:13
**fast** 283:5
**faster** 46:3
**fault** 115:8
**faulting** 142:17
**favor** 11:4
22:12 67:18
162:23
**favorable**
137:3 155:24
155:25 189:23
**favorably**
126:25

**fear** 266:8
**federal** 5:5
25:20 28:7
34:1,8 38:12
121:2,17
126:24 139:16
178:11 283:17
288:2 294:5
**fee** 21:17 23:3
24:10,25 25:14
28:5,16 31:16
31:24 32:5
33:7 39:20
40:21 47:14,15
67:3 73:7,9,13
73:16,24 74:14
75:17 76:15
78:2,17 79:1,2
79:15 80:24
81:3,5,6
123:24,25
124:3,7,15
125:21 126:7
136:13 140:13
140:19,23
152:25 153:2,5
153:15 155:7,7
163:2 178:12
191:9 198:21
217:16 249:6
281:22 285:19
288:21,22
**feeding** 181:20
182:4 184:2

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[feel - firm]**

feel  26:8 164:25
  167:4
fees  4:8 7:21,24
  18:15,16,19
  19:12 20:18,19
  20:20,24 21:7
  23:1,4 24:21
  25:5 26:20,23
  27:9,19 28:13
  31:7 32:4
  33:11 37:12
  44:2,2,6,6
  47:18 55:8,11
  68:20,24 71:12
  73:24 74:7,15
  74:18 75:25
  78:23 81:16
  84:1,25 86:4
  86:16 90:10
  95:23,24,24
  111:5 122:7,8
  127:1 129:8
  135:14,16
  139:6,23 141:1
  142:14 143:1,3
  143:6 146:13
  152:10 153:9
  154:8 159:14
  160:16 162:23
  184:20,20,25
  185:2 192:4
  195:10 198:16
  199:24 232:1
  239:25 241:17
  242:2,6,7

249:23 251:22
  252:12 254:24
  256:5 281:14
  283:22 284:17
  285:9,10 288:9
  288:24
feet  180:15
felicia  104:24
  104:25
felt  85:22 247:5
  270:14
fewer  39:2
  146:7 148:11
  148:25
fiduciary
  221:15
fifth  68:1
  139:18 150:19
  198:17
fight  42:6
  112:8 136:18
  147:11 150:24
  261:21
fighter  96:2
fighting  90:25
fights  95:7
figure  11:24
  68:4 244:21
file  7:14 141:25
  150:10,16
  222:18
filed  59:18
  98:18,19,21
  100:2,3 145:14
  145:18 168:14

204:21 232:17
  284:17
files  188:21
  291:24
filing  99:25
  151:10 167:13
filings  145:14
  166:5
fill  271:17
final  13:6 33:20
  98:24 99:19
  219:2 255:21
finally  100:2
finance  217:7
financial  12:23
  95:10 155:22
  295:10,15
finberg  4:6
  9:22 10:17
  12:7 14:16
  15:16,21 18:10
  72:8,14 101:22
  102:3,3,22,24
  102:25 103:2
  103:12,20
  248:15 249:2,6
  249:18 252:23
  254:17 268:10
  274:25 280:11
  280:12,25
finberg's
  103:11 255:8
find  68:5,15
  76:17 85:17
  95:21 102:8

124:4 129:17
  135:3 194:16
  235:8 264:2
  267:10
finding  190:16
  235:18 274:6
  274:19
fine  20:10
  32:13 53:24
  96:20 194:2
  200:19 248:9
finish  106:17
  213:5 215:8
finished  181:24
fire  124:24
firm  6:8 7:22
  7:24 9:12,12
  12:17,21,24
  16:21 20:2
  22:18,18 27:10
  36:5 38:12,13
  38:13,19,20
  47:23 49:5
  50:3,6,15,22
  51:10,11,12,16
  52:2 53:9
  54:13 59:21
  62:6 63:16
  67:19 83:10,20
  83:22 84:15
  85:8,9,22,24
  88:3,3 89:10
  89:13,21,23
  90:5 91:15,23
  93:4 94:5,12

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[firm - flawed]

| | | | |
|---|---|---|---|
| 94:12 95:17 | 239:20 242:15 | 177:16 190:25 | 131:21 150:6 |
| 104:12 106:10 | 242:24 247:8 | 194:11,11,18 | 158:5 169:12 |
| 106:23 108:10 | 247:10 250:20 | 194:19 195:5 | 241:1,2 260:8 |
| 108:20 114:11 | 250:22 252:12 | 195:16,17 | 260:14,15,21 |
| 114:12 120:13 | 255:12 256:18 | 197:5,6,15,16 | 262:19 264:13 |
| 120:13 121:6 | 261:3 262:2,8 | 199:7,7 201:3 | 264:20 268:16 |
| 127:2,14 | 262:17,25 | 201:4 209:10 | 269:7,12,13 |
| 130:13 131:6,6 | 263:17 265:21 | 209:23 210:6 | 271:3,14 |
| 132:8 133:2 | 266:9 268:21 | 210:15 211:18 | 272:14 273:17 |
| 141:11 142:15 | 268:22 269:9 | 233:22 234:1 | 273:20 274:8 |
| 145:8 146:17 | 269:10,17,18 | 234:10,13,25 | 278:12 |
| 152:23 155:23 | 273:21 276:1 | 235:1,2,3,7,13 | **firth**  187:18 |
| 156:2,11 157:9 | 276:13,14,19 | 236:4 237:23 | **fish**  21:11 |
| 158:12 164:22 | 276:19,23 | 238:12,12,16 | **fishing**  21:10 |
| 171:9 172:17 | 277:6,10,13 | 239:6,10,14,17 | **fit**  17:18,19 |
| 174:17,23 | 278:18 285:4 | 239:17 240:1 | 44:18 206:4 |
| 176:7,11,11 | 290:13 291:13 | 242:17 247:16 | 208:5 221:4,6 |
| 180:21 181:2,4 | **firm's**  75:1 | 247:17 250:19 | 221:7,9 223:13 |
| 186:2,10,19 | 153:11 252:2 | 260:13 262:3 | 223:16,20 |
| 189:16 191:16 | **firms**  9:11 | 262:10 263:10 | 273:19 |
| 191:17 192:23 | 18:12 20:3 | 263:22 266:16 | **fits**  25:22 206:3 |
| 194:5,7,9,18,21 | 22:17 62:12 | 267:9 268:22 | 207:24 208:5 |
| 194:22 195:11 | 87:4 91:18 | 269:10,19,20 | 209:17 225:2 |
| 195:23 196:6 | 101:15 106:11 | 270:1,8 271:25 | **five**  38:5 47:8 |
| 196:15 197:7 | 113:21 120:11 | 278:6 | 55:19 71:22 |
| 197:10 198:8 | 127:6,7,10,12 | **first**  6:2 9:2 | 72:6 81:20 |
| 198:20 199:2 | 129:16 131:20 | 12:20 17:15 | 118:8 136:25 |
| 200:5 201:2 | 131:24 132:4,5 | 37:19 38:2 | 137:3 142:21 |
| 210:9 216:6,11 | 132:6 141:10 | 56:1 64:9 | 142:22 152:16 |
| 218:21,22 | 146:11,16 | 65:12 79:7 | 152:21,22 |
| 219:14 221:14 | 152:6,21,22 | 112:17 113:6,7 | 174:15 248:6 |
| 233:11 234:18 | 153:18 159:18 | 114:2 116:25 | **flat**  35:1 |
| 235:9,14,18 | 164:10,10,11 | 116:25 119:5 | **flawed**  135:23 |
| 236:3,22 237:8 | 164:17,18 | 121:19,19 | 138:10 |
| 238:4,4,5 | 175:5 176:14 | 130:21 131:17 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

[fleshed - frank]

fleshed 178:4
flint 67:16 68:8
flip 115:25
  218:19
flipped 292:18
flipping 41:2
floated 114:7
flush 291:3
focus 18:5 24:5
  42:6,11 49:15
  73:5,8 74:3
  81:14 89:19
  107:15
focused 44:12
  51:21,24 52:22
  52:25 113:4
  273:15
focuses 52:3,9
focusing 54:9
  55:6 174:13
fold 85:10
folders 167:12
folks 9:19
  188:18 227:6
follow 140:9,9
  213:17 226:13
  280:22 281:7
followed
  218:24 269:24
following 29:21
  82:12 277:23
follows 6:3
  250:5
foot 74:6
  231:17

force 74:16
  75:17,19 76:13
  76:23 122:5
fore 32:3
foreclose 162:3
foregoing
  295:5 297:5
foreign 28:21
forever 243:5
forge 1:7 6:11
  6:21 35:2 60:1
  60:10,13,15,20
  123:15 296:1
  297:1 298:3
forget 77:3
  198:17
forgive 24:11
  34:16 120:9
forgiven
  245:14
forgot 105:9
form 5:9 19:1
  52:11 53:16
  63:7 70:23
  80:18,21 90:1
  111:12 119:13
  123:10 126:7
  143:8 144:18
  168:9 255:5
forma 153:11
formal 76:14
  112:20 115:10
  117:14
formalities 5:6

formally
  287:18
format 295:8
formation
  91:18 278:6
formed 17:24
  38:19 70:20
former 196:9
  282:8,9,9,10
forming 166:1
formula 270:13
  279:6
formulate
  278:24 279:3
  279:24
formulated
  258:15
forth 11:9 29:8
  29:18 30:5
  122:6 252:2
  295:4
fortune 33:18
  131:11 239:18
  246:13
forum 98:13,13
  124:2
forward 145:10
  292:23
found 16:10
  24:16 66:23
  69:1 106:3
  113:25 128:13
  193:21 195:13
  213:8 214:1
  215:12

four 10:3 12:6
  17:2 37:8
  128:18 151:10
  152:21,21
  180:14 192:25
  201:15 251:19
  253:25 274:19
fragmented
  126:13
frame 54:2
framework
  201:21 202:11
  228:17 261:25
  264:5
francisco 8:1
  59:18 62:16
  82:25 87:6
  98:18 164:4,10
  164:13,18
  175:6 179:12
  179:21 185:15
  201:25 237:23
  238:2 247:10
  248:22 259:5,6
  259:10 260:5
  261:15 262:4
  264:5 265:21
  266:10,18
  269:2 271:18
  273:6 276:4
  279:10
francisco's
  165:8
frank 9:23
  104:4,5,20

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[frankly - gives]**

| | | | |
|---|---|---|---|
| **frankly** 31:11 45:10,13 54:10 95:11 | 142:21 166:18 284:9 | 73:5 74:5 100:7 101:15 102:20 106:12 | **gentleman** 12:17 42:16 55:5 188:18 |
| **fraud** 122:11 140:12,17 | **fully** 8:15 178:4 271:20 | 128:11 163:13 164:19 168:23 | **genuinely** 261:22 |
| **fraudulent** 122:9 | **fun** 33:25 37:21 **function** 72:15 | 168:24 186:9 202:17 207:8 | **gerry** 136:12 **getting** 52:3,9 |
| **fray** 32:8 | **fund** 23:11,11 256:8,21,24 | 208:13 218:3 220:2 221:1,5 | 52:15,22,25 54:12,14 96:16 |
| **free** 13:1 84:15 84:15 87:25 | 257:4,24 | 221:8,9,11 223:8,8,10,17 | 111:15 154:11 213:15 243:1 |
| 164:25 215:15 265:16 | **funded** 289:11 289:18 | 223:25 224:1,4 227:15,21,22 | 271:24 272:2 273:5 |
| **french** 68:10 | **funding** 224:25 230:23 | 228:2,3 250:15 259:15 264:15 | **giant** 92:18 |
| **frequent** 77:23 | **further** 170:11 | 268:14 273:22 | **gimmicky** 258:18 |
| **frequently** 45:11 98:6 | 184:5 228:15 295:5,8,11,13 | 275:12 282:25 | **gist** 182:6 |
| 118:16 291:22 | **g** | **general's** 258:16 | **give** 6:16 9:21 26:9 27:11,14 |
| **fresh** 116:7 | **g** 9:25 48:13,13 177:6 | **generales** 48:21 48:22 | 45:15 82:11 94:22 124:25 |
| **fresno** 32:21 | **galadzhyan** 177:4 | **generalist** 94:8 | 151:17 152:25 153:2 212:5 |
| **friend** 59:21 82:1 190:4 | **ganjam** 9:25 13:8,8 | **generally** 6:12 34:11 35:13 | 213:23 216:20 229:19 242:21 |
| **friends** 62:19 | **garbled** 184:24 | 53:21 56:16 74:8 101:17 | 244:9 281:24 |
| **friese** 13:7 62:9 99:8 100:24 | **garden** 265:11 **gatekeeper** | 126:16 127:9 142:13 163:10 | **given** 39:22 47:6 56:13,17 |
| 117:11 143:15 156:4 188:1 | 23:4 25:17 **gatekeeping** | 164:8,13 186:6 195:9 233:7 | 57:9 88:14 132:21 136:22 |
| 235:3 | 25:13 26:2,17 27:9,18 | 263:13 271:13 | 170:10 256:13 257:17 276:1 |
| **front** 55:20 82:16 98:15 | **gather** 37:5 | **generated** 146:4 166:15 | 278:14 297:9 |
| 208:24 210:11 267:22 288:23 | **gauge** 271:15 **gears** 112:11 | 192:13 193:13 | **gives** 83:6 97:3 126:16 |
| **full** 25:11 39:16 91:14 92:6 | **general** 35:12 50:17,17 51:2 | | |
| 98:24 99:19 104:19 105:10 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[giving - grabill]**

| | | | |
|---|---|---|---|
| **giving** 40:17 | 220:5 226:1,4 | 105:6,22 | **good** 6:6 17:19 |
| 60:18 141:9 | 226:24 235:8 | 107:21 112:13 | 27:25 32:12 |
| 154:1 200:22 | 240:8 244:21 | 113:24 114:12 | 53:5 55:3 |
| 249:22 | 248:8 249:24 | 114:13,21 | 56:24 66:20 |
| **glad** 43:7 | 259:25 262:19 | 119:7 130:18 | 67:10 70:11 |
| **glass** 96:3 | 263:12,15 | 132:5 136:25 | 79:8 93:17 |
| **glasses** 218:5 | 265:17 267:10 | 140:16 147:24 | 97:4 104:10 |
| **gleaned** 192:18 | 267:14,19,21 | 148:5 149:3 | 106:6 108:12 |
| **globo** 64:21 | 276:2 285:5 | 155:1 156:5,16 | 109:13,16,18 |
| **go** 7:3 10:16 | 292:10 293:2 | 156:16 162:1,3 | 126:22 137:6 |
| 11:9,16 15:23 | **goal** 109:18 | 162:17 165:12 | 187:8 188:24 |
| 16:1 26:7 | **god** 267:16 | 169:3,15 | 190:17 191:5 |
| 32:23 33:23 | **goes** 14:14 | 171:17 172:21 | 213:17 218:7 |
| 35:19 40:19 | 28:10 46:13 | 175:6 176:18 | 218:10 221:4,7 |
| 50:10 54:5 | 59:3 79:23 | 183:24 186:7 | 223:13,20 |
| 56:5,21 59:24 | 83:5 148:16 | 188:20 194:6 | 226:15 248:7 |
| 60:5 64:14,19 | 162:10 173:18 | 200:18 202:25 | 255:19 277:1 |
| 68:5 71:23 | 193:2 243:22 | 203:15 205:17 | **goodly** 129:19 |
| 72:22 82:7 | 265:6 273:20 | 207:15 211:23 | **goodness** 87:11 |
| 90:18 92:24 | **going** 15:8 | 211:25 214:1 | 217:6 |
| 93:4,21 101:24 | 17:21 20:24 | 214:23 216:5 | **goods** 216:3 |
| 102:19 106:1,5 | 21:21 23:12 | 223:19 225:10 | **google** 239:3 |
| 106:20 108:10 | 26:4,9 33:10 | 225:19,22 | **gordon** 210:1 |
| 117:7 130:17 | 35:21 41:17 | 228:10 229:9 | **gosh** 108:2 |
| 131:8,10,10 | 42:23 43:3 | 231:19 240:21 | **governing** |
| 132:11 148:1 | 52:4 53:25 | 244:10 247:15 | 122:4 |
| 154:13 160:22 | 56:4,4 57:11 | 247:16,17 | **governor** 282:8 |
| 162:10,20,24 | 60:9,16 64:20 | 248:3,6,11 | **governors** |
| 165:17 169:2 | 64:25 67:1 | 249:13 254:24 | 74:17 77:1,2 |
| 172:3,8 178:6 | 69:23 72:15 | 256:23 259:25 | 77:19,22 |
| 179:5 181:18 | 82:5 89:15 | 266:6 269:16 | **grabill** 2:10 |
| 182:2 185:23 | 90:18 91:9 | 270:7 274:21 | 24:13 41:17,23 |
| 186:7 194:6 | 93:20 96:15 | 278:24 279:25 | 42:4 52:4,11 |
| 195:20 203:11 | 102:10,25 | 285:5 288:7 | 53:16 70:23 |
| 213:4 214:17 | 104:2,7 105:5 | | 72:11 82:1 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[grabill - hear]**

90:1 93:14
118:6 119:13
143:8 144:18
149:3 158:8
184:9 200:17
203:14,21,25
204:9 225:17
226:8,17
292:15
**gradations**
95:14
**grade** 48:2
**graduate** 104:9
**granting** 4:8
256:4
**gratuitous**
184:21,22
**gravier** 2:5
**great** 6:15
12:16 13:14
17:9 55:25
57:16 65:9
92:25 93:3
101:10 119:6
119:10 147:8
154:17,22
196:10 201:8
257:22 265:8
292:25
**gross** 143:23
241:18 242:1
243:14 244:6
245:16
**grotesque** 19:6

**ground** 7:3
91:11 117:25
**group** 13:2
81:8,9,12
123:25 126:10
**guarantee**
10:10 287:7
**guess** 19:21
38:21 42:25
43:24 53:23
79:8,22 90:10
91:21 113:13
120:6 126:9
136:15 150:23
153:9 159:9
162:9 170:19
174:15 180:8
210:10 215:15
242:14 262:15
276:13 277:24
**guided** 199:11
**guidelines**
295:9
**guild** 282:9
**gun** 147:2
**guy** 96:5 134:1
178:18 255:13
289:18 290:20
**guys** 115:14
151:11 225:25
236:11

**h**

**h** 48:7 61:10
177:6 296:3

**half** 65:22
95:24 129:16
130:21 131:17
142:13 145:11
234:1 257:11
257:12,21,22
**handed** 270:22
**handful** 44:25
45:2 136:25
**handle** 83:12
89:16 93:10
163:11 187:4
209:24 211:19
244:14 276:16
**handled** 148:22
**handling** 37:12
94:6
**hands** 116:2
135:16
**haphazard**
14:24
**haphazardly**
244:20
**happen** 27:13
28:23 29:1
85:7,9 89:6
91:4 119:23
147:23,24
151:3 155:24
164:7 218:24
219:11 265:25
271:22
**happened**
46:17 68:6,14
77:16 85:14

91:23 241:10
**happening**
53:19 116:1
122:12 148:6
278:7
**happens** 92:20
95:15 109:20
109:25 142:1
143:9 170:24
182:25 183:12
238:3 265:12
290:4 291:14
291:18,19,21
**happy** 12:3
34:17 41:3
42:11 109:3
154:9 171:18
259:17
**hard** 150:24
235:12
**hastings** 232:2
233:2,3,8,10
234:11 235:10
235:25 236:4
236:14,22
237:2
**hat** 161:10
**head** 94:9
197:10,25
276:22
**headhunter**
95:16 290:18
**hear** 44:4 60:20
154:24 181:25
212:24 224:12

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[heard - hour]**

| | | | |
|---|---|---|---|
| **heard** 62:18 | **hiding** 95:12 | 264:23 266:8 | **history** 39:22 |
| 89:4 239:3 | **high** 19:25 | 269:20 270:24 | 232:22 |
| **hearing** 27:1 | 20:11 28:16 | 272:21 281:5,9 | **hit** 125:10 |
| 59:3,7 86:15 | 69:2,18 83:9 | 281:17 286:21 | **hits** 10:22 14:2 |
| 87:17,20 88:9 | 89:10 94:16 | 289:18 | **hold** 11:12 63:7 |
| 89:2 90:7 | 106:12,23 | **highest** 39:18 | 101:7 |
| 96:24 97:6,18 | 107:24 108:5 | 50:2,7,21 | **holding** 243:4 |
| 97:19,22 100:6 | 134:5,6 159:20 | 51:20 170:21 | **hole** 25:5 |
| 100:15 102:10 | 163:15 164:10 | 171:11 176:12 | 216:19 |
| 107:9 109:23 | 164:18,18 | 194:12 246:22 | **holes** 259:23 |
| 110:4,7 115:20 | 170:13 171:8 | 265:21 | **holmen** 35:4,14 |
| 116:10 117:3 | 174:25 175:3 | **highlight** | 61:8,10 245:25 |
| 144:3,14 | 175:10,15,22 | 130:18 | **hope** 158:5 |
| 145:15 158:23 | 175:25 179:6 | **highlighted** | 177:19 |
| 179:16 192:14 | 186:19 243:1 | 189:9 | **horrible** 227:19 |
| 267:21 271:22 | 243:20 265:20 | **highlighting** | **horses** 105:23 |
| **hearsay** 133:11 | **higher** 16:9 | 281:16 | **host** 49:3 91:4 |
| **heart** 69:24 | 111:7 112:9 | **highly** 96:22 | 115:6 118:24 |
| **heavy** 107:11 | 127:12 162:8 | 106:11 159:19 | 126:15 127:3,5 |
| 110:18 153:22 | 162:19 170:25 | 180:18 282:17 | 187:11 |
| 170:12,18 | 174:17,24 | **hip** 274:5 | **hot** 44:15 78:21 |
| 177:12 | 175:4,16,20,20 | **hire** 83:12 | **hotel** 46:2 |
| **heck** 153:18 | 176:6 178:24 | 85:25 92:21 | **hour** 18:6 |
| **helms** 218:23 | 180:20 186:5 | 108:21 186:25 | 23:13 34:19 |
| **help** 11:14 54:8 | 188:7,10,16 | 187:2,6 195:10 | 35:6 36:18 |
| 149:6 | 195:10,10,14 | 196:8 239:6 | 37:6,7,19 38:5 |
| **helped** 35:4 | 195:17 196:22 | **hired** 83:20 | 39:24 40:15 |
| **helpful** 76:19 | 197:5 199:7 | 121:4 163:15 | 49:20 87:3 |
| 128:7 134:3 | 201:24 202:17 | 184:15,17,19 | 101:13 110:24 |
| **hereto** 297:7 | 207:7 209:13 | 184:21 185:2 | 110:25 126:5 |
| **hey** 182:12 | 210:19 214:14 | 186:13,14,16 | 134:1 146:6 |
| 185:6 207:12 | 231:3 236:24 | 187:6 193:20 | 155:7,20 156:4 |
| 230:6 253:15 | 237:10 243:21 | 285:10 | 156:5,11 157:4 |
| **hide** 95:18 | 243:23 251:6 | **hiring** 94:3 | 161:13 162:13 |
| | 260:18 264:18 | | 162:15 172:13 |

Veritext Louisiana -- CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[hour - impacts]**

| | | | |
|---|---|---|---|
| 174:15 186:25 194:14 195:12 197:14 203:1 207:16 210:16 229:8 235:25 240:16 250:24 252:19 255:10 263:15,16 266:18,19 268:9 272:11 285:2 | 252:18 255:6 256:12 257:16 257:21 275:17 287:15 | 280:18,19,20 280:23 281:3,4 281:5,15 288:13 289:16 292:9 | 231:22 248:13 256:1 258:6 284:14 |

**hourly** 3:18 19:2,5,18,24 22:21,21 24:6 26:14 27:24 29:5,13 30:1 30:23 31:18 32:18 33:9 35:21 37:1,2 37:16 39:12,15 39:17,18 48:3 48:15,19 50:7 55:6 60:25 82:22,25 117:10 125:7 127:19 128:15 128:22 130:20 131:16 154:19 164:3,4,12 173:19 184:20 184:22 185:14 186:1,11 195:5 228:6,13 250:3 250:20,25 251:9,16 252:1

**hours** 9:23 18:22 20:15,25 21:1,5 22:2 23:9 32:24 58:6 70:2 73:18 103:7 111:2,4,6,6,22 111:23,24 112:1,2,5,5,6,7 113:15 122:16 142:21 143:23 143:25 149:24 150:1,3 151:6 151:11,19 153:13 161:17 162:18 163:6 166:12,12,21 166:22 167:5 167:24 168:1,2 171:22 173:8,8 173:23,23 177:11 178:23 178:23 184:23 193:10,17,22 201:15 240:6 245:7,9 249:4 252:20,24,25 253:8,11,15,15 253:17 254:18 255:9 268:3 272:9,20

**house** 36:8

**how's** 43:1

**huge** 127:16

**human** 27:12 27:13 70:6,7

**hundred** 37:8 71:6,6 215:6 245:22 252:24

**hundreds** 7:1 252:20 253:11 253:17 255:9

**hung** 3:20 15:25 36:25

**hyphen** 129:10

**hypothetical** 86:25

**hypothetically** 85:6

**i**

**idaho** 238:22

**idea** 49:9 69:16 76:24 114:7 147:24 176:10 201:5 222:7 265:25 284:19

**ideally** 56:14

**identification** 43:8 64:22 65:2 155:3 165:22 225:13

**identifies** 189:15

**identify** 25:24 32:15

**image** 116:1

**images** 125:2

**imaginary** 278:25

**imagine** 39:4

**immediately** 84:11 105:16 124:21 136:13

**immigration** 219:10 220:7

**immolation** 83:25

**immutable** 194:20 269:19

**impact** 7:8 85:12 92:13 127:6,16 146:5 163:8 168:24 169:1 175:21 186:1,11 214:21 221:24 244:22 262:13 272:18 283:25

**impacted** 75:21

**impacting** 180:17

**impacts** 60:18 77:8 78:23

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[impacts - inference]**

111:12 142:8 194:21 214:23
**import** 224:16
**importance** 254:22
**important** 22:5 53:21 68:5,6 76:21 80:1 101:23 111:10 130:11,16 137:13 162:4 190:14 194:9 202:9 246:14 246:18,19 247:2,4,6,8,12 247:23,25 248:1 255:18 262:5 266:3 288:12
**impose** 237:19 287:16
**imposed** 282:12
**impression** 106:23 107:24 108:6 145:7 147:10
**impressive** 101:1,16,20 103:12,17 104:6,18 105:1 105:20
**improper** 222:22

**improperly** 193:5
**improve** 227:7
**inaccuracy** 8:9
**inaccurate** 242:4
**inadvertent** 36:14,17
**inadvertently** 35:23 36:8,13
**inappropriate** 19:13 174:10 283:4
**inappropriately** 222:25
**inaudible** 51:22 55:22 92:2 160:7 169:22 255:18 278:15 279:17 286:5
**inclined** 25:1
**include** 24:9 58:10,13 99:18 135:10 209:10 209:15 212:15 212:19 213:14 213:14 214:2 262:3
**included** 208:12,12 212:9 215:3 270:10
**includes** 208:7 212:3 213:22 217:22 269:9

**including** 22:17 38:24 51:13 95:6 110:9,17 118:21 119:7 128:20 139:15 146:21 149:14 171:10 173:8 189:12 196:25 214:15 228:23 277:12 282:19 282:20
**inclusive** 135:4 172:13
**incompetence** 273:4
**incompetent** 273:6
**inconsistent** 252:8
**incorporate** 117:21 241:22
**incorporated** 161:5
**incorrect** 92:18 206:23,24 246:5
**incorrectly** 121:25 175:12
**increase** 132:9 186:15
**increases** 130:24 132:8
**increasing** 73:6 214:22 250:12

**incurred** 7:22 34:24 84:3 201:22 232:1 288:10
**independent** 67:13 91:3 116:11,23 117:3 121:21 143:5
**index** 145:20 165:11 170:22
**indicate** 269:17 294:11,14
**indicated** 10:2 17:2 61:12 132:12 143:22
**indication** 286:23 287:13
**indicative** 57:6 159:18 181:2
**indicia** 159:13 160:2
**individual** 22:14 50:24 61:12 234:3
**individuals** 10:3 159:3
**industry** 31:22 70:18 189:17
**inexperienced** 188:19
**infallible** 191:12
**inference** 116:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

[influence - insurer]

| | | | |
|---|---|---|---|
| **influence** 7:7 80:3 | **infringement** 180:6,7,18 | **instances** 128:8 | 222:5,8 223:12 |
| **influenced** 80:12 | **inherent** 142:23 | **instructions** 155:6 | 223:16 224:7 |
| **inform** 134:12 | **initially** 112:22 | **insurance** 1:7 | 225:5 227:3,8 |
| 143:14 164:7 | **initiated** | 6:11 38:14,15 | 227:9,24 |
| 168:10 | 110:18 | 38:16 39:4,5,7 | 228:16,22 |
| **information** | **injunction** | 44:3,7,8 48:17 | 229:4,12,22 |
| 8:23 18:24 | 145:18 149:7 | 63:2 68:10 | 230:7,13,17 |
| 28:10,11 29:9 | **injunctive** | 108:23 109:3 | 231:4,14 |
| 29:16,19 30:5 | 151:3 | 109:14,20 | 233:16,19 |
| 52:13 65:15 | **injury** 211:21 | 114:13,15 | 236:13,18 |
| 81:25 84:12 | 211:21 220:10 | 115:3 116:9 | 237:1,4,6,11,13 |
| 90:13 93:12 | 220:12 223:25 | 118:15,19,20 | 237:15,16 |
| 94:11 96:17 | 227:19 | 119:1,2,4,6,8 | 240:4 260:6,22 |
| 123:22 124:1 | **inoculates** | 119:19 120:17 | 261:1,7,14,24 |
| 124:18 126:14 | 285:17 | 120:20 121:18 | 262:6 263:14 |
| 126:16 132:22 | **input** 62:8 76:1 | 122:18 123:21 | 263:18,25 |
| 133:16 158:21 | **inquire** 171:19 | 124:12 138:3 | 264:3,8,14 |
| 159:5 165:16 | **inquiries** | 157:10 158:14 | 269:3,8 271:17 |
| 168:2,23 | 126:10 | 158:25 197:1 | 275:5 276:8 |
| 169:25 170:1 | **inquiry** 277:4 | 201:20 202:1,4 | 279:5,10 |
| 184:5 192:18 | **ins** 296:1 297:1 | 202:6,15,18,20 | 282:15,22,24 |
| 213:7 240:1 | 298:3 | 202:23,25 | 286:11,20,24 |
| 263:4,4 268:25 | **inserted** 261:13 | 203:5 204:11 | 287:13 290:14 |
| 269:4 270:18 | **inserts** 145:11 | 204:17 205:1 | **insured** 44:7 |
| 271:1 | **install** 13:11 | 205:10,24 | 109:17,19 |
| **informative** | **instance** 15:7 | 206:10 207:6,8 | 118:22,25 |
| 19:17,23 | 23:2 37:4 | 207:11,13,14 | 120:1,14 |
| **informed** | 76:18 138:23 | 207:21 208:7 | 121:22,23 |
| 244:19 245:24 | 170:21 180:6 | 208:10,17 | 221:24 233:17 |
| 295:9 | 212:8 223:21 | 209:9,13,19 | **insureds** 38:16 |
| **informs** 28:12 | 224:21 272:2 | 212:5 213:23 | 119:20 |
| 215:18 | 285:19 | 214:19 219:24 | **insurer** 120:2 |
| | | 220:13,24 | 121:22 122:15 |
| | | 221:2,8,20,22 | 202:3,19 203:7 |
| | | | 207:9 221:24 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                                www.veritext.com

**[insurer - issue]**

224:24
**insurers** 38:23
  38:24 109:5,24
  118:17 119:9
  120:4 121:3
  122:21 221:6
**intellectual**
  38:25 66:14
  118:23 162:22
**intellectually**
  69:8
**intend** 8:16
**intended** 7:5
**intensive**
  289:20,25
  290:1,2
**intent** 171:20
  266:5
**intentional**
  36:15,16 116:3
**intentions**
  169:14
**interaction**
  294:9
**interchangea...**
  60:10,17
**interest** 13:3
  80:10 141:24
  142:24 143:5
  171:21 247:23
  251:15 254:2
  255:16 258:16
  277:6 295:15
**interested** 55:8
  77:11 124:14

**interesting**
  16:12 54:11
  124:22 292:21
**interests** 23:19
  107:7 142:10
**interim** 64:8
  226:11
**interject** 90:17
**internal** 155:22
  156:15
**internally**
  156:1 240:7
  252:8
**international**
  96:5 164:9,16
  233:10 239:17
  239:19 285:4
  290:5
**internet** 85:18
  95:21
**interpret** 73:15
**interpretation**
  182:19 184:4
  290:6
**interrogatory**
  210:4
**interrupt** 213:2
**intertwined**
  276:14
**introductory**
  61:21
**invited** 77:21
**invoice** 60:3
  61:3,5 146:1
  173:25 182:15

240:9,21 241:4
**invoiced** 60:6
**invoices** 9:11
  35:16 60:1
  64:5,7 73:18
  99:3,6,7,10,12
  99:19 110:3
  144:19 239:24
  240:2,9,12,14
  241:7,12 244:4
  245:5,21 250:6
  287:12
**involuted** 95:12
**involve** 218:9
  290:18
**involved** 9:11
  9:14 32:4 33:3
  37:2 64:4 66:3
  66:11,13 67:12
  69:19 72:9
  85:19 98:8
  102:5 122:25
  139:2,4,5
  146:10 151:9
  167:25 168:1
  169:11 176:13
  183:21 187:24
  194:19 197:9
  197:24 218:20
  219:16 220:11
  224:24 238:12
  238:18,23
  259:15 266:22
  270:8,9 279:7
  280:2,6 283:2

283:14 290:12
  290:18,24
**involvement**
  39:16
**involves** 93:1
  216:2 233:16
  237:5 246:19
  271:10
**involving** 47:18
  73:8 202:19
  207:10 234:17
  238:22 239:2
**irregularities**
  64:11
**irrelevant**
  174:21
**ish** 196:2
**issue** 12:7 22:5
  23:17 24:2
  25:18 32:5
  64:6,9 67:3
  70:24 73:23
  74:9 78:21
  85:17 91:16
  93:24,25 94:2
  113:11,13
  114:5,5,19
  115:9,12
  130:10 135:3,3
  136:1 137:10
  137:10 145:21
  145:25 157:11
  163:7 173:6,16
  173:16 174:21
  175:10,11,18

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[issue - judgment]**

175:23 176:15
177:14 178:3
180:22 184:17
185:4,18
197:22 220:25
245:17 275:14
275:16
**issued** 17:25
56:2 60:1 99:8
99:13 123:14
129:22 231:13
232:18 239:24
287:11
**issues** 8:22 9:5
47:19,19 66:19
73:7,9,13,24
74:14,18 78:2
78:17 83:13
87:3,6 89:14
89:14 93:21,23
94:25 95:4,10
108:8 112:25
113:25 114:8
116:12,13
117:20 119:18
124:15 132:12
142:15 145:22
146:23 167:1,7
180:16 185:1,5
185:7,17 191:9
193:18 204:19
206:9 246:20
246:20 255:19
275:5,19
285:15,16,18

285:19,21
**issuing** 8:25
64:16
**it'll** 10:8,10
13:25 58:2
139:17 165:19
175:10 255:1
**italy** 46:2,15
**item** 21:20
83:14 89:8
100:20 106:8
110:15 140:19
182:15
**items** 10:22
56:17,18
167:19 228:6
228:13

**j**

**j** 1:6,23 9:24,25
294:2 295:2,23
**james** 4:6 9:22
103:23,24
280:25
**jams** 98:16
105:22 165:18
**january** 57:12
131:8,25
**japanese** 290:6
**jardini** 1:13
3:13,20 4:4,12
6:1,6 11:6
26:24 31:4
32:16 33:6
41:19 42:14
72:2 82:9

110:10 118:13
139:22 156:3
159:14 176:24
200:14 206:24
238:5 260:3
282:2 292:14
295:4 296:2,24
297:2,4,12
298:4
**jardini's** 25:12
55:18 143:4
226:21
**jeffrey** 63:1
**jeremy** 2:10
41:22 226:6
**jeremy.grabill**
2:12
**jet** 96:2
**jim** 14:16
102:22,25,25
103:2,11,12
248:15 249:2
250:2 251:25
252:22 254:17
268:10 274:25
**job** 27:25 72:20
266:11 296:2
**joe's** 291:13
**johnson** 139:18
198:12,15,19
198:25
**join** 124:21
**joined** 38:12,20
**joint** 141:17
142:8 153:23

218:12
**jose** 162:23
**journal** 3:17
44:11,15,17
125:6 129:14
233:21,25
234:20
**judge** 1:5,6
21:16,19 22:7
23:3,17,18
24:9 26:4,7,16
27:8,17,23,25
28:12,16,24
29:22 30:12
32:16,20,25
33:5 38:12
76:17 81:22
122:25 136:6
136:17,23
137:9 138:11
182:23 183:11
187:19 248:24
256:4,11,20
257:3 264:2
287:23
**judge's** 28:5
**judges** 22:25
23:8,15 24:2
25:12,18,25
26:22 27:12
29:2,25 80:4
80:12 213:16
228:19
**judgment** 11:4
24:2 85:8

Veritext Louisiana -- CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[judgment - know]

143:1 166:10 270:17,17,19 270:25 271:19 280:14

**judgments** 269:5,6

**judicial** 187:13 187:14

**jump** 19:21 149:9 164:24 172:22 217:4 225:8 260:1

**jumped** 8:11

**jumps** 113:22 166:3

**june** 150:6

**jurisdiction** 76:11 139:14 168:13 258:17 287:2,17

**jurisdictions** 164:8 258:19 287:19

**jurisprudence** 259:20 282:13 283:19

**jurists** 21:20

**jury** 10:7 11:16 13:15 14:3,10 14:10 15:10,12 15:13,18 17:7 39:6 46:4 68:12 70:16,24 95:21 147:7,10 147:14,18,18

**justices** 213:16

**justifiable** 19:3

**justification** 92:19

**justifies** 94:3 188:7

**justify** 94:16 191:14 278:21

**justifying** 19:3 249:18

**k**

**k** 61:10

**k.l.** 177:2

**kane** 1:4 2:4 6:9 296:1 297:1 298:3

**kang** 18:2 19:15

**kansas** 231:15 231:17 259:10

**kara** 62:25

**katie** 149:15

**kay** 35:4,14 61:8,10,12,17 62:2 169:20 170:4 245:25

**keep** 22:24 100:18 107:21 143:11 158:3 200:19 201:6 216:19 290:10

**keeping** 168:18

**keeps** 166:8

**keker** 106:10 106:22 108:1,5

108:6,15,16,20 109:2 110:1,12 110:18 147:21 148:22 156:5 161:9 186:4 267:11

**keker's** 110:16

**kelley** 11:1

**kerr** 139:17 199:1

**key** 194:4

**keywords** 181:20 182:3

**kick** 171:10

**kidding** 188:9

**kind** 13:2 22:19 29:10 30:6 39:3,7,8 49:4 66:14 85:21 91:18 94:5,5,7 94:25 101:20 102:1,10 120:16 130:10 131:7,18 132:25 133:1 138:18 141:17 142:7 161:14 169:13 173:12 180:3,4,20 186:21 190:9 191:4 197:2 202:4 206:6 208:20 211:13 219:16 220:24 221:21 223:22

227:16,18 231:7 247:19 251:15,20 254:4,10 259:14,16,16 262:9,15,25 263:6,8 267:7 271:8,9 272:5 272:11 276:11 277:10 278:17 284:6,10 285:13 287:3

**kinds** 40:5 49:4 78:10 94:6,9 118:22 120:25 128:19,19 132:23 151:1 164:17,20 167:12 181:1 272:6 273:8 275:7 291:10

**kluwer** 227:6

**kluwer's** 125:18

**knapp** 38:20 63:5,10,12

**knapton** 136:12

**knew** 161:20 244:18

**know** 6:25 8:9 9:1,7 14:12,13 14:15,16,18,19 14:21 15:5 18:11 21:10

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[know - knows]

| | | | |
|---|---|---|---|
| 24:1 25:8 | 93:16 94:13,23 | 150:8,21 151:4 | 232:14 233:5 |
| 26:22 28:24 | 95:13,14 96:18 | 151:22 152:5 | 235:20 236:6,9 |
| 31:17 32:8 | 96:20,21 97:14 | 154:16 156:22 | 236:16,24 |
| 34:5 35:25 | 98:14 99:24 | 156:25 158:25 | 239:8,21,23 |
| 36:10 39:21,25 | 100:5,17 | 159:1,2,7,8,10 | 240:7 241:24 |
| 40:4,19 41:3 | 102:11,18 | 160:19 161:9 | 242:23 243:3,5 |
| 43:24 44:15 | 103:5 104:15 | 161:11,15,17 | 244:11 245:12 |
| 45:15 46:4 | 104:17 105:23 | 161:21 162:12 | 245:20,23 |
| 48:5 50:5,7,13 | 105:24,25 | 163:13 173:25 | 247:14,19,24 |
| 50:25 51:25 | 106:1,2 107:14 | 176:10 177:5,7 | 248:24 249:17 |
| 52:13,18 53:4 | 107:21 108:17 | 179:14,20 | 250:13 252:15 |
| 53:7,12,23 | 108:22,23,24 | 181:13 183:4,6 | 253:5,9 258:2 |
| 54:4,24 55:12 | 109:5 110:1,3 | 183:16 185:11 | 259:8,15 262:9 |
| 56:8,17,18 | 110:4 113:16 | 186:14,18 | 262:11 264:7 |
| 57:24 58:2,8 | 114:10 116:15 | 187:23,25 | 265:19,24 |
| 59:20 60:8,12 | 116:19,24 | 188:3,17,20 | 266:22 267:13 |
| 60:13,18 62:12 | 119:17 120:3 | 191:10 192:20 | 267:15 268:14 |
| 62:22 65:17,18 | 120:10,23 | 192:23 193:14 | 269:13 271:19 |
| 65:21,22 66:5 | 121:6,8 123:4 | 195:23 196:6 | 272:8 273:1,8 |
| 66:13,21 67:14 | 123:20 126:5 | 196:14 197:16 | 275:11 277:5,8 |
| 67:15,16,17,20 | 126:17 127:13 | 198:19 199:18 | 277:10 281:23 |
| 68:2,4,13,15,18 | 127:14,15,16 | 199:25 200:4 | 282:23 288:3 |
| 68:23 69:5,12 | 128:3,5 129:5 | 201:1 203:12 | 290:14 291:13 |
| 69:14,25 70:9 | 131:1 132:3,10 | 204:7 209:9,23 | **knowing**  101:9 |
| 70:25 71:5,8 | 133:3,21 | 210:7 211:7,9 | 202:10,10 |
| 74:5 75:4,19 | 134:21 136:18 | 211:12,14,16 | **knowledge** |
| 75:20,21,23 | 137:9,24 138:4 | 212:2,6,14 | 15:3,5 212:20 |
| 76:2,16,22 | 141:4,15 142:1 | 213:3,20,21,24 | 212:20 |
| 77:23 79:19,19 | 142:4,21 145:3 | 214:1,16,23 | **known**  48:2 |
| 80:25 81:23 | 145:4,18,19,21 | 216:18,23,24 | 101:6,11 |
| 83:17,20,24 | 145:21 146:12 | 217:3,11,15,25 | 121:12 122:3 |
| 84:7 85:5,9,17 | 146:15,24 | 221:2 222:6,12 | 180:19 239:3 |
| 85:21 86:12,20 | 147:11,13,19 | 225:2,4 228:23 | **knows**  86:21 |
| 87:2 88:6,10 | 147:23 148:16 | 228:25 229:18 | 159:7 183:5 |
| 90:14,19,22,25 | 148:20 150:1,4 | 229:21 231:6,8 | 195:21 214:20 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[knows - lawyers]**

214:21

**knuckles**
   136:19
**kpc**   63:4,5,15
   63:18 64:14
   232:13
**kpclegal.com**
   298:1

**l**

**l**   5:1 9:24 61:10
   103:8 177:6
**label**   176:3
**labeled**   203:5
**labor**   138:24
   217:5 219:5,7
   258:19
**lack**   12:13 92:1
   184:7 187:9
   244:23 245:5
**laffey**   4:11
   129:11 130:1,4
   130:5,6 153:14
   154:9 178:7,14
   178:24 258:10
   258:11,14
   259:3,20,24
   283:6,9
**land**   129:9
**landed**   147:20
   204:7
**lands**   136:22
**language**   61:21
   114:17 123:14
   136:9,15 169:6
   170:15 182:11

246:16 257:15
   283:11
**large**   103:14
   132:4,5 164:9
   164:16 195:2
   197:4 199:7
   237:22 238:4,7
   238:8,11,11
   239:10 246:20
   269:19
**largely**   16:19
   110:18
**larger**   23:20
   195:9,16 197:5
   197:15
**largest**   20:4
   233:22,25
   234:13,24
   236:4 239:16
   242:17 250:19
   250:19 262:3
**lasted**   110:5
   151:10
**late**   53:25
   171:24
**lateral**   115:7
**latham**   49:18
   186:14
**laudatory**   81:6
**law**   6:8 20:2
   23:6,7,7 31:25
   43:20 44:15,17
   50:3,6 51:15
   54:6,7,10 55:3
   62:16 94:12,12

106:10 116:7
   122:1 127:10
   129:14 131:7
   131:18,21,23
   139:17 157:15
   157:16 160:8
   175:5 186:19
   190:25 216:6
   218:21,22
   221:14 233:11
   233:21,25
   234:18,20
   237:23 242:17
   265:21 277:6
   281:21 283:22
   287:16
**laws**   218:25
**lawsuit**   96:8
   104:23 246:25
   247:2 266:2
**lawyer**   10:16
   12:16,21 15:22
   21:23 28:1,2
   36:24 37:22
   39:17,20 53:8
   68:20 84:14,16
   88:1 91:8 93:4
   93:9 95:23
   96:23 105:6
   108:14 121:23
   139:23 140:11
   164:9,16
   180:21 200:8
   224:18 235:14
   235:15 247:23

255:1,2 272:10
**lawyer's**
   224:21
**lawyers**   7:22
   9:14,15,18
   10:14 11:3,4
   15:1 18:10
   19:2 21:18
   22:10 25:3
   26:21 27:12
   32:6 54:19
   62:21 70:7
   76:1 77:5 78:4
   89:16 91:21,21
   92:23,23,25
   93:12 95:9
   101:5,10,18
   102:8,13,17
   106:6 108:13
   109:9,16,18
   112:24 122:3,4
   127:3 130:20
   131:13,16
   138:25 141:17
   142:2 147:11
   150:22,23,23
   152:4,15,16,19
   152:22 156:24
   157:9,10
   158:12,13,20
   161:9,13
   163:11,15,15
   182:16 194:25
   195:7 196:17
   197:14 198:24

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

[lawyers - life]

| | | | |
|---|---|---|---|
| 199:21 200:8 | lectern 148:18 | leif 18:11 | 161:16 178:15 |
| 202:24 207:14 | lectured 74:13 | lends 288:12 | 180:1 192:23 |
| 208:11 231:8 | led 122:13 | length 30:25 | 201:22 222:18 |
| 234:14 238:9 | 175:13 | 36:22 154:22 | 247:4,12 |
| 247:9 272:4 | left 32:5 57:2 | 157:3,18 | 266:11 271:4 |
| 273:5 277:13 | 88:4 90:19 | 171:20 173:19 | 271:16 272:13 |
| 285:4 290:19 | 96:5 168:13 | 173:20 249:20 | 289:12 290:5 |
| 291:2,11,12,18 | 218:21 246:23 | 265:9 287:5 | 290:11 291:9 |
| 291:19,23 | 291:13 292:7 | lesser 127:6 | lewis 109:9 |
| lead 103:2 | 292:20 294:15 | 146:6 273:4,6 | leyton 9:22 |
| 105:6 | legal 38:10 | letter 57:18 | 12:8,9,11 |
| leading 79:15 | 40:24 44:12,13 | 210:5 223:1 | 15:17 18:10 |
| 79:21,22 80:24 | 63:5,18 64:15 | letters 222:22 | 103:7,16,17 |
| 81:2,15 191:8 | 73:5,16 77:7 | level 74:5 90:8 | 275:1 |
| leads 122:2 | 78:5 81:5,5 | 113:23 117:17 | liability 109:6 |
| lean 107:4,10 | 83:1 95:5,23 | 170:11 171:15 | 109:12 116:3 |
| 107:17 | 99:24,24 | 175:22 176:12 | 118:23 208:19 |
| leap 161:14 | 100:11 123:24 | 184:11 246:22 | 220:1,15,25 |
| learn 54:6 | 124:2,7 139:3 | 246:24 264:20 | 221:1,3,12,16 |
| learned 87:16 | 143:6 157:5 | 266:2 268:23 | 221:18 222:3 |
| 114:8,24 | 204:22 222:14 | 269:11 272:10 | 222:11,15 |
| 213:16 | 238:15 246:21 | 276:1 | 223:8,9,10,17 |
| learning 272:8 | 246:21 273:11 | levels 170:21 | 223:24,24 |
| leave 84:15 | 275:6 282:3 | 171:11 | 224:2,4,10,14 |
| 91:23 95:18 | 290:17 298:19 | levin 7:23 | 224:16,20,23 |
| 265:16 | legally 265:10 | 22:17 59:4 | 225:3,4,6 |
| leaves 91:22 | 278:23 | 82:24 83:13,17 | 237:17 256:17 |
| 94:10 180:21 | legislative 76:8 | 84:22 85:22 | 277:12 |
| 265:11 291:23 | legislature | 86:8 88:3 90:5 | liable 116:5,6 |
| leaving 59:21 | 74:17 77:25 | 97:1,24 98:25 | 116:24 202:21 |
| 83:19 96:11,13 | 78:2,16 | 99:15,21 | 202:22 207:11 |
| 150:5 216:11 | legislatures | 100:14 106:9 | 207:12 |
| 219:14 256:17 | 90:25 | 107:24 108:1 | library 75:1 |
| 291:18,20 | legitimate | 114:12 116:25 | life 70:3 267:18 |
| | 138:5 247:21 | 145:14 151:14 | |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

**[lifting - long]**

lifting 153:22
light 174:8
  242:18 269:3
lightly 122:10
liked 120:11
likely 57:25
  87:14 155:25
  193:21
limit 78:9
  103:10 122:21
  123:15 149:23
limited 15:11
  133:16 178:22
  283:15,22
limiting 284:2
  284:3
limits 122:14
  282:12
line 14:4,4
  21:20 38:7
  90:22 113:20
  134:1 177:19
  220:5,5 226:13
  228:6,13
  237:22 256:11
  257:15 283:19
  296:4,7,10,13
  296:16,19
list 3:3,10 4:1
  11:8 45:4,23
  46:1 56:14,24
  57:14 58:2,5
  66:8 72:6,7
  79:23 91:20
  95:18 120:10

120:16 142:4
  149:14 251:18
  268:3,3
listed 46:9 47:3
  56:9
listing 165:4
lists 72:7 210:3
literally 192:12
  200:3
litigate 25:6
litigated 107:9
  108:16 122:5
  137:4 180:9
  248:1 259:5
litigation 6:9
  6:13 24:13,20
  39:16 48:17
  49:3 73:6 92:1
  92:20 99:1,4
  106:11 108:10
  118:20,21
  122:18,19
  136:17 138:14
  160:24 177:24
  179:8,25 180:1
  180:3,4,20,21
  181:16 185:15
  192:5 201:17
  201:22 202:1
  202:17 204:20
  207:8 208:13
  212:5 216:9
  227:3,8,10,11
  229:4,21,22
  230:12,14

246:14,18,19
  247:12,13
  255:20 257:19
  260:6 261:15
  264:4,6,16
  267:12,12,16
  268:14,25
  269:3,8 271:18
  272:18 276:2,8
  279:5,10
  282:16,25
  283:14,17
  284:6 291:11
  291:20,22,24
litigator 86:20
  291:16
litigators
  196:10
little 26:25
  32:13 33:24
  54:6 67:9
  101:4 109:22
  135:5 149:12
  151:13 157:24
  162:15 181:22
  200:1 201:4
  219:18 232:9
  253:2 254:15
  277:18 285:22
live 164:2
  190:15 199:6
lives 267:19
living 22:18
  37:17 130:8
  156:24 253:18

253:19 255:11
  267:18
llp 1:4 2:4,10
  296:1 297:1
  298:3
load 167:10
  182:7,21
  183:16,17,25
loaded 228:7
loading 180:23
  181:15 185:19
local 40:24
locally 28:8
location 127:2
  128:1 129:12
  130:7 133:3
  160:22,24
  161:3,7 163:21
  178:21 189:12
  189:16 231:7
lodestar 18:20
  28:6,15,17,20
  29:3,25 256:7
  256:9,25 257:1
  257:10
logic 112:10
  134:10
logical 28:23
  111:14 161:14
  182:20 264:15
lone 147:2
  154:4
long 58:15
  62:15,18 70:19
  83:18 108:18

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[long - lot]

| | | | |
|---|---|---|---|
| 108:18 110:4 | 164:25 165:1 | 114:3 123:19 | 238:14 241:1 |
| 126:18 135:25 | 165:11 166:2 | 128:12 144:15 | 241:13 243:13 |
| 142:3 150:4,12 | 166:14 167:22 | 144:19 146:3 | 252:17 253:25 |
| 151:13 154:17 | 179:23,23 | 165:14,24 | 256:16 259:16 |
| 171:16 251:19 | 185:2,7 190:1 | 167:21 176:8,9 | 260:21 261:6 |
| 260:24 291:16 | 193:12,19 | 192:13 194:13 | 261:13,23 |
| **longer**  145:4 | 194:3 197:2 | 196:1 202:24 | 262:6 275:14 |
| 147:6 198:11 | 201:11 203:1 | 207:13 210:3 | 275:16,21 |
| 243:16 | 207:16 213:17 | 210:13,14,15 | 276:15 281:12 |
| **longtime**  59:21 | 214:25 217:12 | 210:23 234:9 | 285:15 290:6 |
| **look**   7:21 10:7 | 218:4 219:8,24 | 243:11 244:2 | **looks**   54:3 |
| 11:13 12:10 | 232:12 233:13 | 250:7,11 257:9 | 98:15 180:22 |
| 16:22 21:5 | 236:25 237:7 | 259:9,11 | 195:21,22 |
| 31:24 40:19 | 238:10 240:5 | 260:24 269:2 | 201:8 232:16 |
| 46:1 49:14 | 240:21 244:6 | 269:11 274:8 | 233:20 246:12 |
| 52:13,18,19 | 245:21 250:14 | 274:13,14 | 249:9 283:4,5 |
| 55:1 57:14 | 251:12 255:11 | 276:6,21 278:1 | 285:14 |
| 61:3 63:18 | 255:11,24 | 282:23 | **los**   28:8 44:11 |
| 70:5 71:19 | 257:12 258:14 | **looking**   11:7 | 44:16 164:12 |
| 78:25 79:13 | 261:2,3,4,6,12 | 27:5 29:4 30:1 | 164:15,17 |
| 82:21 88:2 | 261:14,20 | 35:15 41:4 | 175:5 178:11 |
| 93:23 94:17 | 262:1 266:15 | 43:10 57:1 | 236:22 259:7 |
| 96:25 100:14 | 270:4,23 272:6 | 58:25 59:10 | 259:10 |
| 102:6,7 105:4 | 274:17,23,24 | 72:19 73:3 | **lose**   10:10 86:8 |
| 108:12 112:22 | 278:25 279:19 | 74:6 82:10,14 | 87:11 |
| 122:8 127:10 | 281:6 282:5 | 89:21 108:3 | **loses**   135:13 |
| 128:20 132:23 | 283:13 287:20 | 113:16 128:19 | 137:5 158:19 |
| 133:14 135:16 | 288:3,6 289:8 | 131:2 134:17 | **lost**   10:24 13:1 |
| 136:17 139:20 | 292:23 | 154:8 161:18 | 13:4 84:2 |
| 140:4 143:14 | **looked**   16:10 | 165:4,25 169:3 | 97:16 104:17 |
| 145:13,20 | 26:18 27:6 | 172:9,10 | **lot**   19:8 34:7 |
| 146:1,11 | 59:15 64:7,9 | 176:23 184:25 | 40:4 42:12 |
| 149:13 153:10 | 65:9,10 75:1 | 186:20 211:25 | 51:7 52:13 |
| 154:25 156:16 | 81:20 92:16 | 217:9,23 | 55:1 65:14 |
| 162:17,18 | 97:24 99:20 | 223:13 230:17 | 68:22,23 92:20 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                         www.veritext.com

[lot - maligning]

93:5 94:14 95:6,8,10,15 98:4,5 102:4 105:12 109:10 109:12,16 111:6 117:25 123:20 129:4 135:12,17 147:17 149:13 150:14,19 152:4 153:18 161:17 168:16 171:6,7 185:1 185:4 192:10 196:25 202:24 207:14 222:23 230:12 239:13 263:5 272:17 274:20 285:4,6

**lots** 6:25 7:1 82:6 89:20 186:19

**louisiana** 1:2 1:25 2:6,11 6:10 123:2 139:15 288:2 294:3,7 295:2 295:12,18

**low** 28:21 228:11 229:23 229:25 230:7 230:18 237:15

**lower** 16:20 17:17,20 23:21 133:5,17 171:1 171:2 174:25 175:8,9,25 194:22 195:17 196:19 197:6 199:7 208:14 214:12 223:12 224:4 227:16 233:20 242:12 243:8,22,24 262:11,11,12 263:9 264:7,8 264:12,13,15 264:17,18,21 264:21 269:20 270:24

**lowered** 278:18

**lowest** 263:7 268:23 281:11

**ltd.'s** 4:13

**luxury** 131:6

**lyft** 84:6 87:2 87:24 90:14,20

**m**

**m** 3:15 4:6 9:25 61:10 129:11

**machine** 181:20 182:4 183:20 184:3

**made** 19:14 21:17 39:19 41:11 64:9 68:20 83:11 90:17 96:2,3 144:20,22,24 144:25 147:10

156:9 158:25 166:24 180:11 182:13 192:25 193:17 202:22 204:25 207:12 238:25 250:13 250:14 253:18 269:4,18 270:7 272:23 281:8 289:5 297:5

**mag** 1:6

**magistrate** 136:6,7

**magnitude** 238:17

**mailed** 231:18

**main** 9:20 55:2 185:4 188:15 194:24

**majeski** 136:11

**major** 38:17 122:18 233:10 238:16

**majority** 147:8

**make** 22:1,18 23:4 36:12 37:17 45:7,22 53:1 59:1,22 70:7 74:23 83:21 88:10 91:2 94:15 96:10 101:25 102:21 107:1 111:21 130:16 134:10,15

136:8 140:8 146:7,8 147:17 149:4 162:2,16 163:19 165:13 166:18 171:12 175:12 183:24 191:16 202:14 203:10,11,22 205:2 207:5 212:4 216:17 219:13 220:3 222:23 230:4 239:7 253:19 265:2 267:22 269:23 270:12 270:25 272:15 286:12

**maker** 267:14

**makes** 18:3 23:20 113:21 127:16 133:22 137:9 161:14 288:4

**making** 22:7 23:15 39:23 79:25 86:2 110:9 158:4 192:12 193:10 198:21 247:14 289:6 295:10

**mal** 95:23

**malign** 26:4,7

**maligning** 31:15

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company   www.veritext.com

[malpractice - mean]

| | | | |
|---|---|---|---|
| **malpractice** 78:5,18 208:15 222:10,14 290:17,20 | **marketing** 223:3,7 | **matter** 6:17 7:12 8:16,25 12:7 17:1,25 | 65:14,18 68:19 69:1,3,12,14,25 70:5 71:3,5 |
| **man** 38:21 126:5 | **marketplace** 83:1 131:14 197:13 199:9 236:21 277:8 288:12 | 40:6 50:17,17 51:2 56:2 58:7 61:16,18 62:3 110:5 112:16 | 74:8 75:8,20 79:21 80:22 81:4 83:22 85:3,22 86:22 |
| **management** 52:14 166:5 168:17,17 | **markos** 48:21 48:22,22 | 112:21 113:4 113:11 114:22 117:15 142:5 | 87:7,15 88:10 89:1 90:22 91:10,12 92:9 |
| **manager** 54:25 | **marshalling** 273:10 | 153:13 159:18 161:12 162:7 | 94:13 95:3 96:1,20 101:16 |
| **mandatory** 77:7 | **mashed** 50:19 | 165:1,8 186:9 195:15 231:14 | 101:21 102:20 106:25 107:4 |
| **manpower** 267:10 | **matched** 16:20 **mateo** 248:17 248:20 256:4 | 256:15 262:8,8 266:12 272:15 | 107:10 109:5,6 109:15 110:25 |
| **marginal** 270:7 | **material** 169:19 294:17 | 273:22 283:17 283:18 295:15 | 111:7,14 112:4 112:8 113:13 |
| **marginally** 258:23 269:21 | **materials** 6:23 80:4 98:25 | **matters** 50:18 50:18 51:4,6,6 | 114:6,8,10 116:21 119:16 |
| **mark** 65:1 248:4 255:25 284:12 | 99:17,20 165:5 210:14 | 73:8 136:23 238:17 | 120:4 128:2,12 129:23 132:6 |
| **marked** 43:8 64:22 65:2 | **math** 172:21 240:16,19 | **mcdade** 62:25 211:4,7,18 | 133:25 134:8,9 134:21 136:18 |
| 155:3 165:22 225:13 231:22 | **mathematical** 270:13 | **mcdade's** 211:5 **mean** 24:18,19 | 137:11,16 140:25 143:18 |
| 248:13 256:1 258:6 284:14 | **mathematician** 260:9 | 24:20,23 27:12 28:1 31:18 | 143:22 144:4 145:9 148:5,15 |
| **marker** 277:1 | **matrix** 4:11 129:11 130:1,7 | 32:22 36:16 37:9,18 39:13 | 150:5 159:6 168:11 169:10 |
| **market** 27:23 29:5,13 30:2 36:21 37:16 | 153:14 154:9 178:7,14 258:10,11,14 | 39:21,21 40:4 51:3 52:5 53:24 54:2,21 | 169:25 173:14 175:3 181:13 186:15,22 |
| 39:12 134:13 211:25 250:12 250:15 259:9 276:5 277:2 286:25 | 259:3,20,24 283:6,9 | 58:4,17 59:22 60:4 61:1 | 189:25 191:15 192:8,16,21,22 |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

[mean - million]

193:6,7,24 196:9 197:2,13 197:16,18 202:2 211:3 214:14 216:6 216:18 217:3 218:4 219:11 220:14 221:4 223:21 224:1 227:15 228:4 229:14 230:2 230:12 233:13 234:4 235:17 236:16 237:13 238:5,11,21,21 238:24 239:4,7 239:17,22 248:1 250:8 251:11,14 253:5,9,13 254:8 255:3 256:20 257:22 259:21 261:8 261:17 264:7 265:14,24 266:7 267:6,12 272:8,16,18 273:8 277:10 278:23 282:15 290:7

**meaning** 16:8 17:18 132:17 150:22 171:6 194:11 262:3 292:6

**meaningful** 22:25 25:14 135:25 151:15

**meaningfully** 24:4 127:17

**means** 17:17 24:12 29:15,17 35:15 57:8 73:16 78:16 94:4 100:20,23 133:21 170:12 183:16,19 184:1 202:25 205:25 206:1 207:15 250:24 252:25 276:19 280:16

**meant** 56:24 93:16 132:20 158:8 212:11

**measure** 130:3 130:5 176:5 200:9

**meat** 201:14 262:15

**median** 17:16 260:9 262:20 263:13 272:14 279:2,4,24

**mediation** 86:14 88:19,25 89:7

**mediator** 88:15

**medical** 78:18 95:17 208:15

222:10

**medication** 7:7

**medium** 238:4 238:6

**meet** 159:16 278:25

**mega** 131:11 196:6 239:17

**member** 74:15 75:16 76:23 81:9,11 124:8 124:11

**members** 24:24 25:3

**memorable** 46:1 67:17

**memory** 13:14 49:16,25 56:24 66:19,20 67:10 108:19 277:25 279:21

**mention** 102:3 191:3 255:12

**mentioned** 30:22 145:22 204:16 275:20 291:1

**mentions** 101:9 254:11

**merits** 92:13 247:5 265:7 279:1

**met** 90:9

**method** 256:8 294:12 295:6

**methodology** 15:2 30:19 123:7,9 161:5 176:2 189:21 190:24 195:18 197:11 202:9 214:6 215:17 215:18 227:2 262:21 265:6

**methods** 256:7

**metrix** 129:11

**mic** 26:25

**micra** 78:18

**middle** 88:19 180:4 260:10

**miffed** 192:24

**miles** 177:2

**million** 12:24 18:14 26:21,22 32:6,7,23,23 49:1,2 67:14 83:24,25 84:2 84:17,23 85:2 85:9 86:4,10 86:16,19 88:14 89:25 90:6 94:22 95:24 111:5 113:16 135:15 141:1,2 141:6,18,20 155:7 162:5,13 162:21,22,25 173:7 192:4 200:7 219:19 238:24,24

**[million - multiplies]**

| | | | |
|---|---|---|---|
| 239:1 245:11 247:18 256:22 257:1,3,8,10,11 257:24,25 286:16 289:23 | misconduct 219:21 | 112:11,14 128:23 130:18 158:15 169:15 171:18 205:8 219:25 277:24 279:23 292:11 | 249:23 284:17 288:24 |
| **millions** 96:7 | **misinterpreted** 24:11 | | **motions** 145:17 148:18 151:3 168:19 272:25 273:8 |
| **mind** 45:22 67:21,23 73:12 127:11 128:21 129:19 142:24 171:21 185:11 191:19 233:14 277:3 | **mislead** 240:25 | **moments** 29:24 261:21 | **motivated** 85:22 |
| | **misleading** 250:21 | **money** 21:2 52:3,9,15,23 60:23 86:23 95:8,9 141:12 158:19 192:10 275:13 | **mottaheden** 149:16 |
| | **mismatch** 19:5 | | **move** 26:25 64:25 67:1,5 100:19 106:8 110:15 274:6 |
| **mine** 173:5 | **misreading** 198:3,4 | | |
| **minimize** 169:25 | **missed** 245:7 | **monster** 66:6 66:15 67:12 68:1,11 | **moved** 18:23 97:6 107:17 |
| **minimum** 253:7 | **missing** 245:4 | | **movie** 141:22 282:10 |
| | **misspoke** 152:20 | **montana** 46:19 46:21 | |
| **minor** 176:10 177:16 219:18 | **misstate** 193:24 | **month** 51:17,17 57:21,21,23 159:13 166:6 | **moving** 152:12 153:9 238:6 |
| **minority** 20:20 | **misstatement** 108:2 | | **multi** 164:16 |
| **minute** 21:14 31:10 132:12 132:24 160:23 200:14 226:1 240:20 | **mistakes** 70:7 | **months** 131:21 150:8,10,17 244:3 | **multifaceted** 138:15 |
| | **misunderstan...** 184:10 201:1 | | **multiple** 146:21 174:22 189:11 210:18 227:20 245:5 |
| | **misunderstood** 80:15 131:23 | **morgan** 1:5 | |
| | **mixed** 246:21 | **morning** 8:21 124:20 226:20 | |
| **minutes** 68:3 71:22 118:9 163:23 248:6 249:4 | **mock** 216:22 | | **multiplied** 238:25 |
| | **mode** 287:17 | **mornings** 44:16 | **multiplier** 18:23 22:3 28:21 |
| | **model** 149:5 251:1 252:22 | **motion** 4:8,13 71:14 105:24 110:18 135:15 149:8,9 150:16 162:2 166:4 | |
| **mirror** 116:1 | **modern** 147:14 | | |
| **mischaracteri...** 204:2 205:7 | **modest** 10:6 102:8 | | **multiplies** 113:15 |
| **miscites** 156:22 | **moment** 19:20 35:19 36:13 37:18 41:2 65:7 82:11 84:21 92:5 | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

[multiply - nonpayment]

**multiply** 111:24
**multiplying** 122:7

**n**

**n** 2:1 3:1 5:1 9:24,24,25 44:6 48:7,7 61:10 103:8 177:6,6
**nalfa** 3:17,18 123:23 125:7 125:20 126:6 126:20 127:19 128:9,15,20,25 195:12 250:17
**name** 6:6 13:9 13:23 15:9,12 46:8 60:13 62:14,18 66:6 101:7 104:1 107:2 109:10 143:6 151:25 181:10,12 193:1,1 231:10 249:5 266:9,24 282:6,6
**named** 6:10 47:25
**names** 9:21 10:8 47:9 84:5 87:1 95:22 266:16 274:19 294:16

**naming** 122:6
**narrow** 230:14
**nation** 18:12 127:14 194:12 234:1,14,25 236:4
**national** 81:4 123:24 129:13 233:21,25 234:20
**nationwide** 124:5 259:17
**nature** 114:14 122:5 138:13 170:10 216:5 246:21 265:15 276:2,8
**navy** 96:6 121:17
**neat** 189:5
**necessarily** 43:5 81:23 83:22 85:12 227:19 242:18 266:21 273:3 288:24
**necessary** 111:17 297:6
**need** 7:6 34:14 52:21 55:4 57:15 123:5 147:11,19 149:9 154:1 159:24 163:11 163:14 183:17

186:21 200:14 204:19,25 205:3 210:10 213:3 226:17 232:12 241:22 243:1 248:6 263:9 265:20 272:20
**needed** 28:21 149:6 222:24
**needs** 23:3 101:4 270:11
**negligence** 115:12
**negligible** 9:16 10:4 12:5 17:5
**negotiated** 49:21
**negotiating** 140:12
**negotiation** 20:2
**neither** 101:12 171:8 295:13
**nest** 106:10 108:1,5,15,16 108:20 109:2 110:1,12 147:21 148:22 156:5 161:9 186:4 267:11
**net** 155:7 242:22 245:10
**never** 15:25 31:17 68:25,25

129:9 147:24 154:13 185:6,8 231:17 259:9 259:11 287:17
**new** 2:6,11 16:13 17:6,9 17:24 19:10 23:22 44:14,15 44:17 49:13 56:14 62:14 78:17,22 116:7 175:6 247:8,8 248:12
**news** 44:18 282:3
**newspaper** 40:25 43:18,22 44:10
**nibbling** 157:15
**nice** 189:5
**nilly** 78:17
**ninth** 139:17 160:11,18 189:23 281:20 282:19
**nlj** 234:4,9,21
**nobody's** 198:25
**non** 51:13 137:18 172:13
**noneconomic** 78:10
**nonpayment** 53:15

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[norm - october]

norm  67:9
normal  54:2
northern
  282:20
notarize  298:11
notary  297:13
  297:19
notch  92:23
  93:11 285:3
note  7:14 52:7
  227:3 280:14
  298:9
noted  227:9
  229:4 230:1
  276:21 297:7
notes  11:17
  41:11,13,16,24
  42:7,15,24
  43:1,3
notice  244:4
notion  22:24
  174:5 247:22
novelty  139:1
november
  146:2
number  11:3
  14:6 18:13,22
  20:15 22:2,4
  39:24 40:11,17
  49:22 65:20
  78:8,9 83:9
  85:3 88:8,23
  92:9 106:18
  107:3,16
  117:19 121:2,9

129:19 133:4,5
133:6,17,17,18
134:21,24
143:23,25
146:16 149:22
149:24 162:9
163:6,6,8
164:15 166:9
166:21,22
167:8,23
173:24 177:15
177:15 193:10
194:15 236:7,8
236:10 240:6
241:16,17,18
241:19 242:1,3
242:5,12 243:8
243:15,25
244:6 245:7,9
245:10 254:18
258:20 261:18
273:20 278:24
280:20 281:16
289:16
numbers  16:16
  141:9 146:14
  172:24 175:20
  190:19 227:24
  230:20 238:25
  258:21 261:17
  262:3,19
  273:17
numerical
  238:6

numerous
  15:20 60:15
nuts  138:17

o

o  5:1 9:24 48:7
  61:10 103:8
oath  49:8
  111:10 157:20
  158:1,9
object  41:17
  52:4,6,11
  53:16 70:23
  90:1 119:13
  143:8 144:18
  149:3 203:15
  285:21
objection  25:4
  41:22 52:7
objectionable
  24:16
objections  5:9
  25:1 203:20
objective  30:19
  133:13 134:12
  169:24 170:1
  218:16 274:4
  291:7
obligation
  25:22 55:11
  182:16 183:23
observations
  130:22
observed  9:6
  131:20

obtained  139:4
obvious  145:22
  145:24 216:25
obviously  6:23
  11:17 12:12
  42:17 61:2
  70:19 86:1
  95:9 97:6
  117:9 128:23
  144:7 159:22
  163:14 170:25
  220:21 231:18
  238:13 269:16
  290:2
obviousness
  180:16
occasion  20:12
  37:2 127:21
  128:12,13
  147:3
occasionally
  39:15 118:21
occasions
  127:23
occur  56:14
  130:25 291:11
occurred  81:24
  140:14
occurring
  141:20
occurs  31:1
october  1:15
  57:22 63:7
  166:6 249:7
  293:4 295:18

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[october - opinions]**

| | | | |
|---|---|---|---|
| 298:2 | **okay** 11:21 | 280:25 288:25 | 70:20 76:17 |
| **odd** 90:6 | 27:2 30:10 | 289:19 | 82:5,7,17,22 |
| 256:23 281:14 | 36:7 41:7 43:4 | **olympia** 282:10 | 83:3,5 89:9 |
| 294:21 | 43:16 45:21 | **omission** | 104:5 110:21 |
| **oddly** 38:17 | 55:25 56:4,6,7 | 253:14 254:22 | 114:5 117:4,6 |
| **offense** 7:5 | 60:20 65:5 | **once** 16:4 49:14 | 117:8 128:11 |
| **offer** 8:16 | 69:3 71:20 | 141:22 163:24 | 132:13 133:13 |
| 16:25 19:10 | 72:16,17,21 | 185:6 243:16 | 137:25 142:11 |
| 25:1 113:3 | 76:9 77:5 | 256:21 | 142:19 143:4 |
| 117:15 | 82:21 89:21 | **ones** 56:20 | 143:14 148:12 |
| **offered** 17:1 | 92:12 93:20 | 67:20 132:21 | 151:6 166:1 |
| 184:21 | 97:16,21 99:17 | 181:14 204:16 | 167:22 170:8 |
| **offering** 117:8 | 104:9 106:22 | **op** 43:24 | 170:18 171:13 |
| 245:3 | 112:11 125:5 | **open** 32:5 | 191:17,24,24 |
| **office** 11:23 | 125:16 131:13 | 36:21 70:5 | 192:1 231:25 |
| 36:3,8 54:25 | 132:24 135:11 | 155:9 | 234:19 235:24 |
| 79:10 164:16 | 152:7,14,18 | **opera** 59:21 | 261:11 270:17 |
| 169:20 180:14 | 153:8 155:18 | **operates** | 275:9 |
| 187:1 247:7 | 156:20 160:5 | 101:23 | **opinions** 8:16 |
| 258:16 | 160:23 161:4 | **operation** | 16:25 17:6,23 |
| **officer** 294:5 | 165:3 175:2,10 | 87:24 | 17:24 30:17,20 |
| 295:3 | 175:23 179:4 | **operative** | 32:7 33:6 |
| **officially** 76:10 | 183:18 186:8 | 100:12 | 47:14 55:14 |
| 100:19 | 186:15 194:5 | **operator** 40:8 | 61:23 99:2,22 |
| **officials** 283:12 | 197:23 203:10 | **opine** 139:23 | 108:24 113:3,4 |
| **oh** 40:11 58:8 | 204:7,24 208:8 | 233:8 | 117:7,8,12,14 |
| 66:4 108:2,4 | 217:7,20 218:2 | **opined** 197:9 | 117:19 137:14 |
| 110:22 132:18 | 218:12 219:24 | 266:12 | 138:13,14 |
| 137:3 202:24 | 223:5 230:22 | **opines** 79:13 | 142:17 166:11 |
| 207:14 212:8 | 232:21,25 | **opining** 167:5 | 168:10,25 |
| 217:6 247:3 | 246:18 256:9 | 185:14 | 189:7,21 |
| 249:11 267:16 | 256:21,22 | **opinion** 17:9 | 203:23 207:20 |
| **ohanian** 48:6 | 257:22,23 | 19:10 29:20 | 208:23 215:20 |
| 48:23,24,25 | 262:4,16 | 30:21,24 32:17 | 228:19 230:22 |
| 49:10 | 272:17 276:20 | 68:12,16 70:1 | 242:8 274:15 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

[opinions - paid]

295:12
**opponent** 289:11
**opportunity** 8:18 24:25 167:3
**opposed** 120:21 216:21 253:2 262:20
**opposite** 28:24
**opted** 189:20
**oracle** 4:6 249:10,12
**oral** 1:11
**oranges** 154:20 249:16
**order** 4:8 25:4 54:7 56:13 65:16 94:16 194:6 225:22 257:20 276:3
**ordinary** 20:1 201:25
**organization** 124:7,9 167:13
**organize** 102:16
**organized** 167:11
**original** 59:19 268:4 295:16 295:16
**orleans** 2:6,11
**ostensibly** 29:7 30:3

**ought** 22:16 114:23 167:19 181:3
**outcome** 60:24 295:15
**outlier** 228:9 228:20
**outline** 41:4 43:11 171:25 292:19
**outlines** 148:19
**outrageously** 70:8
**outright** 221:18
**outset** 38:23
**outside** 131:20 248:22 259:3
**outweighed** 137:1,2
**overaggressive** 111:19
**overall** 51:9,10 51:15 163:2 164:6 172:11 173:9 175:13 264:4,6,16,20 268:25
**overarching** 229:20
**overbroad** 143:9
**overemphasi...** 253:6,7
**overgeneraliz...** 95:3

**overhead** 167:9 167:19 181:4 194:24 195:8
**overlap** 116:13 116:20
**overlapped** 115:4
**overpaid** 86:10 219:19
**overpay** 94:21
**overreaching** 140:12
**overseeing** 24:10
**overview** 259:16
**owed** 53:2
**owes** 60:22 86:9
**own** 7:19 12:21 25:17 37:13 86:13 90:17 115:11 122:15 156:20
**owner** 40:8

**p**

**p** 2:1,1 5:1
**p.m.** 1:15 293:3
**pack** 79:21
**package** 189:5
**page** 3:2,7 43:14 45:7 56:1 57:2 70:21 72:20 82:17 113:22

158:4,5 176:20 176:20 192:13 205:9 208:24 209:3 214:25 215:6 225:8 226:13 227:1 240:24 241:1,2 241:3 256:10 258:12 260:4 288:23 294:1 295:17 296:4,7 296:10,13,16 296:19
**pages** 117:20 146:7 161:15 225:23 230:19 251:19 253:25 275:20 295:5 298:12
**paid** 19:4 20:7 22:20 25:7 26:20 33:19 50:10,10 52:25 53:22 54:1,12 54:14,17 55:2 69:13 70:8 82:22 84:1 104:13 111:21 114:22 122:15 122:21 151:19 155:10,25 156:24,25 159:2 160:2,17 195:3 210:22 212:12 214:15

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[paid - partners]

227:16 241:22 241:24 244:10 244:10 250:23 251:20 252:10 252:13,19 254:3,5 255:9 271:24 275:13 280:21,23 281:6 287:6 288:11

**panel** 109:4,7 115:23 119:24 120:6 209:6,11 209:15,23 210:15,20 211:1,3,19,24 212:1,4,13,15 213:22 214:2,8 214:11,14,17

**paper** 67:25 82:18 86:22 165:1 184:1 193:12 210:9 210:10

**paradigm** 279:3,24

**paragraph** 34:16 35:22 36:9 72:23 73:3 74:12 78:25 79:13 83:15 89:9 100:19 106:9 130:19,19 132:16 140:4

149:13 153:10 164:24 169:3 169:12,15 170:8 172:10 180:22 185:19 189:1,8 190:22 194:3 205:18 228:5 230:16 231:24 238:15 246:8,15,16 249:25 250:2 252:17 260:1,3 261:23 267:25 275:21 288:8,8 289:8,19

**paralegal** 149:6 171:7 177:10 189:18

**paralegals** 171:5,8 177:24 250:4

**parallel** 98:11

**paraphrase** 279:25

**pardon** 292:3

**paren** 268:5

**parenthetical** 294:18,19

**parker** 177:8,9

**parody** 32:11

**part** 28:4 29:3 44:4 53:7 54:4 54:9,20 61:1 76:18 83:23 113:6,7 115:8

116:2,16,24,25 118:17 119:4 135:5 142:16 146:25 149:21 163:22 176:10 181:4 187:12 193:22 199:12 199:17 218:23 219:18 221:3 227:17 233:17 245:18 255:23 256:9 273:23 280:22 291:15

**participant** 64:17

**participants** 125:25

**participated** 10:20 260:14

**particular** 32:9 58:7 61:16 64:2 108:11 117:12 128:1,1 206:2 213:12 213:12 214:7 229:20 235:22 235:23 236:25 244:13 258:9 262:2 273:14 276:16 280:6 285:2

**particularly** 7:25 54:14 129:7,17 133:8 149:7 180:5

257:16 261:10 262:9 265:9 283:6

**parties** 5:4 22:13 24:20 47:20 69:21 88:18 95:12 107:6 115:20 141:16 142:6,9 143:5 144:5 168:13 169:14 271:20 275:11 295:13

**partner** 9:23 15:7 47:24 48:14 83:18 85:23 91:23 106:13 127:4 147:5 149:5 170:23 176:24 177:2 189:17 192:25 194:16 219:12 239:14 261:8,14 263:16 269:14 283:24 290:13 291:23

**partners** 9:20 9:25 17:3 37:4 48:6,6 50:7 88:4 101:7,19 104:2 136:11 170:22 171:5 173:9 177:12 188:15 229:21

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[partners - peifferwolf.com]**

239:13 264:22
**partnership**
13:3 94:19
216:16
**partnerships**
218:12
**parts** 59:24
75:7
**party** 55:10
60:13 77:11
115:7 119:1
135:12 157:10
158:13 186:10
224:25 286:2
286:13 288:22
289:1
**party's** 59:8
87:15
**passage** 20:23
122:13
**passed** 29:23
167:20
**password**
167:12
**past** 44:21
67:21 71:4
97:6 115:1
129:1 154:16
158:5 184:8
239:13
**patent** 180:5,7
180:9,12,14,19
238:23 290:2
**patents** 238:22

**path** 203:3
207:17
**pattern** 105:15
271:6
**paul** 232:2
233:1,3,8,10
234:10 235:10
235:25 236:4
236:14,22
237:2
**pauses** 294:11
**pay** 19:1 28:11
53:6 61:5
67:19 76:6
77:6,15 81:11
104:22 114:14
135:13 138:3
156:14,17,17
157:1,4,5,9,10
157:11 158:12
158:13,14
181:5 183:24
183:24 194:25
195:6,6,7,11
200:12 212:9
247:18 257:8
266:6,8 277:9
286:3,8,9,20
**payable** 114:22
123:8
**paying** 18:6
19:1,4 26:22
53:6 76:3
119:1 158:19
159:12 163:3

195:10 203:1
207:15 229:8
247:17 251:23
251:23 255:14
275:3
**payment** 22:16
32:5 53:10
64:5,6,16
157:17 158:21
287:12 288:11
288:15
**payments** 64:8
159:1
**pays** 84:25
108:25 123:16
**pearl** 3:15 8:19
9:7,10 16:7
17:10 27:16
31:13 65:1,17
66:3,10 68:16
70:13 73:14
74:3,21 76:22
76:25 79:13
86:19 92:17
107:11 117:17
129:4 133:12
190:7,18 191:5
191:8 209:18
209:19 226:18
236:7 246:9
258:25 260:17
262:22 265:12
273:25 274:11
284:8

**pearl's** 8:24
16:14 19:10
31:6,9 58:17
71:19 72:19
73:4 74:13
75:11 78:24
82:4,18 83:14
89:9 100:18
106:8 110:15
112:13 132:13
190:23 226:19
270:23
**peek** 265:4
**peer** 235:3,9
**peg** 216:19
**peiffer** 1:4 2:4
6:8 17:4 59:5
59:11 82:22
83:11 86:7
88:24 99:14
102:23 103:3
110:13 115:21
123:14 141:24
142:17 158:18
159:12 186:10
239:24 242:16
247:11,17
265:23 266:1,3
266:11 286:4,8
286:22 287:11
296:1 297:1
298:3
**peifferwolf.c...**
2:7,7

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

[pejorative - personnel]

**pejorative**
  109:15 136:9
**pena** 1:23
  149:17 155:2
  165:20 225:10
  226:2 231:21
  294:2,24 295:2
  295:23
**pencil** 244:21
**pending** 6:9
  106:20 160:18
**penny** 280:13
  280:13
**people** 35:11
  36:7 39:23
  51:7 63:10
  68:13 69:18,20
  69:20,22 78:7
  87:17 95:18
  107:5,6,8
  108:11 109:7
  113:21 116:18
  116:18 129:13
  131:9 135:24
  136:15,18
  138:12 142:15
  143:19 146:10
  146:12,16,21
  146:21,22
  148:1,10,25
  149:2,9,10,20
  149:22,24,25
  149:25 150:2,5
  150:9 151:5
  152:10 167:8

  167:25 169:11
  171:15 173:24
  173:25 174:24
  174:25 175:8
  175:23,25
  176:1,6 186:19
  187:3,5,6
  188:13 193:21
  195:7 203:1
  206:1 207:15
  230:13,15
  235:13 239:18
  239:22 243:21
  243:22,23,24
  262:12 263:15
  265:15 266:15
  267:1 268:13
  275:6 277:9
  279:7 280:2,4
**people's** 274:17
  275:6
**perceived**
  187:8 271:15
**percent** 8:8
  17:17 21:3,23
  21:25,25 23:25
  23:25 71:6,6
  130:20 131:17
  132:2,9 171:4
  171:5 240:15
  240:17 241:5
  241:14 243:17
  243:18,20,22
  245:4,22
  250:16 260:11

  260:14,15
  262:23,24
  269:17 271:24
  272:3 273:5
**percentage**
  18:19 21:3,24
  23:10,11,20,21
  28:15,17,22
  130:24 154:11
  256:7,8,21,24
  257:4,6,24
**perfectly** 140:2
  215:11
**perform** 27:8
  28:6 29:2,25
  53:5 61:2
  64:15 118:18
  139:3 207:22
**performance**
  52:14 246:22
**performed**
  27:22 50:4
  60:2,23 99:14
  115:2 140:20
  170:13 177:12
  235:25
**performing**
  13:3 26:16
  64:1
**performs** 49:11
**period** 38:18
  67:7 107:8
  128:17 150:12
  150:15 151:13
  154:17 243:4

  264:21
**periodical**
  44:12,13
**perkins** 17:5
  82:23 88:25
  99:9 110:13
  141:25 142:18
  144:3
**permit** 71:17
**permitted**
  211:24 285:20
**person** 36:2
  67:4,4 68:24
  69:23 84:24
  120:15 143:20
  147:1,3,19
  148:7,8,9,17,21
  148:24 152:12
  153:25 182:20
  183:23 187:2,6
  188:14 193:2
  235:17 295:10
**person's** 47:24
  51:12
**personal** 15:3,5
  211:21 220:10
  220:12 223:25
  291:6
**personally** 26:9
  65:17,18 87:5
  124:8 290:12
  290:24
**personnel**
  170:22 174:22

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

[perspective - posner]

| | | | |
|---|---|---|---|
| **perspective** 30:17 52:14 155:19 164:21 | 112:18 128:3 139:19 179:3 270:24 | **please** 11:13,19 34:18 42:19 55:15 71:22 118:9 165:21 205:5 231:21 | **pointed** 166:3 |
| **persuasive** 76:14 253:17 254:21 | **placed** 95:17 | | **points** 20:13 117:17 144:20 144:22,24 145:1 166:17 |
| | **plaintiff** 2:3 11:3 13:10 15:21,24 18:7 18:9,12 21:18 21:23 22:10 26:15,21 27:10 31:19 32:6 33:11 36:24 37:13,22 83:17 186:2 250:22 277:5 | | |
| **petersen** 38:20 63:6,10,12 | | **pleasure** 119:6 | **policies** 96:14 114:17 123:21 220:24 221:22 |
| **petition** 31:24 31:25 | | **plra** 283:21,21 283:23,24 284:1 | **policy** 96:19 123:14,19 211:22 221:1 221:18,23 |
| **phelps** 2:10 36:5 61:6 62:1 63:20,22,23 | | **plumber** 53:23 | |
| | | **plumbers** 54:11,20 | |
| **phelps.com** 2:12 | | **plus** 39:4 86:16 87:19 164:9,16 195:11 | **policyholders** 119:7 121:3 |
| **phonetic** 294:18 | **plaintiff's** 4:8 115:11 | **point** 18:3,4 23:7 27:16 30:19 31:3,4 43:14 67:8 69:25 107:12 107:15 111:10 134:11 138:16 138:16,17 146:24 154:25 158:2 160:8 162:16 164:6 165:17 166:10 173:10 174:21 178:10 194:1 204:8 205:21 218:17 230:5 241:15 244:1,9 247:19 255:8 272:16 276:9 289:5 291:7 | **pond** 21:12 |
| **phrase** 278:5 294:20 | **plaintiffs** 22:10 78:20 152:14 | | **pool** 21:10 22:9 |
| | | | **portion** 92:6 224:25 230:23 |
| **phrases** 294:14 | **planning** 117:15 | | **pose** 104:25 |
| **pick** 15:10 18:13 109:10 134:3,23 151:1 | **plans** 7:17 | | **posed** 291:5 |
| | **plastic** 96:3 | | **position** 22:23 23:14 31:4 77:12 115:2 117:5 132:1 140:1 146:2 148:21 160:10 222:6 231:2 252:21 254:18 285:1 |
| | **plastics** 96:2 | | |
| **picked** 214:4 | **platform** 181:16 | | |
| **picking** 14:10 105:14 | **platforms** 183:3,15 | | |
| **picks** 15:13 | **play** 85:13 88:17 115:7 | | |
| **piece** 67:25 86:21 193:12 210:9,10 | **played** 271:7 | | **positions** 65:25 71:1 110:17 111:12 131:9 275:6,7,11 |
| | **pleading** 166:19 | | |
| **pile** 114:21 272:4 | | | |
| **place** 14:6 51:14 80:9 92:10 107:19 | **pleadings** 193:19,20 | | **posner** 287:23 |

[possibility - price]

possibility 54:18 85:19
possible 14:8 28:24 56:11 60:6 85:7 108:18 212:22 274:5
possibly 16:8 139:23 209:12
post 58:23 59:3 59:7 86:14,14 86:15 87:20 88:9 89:2 96:24 97:18,19 97:22 100:6,15 115:20 116:10 117:3 144:3,14 145:15 166:5 192:14 271:22
posting 225:15
potato 238:22
potential 142:7 246:25 282:12
potentially 204:25 208:16 292:23
powder 107:21 143:12
power 183:21
powered 186:19
powerpoint 43:19
ppg 96:5,6

practice 38:22 47:16 49:23 54:5,10 55:2 73:6 110:18 120:24 131:8 131:24 197:2 205:23 253:8 277:21
practiced 31:18
practices 113:9 113:11 253:6
practicing 76:1
practitioner 77:3
practitioners 271:25,25
prairieville 295:18
praiseful 109:11
precise 42:25 110:10 120:10
precondition 64:15
predecessor 38:13
preferred 120:10
preliminary 149:7 150:18
premium 102:18 106:7
prep 58:10,13 58:14,18

preparation 8:4 58:21 59:14
prepare 210:14 244:16
prepared 35:4 61:19 166:20 169:16,20,21 205:1 239:25 295:6,8
prepares 35:25
preparing 99:2 99:22 148:19 244:15
preposterous 201:6
prepping 58:15
prescribes 34:13
presence 239:19
present 31:25 70:25 289:12
presentation 80:18,21
presentations 43:20
presented 23:15 34:6 55:10,14 83:11 92:16 97:8 116:12 275:14 282:17
presenting 102:12 141:11

presents 95:4
preserve 42:19
president 38:22 49:5 50:6 52:2 282:9
prestige 234:11 235:9
prestigious 234:18
presume 222:22
presumption 160:8,12 287:4 287:7 289:7
pretty 32:20 66:20 67:21 180:3 198:5 222:16 283:24
prevail 42:20 71:1 104:13
prevailing 135:12 288:22
previous 198:11 199:14 204:13 205:3,6 206:25 207:1 263:12 269:4 277:12
previously 59:9 65:10 79:10 81:19 156:12 267:24 273:13 277:20
price 243:21,22 243:23,24

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

[pride - proportion]

**pride** 285:5
**primarily**
  39:20 151:7
**principal** 9:15
  9:18,25 12:6
  17:3 103:9
**principles**
  35:12,13 71:16
  73:17 273:11
**print** 12:10
  44:18 125:4
**printed** 11:8,11
  58:23 59:11,13
  258:13 274:12
  274:18,22
**prior** 8:24
  120:19 127:20
  180:16 278:2
**prison** 282:3,16
  283:14,22
**pro** 153:11
**proactively**
  120:12
**probability**
  45:17
**probably** 13:21
  13:22 34:5
  37:5 40:12
  45:16 46:5
  51:5 57:3,23
  57:24 58:18,19
  64:24 65:21
  68:25 72:19
  78:3 79:8,25
  80:17 84:19

98:15 108:7,9
120:3 124:15
125:13 128:17
128:20 135:19
141:6 152:16
202:7 208:12
220:13 222:16
232:19 237:9
270:6 279:12
284:21
**probative**
  237:24 238:1
  238:13
**probe** 19:20
**problem** 11:20
  23:13 32:24
  51:21,24 88:5
  113:5 118:5
  141:5 176:1
  233:23
**problematic**
  52:20 90:11
**problems** 69:10
  122:16
**procedure** 5:5
  294:6,7 295:12
**proceeding**
  98:14 163:17
  293:3 294:10
**proceedings**
  294:13
**proceeds** 195:2
**process** 15:4
  18:25 20:5,25
  27:21 29:8

30:4,24 31:23
51:11 53:7
64:18 70:6
96:9 181:15
224:6 225:21
292:15
**produce** 8:2
  42:20 215:1
**produced**
  161:16 210:4
  289:21
**product** 70:20
  145:25 146:4,5
  146:6 166:14
  166:15 167:22
  167:23,24
  220:15,15
  223:24
**production**
  4:13 267:17
**products**
  118:23 220:16
**professional**
  76:10,18 77:10
  81:7 109:6,10
  109:12 118:14
  123:25 124:6
  138:20 199:11
  207:4 220:1,25
  221:3,12,13,16
  221:18 222:3
  222:11,15
  224:10,14,17
  224:22 225:3,4
  225:6 237:17

256:17 277:12
294:4 295:3
**professional's**
  224:19
**professionali...**
  293:1
**professionals**
  54:7 95:17
**professions**
  77:9 182:17
**profile** 196:25
**profound** 33:13
  84:8 184:10
**progress** 53:3
  185:24
**prohibition**
  295:11
**pronounce**
  284:18
**pronounceme...**
  78:23
**proof** 90:8
**proper** 202:11
  214:4 228:16
  283:14 294:12
**properly** 193:3
  204:25 215:23
  254:12 263:25
  264:2
**property** 38:25
  66:14 118:24
  162:23 220:18
  220:18
**proportion**
  140:19

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

**[proportions - question]**

| | | | |
|---|---|---|---|
| **proportions** 19:6 | 230:22 268:19 | **purposes** 147:5 159:9 199:4 203:5 222:4 240:13 | **puts** 88:8 269:12 276:18 |
| **proposing** 162:8 | **provides** 228:15 | | **putting** 134:15 143:20 170:5 183:19 285:18 |
| **propositions** 91:2 | **providing** 72:3 | **pursuant** 5:5 98:12 252:13 | |
| **propriety** 275:9 | **public** 251:15 254:2 255:16 258:16 277:6 297:19 | **pursuing** 290:20 | **q** |
| **prosecuting** 153:13 | **publication** 258:13 | **purview** 275:8 | **qualifications** 41:5 43:12 |
| **prosecution** 110:16 111:11 153:23 | **publicity** 80:19 | **pushback** 20:9 20:14 | **qualified** 71:11 188:19 |
| **prosecutions** 122:11 | **publicly** 215:13 | **pushes** 26:23 | **quality** 272:12 272:25 |
| **prospective** 116:5 | **publish** 44:10 125:20 126:7 | **pushing** 21:15 24:8,21 | **quartile** 16:19 17:15,16,16,16 214:13 260:14 260:15,18 261:15 262:19 262:20,22 263:7 264:11 264:13,20,22 264:24 268:16 269:7,12,13 271:3,14 272:14,15 273:17,20,24 278:12,21 279:3,4,15,24 280:8 |
| **protect** 25:23 84:1 114:15 | **published** 40:24 79:3 | **put** 13:23 25:4 34:14 67:5 87:7,17 93:9 96:20 102:12 102:14 103:4 106:5 108:12 111:9 115:12 140:6,8 142:11 143:16 151:11 152:11 161:18 178:10 181:19 182:18 184:11 186:20 193:1,1 215:7 216:10 217:15 255:22 257:2 258:23 263:7,21 264:25 267:15 267:21,25 288:6 290:21 | |
| **protected** 167:12 225:15 | **publisher** 79:25 80:3,12 80:17 | | |
| **protective** 225:22 | **pull** 55:15 146:7 151:22 165:12 231:12 236:7 248:3 258:4 284:11 | | |
| **protege** 83:18 85:23 192:24 | **pulls** 14:20 | | |
| **prove** 84:23 222:24 | **punches** 146:7 | | **quartiles** 260:8 |
| **provide** 11:18 55:3 57:15 124:2,2 184:5 | **punish** 86:1 | | **question** 5:10 7:4 8:10 18:15 30:10 31:2 32:14 35:20 54:22 55:9 66:18 68:2 |
| **provided** 6:24 46:10 47:3 61:20 64:10 140:24 169:10 174:9 206:22 | **purchase** 216:2 | | |
| | **purported** 29:20 | | |
| | **purpose** 63:13 178:22 | | |
| | **purposefully** 200:25 | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

[question - rate]

72:13 74:23
84:12,16 92:4
92:7 98:25
103:16 104:24
106:20 116:21
116:22 117:2
121:24 125:16
155:17 159:4
159:10 163:13
175:2 176:13
182:24 183:9
183:11 184:9
184:24 188:25
196:20 197:19
200:6 201:2
204:1 206:20
209:8 213:20
235:5 240:14
279:2 283:23
291:5
**questioned**
280:7
**questioning**
177:20 226:24
**questions** 7:25
11:10 61:3
73:25 74:1
106:19 118:2
139:2 148:5
198:10 200:18
203:19 204:23
245:18 271:11
285:23
**quick** 11:13
75:3 83:2

118:7 174:19
**quickly** 42:21
124:23 172:21
249:18
**quiet** 181:23
212:24
**quinn** 93:4
163:3,5 284:21
284:22 285:3,7
285:17,25
288:7,10,18
289:10,20
**quite** 49:23
67:10 87:20
90:2 94:8
95:12 97:4
98:6,11 118:16
146:19 171:25
187:4 212:23
249:17 282:6
**quote** 52:22
83:9,10 116:20
141:22 172:12
182:21 193:16
229:18 230:1
**quoted** 294:21

**r**

**r** 2:1 44:6 48:13
129:11 296:3,3
**r.s.** 295:4
**rabbit** 33:24
**race** 187:5
**races** 105:24
**rachel** 17:4
86:9 144:3

**rafi** 149:16
**raise** 49:20
131:15 132:2
186:22,23,24
250:10,13
**raised** 54:18
83:13 167:7
295:16
**raising** 131:6
131:21,24
**ramifications**
69:15
**ran** 93:14
**range** 37:6 49:9
58:9 191:21,25
191:25 234:2
239:14
**ranges** 212:5
**ranging** 270:1
**ranking** 106:12
**rare** 32:1 78:22
**rarest** 32:1
**rate** 3:18,23
8:17 16:9,16
16:19 17:13,20
17:25 19:18,23
20:9,24 22:2
22:20,21 23:9
23:13 24:5,6
26:14 27:23
28:1 29:5
32:18,24 33:2
33:13,18 34:16
34:17,20,23
35:1,5,21 36:9

36:23 37:1
39:12,18 48:3
48:7,15,19
49:14,24,25
50:2,7,17,19,21
51:9,10,13,15
64:9 69:1,2
73:18 74:9
83:12 92:21
94:3 110:23
111:3,8,13,15
111:15,23,24
112:9 113:8
122:4 125:18
126:8,19,23
127:1,6,19,24
128:2,9,15,22
128:24 130:14
130:24 132:16
135:2 137:14
141:1 146:5,8
154:14 156:11
156:14,19,22
157:12 159:16
159:17 161:1
161:19 162:19
163:9 169:1
170:13 171:1,2
171:13,14
172:11,17
173:2,10,11,15
173:19 174:2
174:16,21,25
175:9,11,23,24
176:4 178:25

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

[rate - rates]

| | | | |
|---|---|---|---|
| 179:2 184:17 | 244:22 245:8,9 | 32:25 33:9,16 | 187:7 188:10 |
| 185:14 186:1 | 247:9,24 | 37:5 39:22 | 188:20 189:12 |
| 186:15 188:7 | 250:21,25 | 48:24 49:9,12 | 189:15 190:7 |
| 188:14,16,23 | 251:17 252:9 | 49:17,21 50:11 | 190:14,24 |
| 189:6,20,23 | 252:18,20 | 50:15,16,21,24 | 191:5,13,14,15 |
| 190:10,11,13 | 253:11,16,17 | 51:2,5,7,8 55:7 | 192:3,7 194:4 |
| 190:17,20 | 253:21 254:13 | 69:7 74:10 | 194:8,9,10,12 |
| 191:25 192:2 | 255:10 257:11 | 82:22,25 83:16 | 194:13,14,16 |
| 194:5 195:21 | 257:12 258:25 | 92:14 94:16 | 194:17,21,22 |
| 197:15,16 | 259:9,12 260:4 | 102:18 106:7 | 195:10,14,17 |
| 201:16 202:5 | 260:25 261:24 | 112:23 113:5 | 195:17 196:18 |
| 202:13 203:2,6 | 262:6,14 263:2 | 117:10 122:14 | 196:22 197:6,6 |
| 204:8 205:11 | 263:20 264:4 | 122:14,21 | 197:10 198:1 |
| 207:16,22 | 265:3 266:8 | 123:8,17 126:3 | 198:23 199:7,8 |
| 208:6,21 | 268:4,7,12,15 | 126:16 127:6 | 199:20 200:12 |
| 209:10 210:8 | 268:17,19 | 127:12,15 | 201:16,21,24 |
| 210:15 212:3,7 | 269:5,7 270:21 | 130:9,20 131:1 | 202:1 203:1,6 |
| 212:16 213:11 | 270:24 272:19 | 131:3,6,8,10,10 | 207:16 208:11 |
| 213:21 214:18 | 272:21 275:17 | 131:17,20,25 | 208:13 209:10 |
| 214:25 215:3 | 277:9,9 278:12 | 132:6,7,21 | 209:12,13,15 |
| 215:19 217:10 | 278:21 279:9 | 134:6,9 145:21 | 209:15 210:6 |
| 222:5 224:11 | 280:11 281:3,4 | 146:3 155:20 | 210:18,21,22 |
| 224:14 225:11 | 281:10,11,11 | 159:18,20,22 | 211:2,3,24,25 |
| 227:16,23 | 282:18 285:12 | 162:8,10,24 | 212:1,4,8,13,15 |
| 228:3,6,7,13,14 | 285:13,24 | 163:7 164:3,4 | 212:17,18,19 |
| 228:16 230:8 | 287:21,22 | 164:11,12,17 | 213:10,17,22 |
| 230:18 231:3 | 289:18 | 166:11 170:9 | 213:23 214:2,5 |
| 233:19,20 | **rates** 7:25 9:10 | 170:23,25 | 214:8,9,11,12 |
| 234:5,6 235:4 | 16:21 17:17 | 174:6,10 175:1 | 214:14,15,17 |
| 236:14 237:9 | 18:2,5,21,25 | 175:14,14,16 | 214:22,22 |
| 237:14 238:8 | 19:2,4,16,16,25 | 175:25 176:14 | 217:18,19 |
| 240:16 242:11 | 19:25 20:3,4 | 178:24,25 | 219:7 222:5 |
| 242:12,20,21 | 20:25 21:5,21 | 179:6,7 184:22 | 223:11,12 |
| 242:22 243:7 | 29:13 30:2,12 | 185:4 186:5,11 | 224:4 227:22 |
| 243:12,20 | 30:22,23 32:22 | 186:22,24 | 228:2,9,11,22 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                www.veritext.com

**[rates - really]**

229:17,17,18
229:20,21
230:3,11 231:2
233:8 234:3,3
234:15,16,19
234:19,21
235:24 236:14
236:18,18,23
236:24 237:1,4
237:10,12,18
237:19,24
238:13 239:7,9
239:12,14,16
242:9,16 243:9
243:9 246:9,10
246:12 247:10
249:14,18
250:1,3,11,15
250:18 251:2,3
251:6 252:2,3
252:15,16
255:5 256:12
257:16,22
259:9,16 260:5
260:17,18
261:14 262:7
262:11,12,23
262:25 263:21
264:4,6,9,15,17
265:21 266:12
266:15 267:1
268:13,23
269:1,3,20,20
269:22 270:5
270:23,25

271:3,18 273:6
274:24 275:25
279:10 281:1
282:14 283:1
283:13 284:2,3
284:4 285:1
286:1,9,9,14,18
286:19,20,23
287:1,15 288:4
288:13,16
289:14,15
**rather** 16:16
90:12 117:22
135:4 261:7
283:15
**rational** 55:13
235:20
**raymond**
248:24
**reach** 120:12
246:23
**read** 31:6,14
33:5,14 44:15
55:21 58:18
59:13,17,23
74:19,21,24
75:5,6 87:19
97:5 124:4
125:9 130:23
144:2,6 156:7
180:15 182:11
188:21 189:14
190:20 193:20
195:12 200:3
202:8 203:14

203:16 204:14
205:3,6,18
207:1,7 211:4
211:8 215:11
216:15 218:1
222:18 227:14
229:1,14,16,19
229:24,24
230:16,19
281:24,24
282:4 297:5
298:6,8
**readily** 84:13
**reading** 5:6
82:18 87:19
106:16 116:10
117:2 182:20
183:19 229:14
257:14 261:17
**reads** 63:17
**real** 3:23 12:13
13:2 16:15
17:13 40:5
49:2 84:19
85:18 87:8,13
113:17 125:18
126:19,22
127:24 128:2,9
128:24 130:14
130:24 132:16
156:19 167:19
178:25 188:23
189:6,20,23
190:13,17,20
194:5 199:6

200:11 201:16
202:5,13 203:2
203:6 204:8
205:11 207:16
207:22 208:6
208:21 209:10
212:3,7,16
213:21 214:18
214:25 215:3
215:19 216:4
217:10 222:5
223:1 224:11
224:14 225:11
227:23 228:3,7
228:14,16
231:3 234:5,6
237:9,14 238:8
238:24 254:13
258:25 260:4
260:25 261:24
264:3 265:3
268:12,17,19
269:7 279:9
282:18
**realistic** 148:16
**reality** 88:21
**realize** 141:9
158:18 235:22
**really** 16:10
17:14 33:16
37:15 39:21
43:5 47:11
49:15 50:5
51:22,25 54:21
58:5,12,25

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[really - recent]**

| | | | |
|---|---|---|---|
| 59:22 65:14 | 281:23 284:10 | 191:18,20,20 | **reasoned** 269:4 |
| 66:5 67:5,10 | 285:3,22 289:1 | 191:21 198:21 | 269:6 270:25 |
| 68:5 70:11 | 289:4 | 198:24 199:21 | **reasoning** |
| 76:2 78:15 | **realm** 177:17 | 199:22 200:7,8 | 223:15 |
| 84:5 86:3 | **ream** 184:1 | 201:21 213:11 | **reasons** 17:14 |
| 88:13 92:11,22 | **rear** 109:8 | 231:4 233:9 | 176:5 187:11 |
| 93:5,8,21 | 202:2 208:9 | 235:4 236:1,14 | 189:8,19 191:6 |
| 94:20,20,24 | **reason** 69:18 | 247:11 256:6 | 195:16 205:13 |
| 95:20 97:4,9 | 92:10 150:9 | 256:12 257:16 | 205:15 206:7,8 |
| 98:11 101:14 | 195:15 196:2 | 259:13 266:13 | 223:18 245:3 |
| 102:17 103:19 | 200:5 201:25 | 274:25 275:4 | 268:12 275:7 |
| 107:4 113:13 | 208:14 210:23 | 275:17 280:12 | 278:14 |
| 113:18 115:8 | 227:17 236:20 | 282:14 285:2 | **rebuttable** |
| 115:12 116:3 | 269:21 271:13 | 286:12,21 | 160:8 287:3,6 |
| 119:17 121:8 | 271:14 274:6 | 287:21,22 | **rebuttal** 160:12 |
| 128:11 129:4 | 285:12 296:6,9 | 288:5,16 | 289:7 |
| 130:14 131:7 | 296:12,15,18 | **reasonableness** | **recall** 9:2 40:16 |
| 131:18 136:22 | 296:21 | 7:24 24:21 | 43:12 50:3,22 |
| 141:21 149:20 | **reasonable** | 47:19 70:1,5 | 51:19 53:14 |
| 161:11 170:19 | 19:12 20:6 | 73:25 113:12 | 57:20 58:4 |
| 171:7 177:17 | 23:5 27:20 | 157:6,19 | 59:8 66:2,4,10 |
| 178:20 183:6 | 32:18 33:9 | 159:14 160:3 | 67:13 68:11 |
| 191:10 192:21 | 55:14 73:18,18 | 160:13,17 | 81:17 98:2 |
| 195:3 197:5 | 92:14 111:23 | 163:2 184:19 | 99:23 112:16 |
| 201:10 214:14 | 112:23 113:5 | 198:1,16 199:4 | 144:15 198:2 |
| 221:12,16 | 117:11 123:8 | 199:24 200:7,9 | 208:18 231:14 |
| 230:7 237:6 | 137:20 148:11 | 217:16,19 | 233:7 279:15 |
| 238:11,11 | 149:5 150:9 | 231:25 237:2 | 284:25 |
| 243:5,25 | 154:15 157:12 | 245:18 249:25 | **receivable** |
| 247:20 250:8 | 159:17,24 | 285:23 286:25 | 52:19 |
| 250:23 253:3 | 160:1,25 | 287:15 | **receive** 272:11 |
| 255:3,17 | 164:14 166:21 | **reasonably** | **received** |
| 258:17 259:15 | 167:24 168:21 | 60:5 106:23 | 124:19 125:14 |
| 263:5,5 272:5 | 168:21 179:7 | 107:24 108:5 | **recent** 51:18 |
| 274:5 277:17 | 185:14 190:11 | | 56:20 60:7 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

[recent - rejected]

141:22
recently 48:1
  56:18 58:1
  73:7 140:16
  259:21
recess 71:25
  118:10 172:6
  226:3 248:10
  292:12
recipes 95:20
  290:22
recitation
  14:25
recites 274:9
recognize
  21:19 156:21
  156:23 158:1
  177:8 199:9
  249:1
recognized
  121:20
recollection
  40:15 42:2
  48:18 53:18
  137:6 165:10
  232:7 279:13
reconcile
  199:15
record 64:21
  71:24 118:11
  168:12 172:4
  226:1,5,9
  260:2 282:2
  292:10 293:2
  294:8

records 14:22
  180:13
recover 44:2
  78:5 115:16,22
  137:19,21
recovery
  149:23
recur 291:17
redid 140:16
reduce 33:10
  52:15,16
  268:13 269:16
  270:7
reduced 28:17
  243:7 269:10
  269:21 280:19
  281:15
reduction
  33:13 141:2
  171:13 242:11
  242:12 270:7
  280:16 281:2,8
  281:9
redweld 148:3
rees 210:1
refer 63:25
  90:3 154:22
  198:11 199:13
  206:25 280:5
reference 41:4
  107:23 156:10
  165:7 169:16
  178:10 194:5,7
  197:24 198:8
  198:20 199:2

204:8 228:8
  258:10 260:4
  280:4 294:17
referenced 10:4
  12:16 13:7
  17:24 21:14
  38:2 54:11
  74:22 80:16
  81:5 84:20
  95:1 97:11
  98:17 100:9
  132:11 154:7
  165:25 167:18
  169:19 185:19
  220:6 267:24
  277:20 298:5
references
  76:25 78:25
  222:21
referencing
  10:19
referral 153:5
referred 79:9
  79:14 80:23
  122:20
referring 9:19
  43:22 59:3
  99:10 105:16
  121:16 123:16
  152:23 283:11
refers 89:10
  170:8
reflect 50:24
  56:17 144:17
  210:20,22

reflected 7:14
  57:11 145:5
  156:19 209:10
  243:14
reflecting
  153:13 240:15
reflective 33:1
  234:15
refresh 42:1
  232:7
refreshes
  165:10
refute 255:8
regard 193:17
regarded
  106:11 133:11
regarding 78:2
regardless
  60:24 124:16
  245:11
register 3:22
  165:7 168:5
registered
  294:4 295:2
regular 22:21
  126:15 135:15
regularly 56:25
  131:7
regulating 77:4
reimburse
  286:24
reinalt 232:3
reject 174:5
rejected 283:8
  287:18

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

[relate - report]

relate 99:3
154:21,21
289:14
related 8:20
39:7 40:20
211:10,11
219:6 223:21
223:22 227:8
229:3 237:6
295:14
relating 73:23
129:16
relation 30:23
186:12
relations 116:4
116:5 219:9
relationship
60:12 147:6,6
relationships
295:11
relative 65:25
relatively 10:6
45:11 58:1
60:7 78:14,22
107:4,17
234:25 273:11
relaxed 147:15
relevance
138:19 289:17
relevant 27:15
31:13 76:15
102:6 122:22
134:18 139:7
160:25 161:25
163:22 175:21

179:10 189:11
215:7,20
219:22 264:5
283:7,16 284:5
relevantly
78:11
reliable 213:9
213:25 214:3
228:10,19,20
reliance 19:11
relied 75:12
129:24 130:1
178:25 203:4
207:20 217:13
relief 114:11
115:25 151:3
rely 161:23
176:2 189:20
relying 185:9
remaining
282:1
remains 214:16
remember
27:12 30:8
45:10,11,14
46:8 47:9
51:18,20 55:22
56:11 62:22
65:12,15 66:17
66:21,25 67:2
67:11,15,16,24
81:19 114:6
124:20 153:4
153:20 154:11
158:15 160:20

160:21 163:5
172:19 178:13
197:21 202:7
208:20 209:7
210:16 231:10
231:16 232:10
241:2 249:21
282:5 289:4
remembering
33:12 67:8
remove 138:5
removed
136:13 227:7
229:3
remunerative
37:21 253:20
rendered 61:23
reneged 157:22
158:2
renewals 96:15
repeat 113:25
117:23 204:1
204:14
repeating 90:3
90:4
repetition
235:10
repetitive
227:11 229:6
230:11
rephrase 97:21
183:9
report 3:13,15
3:23 4:3 8:2,4
8:8,11,15,18,19

8:20,22,24,25
9:6 13:18
14:20 16:16,17
16:18 17:1,13
17:25 18:1
34:24 36:1,11
41:6,8,11,12,24
42:6,11 43:10
47:4 55:15
56:1 58:19,21
61:20,22 64:11
64:19 65:1,9
71:19 72:19
73:4,14 74:13
78:25 82:19
107:15 112:13
113:24 114:25
117:21,22
125:17,18,20
126:19,23,23
127:1,24 128:2
128:10,24
129:3 130:15
130:24 131:3
132:13,16
133:4,25 135:7
136:12 137:25
140:5 142:12
142:13 145:23
156:6,9,19
164:25 165:25
166:9,18 169:2
172:8 178:25
179:5 185:23
186:1 187:11

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[report - responsibility]**

| | | | |
|---|---|---|---|
| 188:24 189:6 | 282:19 | representing | requires 31:25 |
| 189:15,20,23 | report's 260:5 | 6:8 17:3,4 | 95:5 |
| 190:13,17,17 | reported 1:22 | 42:16 120:21 | requisite 139:2 |
| 190:20,20 | 14:21 17:7 | 186:2,10 | research |
| 194:5 199:10 | 129:15 133:12 | 251:22 253:21 | 266:14 |
| 199:24 201:16 | 133:23 214:12 | 266:11 272:13 | reservation |
| 202:5,11,13 | 295:5 | represents | 144:9 210:5 |
| 203:2,6 204:8 | reporter 1:24 | 240:3 260:10 | reserved 5:11 |
| 205:11,14 | 26:6,24 27:3 | reputation | resigned 48:1,4 |
| 207:17,22,24 | 45:1 51:23 | 138:25 234:11 | resistance |
| 208:6,14,21 | 61:9 71:21 | 236:5 273:22 | 20:19 |
| 209:10 210:14 | 144:23 169:23 | 274:2 277:2 | resolved 15:23 |
| 212:3,7,16 | 172:3 182:1 | request 136:13 | 88:15 |
| 213:9,21 | 241:6 248:5 | 267:17 | respect 64:2 |
| 214:18 215:1,2 | 278:16 279:18 | requested 23:1 | 74:4 89:8 |
| 215:3,7,19 | 286:6 294:2,4 | 28:16 33:1 | 91:14 92:6 |
| 217:10,11 | 295:2,3 | 78:1 | 98:24 99:20 |
| 218:1 222:5 | reporter's 3:7,8 | requesting | 104:20 105:10 |
| 224:11,15 | 294:1 295:1 | 55:11 | 110:21 151:14 |
| 225:11,12 | reporting | requests 21:17 | 242:5 |
| 227:1 228:16 | 14:11,14 295:6 | require 73:15 | respective |
| 231:3,12 | reports 16:6 | 92:21 96:22 | 97:23 |
| 232:12,15,17 | 34:7,14 50:16 | 227:20 246:22 | respond 129:17 |
| 232:24 234:5,6 | 50:20,24 51:1 | 247:1 | 136:21 186:21 |
| 235:10 237:9 | 128:18 129:22 | required 34:13 | 200:19 234:2,2 |
| 237:14 238:8 | represent | 36:16 78:7 | response 30:3 |
| 246:8 254:14 | 60:14 125:3 | 138:24 162:7 | 82:8 210:4 |
| 258:25 259:25 | 172:24 173:3 | 182:22 193:25 | responses |
| 260:3,22,25 | 240:13 | 290:6 295:9 | 128:5 |
| 261:12 264:4 | representation | 297:13 | responsibilities |
| 265:3 268:1,12 | 53:10,15 95:5 | requirement | 26:3,17 27:9 |
| 268:17,19 | representative | 124:13 | 27:19 211:16 |
| 269:7 274:16 | 4:9 | requirements | responsibility |
| 275:15,16,21 | represented | 34:13 | 48:10 76:10,19 |
| 279:9,11,19 | 104:11,11 | | 77:10 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

**[responsible - right]**

| | | | |
|---|---|---|---|
| **responsible** 143:10 | **revealing** 87:21 | **rideshare** 84:6 87:24 90:20,23 | 129:22 130:3,5 132:15 139:9 |
| **responsiveness** 5:10 | **reverse** 194:6 276:3 | **ridiculous** 135:23 138:9 | 140:10,24 141:10,13,14 |
| **rest** 253:9 | **review** 8:4,7,11 8:13 16:13 | **right** 7:16,16 10:17 11:22 | 145:17 147:10 148:7 150:12 |
| **restrictions** 78:4 | 22:25 25:14 47:14,15 50:12 | 12:4 13:24 22:4 24:14 | 150:14 151:22 152:1,2 153:10 |
| **restricts** 281:21 | 58:20 108:10 | 25:24 26:13 | 153:14 154:9 |
| **restroom** 118:7 | 110:11,20 | 28:12 30:9,18 | 155:8 157:6,20 |
| **result** 8:23 9:6 | 115:20 145:7 | 33:20,23 34:10 | 157:21 158:20 |
| 26:16 33:12 | 166:19 169:7,9 | 34:21 39:15 | 159:24 161:5 |
| 139:4,5 155:24 | 171:11 177:23 | 42:21 43:7 | 164:2 165:5,6 |
| 155:25 163:18 | 180:24,24 | 45:18 46:7,15 | 165:7 166:6,7 |
| 273:1 | 181:8,16 | 49:5 52:10 | 172:10 174:13 |
| **resulting** 81:21 | 241:12 253:23 | 53:1,3 55:20 | 174:14 175:8 |
| **results** 81:18 | **reviewed** 8:24 | 56:9 61:3,4 | 175:17 176:8 |
| 104:10 259:4 | 59:8 65:13 | 62:1 67:12,13 | 176:25 179:21 |
| **resume** 72:15 | 87:12 97:18 | 67:21 71:24 | 182:13 184:20 |
| **retained** 6:19 | 165:5 178:1 | 72:22 73:3 | 184:23 185:2 |
| 20:12 34:1,6 | 193:19 289:20 | 74:2 79:5,10 | 186:6 187:10 |
| 63:15,16,19,20 | **reviewing** | 79:24,25 82:2 | 187:19 190:22 |
| 63:21 64:14 | 36:11 64:4 | 82:3,3,19 | 196:8,20 |
| 112:15 118:14 | **reviews** 21:21 | 89:21 92:3 | 197:21 201:23 |
| 118:15,16 | 60:5 | 98:2,23 99:15 | 203:2 204:12 |
| 119:2,19 122:7 | **revisit** 249:22 | 100:16,24 | 205:12 207:17 |
| 233:1,3,5,6 | **revive** 279:21 | 103:1,10,11 | 210:16,25 |
| 271:12 | **rewarded** 38:1 | 104:21 105:15 | 211:9 214:24 |
| **retainer** 112:18 | **richard** 3:15 | 105:21 106:20 | 215:22 217:22 |
| **retention** 106:9 | 8:19 31:6 | 107:18 109:12 | 218:9 219:2,4 |
| 120:8 285:11 | 58:17 72:18 | 109:18 112:13 | 219:21,25 |
| **retentions** 66:22 | 92:17 117:17 | 113:10 117:8 | 220:1,22 |
| **return** 298:12 | 129:4 132:13 | 119:3,4,5,24 | 221:10 225:6 |
| **reveal** 212:7,16 | 190:18 236:7 | 120:8,15 123:4 | 225:20 226:23 |
| | 260:17 262:22 | 124:25 125:6 | 231:9 232:23 |
| | 270:23 273:25 | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[right - saying]**

233:1 236:2 237:1,23 239:11 241:12 242:14 243:16 248:8 249:9,10 249:16 250:7 250:12 253:23 256:10,12,13 257:6,20 258:12 260:8 260:25 261:12 261:16 262:1 264:11,19,23 265:3,23 266:24 267:6 268:2 269:24 270:2,14 273:24 275:17 276:4,10,20,20 276:24,25 277:22 287:24 289:1,4 290:16 292:18

**rights** 22:5 210:5 238:24

**ring** 66:7 231:9

**rings** 231:10

**rise** 266:2

**risen** 131:2 272:3

**rising** 131:1,17 131:21

**risk** 37:25

**road** 20:18 46:18 245:25

**robert** 48:12 62:25 187:18

**robin** 149:16

**robust** 39:1 125:24 127:23

**role** 45:12 64:17 189:17 211:12

**roles** 25:13

**roof** 248:2

**room** 41:13 42:16,21 46:2 171:7 271:9

**ropers** 136:10

**rose** 130:20

**rough** 40:17

**roughly** 39:10 112:16 164:22

**round** 216:19

**rpr** 1:23 294:4 294:24 295:23 295:23

**rubs** 254:15

**rule** 34:10,12 35:12 75:23 76:9,11,12 77:13 138:19 139:10,16 140:16 161:2,6 161:7 198:8,14 199:1,11,17,23 200:6,10,11 208:1,2 214:7 218:2,13 219:5 287:9,10 294:5

**rules** 5:5 7:3 147:16 198:23 199:20 218:25 294:5 295:9,12 298:14

**ruling** 16:4 123:5

**rulings** 236:17

**run** 13:18 15:9 38:20 54:6 67:14 103:25 252:11

**running** 54:5 96:16 213:16 274:19

**runs** 45:6

**s**

**s** 2:1 5:1 9:24 296:3

**safe** 20:23

**salaries** 195:4

**sale** 216:3,12

**san** 8:1 59:18 62:16 82:25 87:6 98:18 121:17 162:23 164:4,10,13,18 165:8 175:6 179:12,21 185:15 201:25 237:23 247:10 248:17,20,22 256:4 259:5,6 259:10 260:5 261:15 262:4

264:5 265:21 266:10,18 269:2 271:18 273:6 276:4 279:10

**sanjeet** 9:24 13:7,8 15:17

**sat** 58:17

**satiric** 54:21

**satisfied** 23:19

**save** 144:22,25 145:3,9

**saving** 143:6

**saw** 9:2 13:15 34:15 64:12 68:3 134:20 136:12 167:14 171:14 182:14 184:25 185:4 222:21 232:12 250:17 255:13 278:1 281:12

**saying** 16:18 23:8,8 26:1 27:15,21 30:15 59:2 69:9 81:22 106:6 114:16 144:20 148:11 157:3,7 157:14 158:15 162:3,9 183:5 183:14 186:4 186:24,24 190:3,10,13 191:3 196:22

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[saying - see]**

210:7 213:20 214:2 218:15 222:7 227:6 228:18,21 237:24 240:22 242:25 253:8 254:25 256:11 257:8 260:16 289:24 290:11 291:18

**says** 43:14 49:19 63:23 73:4 74:13 82:21 88:8 100:20 101:1 107:3,16,16 129:4 130:19 132:5 137:9 159:19 189:15 249:11 250:20 251:25 252:18 253:11 257:20 282:18,21 283:12

**scale** 174:2

**scanner** 11:21

**schedule** 72:7 240:1,2 242:2 242:7

**schedules** 35:5 61:19 169:16 170:5 244:15 263:22

**scheduling** 147:17

**schiller** 195:24 196:20

**school** 43:20 54:6,7 56:22 62:16

**schwarzeneg...** 282:3,6 283:3

**scientific** 180:15

**scope** 112:20 185:13 283:15

**scorched** 291:20

**scour** 14:22

**scratch** 75:15 168:8

**screen** 24:14 65:4 82:13 140:5,7 164:25 165:16 176:21 189:1 248:17 282:9

**screenshare** 55:24 72:15 124:24

**scroll** 56:4 208:25 232:20

**scrolling** 82:4 249:17 254:2 283:5

**seal** 295:16

**search** 45:14 93:14

**seat** 23:10 122:2

**second** 12:25 13:9 23:10 79:6 101:7 112:17 124:25 130:18,19 147:3 176:19 218:5 227:13

**secondary** 31:7 68:21 79:11

**secret** 84:13 85:18 87:5,25 89:5 90:14 91:12 94:20 96:21 97:10 107:1,2 146:23 180:2 192:19 219:16 263:5

**secretary** 72:5

**secrets** 83:21 83:23 84:5,9 84:21 85:3,17 85:19 86:13 87:22 90:5 113:18,18 267:23 278:3

**section** 1:8 10:8 11:11 78:18 205:13 222:12 227:2 254:12 254:13

**sections** 215:6 215:7 217:17

**securities** 23:22

**see** 7:11 8:13 8:18 10:18,20

11:16,16 13:14 31:8 33:11,14 49:14 52:18,20 55:12 56:1,3 56:21 57:3,4 57:14 63:23 65:4 72:21 73:10 75:2 79:4,16 80:8 82:7,10 83:7,8 88:12 106:15 111:19 119:15 125:1,6,7,8 126:4 129:8 133:14 134:17 134:20 141:20 143:21 152:6 153:16 155:6 155:18 165:9 165:15 168:6 168:14 169:4 169:17 170:15 172:14 175:4 176:17,20 179:8 180:25 184:6 185:17 185:23 186:12 186:17 189:1 191:2 192:17 203:2 207:17 215:19 216:8 227:3 229:16 231:24 232:5 232:19 234:12 237:7,24 238:1

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

[see - settlements]

240:21 241:14 241:16,25 246:14,15 248:17 249:7 249:10 250:14 256:7,8,10 260:6,16 261:15 266:15 268:1 273:18 274:15,25 279:20 285:16

**seeing** 15:19 80:5 260:10 292:23

**seek** 62:8

**seeking** 68:24 115:22 116:16 116:17,23 149:23 156:11 170:9 173:2 239:15 288:25

**seem** 145:5 200:15 209:13 247:8

**seemed** 17:22 167:19

**seems** 28:22 74:20 272:16

**seen** 21:9 28:14 59:9 60:3 64:10 65:19 70:3 110:3 140:13 145:25 175:2 250:6 290:10

**segregated** 114:20,24 136:5

**selected** 120:15 132:21 190:24 201:20 214:9 219:25

**selection** 228:15

**selectively** 134:15

**self** 83:25 129:15 192:6,9

**sell** 14:25

**selling** 36:21 217:2 218:7,10 254:9

**send** 58:1 72:5 151:18 157:1

**sending** 72:10

**senior** 35:3,8 61:15 170:6

**sense** 21:22 30:12 85:5 133:22 134:10 191:16 239:7 251:16 265:5 274:19

**sensitive** 66:18

**sent** 125:2 165:18 267:16

**sentence** 130:19 179:24 227:13 229:1 288:8

**separate** 63:13 86:12 115:15 116:23 142:6 142:18 144:5 144:10 173:17 221:25 222:12

**separated** 138:2

**separately** 26:20 42:8 115:15 141:14 144:25

**september** 57:24 112:18 150:7 232:24

**sequence** 122:1

**series** 83:6

**seriously** 25:13

**serve** 23:4 119:24 150:17

**serves** 277:25

**service** 4:9 15:1 53:5 55:3 63:8 111:16

**services** 13:22 36:22 37:16 60:7 61:2 63:13,18 83:1 131:12 137:18 137:18 138:2 139:3 140:20 157:5 170:10 248:2 295:10

**set** 7:12 29:12 35:17 39:22

48:8 60:7 61:21 63:13 73:17,17 74:10 99:9 100:7 122:1 124:5 142:10 169:13 231:17 247:7 252:2 295:4

**sets** 152:15 250:5 284:3

**setting** 63:13 140:12

**settle** 15:22 18:13 25:19 85:2 88:22 101:24 103:15 150:18

**settled** 16:5 32:5

**settlement** 10:8 10:12 18:17 19:3 20:16 21:2 22:9 23:21,23 25:4 25:6,8 30:13 33:17 85:1 106:1 151:2,20 154:12 155:11 177:15 249:19 249:24 251:5 251:21 254:3,4

**settlements** 10:23 11:16 15:12,14,18,20 16:6 17:8

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

[settlements - similar]

| | | | |
|---|---|---|---|
| 18:14 20:23 | 105:8 107:5 | 51:9 143:25 | **significant** |
| 30:21 32:17 | 112:5 117:11 | 240:12,22 | 105:3 112:25 |
| 33:7 85:4 | 143:15 152:8 | **shut** 247:1 | 234:18 253:24 |
| **settling** 93:1 | 156:4 159:2 | **sic** 294:19 | **significantly** |
| **seven** 69:20 | 166:20 170:22 | **side** 15:21,24 | 127:12 180:20 |
| 113:20 136:4 | 175:13 188:1 | 18:7,9,12 | 196:18 231:3 |
| 142:15 143:18 | 194:20 235:3 | 22:10 23:18 | 262:10 |
| 146:21 147:11 | 274:10 277:11 | 24:12,13,15 | **signing** 5:7 |
| 148:13 150:13 | 277:16 286:9 | 26:14 31:2 | 124:20 |
| 257:2 292:9 | **shartsis's** 278:1 | 32:2 36:24 | **silly** 91:24 |
| **seventh** 48:2 | **she'll** 72:10 | 37:13,22 39:9 | 284:10 |
| 69:23 157:16 | **sheet** 165:16 | 55:9,10 61:13 | **simes** 59:4 |
| 159:15 160:7 | 168:4,9 176:17 | 68:5,24 69:6 | 82:24 83:13 |
| 287:2 | 210:15,18 | 70:10,11 80:22 | 84:22 86:8 |
| **several** 79:14 | 298:10 | 83:17 85:16 | 97:1,24 99:1 |
| 89:12 131:10 | **shift** 112:11 | 87:21 90:12 | 99:15,21 |
| 140:2 215:6 | **shoes** 15:25 | 92:24 93:23 | 100:14 106:9 |
| **sf** 100:23 | 36:25 106:4 | 100:3 108:14 | 107:24 108:1 |
| **shape** 19:1 | **shooting** 274:5 | 111:1,17,18 | 145:14 151:15 |
| 111:12 123:10 | **short** 67:7 | 115:25 119:9 | 161:16 178:16 |
| 126:7 168:9 | 149:8 | 135:1,13 137:4 | 180:1 201:22 |
| 255:5 | **shorthand** | 137:5 148:2,8 | 222:18 247:12 |
| **share** 12:1 | 121:16 | 227:20 250:22 | 266:12 271:4 |
| 41:19 88:24 | **show** 10:10,14 | 254:25 268:5 | 271:16 272:13 |
| 176:18 | 12:20 41:3 | 277:5 | 289:12 290:11 |
| **shared** 93:13 | 96:8 102:14,14 | **side's** 135:14 | 291:9 |
| 110:19 117:4 | 124:23 143:17 | **sides** 23:16 | **similar** 29:5 |
| **sharing** 112:13 | 149:2 205:17 | 31:1 38:8 | 30:2 83:1 |
| **sharpen** 244:21 | 232:9 240:22 | 84:14 | 125:20 139:16 |
| **shartsis** 9:12 | 263:23 288:23 | **sign** 298:6,11 | 164:19 174:4 |
| 9:23 12:17,19 | 294:21 | **signature** | 179:8,24,25 |
| 13:7 62:9,14 | **showed** 66:8 | 295:16,16 | 185:15 198:14 |
| 89:15 91:16 | 67:25 240:9,10 | **signed** 298:17 | 209:24 212:12 |
| 94:5 99:8 | **shows** 10:13 | **significance** | 232:11 233:15 |
| 100:23 104:7 | 11:5 12:9,13 | 288:9 | 235:7 271:24 |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

**[similar - solve]**

| | | | |
|---|---|---|---|
| 271:25 272:1 | 99:2 100:21 | 282:11 | **skills**  25:18 |
| 279:2 290:12 | 103:24 104:8 | **situation** | 273:2,2 |
| 290:25 | 106:15 107:25 | 142:24 162:15 | **skipping** |
| **similarly**  144:6 | 109:22 110:2,5 | 172:20 249:20 | 190:22 |
| **simple**  139:9 | 121:15 129:1 | 251:5 285:14 | **slash**  268:5 |
| **simpler**  229:11 | 156:8 157:24 | **six**  52:5 69:24 | **slide**  67:21 |
| **simplistic** | 158:7,15 | 128:6 136:25 | **slightly**  16:20 |
| 114:16 | 160:11 162:8 | 148:10 161:12 | 26:12 56:13 |
| **simply**  7:6 21:1 | 165:2,16 166:1 | 284:24 | 173:12 |
| 27:6 70:19 | 168:6,25 | **sizable**  141:2 | **slip**  119:15 |
| 117:2 118:1 | 170:15 171:24 | 150:2 164:15 | **slow**  53:6 |
| 148:17 174:13 | 172:9 173:4 | 192:4 | **small**  22:15 |
| 213:21 217:22 | 174:9 176:21 | **size**  25:22 | 132:6 150:15 |
| 224:5 | 177:13 179:8 | 127:2,11,14 | 238:4,6 269:20 |
| **single**  16:1 27:7 | 180:1 194:8 | 130:13 133:2 | **smaller**  127:6 |
| 32:15 69:17 | 211:5 213:5 | 189:16 194:7,9 | 132:7 194:21 |
| 146:13 254:11 | 219:3 227:4 | 194:11,18,21 | 195:17 197:6,7 |
| 255:12 259:9 | 248:18 255:21 | 196:21 197:3 | 197:16 199:7 |
| 259:11 | 256:7 284:9,18 | 198:8,20 199:2 | 263:10 |
| **singularly** | 286:10 289:3 | 200:5 201:2 | **smart**  186:19 |
| 52:22 | 291:3 | 234:11,15,16 | **smash**  200:1 |
| **sir**  9:19 11:22 | **sit**  7:16 8:20 | 234:18 235:6,7 | **smattering** |
| 13:14 25:16 | 45:15 100:16 | 235:9 237:8 | 253:1 |
| 26:3 27:3 29:4 | 108:19 113:10 | 238:12 261:3 | **sneakily**  85:24 |
| 30:8 33:21 | 266:9 279:13 | 262:2,8,18 | **soap**  59:20 |
| 35:24 36:15 | **site**  15:6 17:8 | 263:1,9,10,11 | **society**  121:18 |
| 37:8,24 38:10 | **sits**  242:4 | 263:17 268:21 | **solely**  115:19 |
| 40:3,10 41:9 | **sitting**  8:7 | 268:22 269:9 | **solicit**  25:3 |
| 43:23 44:4 | 24:14 25:24 | 269:10,17,18 | **solicitation** |
| 46:7 47:4 | 26:13 27:7 | 272:1 273:21 | 222:22 |
| 48:10 60:11 | 31:15 32:15 | 276:19,23 | **solid**  272:5 |
| 65:7 66:18 | 50:2 74:2 | 278:18 | **solutions** |
| 74:19 75:9 | 123:2 138:8 | **sizes**  270:1 | 298:19 |
| 79:4 82:7,14 | 188:18 216:21 | **skill**  35:17 | **solve**  122:16 |
| 91:15 97:12 | 217:14 239:8 | 139:2 273:22 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                       www.veritext.com

[somebody - split]

| somebody | 82:12 93:25 | sourced 217:19 | specifically |
|---|---|---|---|
| 26:23 28:11 | 97:11,16 | sources 14:20 | 81:14 128:21 |
| 33:17 36:3 | 102:24 104:11 | 75:12 125:17 | 130:6 178:9 |
| 44:19 49:13 | 105:9 106:19 | 128:22 129:21 | 202:7,18 207:8 |
| 50:3 53:25 | 109:11,22 | spare 7:2 | specificity |
| 54:17 68:19 | 149:17 153:1 | speak 43:20 | 263:22 |
| 86:21 89:3 | 157:25 161:8 | 62:2,23 72:2 | specify 60:19 |
| 90:21 93:5,6 | 166:12 168:6 | 76:8 103:22 | spectrum |
| 105:1 106:3 | 179:16 181:22 | 109:22 110:23 | 276:17 |
| 114:14 126:4 | 181:23 183:1 | 157:24 181:22 | spelling 149:18 |
| 132:3 136:24 | 184:22 187:24 | 184:17,19 | 294:16 |
| 138:3 156:16 | 208:2 212:23 | 205:5 259:14 | spend 42:11 |
| 157:1 166:9 | 212:24 215:8 | speaking 74:8 | 58:15,25 83:25 |
| 169:8 173:15 | 224:12,13 | 75:22 76:20 | 84:17 86:23 |
| 183:5,23 184:1 | 229:16 238:1 | 101:17 164:8 | 95:8 111:6 |
| 186:13,14,18 | 248:5 260:2 | 195:9 203:19 | 286:15 |
| 188:10 193:20 | 277:23 280:22 | 213:4 221:20 | spending |
| 218:24 224:20 | 289:9 | 221:20 263:14 | 141:18,19 |
| 246:1 247:22 | sort 102:4 | 271:14 | spent 20:16 |
| 252:9 254:9,10 | 184:2 200:23 | special 18:3 | 37:18 38:2 |
| 256:17 259:12 | 244:16 270:13 | 19:14 230:4 | 58:6 69:19 |
| 266:7 267:13 | 272:13 278:11 | specialized | 101:13 111:5 |
| 283:5 | sought 89:24 | 94:8 95:5 | 112:2,4,5 |
| somewhat | 133:6 134:7 | 96:22 252:4 | 114:20 145:8 |
| 54:21 152:13 | 153:15 | specialty 68:21 | 146:10 152:12 |
| 153:19 250:21 | sound 188:24 | 91:17 94:6 | 153:12,13,18 |
| 276:14 | 197:11 | specific 27:17 | 158:19 161:17 |
| sonos 239:4 | sounds 59:20 | 53:18 66:4 | 163:6 168:20 |
| sophisticated | 91:18 213:24 | 117:19 126:10 | 170:4,20 |
| 48:17 96:4 | soup 67:22 | 129:12,12 | 172:12 253:10 |
| 234:17 278:22 | source 31:7 | 166:17 167:1,5 | 281:3,4 286:25 |
| sorry 26:24 | 68:21 76:15 | 191:19,24 | 288:13 |
| 29:21 44:4 | 79:11 80:6 | 192:1 193:17 | spirit 57:17 |
| 49:2 72:14 | 86:18 89:7 | 193:18 221:7 | split 146:15 |
| 75:8 80:3 | | 221:22 279:12 | |

Veritext Louisiana -- CRLA/goDEPO  cs-Louisiana@veritext.com
A Veritext Company  www.veritext.com

**[splitting - straight]**

| | | | |
|---|---|---|---|
| **splitting** 141:25 195:2 | **stand** 148:1 204:13 | 77:18,22 96:16 120:2 122:19 | **stating** 198:6 |
| **spoke** 12:7 76:9 | **standard** 159:16,25 | 125:21,23 126:10 128:3 | **status** 53:3 |
| **spoken** 61:7 62:5 63:2 | 170:17 278:25 | 134:13 179:5 182:17 190:24 | **statute** 78:22 121:13 122:4 |
| **spontaneous** 294:9 | **standards** 124:5 | 199:1 211:19 228:23 231:17 | 122:17,20,22 123:10 135:14 |
| **spooling** 30:18 | **standing** 38:22 184:2 | 235:15 248:16 252:14 283:12 | 236:19 251:21 252:13 254:5 |
| **square** 216:19 | **stands** 294:22 | 294:3,7 295:2 | 284:1,2 295:9 |
| **squeeze** 289:15 | **star** 191:11 282:10 | **stated** 86:13,15 86:15 114:1 | **statutes** 75:22 77:9 78:16,17 |
| **stacey** 9:22 12:11 103:7,16 | **start** 10:17 32:12 38:10 | 176:5 189:8 191:6 294:20 | 252:14 |
| 103:17 275:1 | 85:10 90:3,4 105:16 162:12 | **statement** 78:13 79:18 | **steal** 221:15 |
| **staff** 85:25 106:14 195:6 | 171:24 188:23 | 93:11 98:19 100:1,12 | **stealing** 256:18 256:18 |
| **staffed** 110:2 175:12 | **started** 14:10 14:14,16,18 | 101:17 115:18 115:19 143:9 | **steals** 276:12 |
| **staffing** 69:17 107:4,10,11,17 | 16:24 38:11 88:2 120:20 | 183:10 189:19 196:11 207:20 | **stellar** 236:5 |
| 113:23 117:19 138:15 141:7 | 196:4 241:16 256:20 268:18 | 227:21 228:2 238:20 242:15 | **stem** 142:25 |
| 146:14,15 148:4 166:25 | 269:23,24 278:13 | 245:4 246:12 255:8 272:10 | **stenotype** 295:6 |
| 170:12,14,18 173:6 175:10 | **starting** 27:1 59:24 268:21 | 291:4,8 | **stick** 67:20 246:15 |
| 175:18,22 176:5,6,15 | 276:9 | **statements** 110:19 116:6 | **sticks** 67:23 |
| **staffs** 106:11 | **starts** 193:2 | 168:18 | **stipulated** 5:3 |
| **stages** 186:8 | **state** 1:25 11:1 25:12,20 26:5 | **states** 1:1 128:4 188:2 237:15 | **stipulation** 3:4 |
| **stake** 108:23 239:6 | 26:8 39:6 71:12 74:15,16 | 250:2 | **stix** 151:1 |
| **stakes** 83:10,22 89:11 | 75:16,22 76:13 77:1,2,4,11,17 | | **stole** 255:14 |
| **stamped** 235:19 | | | **stones** 159:22 |
| | | | **stop** 90:4 112:13 144:4 |
| | | | **story** 59:23 125:1 126:4 |
| | | | 135:25 190:6 |
| | | | **straight** 180:4 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[straighten - supplements]

| | | | |
|---|---|---|---|
| straighten 184:25 | subcategory 218:3 | substance 125:3 | suggests 33:13 245:20 |
| straightforward 70:12 | subdivide 126:9 | substantial 256:13 257:17 | suing 44:2 67:19 87:3 |
| stranger 286:17 | subject 7:19 20:1 33:21 | substitute 167:1 | 115:7,15 119:6 120:20 216:9 |
| stratosphere 265:1 | 35:11 71:13 169:4 181:19 | successful 136:14 | suit 247:4 290:19 |
| streamlining 118:2 | 182:3,19 219:6 256:15 259:22 | suddenly 88:7 | suite 2:5,11 |
| street 2:5,11 3:17 85:11 | 283:18 | sue 83:20 87:24 90:13 91:9,21 | suits 22:12,12 90:23 |
| 96:4 125:6 | subjective 52:15 92:13 | 96:19 114:14 138:3 142:4 | summarized 133:22 169:11 |
| strength 80:22 | 247:22 266:5 | 255:15 | summarizes 275:23 |
| stretch 84:7 192:20 | submarkets 281:21 282:13 | sued 13:1 87:5 91:24 108:20 | summary 87:15 206:18,21 |
| stretching 223:6 | 282:14,15 | 109:2 114:15 290:14 | 267:24 268:2 |
| strikes 90:18 | submission 97:19 | suffice 19:9 | sunday 46:22 |
| stripes 25:19 | submissions 97:18,22 | suggest 24:7 111:18 156:6 | super 228:11 265:20 |
| strong 85:15 236:19 | submit 192:5 | 162:6 184:6 237:19 245:5 | superior 59:18 98:11,18,21 |
| structures 32:19 49:24 | submitted 59:4 64:5 144:10 174:17 248:15 | suggested 28:15 | 165:9,15 248:16 |
| studied 6:23 | 249:2,7 260:13 284:16 289:3 | suggesting 24:3 24:4 33:6 41:1 | superstar 172:1 |
| studies 130:23 | subscribed 297:14 | 69:8 71:5 80:12 104:21 | supervised 16:1 |
| study 213:25 214:3 | subscription 133:14 | 182:8 200:10 214:22 245:19 | supervision 295:7 |
| stuff 128:19 136:20 148:20 221:16 230:8 | subset 277:3 | 287:9 | supervisory 153:19 |
| 267:16 | subsidiary 60:16 | suggestion 87:13 | supplements 79:3 |
| stuffing 216:19 | | | |
| sub 25:2 140:11 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company   www.veritext.com

**[support - take]**

| | | | |
|---|---|---|---|
| **support** 4:13 19:16 86:4 87:12 117:4 134:8 152:10 155:11 166:13 228:15 245:4 284:17 | **sure** 7:5 11:12 11:20 14:15 22:7 23:4 28:14 32:20,25 36:3,12 38:9 39:25 40:8 41:25 42:5,25 | 267:12 269:23 277:24 282:1 283:6,24 **surely** 148:16 195:23 **surgery** 192:22 **surmise** 64:24 **surmising** 15:4 | **swope** 248:24 256:4,11 **sworn** 6:2 178:10 252:1 255:8 288:6 295:4 297:14 **system** 88:11 153:11 156:23 |
| **supported** 252:3 **supporting** 163:2 241:23 243:14 262:21 | 45:7,23 47:1 47:23 53:2 54:3 56:16 59:1 60:14 62:7 71:4 | **surprise** 66:12 168:1 221:17 **surprised** 130:25 283:10 | **systematic** 14:23 |
| **supportive** 18:2 22:21 105:13 156:22 255:5 | 75:22,24,25 80:1 81:1 82:14 88:20 102:21 108:17 | **survey** 29:9,18 30:5,11 126:8 126:10,22 132:5 198:23 199:20,23 | **t** |
| **supports** 23:7 83:16 **suppose** 14:12 43:19 164:6 224:19 | 110:9 111:18 117:24 121:11 124:12 128:7 129:24 133:25 139:14 140:9 151:22 152:9 158:4 161:18 | 206:2 209:16 212:11 213:22 233:21 234:20 234:21 235:6 258:24 261:7 284:3 | **t** 2:10 5:1,1 9:24 44:6 103:8 129:10 129:11 296:3,3 **table** 59:15 **tables** 276:6 **tablet** 270:22 |
| **supposed** 13:12 128:3 133:7,8 134:7 166:23 213:13 | 162:18 165:13 169:1 171:16 176:13 178:8 185:23 188:6 | **surveyed** 132:4 132:6 **surveys** 29:22 189:10 233:22 233:23,25 | **tabulated** 244:20 **taco** 26:20 32:22 33:4 287:23 |
| **suppress** 228:22 230:3 **suppressed** 227:23 | 190:21 198:3,4 198:5 203:10 203:11,22 209:12,21 | 235:20 **survive** 150:16 **susie** 1:5 **suspect** 188:15 | **tailor** 261:10 **take** 11:12 25:13 34:9 36:2 42:17 52:21 54:24 |
| **suppressing** 214:22 **supreme** 77:13 188:2,9,11 196:9 | 211:24 224:5 224:19 232:11 233:6 240:24 250:24 259:6 | 240:11 **switch** 38:8 39:19 | 62:7 63:18 71:21 77:12 87:18 95:18 118:4,6 133:8 134:7 142:20 146:2 155:23 160:10 162:12 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

[take - terms]

162:14 171:18
172:23 173:1,1
180:22 207:2
217:21 229:15
240:16,18
245:16 263:4,4
263:12
**takeaway**
29:13
**taken** 5:4 7:1
21:2 31:4
42:17 71:25
88:16 98:2
115:1 118:10
145:4 172:6
194:1 226:3
240:2 248:10
275:12 277:13
292:12 295:3
**takers** 37:25
**takes** 23:10
88:20 91:22
108:24 198:11
281:1 291:23
**tale** 133:21
**talent** 196:8
**talk** 31:9 42:7
71:11 102:25
112:12 124:3
148:7 164:1
186:9 189:22
208:6 222:25
275:5 285:22
291:12

**talked** 29:23
72:9 139:1,3,8
163:22 173:20
178:6 185:8,12
192:17 197:20
199:13 209:6
226:8 258:8
265:8 268:2
273:12,13
291:11 292:16
**talking** 11:11
12:4 18:8
20:22 45:18
54:16,19 56:7
59:2,2 60:7
77:17 78:15
97:12 99:7
105:21 111:2,3
112:2 128:24
142:14 148:10
150:8,10 151:8
151:14 173:22
173:23 175:5,7
183:4 188:23
194:4 198:22
198:23 199:8
199:18,19
221:13 222:17
231:8 232:22
237:22 239:2
239:10 249:3
254:1,9 259:2
266:5 273:9
284:3,5 286:14
286:19

**talkovers**
294:12
**talks** 18:1
91:17 106:9
110:16 126:3
250:18
**tall** 180:15
**tally** 254:18
**tangent** 32:13
**tangential**
152:13
**tango** 88:21
**target** 216:23
**task** 74:16
75:17,19 76:13
76:23
**tasked** 21:16
24:10
**tasks** 167:6
**tcpa** 156:4
**team** 64:1
106:13 146:25
**teams** 69:23
**technology**
124:18
**teeing** 42:9
**tell** 10:8 31:20
34:17 50:14
52:12 55:23
57:1 63:4 65:6
68:14,14 79:20
95:11 101:14
115:23 149:4
157:22 159:7
168:20 184:12

188:21 190:5
200:2 203:17
205:20,22
212:10,18
213:2 214:20
216:10 217:16
246:2 289:2
**telling** 107:20
200:4
**ten** 44:21 110:6
110:7,8 127:10
127:11 131:21
141:3 175:1
192:10 194:13
267:8
**tend** 87:22,23
220:3 227:16
**tends** 69:6,6
227:10
**tens** 96:7 285:7
285:7
**tent** 85:10
124:16
**tenth** 101:13
196:21
**term** 83:18
139:11 168:5
224:10,13
**termination**
219:9
**terminology**
120:9
**terms** 60:17
157:19 164:13
217:9,23

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[terms - think]**

| | | | |
|---|---|---|---|
| 221:22 235:9 | 204:13 206:25 | 253:3 256:19 | 253:2 255:18 |
| 243:3 245:13 | 207:1 210:20 | 267:7 274:3 | 261:5 272:17 |
| 255:2 285:11 | 215:18 229:10 | 290:15 291:12 | 272:24 273:9 |
| 285:23 | 231:25 249:21 | **things** 9:6 | **think** 11:9 |
| **test** 15:6 | 274:14 295:3,5 | 13:22 27:13 | 12:13,17 13:8 |
| 288:12 | 297:8 298:8 | 37:17 39:2 | 15:13 16:19,21 |
| **testament** | **thank** 11:25 | 58:5 67:2,9,16 | 17:12 19:5,7 |
| 146:15 | 21:13 27:3 | 67:18 68:23 | 23:12 25:3,10 |
| **testified** 6:3 | 72:12 99:18 | 69:9 71:4 72:9 | 29:24 30:25 |
| 45:5,8,25 46:3 | 292:22 | 77:8,8 78:10 | 32:9,12 33:15 |
| 46:24 74:16 | **theirs** 91:17 | 80:8 84:4 85:7 | 35:17 38:3 |
| 77:1,18 128:4 | 145:11 | 87:6 91:4,20 | 39:5 44:22 |
| 135:6 187:9 | **theoretically** | 92:8,9 97:6 | 45:25 46:14 |
| **testify** 45:10 | 57:12 | 102:15 104:22 | 47:6 48:17 |
| 77:21 78:1 | **theory** 58:2 | 111:1 112:7 | 52:12 55:11 |
| 158:22 295:4 | 153:5 | 115:6 116:19 | 56:15 57:16,24 |
| **testifying** | **thereto** 97:23 | 117:22 118:19 | 59:9,10 62:17 |
| 139:21 140:3 | **thing** 21:8,9 | 118:24 140:14 | 62:20,21 63:17 |
| **testimony** 6:16 | 27:24 28:3,23 | 141:7 142:4 | 64:8 66:14 |
| 7:9,20 8:5 10:5 | 29:10 30:7,14 | 143:2 144:8,15 | 69:2,10 70:9 |
| 15:15 25:12 | 37:11,23 49:4 | 147:17 148:8 | 70:22 71:7,17 |
| 30:8 45:19,24 | 52:16 54:9 | 151:1 161:23 | 72:8,21,24 |
| 46:10,13,23 | 61:21 67:2 | 161:25 162:4 | 74:25 75:5,20 |
| 49:8 54:13 | 68:1 77:5 | 163:8 167:12 | 76:7,20 80:1 |
| 55:19 56:10,17 | 78:19 80:1 | 167:13,17,18 | 80:20 84:11,20 |
| 57:10,13 58:22 | 88:6 89:19 | 167:21 170:25 | 85:1,10 86:5 |
| 72:3 77:24 | 108:3 122:3,18 | 173:17 176:16 | 86:18 87:9 |
| 89:22 90:2,7 | 130:25 131:18 | 181:3 186:13 | 88:14,15 89:12 |
| 102:21 103:10 | 135:1 137:10 | 190:2 198:22 | 89:13 90:12 |
| 111:10 131:19 | 138:18 154:20 | 199:20 206:1 | 92:3 93:20 |
| 135:8,9 154:22 | 156:18 168:11 | 210:7 216:3 | 94:3,9,16,16,17 |
| 154:24 156:12 | 174:12 188:6 | 217:8 219:11 | 97:13 98:1 |
| 157:20 182:6 | 194:25 199:2 | 221:5 222:1 | 100:3,19 101:8 |
| 188:12 189:5 | 209:1 226:18 | 239:22 244:7 | 102:6,18 |
| 199:16 204:2 | 226:21 227:16 | 245:13,21 | 104:18 108:9 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[think - time]**

| | | | |
|---|---|---|---|
| 109:7 111:9 | 198:5 201:14 | **thinks** 190:18 | **thoughts** 8:22 |
| 119:11 121:6 | 205:3 208:18 | 247:3 252:15 | 9:5,8 90:18 |
| 124:14,21,22 | 210:12 214:1 | 265:12 | 103:24 124:24 |
| 125:9,17 126:2 | 214:15,24 | **third** 12:11,16 | **thousand** 164:9 |
| 126:6,22,23 | 215:8,10,15 | 16:19 17:15,16 | 164:16 |
| 129:14 133:3,8 | 216:9,24,24 | 17:16 19:9 | **thousands** 7:2 |
| 133:19 134:2,3 | 221:7 223:5,6 | 21:25 23:24 | 111:2,4 173:8 |
| 134:23,25 | 223:13,20 | 43:14 79:5 | **three** 15:18 |
| 135:2,7 136:22 | 225:2,9,24 | 103:21 115:7 | 31:6 56:12 |
| 137:8 138:5,11 | 227:24 230:13 | 157:10 158:13 | 59:9 68:3,19 |
| 139:9 141:5,6 | 230:15 232:11 | 260:9,18 | 68:22 70:21 |
| 142:12,23 | 232:12 234:7,7 | 261:15 262:20 | 79:11 84:11 |
| 144:12 145:6 | 236:8,11 237:5 | 262:22 264:11 | 94:9 97:8 |
| 145:12 148:11 | 237:8 238:10 | 264:22,24 | 128:18 152:6 |
| 151:2,4,10,23 | 239:15 240:24 | 278:21 280:7 | 152:15,21 |
| 152:12 154:7 | 241:9,10,17,19 | 286:2,13 289:1 | 163:23 171:22 |
| 154:15 156:9 | 242:23 244:23 | **thirds** 170:24 | 174:14 176:14 |
| 156:10,12,23 | 245:15 247:20 | **tholin** 149:16 | 177:16 179:24 |
| 159:6 160:15 | 247:24,25 | **thomas** 232:3 | 181:10 239:1 |
| 161:14,21 | 249:14 250:21 | **thorough** 21:13 | 253:25 |
| 162:4,11 | 251:1,4 253:5 | **thoroughly** | **thresholds** |
| 163:14,19 | 253:20 254:2 | 87:21 89:14 | 238:6 |
| 164:19 167:14 | 258:2,9,12 | **thought** 16:15 | **threw** 54:19 |
| 167:25 171:21 | 261:18 264:14 | 31:17 82:12 | **throw** 95:9 |
| 178:4,14,23 | 266:7 267:9 | 88:13 95:20 | 135:24 136:20 |
| 179:22 181:25 | 269:18 272:9 | 97:17 121:25 | 236:7 |
| 183:8,16,25 | 272:12 274:4 | 136:9 140:25 | **throwing** 257:7 |
| 184:3,10,12,24 | 275:23 277:20 | 147:9 154:10 | **thrown** 137:8 |
| 186:20,22 | 278:7,20 283:8 | 163:24 179:17 | **thursday** 1:15 |
| 187:4 188:9,13 | 284:10 285:1 | 180:9 211:23 | 46:22 |
| 188:22 189:22 | 288:4,18,19,21 | 213:4 215:9 | **time** 9:21 10:1 |
| 190:3,13 | 289:12,16 | 247:6 260:22 | 10:16 18:10 |
| 191:11,13,13 | 291:15 292:19 | 260:22 261:23 | 23:16 38:23 |
| 191:14 192:5 | **thinking** 92:19 | 268:15 271:23 | 39:3,11,16 |
| 195:15 196:2 | 201:1 260:19 | 294:11 | 42:12 43:25 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[time - tort]**

47:20 54:1
57:6 58:13,25
62:15,17 65:12
66:2 69:19
70:10,19 71:6
75:2 89:19
97:5 102:13
103:5 105:3
108:18 109:21
111:2,19 114:8
114:19 118:4
118:25 120:4
121:1 135:15
136:5 137:8
138:23 141:16
143:10 144:22
144:25 145:3,8
145:9 146:10
148:7 149:8
150:12 151:13
152:12 153:12
153:18 162:2
168:20 169:10
170:4,6,20,24
172:12 173:5
176:8,17,24
201:7 203:16
207:2 232:21
241:13,13,15
241:20 250:4
252:25 253:10
263:6 265:12
274:18 280:15
282:2 285:25
291:14,19,21

292:6,22
298:15
**timeframe**
298:7
**timekeeper**
189:17 276:1
**timekeepers**
113:20 149:14
176:23 268:3
269:22
**timeline** 292:2
292:5,9
**timely** 50:10
53:1,22 54:12
54:14,17 55:3
**times** 22:2 23:9
23:13 34:6,7
40:25 52:5
56:12 65:20
70:3 73:18
89:18 108:8
121:2 126:25
131:10 135:8
140:2 148:14
181:14 237:21
266:21 271:7
281:18
**tiny** 235:1
**tire** 232:4
**title** 47:24
141:22 211:14
**titled** 225:5,6
**today** 6:17 7:9
8:5,7 16:14
27:7 32:15

34:21 37:23
42:16 45:16
50:2 58:11
59:14 60:10,17
64:25 72:4
78:9 85:11
122:2 138:8
154:23 156:12
234:4 237:21
239:8 259:17
266:9 274:10
274:12,13
275:8 279:13
282:11
**today's** 58:15
58:21
**toe** 147:21,21
148:1,1 156:5
156:5 267:10
267:10
**together** 50:19
80:8 113:14
143:6 144:1,11
170:5 222:1
226:15 261:5
267:25
**told** 31:10
60:15 79:6
81:17 117:16
121:9 133:21
153:19 154:17
179:15 190:1,4
199:19 203:9
204:9 205:20
206:7 211:10

211:18 216:25
217:25 222:8
223:18 224:9
233:15 254:20
254:23
**tonight** 173:20
281:25
**took** 14:6 24:9
85:24 96:9
119:6 140:1
194:10 222:7
231:2 235:24
284:25 290:21
291:13
**tool** 10:19
190:14 274:9
**top** 81:5 83:12
92:21,23 93:11
94:3,9 108:13
112:5 127:10
127:11,11,11
127:13 129:16
141:1 146:24
151:25 170:12
170:18 175:1
177:12 194:11
194:13,18
196:8 267:13
272:4 285:3
**topic** 29:20
77:8,14
**tort** 208:19
220:21,21
282:16

Page 87
Veritext Louisiana – CRLA/goDEPO  cs-Louisiana@veritext.com
A Veritext Company  www.veritext.com

[total - true]

total  86:6 145:8 152:17 153:13 166:21 192:6 239:25 241:25 242:7 243:7 245:7,9 289:16
totally  154:18 174:20 255:4
touched  47:16 140:21 189:4
touchstone  69:4
towards  287:14
town  229:7 247:8
toxic  220:21,21 282:16
tpc  288:11
track  168:18
trade  54:12 83:21,23 84:5 84:8,13,21 85:3,16,18,19 86:13 87:4,22 87:25 89:4 90:5,14 91:11 94:20 96:21 97:10 107:1,2 113:18,18 146:23 180:2 192:19 219:16 263:5 267:23 278:3
trademark 136:3,4

traditional 230:12
trail  33:24
training  147:4
transaction 49:2 157:3,18 287:6
transactions 36:22 49:3
transcribed 295:6
transcribes 35:25
transcript  5:7 201:9,12 203:15 211:5,8 294:15 295:7,8 295:8,16 297:5 297:8 298:5,16
transcription 294:13
transitioning 120:24
transmitted 82:1
transmitting 292:15
transportation 220:8
transporter 40:8
travel  86:16
treat  247:12
treatise  31:5,10 74:22 75:1,6,7

75:11 79:9,14 79:15 80:13,24
treble  84:24,25
trebled  90:8
trial  5:11 7:11 7:13,17 9:13 9:16,16 10:4,6 10:12,15,17,24 10:25 12:5,14 13:25 15:23 16:2,9,11 17:5 36:25 39:6 45:5,8,13,19,24 45:25 46:3,10 46:13,16 55:19 57:10,13 92:23 92:24 93:3,9 93:12,14 95:16 101:21,24 102:9,11,15 103:15,21 104:10,18 105:4,6,17,19 105:22 106:4 108:13,13 113:3 117:15 118:21 119:8 121:1 124:13 136:20 146:25 147:2,14,18,18 148:17 150:11 154:6 163:16 187:9 196:12 196:13 205:17 223:9 235:13

235:15 266:17 266:20,20 272:5 273:2,15 274:1,3,10,17 274:20 276:15 276:25 277:17 277:18 278:9 280:5 285:5,5
trials  10:19,23 12:19 14:6,8 14:11 15:10,11 15:18 104:1 135:18 272:7 285:8
tried  6:25 10:9 10:21,24 13:15 14:3,4 15:8,25 39:5 85:25 93:6 103:20 104:14 135:2 147:7 148:15 267:6
tries  93:5 191:14
trod  91:11
trouble  27:1 129:2
true  16:3 39:24 48:11 50:9 57:12 88:10 111:20,20 115:1,14 117:13 123:12 127:7,9 145:12 146:18 156:25

Veritext Louisiana — CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[true - under]**

171:3 172:16 173:3,14 195:1 195:16 197:4 204:23 214:14 231:1 237:20 238:19 241:25 259:4 295:7 297:8
**truly** 28:25 39:12 148:21
**truncated** 165:19
**trustees** 11:1
**truth** 52:13 79:20 95:11 106:2 127:7 157:23
**truthfulness** 7:8
**try** 37:6 45:11 84:17 91:1 94:15 104:2 109:16 135:3 142:25 173:6 204:1 205:4,7 221:15
**trying** 14:16,18 39:4 52:16 82:13 86:1 89:3 104:22 114:11 175:11 190:4 200:23 213:6,11,15,18 216:21 237:18 237:19 247:7

249:21 261:20 261:21 274:4 286:20 287:16 289:15 291:3
**tsuburaya** 4:13 284:18
**turkey** 99:7
**turn** 49:21 73:25 204:22 241:8
**turned** 91:6
**turning** 41:23
**turns** 22:2 193:4 214:13
**twenty** 38:5 140:11
**twice** 103:7
**two** 7:22 9:11 9:25 12:19 13:5 16:1,16 17:3,4 23:16 31:1 32:4 38:11 60:16 66:17 69:21 88:21 97:7 101:7,8,9 113:19 132:16 141:10 143:22 146:11,16 152:20 153:18 154:20 155:16 159:18 163:7 170:24 173:16 173:24 175:20 176:16 182:14

186:12 198:22 199:19 209:23 211:18 216:8 216:11 218:20 222:1 230:19 238:12 239:22 240:1 247:16 253:9 263:22 280:25
**tx** 298:13
**tymetrix** 129:10
**type** 40:3 48:25 78:14 83:10,22 89:10,13,23 90:23 92:20 94:25 115:10 125:20 127:2 129:12 130:8 131:11 160:6 174:1 178:21 180:2 202:2,23 207:13 209:25 221:3 230:18 261:3 265:11 265:21 277:6 278:2 280:6
**types** 47:12 201:17 227:10 229:11
**typical** 29:5 209:13
**typically** 7:3 18:9 20:16 29:22 30:2

98:8 131:24 145:20 164:4 195:8 202:20 207:11 227:11 251:23
**typo** 238:2

**u**

**u** 5:1 48:13 151:9
**u.s.** 285:6
**uber** 84:6 87:1 87:2,5,24 90:13,20 96:19
**ultimate** 100:1 100:12 118:25 261:11 273:1
**ultimately** 8:17 21:16 24:10 25:10 36:10 113:2 222:24 240:5 270:16 273:16 289:21
**umbrella** 121:10 208:17 216:10 222:16
**unclean** 116:2
**unconsciona...** 75:25 199:3
**under** 7:6 10:8 12:10 13:3 17:13 40:18 49:8 53:25 63:9 111:10 114:23 116:6 121:9 124:15

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[under - use]**

| | | | |
|---|---|---|---|
| 136:10 157:20 | 141:12 147:13 | **unfavorable** | **unquote** 52:22 |
| 158:1,9 182:16 | 154:25 155:17 | 137:3 | 116:20 193:16 |
| 188:11 194:4 | 171:12 172:1 | **unfortunate** | 229:18 |
| 203:6 204:8 | 175:19 185:13 | 171:23 | **unreasonable** |
| 205:11 207:21 | 190:3 197:19 | **unfortunately** | 113:23 |
| 208:13,17 | 200:5 205:5 | 48:1 192:23 | **unreasonable...** |
| 211:21 221:8,9 | 213:1 220:24 | **unicorn** 94:25 | 64:12 |
| 221:18 222:11 | 224:6 228:9 | **uninvolved** | **unregulated** |
| 222:15 224:1 | 252:22 260:19 | 191:1 | 122:17 |
| 225:3 237:17 | 264:1 288:19 | **union** 121:17 | **unrelated** |
| 238:9 252:1 | **understanding** | 219:9 | 190:8,25 222:2 |
| 256:6 258:9 | 6:18 14:9 86:6 | **unique** 35:13 | **unreliable** |
| 259:13 264:3 | 89:24 109:1 | 63:8,14 83:12 | 133:11 |
| 268:16 270:19 | 183:2,15 184:7 | 89:14,14,17 | **unsuccessful** |
| 289:6 290:21 | 205:24 210:23 | 91:16,25,25 | 136:14,16 |
| 295:6 | 211:1 221:11 | 92:21 93:21,22 | **unusual** 91:25 |
| **undercounted** | 225:18 226:10 | 93:24,25 94:2 | 94:18 118:22 |
| 280:17 | 295:7 | 94:4,13,24 | 180:5 291:1,2 |
| **underlying** | **understood** | 95:2,4,7 96:10 | 291:5,9,14,25 |
| 97:1,24 98:25 | 17:11 38:9 | 96:22 180:7,9 | **unwarranted** |
| 99:21 123:3 | 117:5 144:13 | 180:11,13 | 92:19 |
| 144:16 145:25 | 204:6 226:23 | 265:13,23 | **updated** 56:25 |
| 165:8 192:14 | 271:2 | 266:3 | 57:1,7,14 58:2 |
| **underneath** | **undertake** | **united** 1:1 | 72:5 |
| 63:16 | 25:14 | 188:2 | **upset** 200:15 |
| **underreprese...** | **undertook** | **universal** | **upward** 259:5 |
| 22:13 | 205:10 | 231:13 | 259:7 272:13 |
| **understand** | **underwhelmi...** | **universally** | 277:15 |
| 6:15 7:5 14:24 | 16:15 17:10 | 16:3 69:7 | **urge** 283:13 |
| 16:7 22:23 | **underwriters** | **universe** | **usa** 93:6 |
| 31:23 71:18 | 231:13 | 230:13 | **use** 5:11 17:21 |
| 85:4 89:20 | **unethical** 201:4 | **university** 11:2 | 19:2 29:14 |
| 93:22 100:20 | **unfair** 101:17 | **unpack** 19:8 | 31:15 55:12 |
| 106:22 112:10 | 116:7 206:18 | 89:20 268:18 | 60:9,16 80:9 |
| 132:14 137:13 | | | 118:7 126:2 |

Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

[use - versus]

128:14 129:13 130:3,5 135:2 136:15 171:8 174:24 175:8 178:22 205:13 209:19 223:11 224:3 234:4 237:9,11 243:21 258:3 258:25 259:1 259:20,22,23 262:22 264:22 264:24 270:13 281:21 282:1 282:13,18,22 283:8

**used** 9:9 17:12 27:16 93:6 96:9 107:5,5,8 123:7 126:1 129:14 190:18 190:19,19 191:5 193:21 195:9 209:4,21 225:1 233:21 237:4,13 271:14 279:16 281:10,11 282:24 283:1,3 294:11,19 298:16

**useful** 126:1,13 126:13,17 127:21,25 128:2,9,13

129:7,18 133:9 154:10 191:25 258:23 261:9

**uses** 9:13 19:15 156:20 190:24 198:15 246:9 258:25

**using** 31:13 129:2 134:18 146:20 175:22 175:24,25 176:6 209:16 209:16 243:23 258:19 261:9 282:24 283:5

**usual** 7:3

**usually** 18:23 20:3 23:16,19 23:22 25:5 47:18 90:16 123:20 136:25 142:1 147:2,16 148:4 180:14 216:2 227:18 234:2 240:10 285:8,9

**utility** 134:17

**utilize** 236:13 237:1 259:3 260:23 261:25

**utilized** 168:5 208:22 271:17 276:5 279:9

**utilizing** 42:1 202:10 222:4

| **v** |
| --- |

**v** 3:20 151:9 296:1 297:1 298:3

**vague** 138:16 167:14 182:18

**vaguely** 209:8

**valid** 190:14 295:15

**validate** 21:9

**validating** 192:6,9 236:11

**valley** 1:7 6:11 6:20 35:2 60:1 60:10,13,15,20 123:15 296:1 297:1 298:3

**valuable** 154:2

**value** 21:22 134:23 140:20 140:24 167:23 257:1,10 258:1

**valued** 90:5

**van** 106:10 108:1,5,15,16 108:20 109:2 110:1,12 147:21 148:22 156:5 161:9 186:4 267:11

**variable** 159:19 178:21,21

**variables** 127:5 127:16 130:16

**varied** 37:5

**varies** 51:17

**variety** 37:13 49:22 265:11

**various** 59:25 79:12 118:19 258:19 288:10

**venice** 46:2

**ventures** 218:13

**venue** 276:2,4

**venued** 179:11 179:13,18,21 189:13

**verdict** 12:12 13:10 122:11 147:7

**verdicts** 10:7 11:16 15:12,13 17:7

**verifiable** 235:21

**verified** 294:17

**verify** 182:10 298:8

**veritext** 298:12 298:19

**veritext.com.** 298:13

**version** 139:15

**versus** 1:6 126:15 137:3 181:18 182:2 231:13 236:9 239:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

[victories - way]

| victories | w | 240:25 241:21 | 18:17,23,25 |
|---|---|---|---|
| 251:13 | wage 22:13 | 249:24 264:8 | 19:17,22 20:18 |
| videoconfere... | 87:3 219:9 | 264:16 265:17 | 26:12 31:18 |
| 1:12 | wait 132:18,24 | 271:22 282:1 | 33:23 52:12 |
| view 42:17 55:5 | waived 5:8 | wanted 24:16 | 53:14 55:3 |
| 74:6 88:23 | walk 202:14 | 24:18 26:21 | 82:3 84:14 |
| 92:13 133:23 | walked 275:24 | 32:6 78:20 | 87:7 92:22 |
| 208:17 230:14 | wall 3:17 125:6 | 93:3 107:18 | 100:18 111:12 |
| viewed 164:14 | walmart 187:1 | 119:15 149:23 | 114:16,20 |
| views 97:8 | want 18:20 | 171:24 215:5 | 121:16 122:17 |
| 266:1 | 21:5 22:24 | 215:10,14 | 123:10,18 |
| vigorous 71:1 | 23:24 25:7 | 226:6 232:21 | 124:5 126:7 |
| 110:16 111:11 | 36:1 42:6 | 233:19 274:23 | 133:22 137:12 |
| violate 221:14 | 45:22 53:1 | wants 54:17 | 142:1 151:18 |
| virtues 217:14 | 55:1,21 68:19 | 69:10 136:8 | 151:20,23 |
| volume 31:6,9 | 69:16 70:4 | 140:9 200:21 | 155:1 156:9,20 |
| 79:11 | 72:22 75:25 | 239:6 | 156:25 157:8 |
| volumes 68:22 | 80:6 88:1 90:8 | war 148:5 | 158:11 159:10 |
| vouch 129:7 | 93:21 101:21 | warfare 148:6 | 163:17 168:9 |
| vouching | 102:19,21 | warrant 141:19 | 168:25 171:4 |
| 133:18 | 103:10 105:24 | 278:11 | 174:23 187:3 |
| vs 11:1 18:2 | 106:3 112:12 | warranted | 190:18 191:4,5 |
| 19:15 59:5 | 115:23 118:4,6 | 136:9 151:5 | 192:6,19 196:5 |
| 66:6 67:12 | 120:5 124:23 | 277:15 | 197:13 202:24 |
| 68:1,11 121:17 | 131:12 133:16 | warrants | 207:14,19 |
| 232:3 282:3 | 136:15 156:15 | 272:13 | 208:3 212:6,9 |
| vu 3:20 151:9 | 159:17 164:1 | washington | 212:19 213:7 |
| 155:21 156:9 | 164:24 165:13 | 130:7 258:15 | 213:13,17 |
| 158:7 172:16 | 175:19 178:6 | waste 203:16 | 214:16 220:12 |
| 172:23 174:7 | 183:23 185:6 | water 67:17 | 221:23 224:4 |
| 174:16 175:16 | 195:10 201:11 | 68:8 | 225:9,24 228:8 |
| 175:18 176:8 | 203:10,19,22 | watkins 49:19 | 228:9,20 235:5 |
| 176:18 178:5 | 204:7,14,15 | 186:14 | 244:14 251:14 |
| 258:8 | 213:1 217:4 | way 14:23 | 254:15 255:5 |
| | 223:11 240:4 | 16:11 17:22 | 256:25 257:9 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

**[way - words]**

257:11 258:24 259:8 262:16 265:18 274:7 275:10 278:5 281:6 282:17 290:1,2

**ways** 75:24 89:12 102:11 126:16 128:6 258:18

**we've** 25:10 29:23 53:24 67:7 72:24 113:13 128:23 128:24 152:20 153:10 169:15 171:17 177:11 184:18 215:17 225:10,21,23 239:3 249:3 256:11 260:8

**wearing** 218:6

**web** 258:12

**website** 89:15 91:19 124:17 251:11,19 253:23 277:21 278:1,11

**week** 46:18,19 56:12 112:18 137:2 225:25 274:21

**weekend** 46:20

**weekends** 110:10

**weeks** 253:9

**weight** 76:14

**weirdly** 260:17

**welcome** 124:15 267:17 272:17

**wells** 18:2 19:15 132:3

**went** 7:23 54:7 62:16 64:19 83:20 85:24 88:18 96:6 121:1 122:11 124:17 150:6,7 163:17 214:8 218:21 224:6 234:9 270:14

**westlaw** 10:7 10:19 11:10 14:14,20 17:7 93:14 133:14 274:9

**whatsoever** 49:9 145:14 156:10 177:19 283:25 289:17

**whichever** 55:9 85:16

**wide** 37:13 49:3,22 51:10 51:11,12

**widely** 121:20

**widgets** 255:14

**wild** 69:16

**willful** 253:14

**willing** 195:11

**willy** 78:17

**wilson** 196:14 196:21,24 210:1 212:9 213:18

**win** 12:23 54:8 86:23 95:22 96:18 106:25 136:3 150:24

**windfall** 21:7

**wins** 137:4

**wireless** 13:12

**wise** 1:4 2:4 6:9 273:24 296:1 297:1 298:3

**wistrich** 136:16 138:12

**withdrawn** 53:9,14

**withstanding** 193:11

**witness** 5:7 6:20 13:22 27:2 30:17 37:11 68:17 70:14,22 75:13 171:19 200:24 201:10 225:14 270:16 292:1,4 292:8,25 294:20 298:5,7 298:9,11,15

**witnesses** 271:10

**wolf** 1:4 2:4,5 6:8 17:4 59:5 59:11 82:22 83:11 86:7 88:24 99:14 102:23 103:3 110:13 123:14 141:24 142:18 154:4 158:18 159:12 186:10 239:24 242:16 247:12 265:23 266:1,3,11 286:4,8,22 287:11 296:1 297:1 298:3

**wolf's** 115:21

**wolters** 125:18 227:6

**won** 136:2

**wonderful** 11:25 43:4 60:22 188:6 189:4

**word** 94:4 118:1 133:10 217:21 229:15 240:18 254:14 254:16 294:20

**words** 7:19 68:19 138:11 174:14,15 179:24 182:14

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

[words - yeah]

200:5 224:16 294:14,16

**work** 15:24 19:17 25:3 29:13 34:21,23 35:1 37:12 38:14,17 39:8 39:9 47:12,22 48:22,25 49:3 49:10 50:4,18 51:10,11 53:5 53:22 60:2,23 61:7,17 62:3 62:24 63:6,9 63:11,11 64:2 64:3 66:23,24 67:6 68:7 70:20 73:5,13 75:13,21 76:20 81:18 85:11 92:15 93:1 98:4,5 99:8,13 101:12,18,19 102:7 105:13 106:24 111:22 112:12,19,20 113:7 115:2,4 118:18 119:3 120:2,11,15 121:7 126:21 127:20 128:16 143:2,2,6 144:10 145:25 146:4,5,6,13 150:14,19

151:7,13,19 153:24,25 155:20 166:14 166:15 167:9 167:22,23,24 170:12 171:7 171:10,15,25 173:11 176:7 176:12 177:16 178:15 180:23 183:3,15 192:1 195:5 211:20 226:14 230:18 232:8 235:17 235:25 244:8 244:12 250:22 251:9 255:19 257:9 258:1,3 258:8 272:19 272:22 277:7 290:19

**worked** 48:5 53:13 61:13,15 102:23 110:12 146:17 151:23 152:10 181:7 184:8 279:11

**working** 36:4 38:23 49:18 51:8 58:6 62:22 78:24 100:18 142:22 146:12 151:6 152:4 161:10 279:8 280:2,4

**workplace** 87:6

**works** 22:19 48:16,23 151:21 184:7 203:12 225:24 256:25

**world** 12:13 35:14 55:6 76:15 87:3,8 87:13 123:21 135:4 199:6 200:12 230:14 242:18 255:22 255:23 259:11 265:10

**worse** 146:8

**worst** 85:7

**worth** 83:24 84:22 88:9 96:7 113:18 155:10 183:24 223:4 238:23 238:24 244:3 266:6 286:16

**wow** 149:15

**wrap** 32:14

**write** 156:15 169:7,8

**writing** 80:4 272:25 273:2

**written** 40:20 43:15 44:20,24 68:21 74:13,22 74:24 75:5,6 150:17 270:22

**wrong** 21:16 28:4 29:4 44:19 71:6 94:17 108:3 129:3 154:2 155:18 156:8 162:11 168:5 185:25 190:19 191:9,13 206:17,21 216:10 245:22 254:14,15,16 274:8

**wrongful** 219:8 220:10 223:25

**wrongly** 44:8

**wrote** 86:21 145:11 156:6 165:14 169:9

**x**

**x** 3:1 49:20 129:11 149:24 157:4

**y**

**y** 61:10 103:8 129:10 177:6

**y'all** 286:13

**yeah** 18:1 25:2 39:13 57:16 63:18 72:9 92:8 94:1 98:10 108:4 116:19 120:4 144:11 152:6

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[yeah - zillion]**

152:16 157:22
177:10 195:25
196:12 198:5
206:11 226:17
227:15 233:10
234:13 241:18
242:25 249:11
254:20 257:3
258:15 261:17
271:13 284:10
285:3 286:11
290:13
**year** 14:9 15:25
36:25 37:8,9
38:9 40:9 45:6
46:24 47:7
49:21 50:4,22
57:10 68:20
78:6 81:21
130:25,25
131:11,25
132:9,10
150:19 194:15
209:4,5 232:14
232:18 252:20
252:24 253:8
254:19 289:2
**years** 14:6,15
15:24 31:22
32:4 35:15,16
37:10,19 38:3
38:5,11 39:10
39:10,25 40:12
40:12,14 44:21
53:13 55:19

66:22 70:21
78:21 94:2
101:11 104:15
104:16 119:1,5
119:23 121:8
129:2 130:12
136:1 137:10
142:21,22
150:13 151:10
184:8 192:25
203:13 205:23
257:2 261:4
267:8 268:24
**yesterday**
124:17 125:2
125:14
**yolanda** 1:23
294:2,24 295:2
295:23
**york** 23:22
44:14,15,17
175:6
**young** 85:23
102:13 192:24
**younger** 147:4

**z**

**z** 177:6
**zillion** 93:7

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.